## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| _____ : | |
| SECURITIES AND EXCHANGE : | |
| COMMISSION, : | |
| : | Civil Action No.  19-cv-4324 |
| Plaintiff, : | |
| : | |
| v. : | Jury Trial Demanded |
| : | |
| COMER CAPITAL GROUP, LLC and : | |
| BRANDON L. COMER, : | |
| : | |
| Defendants. : | |
| _____ : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following:

## NATURE OF THE ACTION

1.     This case involves a breach of fiduciary duty by a municipal advisor and its principal in connection with a $6 million bond offering by the Harvey Public Library District (the "District") on January 16, 2015 (the "Bonds").

2.     Municipal advisors are market professionals who provide advice to municipal entities about, among other things, the issuance of municipal bonds.  Municipal advisors and their associated persons are fiduciaries, and owe their issuer clients a duty of care and a duty of loyalty.  Municipal advisors must deal honestly and with the utmost good faith and act in the client's best interest without regard to their own financial or other interests.

3.     The District is a small, unsophisticated issuer which had never issued bonds before.  In late 2014, the District hired Defendant Comer Capital Group, LLC ("Comer Capital")

to serve as its municipal advisor for a contemplated bond offering which was intended to finance the expansion and renovation of the District's library building. Comer Capital is majority owned and controlled by Defendant Brandon L. Comer ("Comer").

4.     The District relied on Comer Capital and Comer to provide advice and to represent the District's interests during the bond offering process. The District hired Comer Capital to, among other things, provide advice on the selection of an experienced underwriter for the Bonds, conduct research and analysis on appropriate pricing for the Bonds, assist with the pricing of the Bonds, and negotiate on the District's behalf to ensure it obtained a competitive price for its Bonds.

5.     Comer Capital and Comer did not provide these services and breached their fiduciary duty to their client, the District. Instead, Comer Capital and Comer deferred entirely to the underwriter of the Bonds, IFS Securities ("IFS"), on the sale and pricing of the District's Bonds. IFS was the sole underwriter of the Bonds, responsible for marketing and selling the Bonds to investors. However, IFS did not have experience leading an underwriting for bonds like the District's Bonds. IFS conducted inadequate marketing efforts, did not contact appropriate buyers for the Bonds, and mismanaged the order period for the sale of the Bonds. IFS ultimately sold the Bonds at a price that was not fair and reasonable to the District.

6.     As a result of the Defendants' breach of their fiduciary duty to their client, the District is anticipated to pay at least $500,000 in additional interest over the life of the Bonds.

7.     Through the activities alleged in this Complaint, Defendants violated Section 15B(c)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78o-4(c)(1)].

8.    Accordingly, the Commission seeks a judgment from the Court:  (a) finding that Defendants committed the violations alleged herein; (b) permanently enjoining Defendants from committing, or aiding and abetting, future violations of Exchange Act Section 15B(c)(1); (c) requiring Defendant Comer Capital to disgorge, with prejudgment interest, ill-gotten gains; and (d) requiring Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 77aa].

10.    In connection with the conduct alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because the events or omissions giving rise to the claim(s), specifically, the acts, practices, transactions and courses of business constituting the alleged securities law violation(s), occurred in substantial part within this district.

## DEFENDANTS

12.    **Comer Capital Group, LLC ("Comer Capital")**, is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Comer Capital is registered with the Commission and the Municipal Securities Rulemaking Board ("MSRB") as a municipal advisor.  Registered municipal advisory firms are required to file Form MA-I with the

Commission to provide information regarding natural persons who engage in municipal advisory activities.

13. **Brandon L. Comer ("Comer")**, age 37, is a resident of Jackson, Mississippi. Comer is the Managing Partner, Chief Compliance Officer and majority owner of Comer Capital. He is identified on Comer Capital's Form MA-I as an associated person of Comer Capital.

## RELEVANT THIRD PARTIES

14. **Harvey Public Library District (the "District")** is a legal entity located in Harvey, Illinois with independent corporate authority and certain taxing power under the Illinois Public Library District Act, 75 ILCS 16. The District is coterminous with the City of Harvey, Illinois, but it is a sovereign unit of local government that is separate and distinct from the City of Harvey. Taxes for the District are billed and collected by the Cook County, Illinois Clerk, and the City of Harvey does not control the District's budget or revenues. The District is governed by a seven-member elected Board of Trustees.

15. **IFS Securities ("IFS")** is registered with the Commission as a broker-dealer. IFS is headquartered in Atlanta, Georgia.

## STATEMENT OF FACTS

### Roles of an Issuer, Underwriter and Municipal Advisor in a Negotiated Offering

16. The District issued the Bonds by means of what is known as a "negotiated sale." In a negotiated sale, the issuer's goal is to obtain the lowest borrowing cost for the bonds, that is, to minimize the amount of interest the issuer will pay to investors over the life of the bonds.

17. The issuer's borrowing cost is determined by the price, yield and coupon at which the bonds are sold. The price and yield are interrelated. A bond's price is inverse to its yield; the lower a bond's price, the higher the yield of the bond, and vice versa. A higher yield/lower price

means the issuer will pay more interest over the life of the bond. The fixed annual interest rate paid by the issuer is called the coupon and is expressed as a percentage of the face value of the bonds.

18.     In a negotiated sale, the issuer selects an underwriter (or a group of underwriters, known as an underwriting syndicate) to market and sell the bonds to investors. The lead or sole underwriter negotiates the key terms of the offering with the issuer, including the price, yield and coupon of the bonds. The underwriter (or underwriting syndicate) purchases the bonds from the issuer on those terms and then sells the bonds to the underwriter's customers, the investors. The underwriter has an arms-length relationship with the municipal issuer.

19.     State and local governmental entities like the District often retain a municipal advisor to assist with the bond offering process, including providing advice on the selection of the underwriter, financing alternatives, and the price, yield and coupon at which the bonds should be sold to the underwriter and investors. A municipal advisor serves the issuer in a fiduciary capacity and must act in the best interest of the issuer within the scope of the engagement. As a representative and fiduciary of the issuer, the municipal advisor is also in an arms-length relationship with the underwriter. Particularly with respect to the pricing of the bonds, the municipal advisor and the issuer are adverse to the underwriter.

20.     To maximize the potential for the lowest borrowing cost, the issuer's goal in the underwriter selection process is to select the underwriter that has the best potential for obtaining the lowest borrowing cost, typically an underwriter that has, among other things, demonstrated experience in selling the type of bonds being sold by the issuer. To assist in this selection, it is generally considered a best practice for an issuer (particularly an unsophisticated issuer like the District) to retain a municipal advisor *before* retaining an underwriter. This practice gives the

5

issuer the benefit of professional advice in the selection of an underwriter who is experienced in selling the type of bonds to be offered.

## IFS Was Engaged Without a Competitive Process

21.     The District's voters passed a referendum in April 2011 authorizing the issuance of bonds to finance the renovation of the District's library and to purchase updated equipment. In late 2013 or early 2014, the District decided to proceed with the bond issuance.

22.     The District was an unsophisticated issuer which had never issued bonds before it issued the Bonds which are the subject of this action.  The District's Director was a librarian who had no experience with the bond offering process.  IFS became involved with the bond offering because a member of the District's Board of Trustees was acquainted with a person who later became associated with IFS.  The trustee invited that person to attend Board meetings to discuss the Bonds.

23.     On September 30, 2014, without having conducted a competitive process or having retained a municipal advisor, the District selected IFS to underwrite the Bonds.  At the time, IFS had served as the sole or co-lead underwriter for only five prior municipal offerings, none of which involved long-term credit-rated bonds.

24.     To memorialize this selection, the District signed a "letter of intent" with IFS indicating its intent to engage IFS to underwrite the Bonds.  The agreement was non-binding and provided that the District could terminate the agreement at any time.  The agreement also specifically provided that it did not restrict the District from selecting a different underwriter (or additional underwriters) to underwrite the Bonds.

## Comer Capital Was Engaged Based on IFS's
## Recommendation and IFS Helped Negotiate Comer Capital's Fees

25.    The District's counsel recommended the District hire a municipal advisor for the

offering.  In an atypical arrangement, essentially the opposite of the recommended practice (i.e.,

a municipal advisor helping an issuer client to hire the *underwriter*), IFS recommended that the

District hire Comer Capital as its municipal advisor.  IFS had worked with Comer Capital on

other bond offerings.  An IFS representative contacted Comer, told Comer that IFS had referred

the District to Comer Capital for municipal advisory services, and provided Comer with the

contact information for the District's Director.  On September 30, 2014, the Board interviewed

Comer and, on the same day, engaged Comer Capital as its municipal advisor.  The District did

not interview any other municipal advisor.

26.    Comer Capital initially sought a flat fee of $20,000 for its municipal advisory

services.  During an interview with the Board, the Board asked Comer to agree to a lower fee and

Comer agreed on behalf of Comer Capital to accept $15,000.

27.    A few days later, Comer asked IFS to negotiate an increase of Comer Capital's

fee with the District.  Over the next few months, an IFS representative raised the issue of

increasing Comer Capital's fee with at least one of the District's Board members and stated he

would speak with another.  As a result of IFS's inquiry, Comer Capital's fee was raised back to

$20,000.  After the bond sale closed, Comer negotiated a further increase in Comer Capital's fee

ultimately increasing it to $40,000.

28.    As discussed above, a municipal advisor owes a fiduciary duty to the issuer and

must deal honestly and with the utmost good faith and act in the client's best interest without

regard to their own financial or other interests.  As a representative of the issuer, a municipal

advisor is in an arms-length relationship with the underwriter.  It was therefore inappropriate,

7

and a breach of fiduciary duty, for Comer to ask IFS to intercede with the District and renegotiate Comer Capital's fee on Comer Capital's behalf. Comer's request also created a conflict of interest for Comer Capital in acting as the District's municipal advisor because it now "owed" IFS for working to increase its fee.

### Comer Capital Agreed to Provide Specific Services and Advice to the District

29. The agreement for services between Comer Capital and the District, signed by Comer, set forth the duties Comer Capital agreed to provide to the District. Those duties included: (1) working with the District to develop a request for underwriting proposals to "identify those firms which are most experienced with marketing securities of the type being offered"; (2) to "negotiate on the District's behalf to ensure that the issue is aggressively priced relative to current market conditions"; and (3) to "assist the District in determining the appropriate level of pricing" including conducting "historical pricing analyses and analyses of the market" and "establish[ing] clear pricing benchmarks or targets." Comer was the individual at Comer Capital who was primarily responsible for providing municipal advisory services to the District.

30. Comer Capital and Comer failed to provide these services to the District. As explained below, Comer Capital and Comer's failure to provide these services to the District had significant consequences and led to the District receiving a price for its Bonds that was not fair or reasonable. As a result, the District's borrowing costs are substantially higher than they should be.

### The Defendants Did Not Provide Advice to the District About the Underwriter

31. As described above, the District selected IFS to underwrite the Bonds before it retained Comer Capital as its municipal advisor. However, this did not mean that the District

8

was required to use IFS to underwrite the Bonds. The District's letter of intent with IFS specifically provided that it could select a different underwriter for the transaction. Comer also understood that the District was not required to use IFS and could select another underwriter at any time prior to the closing of the Bond transaction.

32.     Thus, Comer Capital and Comer: (1) knew that the District was an unsophisticated, first-time issuer which had selected an underwriter without advice from a municipal advisor; (2) had specifically agreed to assist the District in identifying underwriting firms which were experienced in selling the type of bonds being contemplated; and (3) knew that the District was not required to use IFS to underwrite the Bonds.

33.     Despite this, once they were retained by the District, Comer Capital and Comer made no effort to assess IFS's experience or qualifications to sell the Bonds. They did not inquire about the process by which the District had selected IFS to conduct the underwriting. They did not inquire as to whether the District had considered other underwriters. Although Defendants had worked with IFS on prior offerings, none of those offerings involved, and IFS had not otherwise underwritten, bonds like the District's Bonds. Comer's only experience with IFS was for offerings of short-term bonds by distressed issuers. By contrast, the District was not a distressed issuer, and its bonds were long-term.

34.     The Defendants' failure to provide contracted-for advice to the District regarding underwriter selection was a breach of their fiduciary duty.

**<u>Background on the District's Bonds</u>**

35.     The District's Bonds had several features that should have made them appealing to a broad range of investors.

36.     First, the Bonds were insured.  Bond insurance increases the likelihood that bondholders will timely receive their principal and interest payments.  The District purchased an insurance policy that guaranteed the scheduled payments of interest and principal on the Bonds in the event of default by the District, greatly minimizing investor risk.

37.     Second, the Bonds carried an "investment grade" bond rating.  Standard and Poor's Rating Services – which grades bonds on a letter scale from AAA to D, indicating credit worthiness and risk – assigned the Bonds a rating of "AA," as insured, with an underlying rating of "BBB" and a stable outlook.

38.     Third, the Bonds had a "lock-box" feature.  The District was required to pledge that its tax proceeds would be deposited with a tax escrow agent, who would then use the proceeds to pay bondholders.  This feature, like insurance, helps to ensure that bondholders receive timely principal and interest payments, thereby making the Bonds more attractive to investors.

39.     Fourth, the Bonds were what is known as "bank qualified" under the Internal Revenue Code.  This designation is considered a strong selling point because, if purchased by a commercial bank for its portfolio, the bank may deduct from its taxes a portion of the interest cost of carry for the bonds.  In general, bank qualified bonds increase the pool of potential purchasers by attracting smaller banks, and also because potential purchasers understand that such bonds are attractive in the secondary market.

**The Roles of the Underwriter**
**and the Municipal Advisor in Pricing an Offering**

40.     In a negotiated sale, the lead or sole underwriter manages the pricing process.  If a municipal advisor has been engaged by the issuer, the municipal advisor will typically oversee

the pricing process on behalf of the issuer and provide input, analysis and advice to the issuer on all aspects of the process.

41.     To determine the price, coupon, and yield for a negotiated bond offering, an underwriting firm typically draws on its experience in the market, considers market conditions, reviews comparable bond offerings and solicits the views of, among others, the firm's customers and other target investors.

42.     During this marketing period, which can last a week or more, the underwriter typically disseminates pertinent information about the offering to potential investors, receives feedback as to the amount of bonds prospective investors are willing to purchase and at what price and yields, and conducts analyses to determine a fair price for the bonds.

43.     The underwriter will then release proposed pricing terms, agreed to by the issuer, to interested investors and provide a limited period of time (often only a few hours), called the "order period," for investors to place preliminary orders for the bonds.  The underwriter may adjust the proposed pricing terms before suggesting a final price to the issuer.  The municipal advisor will typically provide input, analysis and advice to the issuer on whether the proposed prices and final prices are fair and reasonable.

44.     Upon mutual acceptance of pricing terms, the issuer and the underwriter then execute a bond purchase agreement, pursuant to which the underwriter will purchase the bonds from the issuer.  The underwriter then sells the bonds to those investors who subscribed during the order period.

## The Underwriter Did Not Reasonably Conduct the Offering

45.     As discussed above, IFS did not have experience as a sole or lead underwriter of long-term, credit-rated bonds, like the District's Bonds.  IFS did not reasonably manage several aspects of the underwriting.  Among other things:

a.   IFS made inadequate efforts to identify small banks that potentially would have an interest in purchasing the Bonds given that the Bonds were "bank qualified."  At the time of the offering, IFS had underwritten only one bank qualified offering and the IFS employee who was primarily responsible for finding buyers for the Bonds was unfamiliar with the benefits a bank would receive from purchasing bank qualified bonds.

b.   IFS mismanaged the pre-order marketing period.  IFS scheduled the order period for the Bonds for Tuesday, January 13, 2015.  As noted above, the order period is typically only a few hours long, during which an underwriter confirms preliminary orders from investors it has previously contacted and who have expressed interest in the bonds at a particular price and yield.  After initial pricing efforts in December 2014, IFS waited until Thursday, January 8th or Friday, January 9th, just a few business days before the planned order period on Tuesday, January 13, to market the Bonds to potential investors.  At that point, however, the bond insurance (and the higher, insured rating) for the Bonds had not yet been confirmed by the bond insurance company.  The bond insurance was only confirmed on the evening of January 13. This short marketing period was unreasonable under the circumstances, particularly given that the District was a first-time issuer.

46.     When IFS was unable to identify any interested investors before or during the order period, it postponed the order period to Wednesday, January 14, 2015.  Late in the day on January 14, IFS contacted a representative of a broker-dealer ("Broker-Dealer") which had

previously bought an entire lot of bonds from IFS in a different offering. Given the late hour, Broker-Dealer told IFS to call back the next day.

47.     On January 15, IFS made two offers to sell the Bonds to Broker-Dealer. Broker-Dealer did not make a counter-offer to either.

48.     On the morning of January 16, Broker-Dealer identified one of its own customers who was interested in the Bonds. Broker-Dealer countered IFS's last offer by demanding a yield of 5.05%, which was a higher yield than IFS had offered the day before. It was therefore worse for the District because it meant higher borrowing costs. IFS did not attempt to negotiate any further or find other buyers.

49.     In consultation with IFS and Comer Capital, the District agreed to accept this offer. On January 16, 2015, IFS executed a bond purchase agreement with the District and sold all of the Bonds to Broker-Dealer at an initial offering price of $115.73, a coupon or fixed annual interest rate of 7.10%, and a yield of 5.05%. The closing for the bond transaction took place on January 30, 2015.

50.     Two days before the bond transaction closed, Comer negotiated with the District for an increase in Comer Capital's fee, from $20,000 to $40,000. No additional duties or obligations were added to the agreement to justify the increase in fee.

**Comer Capital and Comer Failed to Provide
<u>Advice to the District on the Pricing of the Bonds</u>**

51.     In its agreement with the District, Comer Capital specifically agreed to assist in the pricing of the Bonds and to "negotiate on the District's behalf to ensure that the issue is aggressively priced relative to current market conditions." Among other things, Comer Capital specifically agreed to:

    a.   Establish pricing benchmarks for the Bonds;

    b.   Oversee the pricing process for the Bonds;

    c.   Assist in determining the appropriate level of pricing for the Bonds;

    d.   Conduct historical pricing analyses and analyses of the market to determine the appropriate pricing goals of the District; and

    e.   Conduct analysis comparing one issue against another, attempting to establish clear pricing benchmarks and ranges.

52.     In the agreement, Comer Capital also represented to the District that its "involvement in the municipal market gives us the needed perspective to assist our clients to market and price their debt issues in a knowledgeable manner." Comer Capital further represented that it had committed a "significant portion of its research efforts into studying the municipal market and the factors which affect the manner in which an individual security is priced in that market."

53.     Despite the obligations set forth in its agreement with the District and despite Comer Capital's claimed knowledge and expertise in pricing municipal bonds, Comer Capital and Comer did not provide advice or assistance to the District on the pricing of the Bonds. Instead, Comer Capital and Comer simply deferred to IFS on the pricing and the pricing process. Among other things:

    a.   Defendants did not conduct any analysis of the pricing of bonds which were comparable to the District's Bonds;

    b.   Defendants did not establish pricing benchmarks;

    c.   Defendants did not advise the District as to the anticipated or expected range of interest rates for the Bonds based on comparable offerings or market conditions;

    d.   Despite being aware that IFS was having difficulty finding a buyer, Defendants did not recommend rescheduling the order period to allow IFS more time to market the Bonds and find interested investors willing to purchase the Bonds at a fair and reasonable price; and

e.   Despite being aware that IFS was having difficulty finding a buyer, Defendants did not recommend that the District hire a different or an additional underwriter to assist in pricing and selling the Bonds.

54.   Once IFS finally found a buyer for the Bonds at a yield which was above comparable market levels (meaning a higher borrowing cost to the District), Comer Capital did not advise the District that the final yield of the Bonds was above market levels for newly issued comparable bonds.  Instead, Comer assured the District that the price was fair and reasonable.

55.   The Defendants' failure to provide contracted-for advice to the District regarding the pricing of the District's Bonds was a breach of their fiduciary duty.

## **The Price of the Bonds was Not Fair and Reasonable to The District**

56.   Contrary to Comer's assurance, the price and yield of the Bonds was not fair and reasonable to the District, as evidenced by: (1) a comparison of the final price and yield to IFS's own pre-sale internal pricing estimates; (2) a comparison of the final price and yield to contemporaneous comparable bond offerings; and (3) the dramatic increase in the price/decrease in yield after IFS sold the Bonds to the only buyer it could identify.

### The Yield Was Substantially Higher Than IFS's Pre-Sale Internal Forecasts

57.   One month prior to the Bonds' issuance, IFS had estimated that the Bonds would sell at a yield of 3.79%.  In the days preceding the order period, IFS was still estimating a yield in the high 3% range.  The yield at which the Bonds were ultimately sold (5.05%) was 126 basis points higher than expected and much less favorable to the District.

### The Yield Was Substantially Higher Than Comparable Bond Issues

58.   The yield on the Bonds was also substantially higher than the yield on comparable bond issuances during the same time period.

59.   The table below shows a comparison of the Bonds to five issuances in Illinois that were similar in size, credit, and maturity to the Bonds:

15

| ISSUER | FIRST TRADE | SIZE OF ISSUE ($M) | MATURITY DATE | COUPON | ISSUE YIELD (%) | RATING WITH INSURANCE | UNDERLYING RATING |
|---|---|---|---|---|---|---|---|
| McHenry County Comm. School District | 12/11/2014 | 9.120 | 01/01/2033 | 5 | 3.78 | AA | BBB, negative outlook |
| Adams County School District | 12/12/2014 | 9.785 | 02/01/2033 | 4 | 3.34 | AA | A- |
| Butterfield Park District | 01/09/2015 | 2.985 | 01/01/2033 | 4 | 3.25 | AA | A, stable outlook |
| Morgan Sangamon Etc. Counties School | 01/15/2015 | 3.500 | 12/01/2031 | 4.5 | 3.1 | AA | A+ |
| Harvey Public Library District | 01/16/2015 | 6.000 | 12/01/2032 | 7.1 | 5.05 | AA | BBB, stable outlook |
| Joliet Park District | 01/22/2015 | 9.605 | 02/01/2033 | 4 | 3.25 | AA | A- |

60.    As the above chart demonstrates, the yields on the five comparable bonds range between 3.1% and 3.78%, but the yield on the Bonds was 5.05%, well over a percentage point higher than the highest of the comparable bond issuances.

Subsequent Trading in the Bonds Further Illustrates the Mispricing

61.    The mispricing of the Bonds is also illustrated by the subsequent sales of the Bonds in the secondary market.  Market participants recognized that the Bonds were underpriced, and secondary market purchasers seized the opportunity to profit from the mispricing.

62.    On January 16, the same day that Broker-Dealer purchased the Bonds from IFS, Broker-Dealer sold the Bonds to a private fund ("Private Fund") at a price of $116.15 and a 5% yield.  As noted above, Broker-Dealer had identified Private Fund as an interested investor for

16

the Bonds even <u>before</u> it bought the Bonds from IFS. Broker-Dealer made an immediate commission of $25,260.

63.     About a month later, on February 19, 2015, Private Fund sold the Bonds to an investment bank ("Investment Bank") at a price of $122.35 and a 4.3% yield. Private Fund made a profit of $359,100.

64.     Investment Bank then immediately sold the Bonds to six of its own customers, all small regional banks, at a price of $124.86 and a 4.0% yield. Investment Bank made a profit of $162,160.

65.     Thus, within the span of about a month, the yield on the Bonds dropped approximately one hundred basis points, from 5.05% to 4.0%, which yield was more closely aligned with the comparable bond issuances described above in paragraph 59, and the price rose over $9, from $115.73 to $124.86.

66.     The District is anticipated to pay at least $500,000 more in interest over the life of the bonds than it would have if the Bonds had been sold at a fair and reasonable price.

## CLAIM FOR RELIEF

### Violation of Section 15B(c)(1) of the Exchange Act

67.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-66 above as if set forth fully herein.

68.     The Bonds are "securities" under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

69.     Pursuant to Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)], a municipal advisor and any person associated with a municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom the municipal advisor acts as a municipal

advisor, and no municipal advisor may engage in an act, practice or course of business which is not consistent with a municipal advisor's fiduciary duty.

70.     By engaging in the conduct alleged above, Defendants Comer Capital and Comer acted as a municipal advisor and person associated with a municipal advisor, as those terms are defined in Sections 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act [15 U.S.C. §§ 78o-4(e)(4) and (7)] and, as such, they owed a fiduciary duty to the District.

71.     By engaging in the acts, practices and courses of business described above, Comer Capital and Comer breached their fiduciary duty to the District in violation of Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Defendants Comer Capital and Comer and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from future violations of Section 15B(c) of the Exchange Act [15 U.S.C. § 78o-4(c)];

B.     Order Defendant Comer Capital to disgorge its ill-gotten gains, plus prejudgment interest;

C.     Order Defendants Comer Capital and Comer to pay appropriate civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.     Award such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Commission requests a trial by jury.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

s/ Natalie G. Garner
Natalie G. Garner (Ill. Bar No. 6278052)
Michael D. Foster (Ill. Bar No. 6257063)
Brian D. Fagel (Ill. Bar No. 6224886)
John Birkenheier (Ill. Bar No. 6270993)
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: June 27, 2019