Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:               )

                                )   File No. C-08209-A

HARVEY PUBLIC LIBRARY           )

DISTRICT BONDS                  )


WITNESS:   Keith Price

PAGES:     1 through 106

PLACE:     Securities and Exchange Commission

           175 West Jackson Blvd., Suite 900

           Chicago, IL  60604

DATE:      Tuesday, January 12, 2016


     The above entitled matter came on for hearing,

pursuant to notice, at 12:58 p.m.

Diversified Reporting Services, Inc.

(202) 467 9200

Page 2

```
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4       NATALIE GARNER, ESQ.
 5       BRIAN FAGEL, ESQ.
 6       JONATHAN WILCOX (Via Telephone)
 7       Securities and Exchange Commission
 8       Division of Enforcement
 9       175 West Jackson Blvd., Suite 900
10       Chicago, IL  60604
11
12       JOSEPH CHIMIENTI, CFE (Via Telephone)
13       Securities and Exchange Commission
14       200 Vesey Street
15       New York, New York
16
17   On behalf of the Witness:
18       JONATHAN R. BUCK, ESQ.
19       NICHOLAS COLVIN, ESQ.
20       Perkins Coie, LLP
21       131 South Dearborn Street
22       Suite 1700
23       Chicago, IL  60606
24       (312) 324-8400
25
```

Page 3

```
 1           CONTENTS
 2
 3   WITNESS:              EXAMINATION
 4   Keith Price                5
 5
 6   EXHIBITS:  DESCRIPTION        IDENTIFIED
 7   61     Price subpoena        33
 8   61     Collection of documents
 9          relating to 2011 ordinance    40
10   62     Transcript of Board
11          meeting recordings    47
12   63     Retention of bond counsel    61
13
14   *Exhibit Number 61 marked twice.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           PROCEEDINGS
 2       MS. GARNER:  Let's go on the record.  The
 3   time is 12:58 p.m.  It's January 12th, 2016.  My
 4   name is Natalie Garner, and we have Brian Fagel.
 5   Appearing by phone is Joseph Chimienti and Jonathan
 6   Wilcox.  We are all Officers of the Commission for
 7   purposes of this proceeding today, which are taking
 8   place at the Chicago Regional Offices here in
 9   Chicago.
10       Your testimony has been subpoenaed today
11   in connection with an investigation captioned in
12   the Matter of Harvey Public Library District Bonds,
13   Case No. C-8209.
14       We're here to determine whether there
15   have been violations of certain provisions of The
16   Federal Securities Laws.  The facts developed in
17   connection with this investigation may also
18   constitute violations of other Federal and/or State
19   Laws.
20       Do you understand this?
21       MR. PRICE:  Not really.
22       MS. GARNER:  I'm just saying we're
23   investigating Federal Securities Laws, but in the
24   course of our investigation, that might cover other
25   violations besides Federal Laws.  That is just a
```

Page 5

```
 1   general disclaimer we make to all our witnesses.
 2       MR. PRICE:  Okay.
 3       MS. GARNER:  We'll begin by swearing you
 4   in.  If you could raise your right hand.
 5       MR. PRICE:  My other right?
 6       MS. GARNER:  Yes.  Do you swear or affirm
 7   to tell the truth, the whole truth and nothing but
 8   the truth?
 9       MR. PRICE:  To the best of my ability, I
10   do.
11       MS. GARNER:  Thank you.
12   Whereupon,
13           KEITH PRICE
14   was called as a witness and, having been first duly
15   sworn, was examined and testified as follows:
16           EXAMINATION
17       BY MS. GARNER:
18       Q   Can you state and spell your full name
19   for the record?
20       A   Keith Price, K-e-i-t-h P-r-i-c-e.
21       Q   And can you give us your home address?
22       A   408 Calumet Boulevard, Harvey, Illinois.
23       Q   Your Social Security Number?
24       A   Last four, or the whole thing?
25       Q   Whatever you are comfortable.  The last
```

Page 6

1  four is fine.
2  A
3  Q  And your birthday, please?
4  A
5  Q  Before we went on the record, I provided
6  you with a copy of the Formal Order, and the Formal
7  Order basically gives us authority to investigate
8  this matter.
9      Have you had a chance to review the
10  Formal Order?
11  A  I did today, yes.
12  Q  Also, before going on, we gave you a copy
13  of Exhibit 1, which is SEC Form 1662. That just
14  gives information about how the Commission uses
15  information that it uncovers in investigations.
16      Have you had an opportunity to read the
17  Form 1662?
18  A  I scanned it, yes.
19  Q  Do you have any questions, Mr. Price?
20  A  No, ma'am.
21  Q  You have a right to be accompanied,
22  represented and advised by counsel before, during,
23  and after your testimony here today.
24      Do you understand this?
25  A  Yes.

Page 7

1  Q  And are you represented by counsel?
2  MR. BUCK:  We, Jonathan Buck and Mike
3  Colvin from Perkins Coie. We represent the Harvey
4  Library, Public Library District, excuse me, and
5  Keith Price in his capacity as former president of
6  the Harvey Public Library District.
7  MS. GARNER:  Okay, thank you. Do you
8  understand that the statutes set forth in
9  Commission Exhibit 1, which is the Form 1662,
10  provides criminal penalties for knowingly providing
11  false testimony or knowingly using false documents
12  in connection with this investigation?
13  A  I do.
14  Q  You understand you may assert your rights
15  under the Fifth Amendment and refuse to answer any
16  question that may tend to incriminate you?
17      Do you understand you have the right to
18  assert your Fifth Amendment to refuse answer any
19  questions?
20  A  To be quite honest, I do. That is one of
21  the things I discussed with my attorneys dealing
22  with the fact that I feel like it's a witch hunt.
23  Honestly, I feel like it's a witch hunt dealing
24  with the fact that Harvey has been in the news so
25  negatively.

Page 8

1  Q  So I am angry with this whole situation.
2  Yes, I do know that I can --
3  Q  Okay.
4  A  -- assert my Fifth Amendment rights.
5  Q  Okay, thank you. I don't know if you
6  have ever given a deposition or testimony before,
7  but I'm just going to explain to you how it works.
8      We have the court reporter who is taking
9  down everything that is being said today. So I
10  just ask that all your answers to my questions be
11  verbatim.
12      It's difficult for her to pick up head
13  nodding or uh-huh. Just, to the best you can
14  remember, give a verbal answer to every question.
15  A  Okay.
16  Q  And for the same reason, I ask that you
17  let me finish my question before answering, and
18  I'll do my best to remember to let you finish your
19  answer before I ask my next question just so we're
20  not speaking over one another.
21  A  Fine.
22  Q  Just so she can get a clear record. If
23  you don't understand the question, just let me
24  know. If I ask you a question, and you answer, I'm
25  going to assume that you understood it.

Page 9

1      Feel free to ask me to rephrase it or
2  tell me you don't understand. Okay?
3  A  Not a problem.
4  Q  I'll be showing you exhibits during
5  testimony today. You are free to look at these
6  exhibits during testimony; but after testimony is
7  done, you have to leave them behind. You can't
8  take them with you.
9  A  Fine.
10  Q  Okay. Do you understand everything we
11  just went over?
12  A  I do.
13  Q  Is there any reason why you couldn't
14  provide complete and truthful testimony here today?
15  A  No, no.
16  Q  Okay. I'm going to go over some
17  background questions. Is your country of
18  citizenship the U.S.?
19  A  Yes.
20  Q  Okay. What's your marital status?
21  A  Married.
22  Q  Is this your first marriage?
23  A  Yes.
24  Q  And what's your wife's name?
25  A  Tamika.

Page 10

1    Q  And her last name is Price as well?
2    A  Correct.
3    Q  What's her maiden name?
4    A  Cleveland.
5    Q  Do you have any children?
6    A  Yes.
7    Q  How many?
8    A  Are you talking biological or steps or --
9    Q  Whoever you consider your children.
10   A  I say seven then.
11   Q  Seven?
12   A  Yes.
13   Q  Okay.  Can you give us their names and
14 ages?
15    A  Rico, Nicarrico Cleveland, 21; Erica
16 Sweeney, she's around 22; ____, who should
17 be around, like, 10; and we have ____ who
18 is 15; ____ is 13; ____ who is 13; and
19 ____, who is 13.
20   Q  Okay.  Are those triplets?
21   A  They're not triplets.
22   Q  Okay.
23      MR. BUCK:  That's not usually the one you
24 gave the initials on paper for.
25      BY MS. GARNER:

Page 11

1    Q  The address you gave us earlier, has that
2 been your residence for the last three years?
3   A  Since I moved, yes.
4   Q  Okay.  Have you ever testified in any
5 proceeding conducted by the SEC or a Federal or
6 State agency for a Federal or State Court?
7   A  No.  That's why I really didn't want to
8 do it.
9   Q  Okay.  Have you ever been deposed in
10 connection with any court proceeding?
11   A  Yes.
12   Q  And what was that proceeding?
13   A  Just different proceedings while at the
14 Harvey Park District.
15   Q  Okay.  Were those court proceedings?
16   A  Yes.
17   Q  Okay.  And were you -- and do you recall
18 the titles of those proceedings or the cases?
19   A  No, it was after the park district
20 president, vice-president, and the secretary had
21 gotten indicted.  So they just called me down.
22   Q  So this was a criminal proceeeding?
23   A  I believe so.
24   Q  Was it just one proceeding that you
25 provided depositions in or multiple?

Page 12

1    A  I mean, yeah, I've had depositions for
2 fights and things of that in the past, but, yeah.
3   Q  Do you recall how many times you've been
4 deposed?
5   A  Probably three.
6   Q  Do you recall the years or the dates you
7 were deposed?
8   A  Not exactly.
9   Q  Do you have a range, was it the '90s,
10 2000s?
11   A  Every time would probably be in 2000s.
12      MR. FAGEL:  More than five years ago?
13      THE WITNESS:  With the Park District,
14 yes.  With the case of Mr. Williams, I think that
15 was probably more than five years ago also now.
16 So, basically, everything has been, to the best of
17 my knowledge, over five years.
18      BY MR. FAGEL:
19   Q  What is the case of Mr. Williams?
20   A  He threatened me, and I broke his jaw.
21   Q  Did that result in any sort of sanction,
22 or any penalty, or anything like that?
23   A  Just -- what did I have?  Supervision,
24 something like that.  It was nothing.
25   Q  Supervised parole?  OR not parole,

Page 13

1 supervised probation?
2   A  Yeah, I think that is what it was.
3   Q  And do you know what court that was in
4 front of?
5   A  It was in Cook County.
6   Q  Cook County?
7   A  Can I ask a question?
8   Q  Uh-huh.
9   A  What does that have to do with what I'm
10 down here for?
11   Q  These are standard questions we ask every
12 witness.
13   A  Okay.  I don't know.  I'm just so suspect
14 of the whole thing.  So --
15      BY MR. FAGEL:
16   Q  Let me say something, and I'll say it on
17 the record, just to try to put you at ease.
18      The focus of our investigation is the
19 Harvey Public Library District Bonds.  I mean, that
20 is really what we're asking about.  I know that
21 there are, you know, other issues obviously
22 involved in the City of Harvey.
23      That is not what we are talking about
24 here, and once we get into the substance, and
25 Natalie gets into the questions that are the focus

Page 14

1  of our investigation, I think you'll see the kinds
2  of things that we're asking about, and it's a very
3  sort of limited set of circumstances involving that
4  issuance of those bonds.
5      A   Okay.
6      Q   So, you know, other issues we're not
7  exploring.
8          You know, this is not a witch hunt. It
9  is really just a focused investigate regarding
10  whether there were violation of the Federal
11  Securities Laws, and these are civil of
12  proceedings, not criminal.
13         And, you know, in terms of what we've
14  asked you to come here, it really boils down to you
15  being a witness to, you know, certain events and
16  certain proceedings that took place in front of the
17  Public Library District.
18         So that's really why we wanted you to
19  come in and talk to us. You know, we appreciate
20  your cooperation and your assistance in answering
21  our questions.
22      A   I was very hesitant about it. Okay,
23  that's in not a problem.
24      Q   Great. Thank you. And if at any point
25  you want to, you know, go off the record, let us

Page 15

1  know and we can talk about things. If there are
2  any concerns about the questions we're asking, or
3  about the things we're getting into --
4      A   I really only have one concern. What
5  brought about this investigation? I only feel like
6  that would be right for me to know because my name
7  is involved in it.
8          And if this was a complaint that was sent
9  to you all by someone, and they are alleging
10  certain things, I should have the right to sue or
11  take them to court as well. I mean, what brought
12  on the investigation?
13      MR. BUCK:  And to provide a little
14  context, before you guys decide how you want to
15  answer, my understanding is that some -- despite
16  the fact that this is a non-public investigation,
17  there has been some information that has been
18  leaked in the Harvey community regarding the
19  investigation; and probably more importantly, some
20  of that information is entirely inaccurate, even as
21  to what an SEC investigation is and, you know, what
22  it means.
23          So I think there is misinformation that
24  is perpetrating through the Harvey community, at
25  least in some form, that heightens frustrations,

Page 16

1  sensitivity of people that are down there trying to
2  deal with things.
3      MR. FAGEL:  Right.
4      BY MR. FAGEL:
5      Q   I think as your attorney just mentioned,
6  our investigations are non-public, so they are
7  confidential. I wish I could answer your question.
8          We initiate investigations for various
9  reasons. Sometimes we get tips from the public.
10  Sometimes we do certain, you know, monitoring of
11  activity for insider training. For example, we
12  look and see who has been trading and kind of
13  determine --
14      A   Shouldn't I have the right to face my
15  accusers?
16      Q   I don't think -- because there is no one
17  on the other side of this investigation, no one
18  is -- it's not like a lawsuit where this is a
19  plaintiff and defendant.
20      A   Okay.
21      Q   It's not like someone is charging you.
22  It is someone brought something to our attention,
23  and we, as the government, are obliged to -- you
24  know, we have obligations to investigate certain
25  allegations, and that's it really it.

Page 17

1          As far as you being accused, we're not
2  accusing you of anything. That's really not the
3  purpose of why we're here. It really is fact
4  finding.
5      A   If I could, one more question before we
6  get started.
7      Q   Sure.
8      A   I know you said it's private, and I know
9  I just read -- I just thumbed through it. So do
10  you not give out freedom of information if someone
11  fills out a freedom of information on this?
12      Q   We have obligations under the Freedom of
13  Information Act to provide information regarding
14  our investigations. Typically, we don't give out
15  any information until an investigation is closed.
16          So while we're conducting the
17  investigation, because it could interfere with, you
18  know, our ability to do our jobs; but, yes, we do
19  have FOIA obligations. Those are things that we
20  could ultimately provide.
21      A   So, technically, it's not private?
22      Q   It is. During the course of the
23  investigation, it is private.
24      A   Right.
25      Q   And it's considered a confidential

Page 18

1 non-public proceeding, but eventually what happens,
2 and just to give you some some context, what we do
3 is we gather facts. We gather information from
4 various people, and you're not the only person
5 we're speaking with.
6       Eventually, we get to a point where we
7 make a determination whether we think there is an
8 action to be filed, so a lawsuit where we would be,
9 you know, suing certain individuals, entities,
10 depending on the circumstances. At that point, it
11 becomes public because we file it in open court.
12    A    Okay.
13    Q    But we're not even -- you know, we are
14 not at that point right now. We are again at the
15 fact-finding stage. So really all we're doing is
16 trying to make sure we understand what exactly
17 happened, and then we can make a determination
18 later on whether that warrants a lawsuit, claiming
19 that there were violations of the Securities Law?
20    A    Okay, great. And before I leave, I would
21 like to have your card as well.
22    Q    Absolutely. I can give it to you right
23 now.
24    A    Thank you, sir.
25       BY MS. GARNER:

Page 19

1       Q    Other than the situation involving Mr.
2 Williams, have you ever been indicted or convicted
3 of a crime by any State or Federal Authorities?
4    A    Mr. Williams, and then one in -- I had
5 the unfortunate case of domestic battery back when
6 O.J. Simpson had just beat the trial dealing with
7 the murder.
8    Q    That's back in the '90s?
9    A    It occurred in the '90s. Yes, it was
10 around '95, maybe '96.
11    Q    Okay.
12    A    I had an unfortunate privilege to catch a
13 domestic during the time when O.J. Simpson had just
14 beat the murder trial.
15    Q    Was there -- were you convicted?
16    A    Yes.
17    Q    Do you recall what your sentence was?
18    A    Four months.
19    Q    Four months, okay.
20    A    I had never been convicted of anything in
21 my life. Had never done anything. There was no
22 bruising, no marking, no ambulance attention, and
23 that judge gave me four months in the County.
24    Q    Okay. Have you ever been named as a
25 defendant or respondent in any action brought by

Page 20

1 the SEC?
2    A    I do not believe so. The only other
3 time -- the first time I ever heard of SEC is when
4 the City of Harvey was under investigation about
5 the SEC. That's the first time I ever heard of the
6 Security Exchange.
7    Q    Okay. Let's shift to your educational
8 background.
9    A    Yes.
10    Q    Did you attend high school?
11    A    Yes.
12    Q    Did you graduate?
13    A    Yes.
14    Q    What high school did you attend?
15    A    Thornton Township High school.
16    Q    Where is that?
17    A    That's in Harvey.
18    Q    What year did you graduate?
19    A    1990.
20    Q    Did you end attend any school post-high
21 school, any college or junior college?
22    A    I went to the Army.
23    Q    You went to the Army?
24    A    Yes.
25    Q    How long were you in the Army?

Page 21

1    A    Three years.
2    Q    And what was your highest rank there in
3 the Army?
4    A    E3.
5    Q    And so was that from '90 to '93?
6    A    '90 to '93.
7    Q    After that did you attend any schools?
8    A    I went to Western.
9    Q    Western Illinois?
10    A    Yes, McComb.
11    Q    Did you graduate?
12    A    No, I didn't.
13    Q    How many years did you attend Western
14 Illinois?
15    A    I actually did a semester. Financial aid
16 stuff didn't come through.
17    Q    Okay. Any other schooling?
18    A    Cain's Barber College.
19    Q    How do you spell Cain's?
20    A    C-a-i-n apostrophe S.
21    Q    Did you receive any certificate or --
22    A    I finished the course, yes.
23    Q    Okay. And when was that?
24    A    I believe it was in the '90s.
25    Q    Do you recall the semester, when you

Page 22

1 attended that semester at Western Illinois?
2 A Maybe '94, '95.
3 Q Okay. Do you hold any professional
4 licenses?
5 A No, not at the time, no.
6 Q Have you ever held any professional
7 licenses?
8 A No.
9 Q Okay. Have you ever been a member of a
10 professional or business club or organization?
11 A Informed Barbers Association where we go
12 around with candidates and take them to barber
13 shops to speak to regular people.
14 Q Okay.
15 A Organization, no, not off the top.
16 Q And after high school, before you joined
17 the Army, were you employed?
18 A No, I went straight.
19 Q And after the Army, were you employed?
20 A Yeah, I had multiple.
21 Q Okay. And what was your first job out of
22 the Army?
23 A I don't remember. I was security at
24 Diamond. Before Diamond Security Company --
25 Q Security guard?

Page 23

1 A Yes.
2 Q Okay.
3 A I worked at Heil Chicago for a little
4 while.
5 Q At what?
6 A Heil Chicago, H-e-i-l. The trailers,
7 usually you'll see their name on the back of
8 trailers and trucks, and stuff like that.
9 Q And what did you do there?
10 A Basically, it was move cylinders around,
11 forklift work.
12 Q Okay.
13 A So, basically, forklift work and pick up
14 runs.
15 Q So how long were you a security guard?
16 A I think it was a couple years when my car
17 got stolen, and they wouldn't give me any money
18 towards it, I quit.
19 Q Okay. So was that about '39 to '95?
20 A No.
21 Q '94 to '95?
22 A It might have been after. It might have
23 been '96, '97.
24 Q When were you at Heil?
25 A Shortly thereafter.

Page 24

1 Q Okay.
2 A And then on the other spot was Dominick's
3 cleaning out trailers.
4 Q The store?
5 A The factory, like, off of 294.
6 Q Okay. The factory?
7 A I didn't stay there long, though.
8 Q Okay. And after Dominick's?
9 A I mean, I basically was a barber, doing
10 barber, basically barber.
11 Q Okay. And then after Dominick's, were
12 you employed anywhere besides as a barber?
13 A I did, like, a year at the Mosquito
14 Abatement, but they didn't bring me on full-time.
15 Q Okay.
16 A That's, like, more of the recent stuff.
17 That's basically it.
18 Q And are you currently employed?
19 A All I do is barber, cut hair.
20 Q Okay.
21 A And I drive for Uber. I guess that is a
22 form of employment.
23 Q Just a few more questions. Have you ever
24 been an officer or director of a publicly-held
25 company?

Page 25

1 A No.
2 Q Are you now, or have you ever been, a
3 beneficial owner of five percent or more of any
4 class of equity securities of any publicly-held
5 company?
6 A Not to my knowledge, no.
7 Q Thank you. Let's switch to the Library
8 District Board. You served on the Board of
9 Trustees for the Library District, correct?
10 A Correct.
11 Q Are you currently on the Board?
12 A No, ma'am.
13 Q And when did your -- when did you leave
14 the Board?
15 A My term ended in 2011. I'm sorry,
16 2000 -- I got on in '09. Six years, 2015.
17 Q So you joined in 2009?
18 A I got elected in 2009, correct.
19 Q When exactly did you serve as the Board
20 president?
21 A I think it was the last two years.
22 Q And does the Board elect the officers?
23 A Yes, ma'am.
24 Q Can you tell us what your duties were as
25 the Board president?

Page 26

1  A   Just basically to work with the director,
2  and if the Board has certain questions, they would
3  bring them to me, and then I would take them to the
4  director and try to resolve any issues.
5      Q   Okay.
6      A   And then other than that, you preside
7  over the meetings. That is basically all it is.
8      Q   So you regularly attended meetings?
9      A   Yes.
10     Q   And these were monthly meetings?
11     A   Yes.
12     Q   Outside of the Board Meetings, did you
13  have much interaction with other Board Members?
14     A   Not much. I mean, we all live in Harvey.
15  You may see someone in passing or see them at
16  another meeting. So we see each other.
17     Q   Did you run for reelection?
18     A   No.
19     Q   Any particular reason why you didn't?
20     A   Because I didn't want Anita Alvarez
21  targeting me again, as she has, and refused to with
22  other higher-ranking elected officials, such as
23  Zuccarelli, Bob Rita, Al Davis, Thadeus Jones.
24         In 2011, she filed a court warrant to act
25  on me for holding too many positions claiming that

Page 27

1  they were incompatible. After she removed me from
2  three or four positions that I was in, I then went
3  and filed complaints on higher-ranking positions,
4  who clearly held multiple positions, and her
5  violating the Illinois Constitution by being a part
6  of the General Assembly and also holding other paid
7  elected positions, which she failed to do anything
8  about.
9      Q   Okay.
10     A   So I was up for reelection for alderman,
11  and I would have had to run at the same time as the
12  Library Board, and I didn't want to risk that
13  chance of being taken out of the spots.
14     Q   Okay.
15         BY MR. FAGEL:
16     Q   What were the other positions that Ms.
17  Alvarez removed you from in that action?
18     A   She removed from there all three, except
19  for the library, because that was the last one I
20  swore into.
21         She removed me from School District 152.
22  She removed from the City Council, which 13, 18
23  days later, I was reelected. And she removed free
24  me from the Park District, only leaving me with the
25  Library, which was the last one that I swore into.

Page 28

1      Q   When did this occur?
2      A   I was removed in 2011.
3      Q   Okay.
4      A   The whole case is on the Internet and
5  everything.
6      Q   How much interaction did you have with
7  Ms. Flowers, the Library director?
8      A   As the president, you interact. I mean,
9  that's what I'm supposed to do. I wouldn't say
10  daily, but quite frequent, though.
11     Q   Okay. And usually by phone or in person?
12     A   Phone, person, however.
13     Q   And so, currently, you are an alderman,
14  correct?
15     A   Yes.
16     Q   You don't hold any positions on any other
17  boards right now?
18     A   No, ma'am.
19     Q   In the past, your testimony on the School
20  District and Park District Boards?
21     A   School District, Park District and
22  Library.
23     Q   Okay. So in your prior experience as
24  being a Board Member of the Park District and
25  School District, did you have involvement in bond

Page 29

1  issuance?
2      A   Only once.
3      Q   When was that?
4      A   That was when I became the president.
5      Q   For the Library?
6      A   No.
7      Q   When?
8      A   When I became the president for the Park
9  District. The Park District was on the State watch
10  list, five years behind in audits. The workers
11  insurance had lapsed. So we were trying to find a
12  way to get out of that situation.
13     Q   What was your role in connection with the
14  bond issuance?
15     A   As a role or just --
16     Q   With the Park District, for the Park
17  District?
18     A   Will just vote, a vote.
19     Q   Did the Park District work with the
20  municipal advisor or financial advisor?
21     A   At that time I don't believe so.
22     Q   Did they work with an underwriter?
23     A   Yes.
24     Q   Was who the underwriter?
25     A   That is when I met Alvin Boutte.

Page 30

1    Q   Okay. So do you recall what year this
2 was?
3    A   I was taken out in '11. I'll say
4 probably around 2009 or '10. It may be 2008,
5 because I know it was set up to be paid back, like,
6 in three years; and after I left, the last payment
7 was May. So it might have been -- so between '08,
8 '09, '10, right up in there.
9    Q   Okay. How did Mr. Boutte come to your
10 attention?
11    A   I think at that time it was several
12 different people that were talking to the Park
13 District about bonds.
14    Q   Okay. Did the Park District issue a
15 request for proposals, request for qualifications
16 to potential underwriters?
17    A   I believe they did.
18    Q   Okay. And do you know where Mr. Boutte
19 was working at the time?
20    A   I don't remember the exact name. I don't
21 remember the exact name. I don't remember the
22 exact name.
23    Q   But his firm submitted a RFP or RFQ?
24    A   To the best of my knowledge, yes.
25    Q   And do you recall how Mr. Boutte's firm

Page 31

1 was selected to be the underwriter?
2    A   I believe it would have had to have been
3 by a vote of the Board.
4    Q   Okay. To your knowledge, how many bond
5 issuance has the Library District done?
6    A   The only one that I'm aware of, since
7 being there in 2009, is the one that we did. It
8 was a referendum put on the ballot asking the
9 taxpayers did they want a bigger, newer, library,
10 and it passed in 2011 with 70 percent yes.
11    MS. GARNER: Joe or John, did you have
12 anything on the Park District bond issuance before
13 I move on?
14    BY MR. WILCOX:
15    Q   Do you recall -- I'm sorry, this is John
16 Wilcox. Do you recall the size of the Park
17 District's bond issuance?
18    A   A million dollars bond.
19    Q   And it was underwritten by Mr. Boutte's
20 firm?
21    A   I believe he was the underwriter, yes. I
22 mean, I know he was there. Now, exact title,
23 underwriter or whatever; but, yes, it was thorough
24 the dealings of Mr. Boutte's firm.
25    Q   And had you met Mr. Boutte prior to his

Page 32

1 being underwriter for the Park District bonds?
2    A   Yes, I believe I did. I believe I did.
3    Q   And can you tell us approximately when
4 and, you know, what were the circumstances that you
5 met him?
6    A   I think I met him through a guy named
7 Melvin Caldwell. Other than that, I didn't know
8 him at all.
9    BY MS. GARNER:
10    Q   Who is that, Melvin Caldwell?
11    A   He is some type of PR person, but, yeah,
12 that is how I met it.
13    Q   Can you spell -- is it Caldwell?
14    A   C-a-l-d-w-e-l-l, I believe.
15    BY MR. WILCOX:
16    Q   Mr. Price, for the Park District Bond
17 offering, did you get involved with the
18 underwriter, in terms of negotiating details of
19 that underwriting?
20    A   When you say "involved," do you mean as a
21 Board Member? The Board got involved.
22    Q   Okay. Can you tell us, you know, how you
23 got involved as a Board Member in the financing, in
24 terms of, you know, interest rates or maturity, any
25 of the structure of the bond offering?

Page 33

1    A   Now, that -- all I basically remember is
2 it was set up to come directly out of the taxes to
3 go straight to a bank to pay for our portion of
4 what we owed. As of negotiating, I wouldn't say I
5 negotiated anything.
6      Like, how you say, with the interest rate
7 and all that, no. But as of the setting up of the
8 withdrawals, and the money going straight to a bank
9 to cover the bond issuance, or the repayment,
10 however you want to look at it, I mean, yeah, the
11 whole Board was involved with that.
12    Q   And do you recall what was the purpose of
13 that bond offering? What were the proceeds used
14 for?
15    A   The proceeds were used for a majority of
16 things. The Park District owed a lot of people
17 money, was five years behind in back audits, like I
18 stated earlier. So, I mean, as of the exact
19 expenditure of every dollar of the million, I don't
20 recall.
21    Q   Okay, thank you.
22      (SEC Exhibit No. 61 was marked
23      for identification.)
24    BY MS. GARNER:
25    Q   Let's take a step back. I'm going to

Page 34

1    introduce your testimony subpoena as an exhibit.
2    I'm showing you what's been marked as Exhibit 61.
3      Do you recognize this document?
4     A  I mean, I see it now. To be quite
5   honest, I didn't look at -- I mean, I know Mr. Buck
6   sent it to me, but I didn't look at it.
7     Q  This is a copy of the subpoena that you
8   are appearing pursuant to today, right?
9     A  That's what it says, yes.
10    Q  Okay. And other than meet with your
11   attorney, did you do anything to prepare for your
12   testimony today?
13    A  Today, no.
14    Q  For your testimony today. It didn't have
15   to have been today, but did you do anything to
16   prepare for your testimony, other than meet with
17   Mr. Buck?
18    A  No.
19    Q  Okay. And did you review any materials
20   or records in preparation for the testimony today?
21    A  No.
22    Q  Did you speak with anyone?
23    A  Besides the materials that we discussed
24   earlier.
25    Q  Okay.

Page 35

1    A  Okay.
2    Q  Fair enough. Did you speak with anyone,
3   other than Mr. Buck, about your appearance today?
4    A  I asked -- like he told you all earlier,
5   it was rumors out about the investigation. I asked
6   Ms. Flowers -- well, she called me and said, "You
7   may have to appear and testify."
8     I'm, like, "Testify for what?" And she
9   told me. And I was, like, "Well, what is this?"
10   You know, I did call Boutte afterwards and say,
11   "Hey, what is this? They're talking about I'm
12   supposed to testify."
13     He said he really don't know what they're
14   looking for, but he was informed. That's why I was
15   questioning who made the complaint, because we had
16   one resident that complained at a meeting about
17   what was going on.
18     When he complained, we addressed that
19   issue by getting a financial advisor and Mr. Boutte
20   on the phone. I think Mr. Boutte might have
21   actually been present at that meeting.
22    Q  Okay.
23    A  But we got the financial advisor on the
24   phone, and he assured us what he was accusing
25   people of wasn't what it was.

Page 36

1    Q  Did Mr. Boutte say anything about our
2   investigation?
3    A  Nothing more than he didn't really
4   understand what you all were looking for.
5    Q  Okay. What about Ms. Flowers, did you
6   discuss the investigation with her?
7    A  I mean, only, like, "What the hell is
8   it?"
9     MR. BUCK: I guess, to the extent that
10   she would just be relaying information from your
11   attorneys, or from the District's attorneys,
12   regarding the investigation, I would ask you not to
13   disclose attorney-client privilege information.
14     But if she was giving her own commentary
15   on the investigation, or if she discussed with you
16   her testimony, you certainly can talk about that
17   because I don't think that's privileged.
18     THE WITNESS: No, we didn't talk about,
19   like, her, no. I mean, I knew she had to come
20   down. That's basically it.
21     BY MS. GARNER:
22    Q  Okay.
23    A  But, no, we didn't discuss.
24    Q  Okay. Other than Mr. Boutte or Ms.
25   Flowers, did you discuss the SEC investigation with

Page 37

1   anyone else?
2    A  Well, in the beginning she said it was
3   myself and Mr. Wiley that had to come down for
4   questioning.
5    Q  Okay.
6    A  So I asked him. I mean, of course we
7   talked about, "We hear you got to go somewhere.
8   Well, was is it?" He didn't know anything about
9   it.
10    Q  Okay.
11    A  So that's basically it.
12    Q  Okay. Prior to becoming involved in the
13   District's bond, the Library District's bond
14   issue -- today, when I refer to the "District," can
15   we agree I'm talking about the Library District?
16    A  Yes.
17    Q  Okay. Before working on the District's
18   bond issuance, did you know in connection with
19   bonds what a yield was?
20    A  No.
21    Q  Do you know what it is now?
22    A  Not that, no.
23    Q  What is your understanding?
24    A  A yield, I thought that was just
25   basically like a certain interest rate that you

Page 38

1   cannot exceed.
2       Q   That you can exceed that?
3       A   You can't exceed.
4       Q   Did you have any idea, this again is
5   prior to your work on the Library bonds, did you
6   have any idea what a fair price for bonds would be?
7       A   No, ma'am.
8       Q   What about now?
9       A   Obviously not, if I'm sitting here with
10  you all.
11      Q   Before working on the bonds, did you know
12  what bank-qualified bonds were?
13      A   No.
14      Q   Do you know what they are now?
15      A   No.
16      Q   No?
17      A   No.
18      Q   Okay.  Do you know the difference between
19  a serial bond versus a one-term bond?
20      A   I believe that was explained over the
21  years.  It was a couple different routes that could
22  have been taken.
23      Q   Explained by whom?
24      A   The underwriter during the process.
25      Q   Mr. Boutte?

Page 39

1       A   Yes.
2       Q   Okay.
3       A   But I don't -- I couldn't just sit here
4   and tell you, or break it down, no, I couldn't.
5       Q   Okay.  Did you have any knowledge of
6   credit ratings, prior to working on the Library
7   bonds?
8       A   Well, when you say "credit ratings" --
9       Q   In connection with bonds and issues of
10  bonds.
11      A   Well, I've heard of junk bonds.  I've
12  heard of, you know, A, B, you know.  So, I guess,
13  yes.  I guess, yes.
14      Q   Besides the Board and yourself, were
15  there any other District -- and Ms. Flowers, were
16  there any other District employees involved in the
17  bond offering, to your knowledge?
18      A   District employees?  No, not to my
19  knowledge.
20      Q   The District did a bond offering in
21  January 2015, right?
22      A   I think that's when it was finally set to
23  go, yes.
24      Q   And the purpose of the bond, issuing the
25  bonds, was to finance the Library's renovation?

Page 40

1       A   Yes, expansion and renovation.
2       Q   When did the district first consider
3   doing a bond offering?
4       A   2011, when it passed by referendum, like
5   I told you earlier.
6       Q   Okay, I'll hand you what is being marked
7   as Exhibit 61.  Exhibit 61 is Bates stamped
8   SEC-HPLD-E-0003426 through 3440.
9           (SEC Exhibit No. 61 was marked
10          for identification.)
11      BY MS. GARNER:
12      Q   Do you recognize Exhibit 61, Mr. Price?
13      A   It looks like minutes from a Library
14  Meeting.
15      Q   Feel free to look through it.
16          Is it fair to say that Exhibit 61 is a
17  collection of documents relating to the 2011
18  ordinance that passed giving the District
19  permission to do a bond offering?
20      A   Yes, ma'am.
21      Q   If you would turn to page -- if you look
22  at the bottom right-hand corner, it would be
23  page -- the last four digits is 3433.
24      A   I'm happy to be on it, yeah.
25      Q   You are right there.

Page 41

1       A   Yes.
2       Q   If there is a recording of how the
3   trustees voted on whether or not to adopt the
4   ordinance or put it to a vote, and your vote is
5   recorded as nay; is that accurate?
6       A   Yes.
7       Q   Can you tell us why you voted against
8   putting the ordinance to a vote?
9       A   First of all, I didn't.  At that time,
10  myself and Ms. Annette Turner, who passed it now,
11  we didn't feel like the referendum was worded in a
12  way that it would thoroughly let the residents
13  understand.
14          We actually voted "no" to even have it
15  put on as a referendum.  Yeah, that was my stance
16  then.  I definitely voted against it.
17      Q   Did you disapprove of the bond amount?
18      A   Not so much the amount of the bond was my
19  issue, it was, more or less, like, for 16,000,000.
20  I made all type of jokes, like, we should have a
21  bowling alley in there.  We should have -- you
22  know, it was a huge amount.
23          And, yeah, I guess I wasn't too
24  comfortable with the amount at all.
25      Q   Okay.  Before the Library decided to move

Page 42

1  forward with the bond offering, did the board
2  consider any alternatives to financing the
3  renovation?
4      A   Well, we had -- when we originally
5  discussed it afterwards, it was supposed to be some
6  funding coming from the State where if we floated a
7  $4,000,000 bond, that they would do the other 12
8  for. Whatever reason, that fell through.
9          So that's basically, I believe, when we
10 started looking for alternate routes to follow
11 through with what the people had voted for.
12     Q   Okay. So when did the funding for the
13 grant fall through?
14     A   I'm not exactly sure, but it was about
15 probably a year, maybe two years, after it was
16 approved.
17     Q   Maybe 2013?
18     A   Possibly. I mean, I'm not exact on exact
19 dates, but we ended up finding out that we weren't
20 going to receive that, because we were prepared to
21 float the four, and then the other funding was
22 supposed to come from the State, something to do
23 with Library.
24         We were told multiple different times
25 that we were, like, third on the list or second on

Page 43

1  the list -- I don't remember exactly the placement,
2  but we really thought we were going to get that and
3  be able to do that with just floating the
4  $4,000,000 bond.
5      Q   Okay. At this point, so then the grant
6  funding fell through, and the Library decides,
7  then, to then move forward with a bond issuance; is
8  that accurate?
9      A   Yes.
10     Q   After the Library Board decides let's
11 move forward with the bond issuance, when did the
12 board decide that it needed to get a underwriter?
13     A   Well, everybody, the Board was asking
14 questions like, "Well, who knows a person that
15 deals with bonds?" I only knew two. I only knew
16 Mr. Boutte, and the one that always seems to do the
17 bonds for Harvey, which I was kind of skeptical. I
18 don't even remember, a short man with the real
19 thick whiskers, mustache. I don't even know his
20 name.
21     Q   Okay.
22     A   So the Board asked could he come in and
23 explain bond procedures.
24         I called him and asked him could he. He
25 came in. He started explaining, answering

Page 44

1  questions. Any time the Board wanted to talk to
2  him, he would make his self-available to speak. So
3  that's how we started discussing bonds.
4      Q   Okay. Do you recall when you contacted
5  Mr. Boutte about coming to a Board Meeting and
6  discussing underwriting?
7      A   I don't know the exact first meeting that
8  he came to, but I know it was shortly after the
9  original plan fell through.
10     Q   Okay. Did Mr. Boutte attend Board
11 Meetings prior to you asking him?
12     A   No.
13     Q   Did the District consider issuing RFPs or
14 RFQs similar to what the Park District did in order
15 to find underwriters?
16     A   I know we did it for -- I know we did it
17 for everything after that. I don't believe --
18 after he had talked to us and all that for about --
19 I think he basically attended meetings. It might
20 have been discussions for about a year.
21     BY MR. FAGEL:
22     Q   You're talking about Mr. Boutte?
23     A   Yes. The Board felt pretty comfortable
24 with him, and it was put to a vote to use him. So
25 I don't believe they were. I don't believe it was.

Page 45

1      Q   You may have already answered this. Can
2  you explain a little more detail about the reason
3  why you voted against the ordinance, or why you
4  voted against putting this to the voters initially
5  in this document we were looking at?
6      A   Looking at the 16,000,000, at that time I
7  don't believe it was really stated that we would
8  only have to float 4, but we really didn't like --
9  well, I didn't like, and Ms. Turner didn't like,
10 obviously, the wording that was represented to the
11 people.
12     Q   Is that because it didn't mention the
13 fact that you were expecting to get the $12,000,000
14 from the State?
15     A   At that time I think it was just the
16 overall -- I didn't think it was very descriptive,
17 when you're talking about homes over 100,000 would
18 be taxed this much. I mean, there's not really
19 that many homes that are really selling out there
20 over 100,000.
21         I just didn't really think it gave an
22 accurate amount. So I just wasn't comfortable with
23 that whole wording. Like I said, I didn't even
24 want it to be voted on.
25     Q   Okay. And did you have concerns just

Page 46

1  about the fact that the Library Board would be
2  borrowing this amount of money? I mean, was that
3  the sort of scope of borrowing $16,000,000 part of
4  your concern?
5      A  Yes, yes.
6      Q  Was that based on concerns about having
7  to pay that back over time?
8      A  I think my main concern, knowing me,
9  would have probably just been the community,
10  period, the number of abandoned homes, businesses
11  leaving, things like that. I mean, so, once it was
12  voted on, we had a certain amount of time to make
13  it happen.
14      Q  And did you think that the project this
15  was -- the money was meant for was not something
16  that was useful or necessary for the community?
17      MR. BUCK: Are you asking about the time
18  in 2011?
19      MR. FAGEL: In 2011.
20      MR. BUCK: I want to make sure he's a
21  putting himself in the right time frame reference.
22      MR. FAGEL: Right. Thank you.
23      BY MR. FAGEL:
24      Q  At the time you voted against the
25  ordinance.

Page 47

1      A  I voted against the ordinance because I
2  voted against it even going on the referendum. I
3  still wasn't -- I just wasn't comfortable with the
4  whole issue at that time.
5      Q  Okay.
6          (SEC Exhibit No. 62 was marked
7              for identification.)
8      BY MS. GARNER:
9      Q  I'm handing you what's been marked as
10  Exhibit 62. Exhibit 62 is a transcript we received
11  in connection with our investigation a subpoena we
12  issued to Harvey Library District, Public Library
13  District.
14          They produced audio recording of the
15  meetings, Board Meetings. So Exhibit 62 is a
16  transcription of Boarding recordings for
17  December 12, 2013, February 13, 2014, February
18  18th, 2014, and March 6th, 2014, as well as March
19  19th, to 14.
20          And the SEC just basically went to the
21  court reporters it had contracts with and had them
22  do transcriptions based on the audio recordings.
23          So if you can --
24      MR. BUCK: Before we dive into questions
25  on this, I mean, we've been about an hour.

Page 48

1      MS. GARNER: Do you want to take a break?
2      MR. BUCK: I don't know if there is a
3  time you want to time take a break, and given that
4  you are going to be asking questions about stuff a
5  couple years ago, I don't know if there is certain
6  sections you want him to read before you get there,
7  or whether you are going to do it course of the
8  questions.
9          I'm kind of raising as a question before
10  we just into this.
11      MS. GARNER: We're area not going to be
12  on that long.
13      MR. BUCK: Okay.
14      MS. GARNER: If you want to take a break
15  after we go through this, I think that's fine.
16      MR. BUCK: That's totally fine. It was
17  more like an efficiency question.
18      MS. GARNER: Yeah, we're not going to be
19  on this long.
20      BY MS. GARNER:
21      Q  Would you mind flipping to page it's 432.
22  At bottom of this document, it would be page 109.
23  Sorry. So up here, it would be 109 right here.
24      A  Oh, okay.
25      Q  If you could read page 432 to 435 just to

Page 49

1  yourself, and let me know when you're done?
2      A  432?
3      Q  Yes, through 435.
4      A  To 435?
5      Q  Yes.
6      A  Am I to think the male speaker is
7  attorney at the time Chris Clark?
8      Q  Yeah. Obviously the person doing the
9  transcription didn't know, but based on my
10  listening of it and reading this at the same time,
11  I think it is.
12      A  It sounds like the Allstate man? I mean,
13  if he sounds like the Allstate man, it definitely
14  was Clark.
15      Q  That's a fair description. Just so you
16  know, this is an excerpt from a March 19th, 2014
17  meeting?
18      A  Uh-huh.
19      MR. BUCK: Do you know whether this was a
20  portion of the meeting that was provided to -- I
21  know there were some tapes that were provided to
22  you before we got involved.
23          Do you know if this was a portion that
24  was done in executive session?
25      MS. GARNER: My understanding is that

Page 50

1   when -- we didn't get the executive session.
2           MR. BUCK: Okay.
3           MS. GARNER: I don't think they actually
4   recorded when they are in the executive session. I
5   could being mistaken. I don't know.
6           When I was listing to it initially, it
7   appeared that when they went into executive
8   session, the tape stopped.
9           MR. BUCK: I have some concern that
10  you're going into it further. I would not want --
11  certainly I don't want to interfere with questions,
12  but I also don't want to let an issue that may have
13  to do with public records and other things. I need
14  to spend a little time digging into further.
15          MS. GARNER: Okay.
16          MR. BUCK: But I do not want an allowance
17  of some of the questions, necessarily, of factual
18  issues today to be viewed as an expansion of some
19  inadvertent waiver of otherwise privileged material
20  on the part of the District.
21          MS. GARNER: Okay.
22          MR. BUCK: So we can maybe have that
23  fight separately, but it may depend on your
24  questions.
25          MS. GARNER: Okay.

Page 51

1           MR. FAGEL: Okay. If we get into that
2   territory, let us know.
3           MR. BUCK: It's the conservatory side.
4           MR. FAGEL: Right.
5           MR. BUCK: I'm not trying to create an
6   issue.
7           MR. FAGEL: Right, I understand.
8           MR. BUCK: And what was the back end of
9   the pages you wanted him to read to?
10          MS. GARNER: Just to 435.
11          THE WITNESS: You said 435?
12          BY MS. GARNER:
13      Q   Yes.
14      A   Okay, I read to 435.
15      Q   And based on your view of this excerpt of
16  the transcript, is it fair to say that the Board
17  considered the question of whether or not to issue
18  bids, in order to find an underwriter to, as it's
19  phrased here, float the bonds?
20      A   Yes.
21      Q   But the Board ultimately decided not to
22  float the bonds; is that correct?
23      A   To float the bonds?
24      Q   I'm sorry, to issue bids or to issue
25  RFPs?

Page 52

1       A   Like I said earlier, I don't believe it
2   was put out. I do not believe it was put out. I
3   read one portion here. You had me start on 109,
4   right?
5       Q   Yes.
6       A   I read one portion here where it said
7   male speaker. Where did you start me reading? I
8   know 109.
9       Q   432.
10      A   432?
11      Q   Uh-huh.
12      A   I see right there where he said, "I don't
13  think we have to." I think that's line 14 on 432.
14  That is why I was asking was that the attorney that
15  said that. So as you see, it was a little bit of
16  confusion.
17      Q   Okay.
18      A   Through the conversations of him saying
19  "yes," him saying "no" to one thing, "yes" to the
20  financial part so, yeah, I believe we may have went
21  with --
22      Q   Okay. Did the Board consider any other
23  underwriters?
24      A   No one had any that they knew of.
25      Q   Okay. And when the Board was selecting

Page 53

1   an underwriter, or before you even made the
2   suggestion of Mr. Boutte, did the Board have any
3   criteria in mind for what they wanted in an
4   underwriter?
5       A   I don't believe so. I think they just
6   wanted to get more familiar with the bond process.
7   That was the whole purpose of me even asking him to
8   come speak to the Board.
9       Q   Okay. Did you ever have a thought that
10  maybe Mr. Boutte would come and explain the bond
11  process; and then after the Board became more
12  familiar with the bond process, the Board would
13  then make a decision on who to hire as the
14  underwriter?
15      A   Basically, that's what occurred. He had
16  spoken with the Board for a while. So right here,
17  it looks like that was when the Board was basically
18  trying to decide to move forward with the bond.
19          I don't remember the time limit that we
20  have, but it was a certain amount of time that we
21  had to honor the referendum of the public. I can't
22  remember if it was five years, but I think it was
23  five. I'm not sure. It was four or five years.
24      Q   Okay.
25      A   So it was getting to the point where,

Page 54

1    like after that first deal fell through, it was
2    like the walls were closing in.
3      Q   All right. We've been going about an
4    hour. So is this probably a good time to take a
5    break.
6      MR. BUCK: Sure.
7      MS. GARNER: The time is 1:58 p.m. We're
8    off the record.
9      (A brief recess was taken.)
10     MS. GARNER: We're back on the record.
11   The time is 2:11 p.m.
12     BY MS. GARNER:
13     Q   Mr. Price, can you confirm that during
14   the break, you had no conversations with either
15   myself or Mr. Fagel about the substance of this
16   investigation?
17     A   I agree, I didn't.
18     Q   Okay, thank you. I'm going to hand you
19   what's been previously marked as Exhibit 13, and
20   it's the Board minutes for a May 8th, 2014 meeting.
21   It looks here when the roll call was initially
22   taken, you were absent, Mr. Price; however, it
23   looks like you later, if you look at the second to
24   last page, there's another roll call, and you were
25   there.

Page 55

1      Do you recall this May 8th, 2014 meeting?
2      A   If I can read through it a little more.
3      Q   Okay.
4      A   It should have been noted, like, whatever
5    time I came in. I don't see that. I do remember
6    talking about Ms. Patterson talking about the
7    dancing should be free and me pushing the literacy
8    issue.
9      Q   Okay.
10     A   I do remember that.
11     Q   I wanted to direct your attention to the
12   second to last page where a motion was raised to
13   hire Mr. Boutte to begin the bond floating process
14   at the top of the page, or near the top.
15     A   The second line?
16     Q   Yes, that's it. Do you see what I'm
17   referring to you?
18     A   I mean, yeah, I read that. I was reading
19   the rest of it.
20     Q   I just want to focus on that one. So a
21   motion was made to hire Mr. Boutte to begin the
22   bond floating process, and you seconded that
23   motion, correct?
24     A   Yes.
25     Q   You voted in favor to pass the motion?

Page 56

1      A   Correct.
2      Q   Okay. At the time is this the time that
3    the Board formally hired Mr. Boutte to do the
4    underwriting?
5      A   I would believe so, from the way it's
6    worded on the minutes.
7      Q   Okay.
8      A   I would believe so.
9      Q   But prior to that, Mr. Boutte had been
10   attending meetings, correct?
11     A   I do think, yeah, he had been advising
12   the Board, like, just trying to get them an
13   understanding of bonds and the procedures.
14     Q   Okay. Did you or the Board do anything
15   to determine whether Mr. Boutte was qualified to do
16   the underwriting?
17     A   I can't answer for anyone else because of
18   past. I believe he was. I don't know if the
19   attorney at that time did any extra checking. So I
20   don't know.
21     Q   When you say "the past," are you
22   referring to his work on the Park District's
23   offering?
24     A   Correct.
25     Q   At the time this motion was passed, were

Page 57

1    you aware that Mr. Boutte was employed by Kipling
2    Jones?
3      A   I can't remember the exact company that
4    he was employed by.
5      Q   Okay.
6      A   But that question did come up somewhere
7    along the line. At one point, he was even asked
8    was he suspended, which he explained that, no, he
9    wasn't, or whatever; but, yeah, I don't know the
10   exact company that it was, but --
11     Q   Okay. And at the time the District
12   entered into a written agreement with Mr. Boutte?
13     A   That's a good question. I don't recall
14   the actual written agreement. It may be one. I
15   just don't remember it at this time.
16     Q   And at the time, did the Board Members
17   discuss fees or compensation with Mr. Boutte?
18     A   I don't know if it was discussed at this
19   meeting, but I'm sure it was discussed at a
20   meeting. I'm quite sure fees were probably
21   discussed.
22     Q   And were they discussed prior to this May
23   8th meeting?
24     A   I'm absolutely not sure if they were
25   discussed prior; or once they agreed that they

Page 58

1   would bring them on, they were discussed. I'm not
2   sure.
3       Q   Okay. And did you ever have any contact
4   with anyone from Kipling Jones, other than Mr.
5   Boutte?
6       A   Not really, to my knowledge. I know at
7   one point somebody contacted me. I don't know if
8   it was Kipling and Jones. I don't know if it was
9   from the attorneys. I actually don't even know if
10  it was right around this time period. Somebody
11  contacted me asking did we hire a financial
12  advisor, but I don't know.
13      Q   You said someone contacted you asking you
14  if you hired a financial advisor?
15      A   Yes.
16      Q   Who contacted you?
17      A   I really don't know.
18      Q   Do you recall who this was?
19      A   Right, I don't know. I don't really
20  know.
21      Q   Okay. At the time did you understand the
22  difference between an underwriter and a financial
23  advisor?
24      A   Well, my whole issue was to follow
25  everything that I had read in that SEC complaint

Page 59

1   that came down with Harvey. We had one attorney
2   that was telling us he could be the bond attorney,
3   too.
4       We found out later that, no, you can't be
5   the attorney for the Board and the bond attorney.
6   You know, Chris Clark had told us is that he could
7   be the bond attorney. So we found out that you
8   couldn't.
9       So, basically, everything that I,
10  personally, was trying to do, was trying to look at
11  that SEC article and say, "Okay, we need a
12  financial advisor. Okay, we need a bond attorney."
13  So, basically, it was just trying to follow what I
14  had read on that complaint.
15      Q   And did you recall when you read that SEC
16  complaint?
17      A   When did that come out? I know we were
18  out of town at a conference when it came out. I
19  don't really know the exact date.
20      BY MR. FAGEL:
21      Q   And you're talking about when the SEC
22  brought the case against City of Harvey?
23      A   When the article had actually hit, yeah.
24  When the article had hit the newspaper. So it was
25  make sure we have all these things in place that

Page 60

1   they said we should have.
2       BY MS. GARNER:
3       Q   Did you understand the difference between
4   a financial advisor and an underwriter?
5       A   Well, the underwriter, to me, was the
6   person that was going to basically try to sell the
7   bonds. The financial advisor was the person that
8   basically should advise you financially if what
9   you're trying to do is achievable, I guess, with
10  the community in which you live in.
11      Q   Okay. And during this time, up until at
12  least May 8th, 2014, the Board had not hired an
13  underwriter, or a financial advisor, correct?
14      A   No, I don't believe we did.
15      Q   Okay. And at some point, Mr. Boutte
16  switched firms and joined IFS?
17      A   See, I don't know --
18      Q   Okay.
19      A   -- if he does a switch in there. That is
20  what I was saying earlier, I don't know the name of
21  the actual company, when you asked about the other
22  company. So I can't personally answer that.
23      Q   Okay. Did Mr. Boutte ever come to you
24  and say, "I'm leaving this firm to go join another
25  firm"?

Page 61

1       A   No, ma'am.
2       Q   Do you recall the Board passing a
3   resolution to hire IFS Securities?
4       A   No. We passed resolutions, of course,
5   but as of what exact name may have been on there,
6   I'm not 100-percent sure on that.
7           (SEC Exhibit No. 63 was marked
8           for identification.)
9       BY MS. GARNER:
10      Q   I'm handing you what's been marked as
11  Exhibit 63. 63 is Bates stamped CCG 0040 through
12  0043.
13          Do you recognize this document, Mr.
14  Price?
15      A   I definitely must have seen it at a
16  meeting. My signature is on it.
17      Q   And can you tell us what it is?
18      A   The resolution approving the retention of
19  bond counsel, a municipal advisor, an underwriter,
20  and a bond registrar paying agent, trustee,
21  agent/trustee, in connection with the issuance and
22  sale of the lottery bonds for the purpose of
23  financing the cost of certain Library improvements.
24      Q   And you voted in favor -- I'm sorry?
25      A   It says, "Approved and passed April 5th,

Page 62

1    2011."
2        Q    Actually, I think it was --
3        A    That was for the consolidated
4    recollection, right.
5        Q    Yes. I think that was passed on
6    September 30th.
7        A    September 30th, right.
8        Q    2014. And you voted in favor of this
9    resolution, correct?
10       A    Yes.
11       Q    And if you look at Section 3, the
12   approval and retention of an underwriter, it says,
13   "Based upon its qualification, experience and the
14   qualities, skills and abilities of the proposed
15   team members and personnel, the firm of IFS
16   Securities is hereby approved and retained as the
17   underwriter."
18            And does that refresh your recollection?
19       A    Where do you see --
20       Q    In Section 3.
21       A    I was reading Section 4. If it's on the
22   paper, then it was there.
23       Q    Okay. And I just want to be clear, Mr.
24   Boutte never came to you or the Board and said,
25   "I'm switching firms"?

Page 63

1        A    I do not recall that at all. And usually
2    before I sign anything, I get approval from the
3    attorney. So if the attorney told me it was
4    good --
5            MR. BUCK: Mr. Price, I'm going to ask
6    you not to relay conversations that you would have
7    just had between you as Board president and counsel
8    to the Library District Board, just to preserve the
9    attorney-client privilege.
10           THE WITNESS: Okay.
11           MR. BUCK: If there is other people
12   present for discussions, like Mr. Boutte or IFS,
13   they would not fall into that same restriction.
14           THE WITNESS: Okay.
15           MR. BUCK: Thank you.
16           BY MS. GARNER:
17       Q    Did you ever have contact with anyone
18   from IFS, other than Mr. Boutte?
19       A    Not to my knowledge.
20       Q    What about Craig Walker, did you have
21   contact with him?
22       A    Craig Walker? The name doesn't ring a
23   bell.
24       Q    Okay. Did Mr. Boutte ever meet with you
25   outside of the Board Meetings when the bond

Page 64

1    issuance was going on, or when the whole process of
2    getting the bond issue was going on?
3        A    I wouldn't say we met, no. I mean, it's
4    not like we sat down and had dinner or drinks or
5    anything like that. So I wouldn't believe so. We
6    may have talked a couple times, but, no, I don't
7    believe we had a sit-down meet.
8        Q    Were you aware of weekly meetings that
9    went on with Mr. Boutte and Sandra Flowers and
10   perhaps Dee Jarad to discuss getting the bonds
11   ready for issuance?
12       A    Yes, I believe, yes. They were supposed
13   to meet to iron out all the -- make sure everything
14   was supposed to be done right.
15       Q    Did you participate in any of those
16   calls?
17       A    I may have in one or two. For the most
18   part, I don't believe so. That was mainly with the
19   attorney and Ms. Flowers. So --
20       Q    Okay. What about Mr. Wiley, do you know
21   if he participated in those calls?
22       A    I'm not sure.
23       Q    Okay. Did Mr. Boutte advise the District
24   as to whether or not it should do a bond issuance?
25       A    I think we were already leaning towards

Page 65

1    doing a bond after the first thing that fell
2    through. So I can't say that he, basically -- the
3    way he worded it was, like, he advised us to do a
4    bond.
5            I think it was, more or less, we were
6    trying to figure out how do we make this project
7    go, although the main way we planned on doing it
8    had fell through, and the fact the floating bond
9    came up; and then, I think, like I said, I reached
10   out to him and asked him to come explain it.
11           I wouldn't say he basically said, "Hey,
12   you all should do this," you know. He just
13   basically was explaining to the Board.
14       Q    Okay. Did Mr. Boutte ever discuss the
15   difference between negotiated or competitive sale
16   bonds?
17       A    I think he did. I think he did discuss
18   that at meetings. There may be minutes on that.
19       Q    Okay. Did he explain the difference
20   between the two?
21       A    I believe he did. I believe he
22   explained -- it was something like -- it had
23   something to do -- I don't know if he was talking
24   about rates or the possibility of getting it done.
25   One was easier than the other, or something like

Page 66

1    that.
2         So I do remember him going over different
3    ways at meetings. So, I don't know exactly which
4    bonds. You know what I'm saying?
5    Q   Uh-huh.
6    A   It was, though.
7    Q   Did he ever advise the District on the
8    amount of bonds to issue?
9    A   No. I think we basically had a number
10   that we were set at, that we were -- I think we
11   basically asked him. So if you're saying did he
12   say, "Hey, what you all are trying to do is too
13   much," I really I don't -- you know, rephrase
14   because that could be a couple different ways. I
15   don't really know.
16   Q   Did he advise the District, let's say,
17   did he say to the District you should do a
18   $4,000,000 bond issuance or a $5,000,000 issuance?
19   A   No. I think the whole purpose of the
20   Library was basically to double the space, to try
21   to double the space in which we had. We wanted to
22   float a little less, but when we were talking to
23   the -- what's his name? What's his name, the
24   construction manager?
25        When we were talking to the construction

Page 67

1    manager, it wasn't going to be feasible at that
2    amount.
3    Q   Okay.
4    A   So I believe we had to try to get a
5    little bit more to make it happen.
6    Q   Okay. Did Mr. Boutte ever provide the
7    District with advice or information on bond
8    pricing? Do you know what I mean by "bond pricing"?
9    A   I don't know. You can explain what you
10   mean buy it.
11   Q   Well, do you have an understanding of the
12   term?
13   A   The pricing of bonds. So I don't know.
14   You can break it down for me a little better. I
15   don't know.
16   Q   Did Mr. Boutte ever say, you know, you
17   should try to aim to have the bonds between a
18   certain range of interest rates?
19   A   Yes, we did talk about that not
20   exceeding -- I think it was 7 percent. We first
21   were told about the bonds. I think they said we
22   first came in with a B credit rating, and we were
23   supposed to be at, like, 4.5 percent, or something
24   like that.
25        The SEC article hit, and we were informed

Page 68

1    that a lot of people that were interested had
2    backed away from the purchasing of the bonds. I
3    don't know if that's true.
4         I don't know if it's false, but at that
5    time when everybody backed away, at some point
6    something about the interest rate had inclined a
7    little bit, too, but I was always under the
8    presumption that it never exceeded the 7 that we
9    eventually agreed on.
10   Q   Who gave you -- where did that 7-percent
11   figure come from?
12   A   It came up at some meetings.
13   Q   Did Mr. Comer advise you on that
14   7-percent number or Mr. Boutte?
15   A   I'm not actually sure which one may have
16   actually advised on it. We had Mr. Comer on the
17   phone a lot of times. We had Tyson. We had him on
18   the phone. I don't know if that is
19   attorney-client.
20        MR. BUCK: The conversations -- I do not
21   want to you relate direct conversations between the
22   trustees and Tyson. Now I think if there was a
23   group call where you have Tyson and Alvin Boutte
24   and others, for instance, that would not.
25        I think those are fair discussions, but

Page 69

1    if there was a call where it was just Lance Tyson
2    with the Harvey District Trustees, that would be
3    privileged issue.
4         THE WITNESS: Okay. Well, I just don't
5    know much. The percentage, yeah, it came up. We
6    were pretty disappointed that the percentage went
7    up, and then we also had to put more money in the
8    reserve than we expected to put in the reserve.
9         That came up, which caused a couple
10   slight cuts. Like, where we were going to have two
11   fireplaces for the adults to read in and be
12   comfortable. You know, certain things, little
13   certain things on the inside, had to get cut
14   because more money had to go into the reserve.
15   BY MS. GARNER:
16   Q   We're going to get into that a little bit
17   more, but did someone explain to you why the
18   interest rates were going up? Was it due to the
19   lack of interest.
20   A   I believe it was something about -- I
21   believe, it is just my personal opinion, that it
22   was dealing with the lack of selling the bonds.
23   Like, people had backed away from really even
24   wanting to purchase the bonds.
25   Q   And who was communicating this to you,

Page 70

1  Mr. Boutte or Mr. Comber?
2      A   Mr. Boutte had communicated that to the
3  Board.
4          MR. WILCOX:  Natalie, can I ask a
5  question?
6          MS. GARNER:  Is this John?
7          MR. WILCOX:  I'm sorry, it's John.
8          MS. GARNER:  Go ahead.
9          BY MR. WILCOX:
10     Q   Mr. Price, did Mr. Boutte or his firm
11  formally send you any price analysis with
12  approximate interest rates so the Board could see
13  how much the cost of the funds would cost the
14  Library District over time, and how much they would
15  have to repay?
16     A   I believe we did get that.  That might be
17  a document that the director may be able to put her
18  hand on a little quicker than me, but I believe
19  that was explained.
20         MR. WILCOX:  Okay.  Thank you.
21         BY MS. GARNER:
22     Q   When did the District first consider
23  hiring a municipal advisor?
24     A   I think it was shortly after Mr. Boutte
25  came on.

Page 71

1      Q   He came on -- well, when would you say
2   Mr. Boutte came on as the underwriter?
3      A   Basically, when we voted, like, in those
4   minutes that you showed us.
5      Q   In May?
6      A   I would say that is when he officially
7   probably came on.
8      Q   Okay.  So there was a discussion to hire
9   a municipal advisor in May 2014?
10     A   You said a municipal advisor?
11     Q   Yes, a financial advisor.  I'm sorry,
12  maybe I misspoke.
13         MR. BUCK:  I think he said -- I don't
14  mean to interrupt, but I think he said he thought
15  it might have been shortly after Mr. Boutte came
16  on.
17         MS. GARNER:  Right.  And I asked him when
18  he said Mr. Boutte came on.  That was in May 2014.
19         THE WITNESS:  Yeah, I believe it was.
20         BY MS. GARNER:
21     Q   So that was around then that the Board
22  first considered hiring a municipal advisor?
23     A   I can't say that's the first time
24  considering it.
25     Q   Okay.

Page 72

1      A   But I believe that -- like I said, we
2   were focusing on having an attorney.  We were
3   focused on having have an advisor and then an
4   underwriter.  So it was -- we just wanted to make
5   sure we had them all in place.
6          I can't pull the exact date for you, but
7   I do believe -- I believe it was shortly after we
8   talked with Boutte.
9      Q   Okay.  And how did the idea of the Board
10  getting a financial advisor come about?  Who raised
11  that issue?
12     A   I may have asked it.  The attorney may
13  have asked it.  I know, like I said, when I read
14  that article, everything that article talked about,
15  I wanted to make sure we had.
16         I don't know who exactly may have raised
17  the issue, but I know it was one of my concerns to
18  make sure that everything that was in that paper
19  were covered by us.
20     Q   Okay.  When did you first hear of Brandon
21  Comer?
22     A   I heard of Brandon Comer -- I think that
23  was through Alvin Boutte.
24     Q   Did the Board ask Mr. Boutte to make a
25  recommendation for a financial advisor?

Page 73

1      A   I believe they did.  I think they, upon
2   talks with Mr. Boutte, I believe that they asked
3   him who has he worked with in the past, who does he
4   recommend, and I think he said he had a good
5   history with Mr. Comer.
6      Q   Did the Board consider hiring anybody
7   else as a financial advisor?
8      A   It may have come up.  It may have come
9   up, and I don't know if Mr. Boutte's expression on
10  their work history may have influenced the, you
11  know, the consideration, but I think it did come
12  up.
13         We were going to look for some financial
14  advisors, and he brought up the point that he had a
15  great working relationship with Mr. Comer, for
16  whatever reason.
17     Q   Okay.  When did you first have contact
18  with Mr. Comer?
19     A   I think we all met him at -- I think we
20  all met him at a meeting.  I think he called in to
21  a meeting.
22     Q   Do you recall when this was?
23     A   No, not an exact date.
24     Q   Had the District ever worked with a
25  municipal advisor before, the Board?

Page 74

1    A   Did the Library District ever work with a
2  municipal advisor?
3    Q   Yes.
4    A   Not to my knowledge, not since my time on
5  the Board.
6    Q   Did the District do anything, or the
7  Board do anything, to determine whether or not
8  Comer was qualified to act as a municipal advisor?
9    A   I don't know if the attorney -- I think
10 the attorney may have checked on them or not.  I'm
11 not sure.
12   Q   By the attorney, are you referring to Ms.
13 Jarad?
14   A   If she was there at that time, but
15 because at some point Chris Clark was let go.
16   Q   Okay.  Do you recall when Mr. Clark was
17 let go?
18   A   Basically after he basically called the
19 whole Board stupid.  So, you know, I think that
20 kind of wrote his check.  I don't know the exact
21 time, but we had issues with the fact that he, at
22 first, like I said, was telling us he could be the
23 financial advisor.
24       I mean, I'm sorry, the bonds attorney and
25 the attorney for the District.  We found out it

Page 75

1  wasn't so.  You know, it was a couple other things.
2        He talked very bad to a few of the
3  trustees on the topic of purchasing the homes
4  that's across the street from the Library.  There's
5  a couple trustees that have purchased homes; and,
6  to me, are kind of familiar the process of buying
7  homes.
8        He basically told them, "I'm the one with
9  the education here, and you all don't basically
10 know anything.  You might be educated in one area,"
11 but they actually have purchased homes.
12       So it's, like, if we're talking about
13 cutting hair or being a barber, I could talk about
14 that.  So we tried to use, like, different Board
15 Members' abilities to your advantage when you're
16 going through certain situations.  So maybe Ms.
17 Jarad was there at that time.  Maybe she was.
18   Q   Okay.  All right.  I want to show you
19 what's been previously marked as Exhibit 56.  Do
20 you recognize this exhibit?
21   A   Yes, definitely.  Like I said, we saw a
22 lot of paperwork.  I see my initials.  It's
23 definitely my initials.  I'm sure this was
24 presented at a Board Meeting.
25   Q   And that's your signature on page CCG

Page 76

1  0051?
2    A   0051, yes.
3    Q   And those are your initials in the
4  margins of this document?
5    A   Yes.
6    Q   Do you recall when you signed this
7  agreement?
8    A   The exact dates, I do not.
9    Q   The letter is dated -- by Mr. Comer is
10 dated December 16, 2014, correct?
11   A   Yeah, that's the date on the letter.
12   Q   And this is basically his proposal to act
13 as the financial advisor for the Library District,
14 correct?
15   A   That is what it looks like.
16   Q   So it's fair to assume that you signed
17 this after September 16th, 2014, right?
18   A   I would say that's fair to assume.
19   Q   Okay.  Let's see, I think if you could
20 flip to page 50, there's change in the compensation
21 for Mr. Comer.
22       It looks like it was changed from 20,000
23 to 15,000; is that correct?
24   A   Yes.
25   Q   You initialed that change, right?

Page 77

1    A   Yes.  I actually requested that change.
2    Q   Okay.  Why did you request that change?
3    A   Because I was trying to save the District
4  any money I could.  I mean, if he had said 25, I
5  would have said 20.  He said 20, I would ask him
6  could he do it for 15, and then somewhere along the
7  line that changed.  So, you know --
8    Q   Can you tell us why that changed?
9    A   I don't know.  He came back -- I think it
10 may have been him.  I don't know if it was him or
11 it was the attorney.  That's what I'm saying, it's
12 all -- so I didn't like the fact that he tried to
13 go back up.
14       But like I said, I don't know if it was
15 him or the attorney that went up, but he agreed to
16 the 15, and I was, like, "Hey, he should stay at
17 the 15."  So --
18   Q   Okay.
19   A   I kind of remember that.
20   Q   Okay.  So if you flip to -- sorry, if you
21 go back to that exhibit and flip to the last page
22 which is 52.
23   A   Okay.
24   Q   In the middle of that page it says,
25 "compensation," and it looks like the compensation

Page 78

1  for Mr. Comer went back up to 40,000; is that
2  right?
3       A  I don't know when this was -- this is
4  from January, yeah, yeah. Yeah, that's definitely
5  what it says. This definitely wasn't together at
6  the same time, though, right?
7       Q  Right.
8       A  Okay.
9       Q  Do you know why his compensation went up
10  to 40,000?
11      A  I don't know. I remember this issue. I
12  didn't want to pay him. I think, if you had the
13  minutes or not, the Board ended up agreeing to
14  giving him his money. I didn't want to give it to
15  him.
16      Q  Okay. That was my next question. I'm
17  not sure if it was reflected in boards' minutes, at
18  least the ones I reviewed.
19      A  I'm not sure. I wasn't with it. I don't
20  even know -- I don't know if he even got it, or if
21  this was just a request. I don't even -- I can't
22  really say if he got it or not.
23      Q  I see Mrs. Flowers executed this
24  amendment that raised his fee?
25      A  Yes, she brought to our attention. She

Page 79

1  had brought it to our attention that he wanted to
2  get 40,000. And I was, like, "Well, if he couldn't
3  do the work for the 15, why would he accept that?"
4       So, I mean, I remember that situation,
5  but it's kind of hard to, like, say exactly at what
6  meeting what occurred. Yeah, I definitely remember
7  he jumped up.
8       Q  Okay.
9       MR. CHIMIENTI: I have a question here.
10      MS. GARNER: Go ahead.
11      BY MR. WILCOX:
12      Q  Mr. Price, do you recall Mr. Comer doing
13  additional work to justify the increase in his fee,
14  or was he just looking to raise the fee?
15      A  I'm really not sure about that, sir. I
16  don't know what he may have considered additional
17  work. I don't know to what extent he had to do
18  whatever he was doing.
19      I just know that when he originally said
20  20,000, my first instinct was to try to save the
21  District a little money. He agreed to the 15.
22  Then, like, months later, it came up that he was
23  trying to get 40,000.
24      Q  And in the original agreement with the
25  $15,000 figure, it was outlined what his

Page 80

1  responsibilities were to earn the $15,000; is that
2  right?
3       A  Experience, work product, scope of
4  services, yes, yes.
5       Q  Okay. And from your recollection, did he
6  do anything beyond the scope of that engagement?
7       A  I can't be sure. I want to say I don't
8  believe so, but I can't be 100-percent sure on
9  that.
10      Q  Okay. Thank you.
11      BY MS. GARNER:
12      Q  Did Mr. Comer ever approach you about
13  raising his compensation or his fee?
14      A  No, it was brought to our attention by
15  Ms. Flowers.
16      Q  What about Mr. Boutte, did he ever come
17  to you asking --
18      A  About raising --
19      Q  -- Mr. Comer's fees?
20      MR. BUCK: You've got to wait. Just for
21  the court reporter's benefit, if you could wait.
22      THE WITNESS: I don't recall him coming.
23  I just remember hearing about this from Ms.
24  Flowers.
25      BY MS. GARNER:

Page 81

1       Q  Okay. I'll show you what's been
2  previously marked as Exhibit 26.
3       A  Can you give me one second? I'm going
4  crazy over here right now.
5       MS. GARNER: There's two copies here.
6       BY MS. GARNER:
7       Q  Exhibit 26 is an e-mail from Alvin Boutte
8  to Brandon Comer. The subject is Harvey, and the
9  date is December 2nd, 2014, correct?
10      A  Yes, that is what it says.
11      Q  It says -- Mr. Boutte says to Mr. Comer,
12  "Brandon, I spoke with Will Wiley yesterday. He
13  agreed to raise your fee. He knows you clearly
14  deserve it for the amount of work being done. We
15  weren't specific on the amount, but I'm going to
16  Price to get the amount you want. Price has been
17  in Arizona for Thanksgiving, Alvin."
18      So did Mr. Price ever contact you
19  regarding Mr. Comer's compensation in or around
20  December of 2014?
21      A  You want to rephrase your question?
22      Q  Did you not understand it?
23      A  You said did Mr. Price get in contact
24  with me.
25      Q  I'm sorry. Did Mr. Boutte?

Page 82

1    A  I don't recall him getting in touch with
2  me. I do not recall him getting in touch with me.
3    Q  Were you in Arizona for Thanksgiving; is
4  that accurate?
5    A  That's a good question. Yeah, I did go
6  to Arizona one Thanksgiving. I was in Arizona one
7  Thanksgiving, and it definitely probably -- it's
8  December 2nd. Yeah, I might have still been there.
9    Q  Okay.
10   A  I may have still been there.
11   Q  Did you ever discuss with Mr. Wiley
12 whether or not he had spoken to Mr. Boutte about
13 raising Mr. Comer's fees?
14   A  I know that Board Members had talked
15 about it. I, personally, thought he was, more or
16 less, at the meetings. Wiley and I may have talked
17 about it. He may have said, "Hey, he wants more
18 money," you know, but I really was not set on
19 giving the guy more money.
20   Q  Okay. But, specifically, did Mr. Wiley
21 mention that he had discussed Mr. Comer's
22 compensation with Mr. Boutte?
23   A  I don't remember having that exact
24 discussion, no.
25   Q  Okay. You had mentioned that Board

Page 83

1  Members had discussed Mr. Comer's compensation?
2    A  Yeah, it was definitely discussed at a
3  meeting, you know. Some people felt like, yes, he
4  deserved it.
5       Some people felt like, "Hey, he shouldn't
6  have said 15, if he wasn't okay with 15,000." So,
7  I do remember a Board Meeting in which that was
8  thrown around the table.
9    Q  Do you recall what meeting that was? And
10 I ask because I don't have meetings or recordings
11 that reflect a conversation.
12   A  I do not. I don't know if that was at,
13 like, a special meeting. I don't know. I don't
14 recall, but, yeah, it was definitely discussed.
15   Q  Okay.
16   A  I don't know if it was in executive
17 session, which being that it's personnel,
18 basically, and finance, it may have been discussed
19 in executive session.
20   Q  Okay. Do you recall if the discussion
21 was before or after the contract of Mr. Comer was
22 signed?
23   A  Well, with the date right here, with this
24 being December, and the other one you showed me
25 being September, I would think it was definitely

Page 84

1  after the contract was signed.
2    Q  And I'm just trying to get at if why at
3  the Board you had agreed to do Mr. Comer's fee for
4  $15,000? Why, after they had entered into the
5  agreement, why they would discuss raising the fee
6  for him?
7    A  You know, that's a great question. I
8  don't know if they felt like the scope of work he
9  was doing deserved more, like this says, or I'm
10 really not sure.
11   Q  Do you recall what Board Members
12 discussed this compensation at the meeting?
13   A  I think Ms. Patterson might have asked
14 the question about he's done a lot of work. He may
15 deserve it. I think Ms. Fields basically didn't
16 want to give him any more money. Really, I'm just
17 speculating. So I really don't know.
18   Q  Okay. You can put that aside. I'm going
19 to show you now what's been previously marked as
20 Exhibit 27. So Exhibit 27 is an e-mail dated
21 January 26, 2015, from Alvin Boutte to Brandon
22 Comer, and actually it is a couple e-mails, but I
23 want to focus on the short e-mail at the top.
24      Do you see that?
25   A  That's 26. I took 27. I thought I was

Page 85

1  looking it over.
2       MS. GARNER:  Did I not give you one?
3       MR. BUCK:  He's got one now.
4       MS. GARNER:  You might have two right
5  there.
6       THE WITNESS:  That's 27 in your hands.
7       MR. BUCK:  That's okay, we're fine.
8       BY MS. GARNER:
9    Q  Do you see the e-mail I'm referring to at
10 the very top?
11   A  Yes. From Alvin to Brandon?
12   Q  Yes. It says, "I need to catch up with
13 Price regarding fees today. Think we need to bump
14 lawyers and you up 5,000." And this is dated
15 January 26th, 2015.
16      Again, around this time, do you recall
17 discussing Mr. Comer's fees with Alvin Boutte?
18   A  I don't recall discussing it. It doesn't
19 mean that he didn't call me and ask me about it.
20   Q  Okay.
21   A  It may have been so, like, matter of fact
22 to me. No, I don't remember it. I definitely see
23 what he sent to Brandon Comer.
24   Q  And when Mr. Comer's fees were raised,
25 they were raised substantially. I mean, it more

Page 86

1  than doubled.
2      A  Comer's raised greatly, right.
3      Q  Right.  When Mr. Comer's fees were
4  raised, is that something the Board would have been
5  voted or a motion would have been made to vote on
6  that?
7      A  Yeah, it would have had to have been
8  voted on to give him that amount that he was
9  asking.  That is why I said there's got to be some
10  minutes somewhere where that raise was voted on.
11      MS. GARNER:  John, I think that there's
12  such a document out there.  We haven't been given
13  it.
14      MR. BUCK:  I'll take a look.
15      MS. GARNER:  Okay.
16      MR. BUCK:  I mean, I'll see what we can
17  find.  I know they went through a search for
18  different things.  There was -- I think there was
19  some uncertainly of completeness of where they
20  could find things because of transition in
21  personnel and such, but I look for the specific and
22  follow up.
23      MS. GARNER:  Okay.
24      MR. BUCK:  I know that they did, before
25  we even got involved, in taking some significant

Page 87

1  efforts to try to get you guys what was asked in
2  response.
3      MS. GARNER:  Okay, thank you.
4      MR. WILCOX:  Natalie, I just have a
5  question.  This is John.
6      BY MR. WILCOX:
7      Q  Mr. Price, did Mr. Comer attend in person
8  any of these Board Meetings?
9      A  I don't ever remember seeing Mr. Comer
10  besides over-the-phone conversations.  I remember
11  seeing Brandon.  Not Brandon, Brandon is Comer.
12  Lance Tyson, the bond attorney.
13      I remember seeing Mr. Boutte.  It's
14  funny, I would damn need a picture of a financial
15  advisor to say if he was there or not.
16      Q  Okay.  So you don't recall every meeting
17  Mr. Comer in person?
18      A  No, sir.
19      Q  Okay.  From your recollection, you don't
20  recall him attending any of the Board Meetings you
21  were at?
22      A  I do not recall it.
23      Q  Are you aware of any of the other Board
24  Members meeting Mr. Comer in person?
25      A  I'm not aware of it, no.

Page 88

1      Q  Okay.  Okay.  Thank you.
2      BY MS. GARNER:
3      Q  All right.  So when Mr. Comer was brought
4  on as financial advisor, do you recall him ever
5  making suggestions to the Board about alternatives
6  to the bonds financing?
7      Did he ever suggest, "Maybe instead of
8  going with the bonds, you want to try X, Y and Z,"
9  or "Here are your options as a Library District for
10  financing a renovation project"?
11      A  I don't recall it.  I don't recall it.  I
12  can't say that he may not have mentioned something,
13  but I definitely don't recall it.  Because I,
14  basically, thought we were so set on the bonds.
15      Q  And did Mr. Comer ever explain the
16  advantages and disadvantages of doing bond
17  financing?
18      A  I don't recall that actually being spoken
19  about.  Anything basically dealing with the bond
20  questions, I think basically were directed at Mr.
21  Boutte.
22      Q  Okay.  Did Mr. Comer ever suggest
23  different types of bond structure?  By different
24  types, I mean a one-term bond maybe versus a
25  multi-term bond?

Page 89

1      A  I do believe that was discussed.  I
2  believe that was discussed.  I mean, when I say
3  when I had so many meetings, we had so many
4  meetings, special meetings.  It was a lot of
5  different stuff discussed.
6      Q  Was that discussed specifically with Mr.
7  Comer?
8      A  I can't be 100-percent sure saying yes or
9  no with that.
10      Q  Did Mr. Comer discuss the pros and cons
11  of getting your bonds insured?
12      A  I can't be 100-percent sure on the answer
13  to that either.
14      Q  Did he ever discuss with you or other
15  members of the Board what considerations go into
16  pricing bonds?
17      A  I know Mr. Comer had a lot of discussions
18  with the director.
19      Q  Okay.
20      A  That's what I know.  I don't know a lot
21  of things that were discussed.  They would probably
22  take it to her.  She would probably bring it to the
23  Board, but like a lot of those type of discussions,
24  I just can't remember the difference of those
25  discussions.

Page 90

1    MR. CHIMIENTI: This is Joe. Can I ask a
2    question?
3    MS. GARNER: Yes.
4    BY MR. CHIMIENTI:
5    Q   Do you remember Mr. Comer explaining to
6    you or the Board, or both of you, how to make the
7    bonds cheaper for the District? In other words,
8    how to make it cost less, either in interest or
9    fees or both?
10   A   I do not recall that at all. I just
11   recall the fact that the interest rates went up
12   after that SEC article hit. At first, we were
13   supposed to be, like, at 4 percent, 4.5 percent
14   with a B rating is what we were told.
15         They say everything fell apart when that
16   article hit, and that is coming from them. Like I
17   said, I couldn't tell you if it was ten potential
18   buyers. I couldn't tell you if it was always only
19   one buyer. I couldn't tell.
20   Q   Thank you.
21   BY MS. GARNER:
22   Q   Was it your understanding that Comer was
23   negotiating the pricing of the bonds with IFS and
24   Mr. Boutte?
25   A   I would think that would be part of his

Page 91

1    job, yes.
2    Q   Do you know if that's what he did? Did
3    you have any reason to believe that he was actually
4    doing that?
5    A   Now, I don't have any reason to believe
6    it was actually occurring, no.
7    Q   He never came to the Board or to you and
8    said, "This is what's going on with my negotiations
9    with IFS and Mr. Boutte," as far as pricing the
10   bonds?
11   A   I really do not remember. He could be a
12   ghost. Really, I -- like, I don't remember him
13   coming to us with a lot of conversation like that.
14         I mean, when we needed him, we called him
15   on the phone. He was there. He answered any
16   questions people had, even to the point where we
17   had people making accusations, we got him on the
18   phone. He explained to them. So, no, I can't.
19   Q   Did Mr. Comer ever bring up the issue of
20   IFS's fee with you or the Board?
21   A   I don't remember him even bringing up a
22   fee with us.
23   Q   Mr. Comer?
24   A   I don't remember him bringing up a fee,
25   because when you say IFS, you're talking about Mr.

Page 92

1    Boutte?
2    Q   Mr. Boutte, right.
3    A   Yeah, I don't.
4    Q   He never voiced concerns about maybe
5    their fee was too high?
6    A   No, because if he would have, I would
7    have questioned it, and I'm sure the Board Members
8    would have questioned it. We got a lot of senior
9    women on the Board as well. I'm sure they would
10   have questioned that.
11         When you think you are bringing people in
12   to do the job, you're just hoping they do the job
13   that they're supposed to do.
14         MR. WILCOX: Natalie, this is John. I've
15   got a question.
16         MS. GARNER: Okay.
17         BY MR. WILCOX:
18   Q   Mr. Price, did Mr. Comer -- was he
19   critical of any aspect of the funding that IFS
20   presented to you?
21   A   My answer would be I don't believe he
22   was. When you say "critical," you mean in a
23   negative light, correct?
24   Q   Or just, you know --
25   A   Like this is too much?

Page 93

1    Q   Like for accuracy.
2    A   Yeah, I don't recall, because if he had
3    questioned me about it, I would have also
4    questioned Mr. Boutte, or whoever he was saying
5    that something may not have been right or too much.
6    I would have addressed the issue.
7    Q   Okay. And do you recall Mr. Comer
8    suggesting that the Board should potentially look
9    at underwriters for their recommendations or
10   pricing on this transaction?
11   A   I don't recall that either, sir.
12   Q   Okay, thank you.
13   A   You're welcome.
14   BY MS. GARNER:
15   Q   So you had an understanding, after that
16   article was released, that the IFS was having
17   difficulty selling the bonds; is that your
18   understanding?
19   A   Yeah, that was my understanding.
20   Q   Did Mr. Comer ever question or take issue
21   with the way the IFS or IFS's efforts to get the
22   bonds sold?
23   A   I don't remember any type -- I don't
24   recall anything where he was questioning what Mr.
25   Boutte's firm was doing or questioning pricing. I

24  (Pages 90 to 93)

Page 94

1  don't recall of them doing that.
2      Q   Do you recall Mr. Comer letting you or
3  the Board know that he was undertaking efforts to
4  try to find a buyer for the bonds?
5      A   Most of that stuff was relayed back to
6  us, I believe, by Mr. Boutte, where he would say
7  that the buyers had backed out, the people that
8  were interested had backed out.  So I don't -- no,
9  I don't think Mr. Comer did.
10     Q   In this whole process, would you say the
11 Board's primary contact in connection with this
12 whole process was Mr. Boutte?
13     A   Yes, unless they had any, like, direct
14 questions that they wanted to ask the financial
15 advisor.  But he always talked about, like, when
16 the Board questioned him, he talked about how their
17 firm -- like, the ranking of their firm and things
18 of that nature.
19         But it was most of the time any questions
20 that was directed, unless they asked him directly,
21 like, while he was on the phone or anything like
22 that, it was basically answered, I would say, by
23 Mr. Boutte.
24     Q   Okay.
25         MR. WILCOX:  Natalie, I just have one

Page 95

1  other question.
2          BY MR. WILCOX:
3      Q   This is John Wilcox.  Mr. Price, do you
4  recall Mr. Comer doing any independent or
5  presenting the Board any independent analysis on
6  the pricing of the bond?
7      A   I don't recall that.  It doesn't mean
8  that it didn't happen.  He may have sent -- he may
9  have sent something like that to the director.
10 Usually, most of the time the contact is Ms.
11 Sandra, and then she'll relay the messages to the
12 Board or whatever, but I can't say he didn't.  I
13 just don't recall that he did.
14     Q   Okay.  And do you remember Mr. Comer
15 vetting or blessing any of the or do anything
16 analysis on the price-and-yield analysis that Mr.
17 Boutte presented to the Board?
18     A   I do not.
19     Q   Okay.  Thank you.
20     A   You're welcome.
21         BY MS. GARNER:
22     Q   All right.  Mr. Price, I'm going to show
23 you an e-mail that's been marked as Exhibit 28, and
24 it's actually an e-mail from Craig Walker forwarded
25 to Brandon Comer, but he's forwarding the e-mail

Page 96

1  from you to Craig Walker.
2      Q   Do you see that?
3      A   Yeah, I see that.
4      Q   Dated January 14th, 2015, and it
5  provides -- you wrote your name, your title on the
6  Board of the Harvey Library District and your
7  address.
8          Do you see that?
9      A   I see it.
10     Q   And then you write, "The Harvey Library
11 District Hired IFS Securities prior to Comer
12 Capital being hired as financial advisor and Kutak
13 Rock as bond counsel.  Fees and compensation were
14 negotiated directly at such time.  Regards, Keith
15 Price."
16         Do you recall sending this e-mail?
17     A   I don't recall I recall sending the
18 e-mail.
19     Q   Okay.
20     A   I do not recall the last part of this
21 e-mail being on there.  I remember sending an
22 e-mail.  As a matter of fact, this is actually what
23 I was talking about earlier when I said somebody
24 contacted me, and I said that we did hire IFS prior
25 to hiring Comer.

Page 97

1      Q   Okay.
2      A   So I remember sending it, but I don't --
3  I remember having a financial advisor.  I don't
4  remember the Kutak Rock bond counsel and fees were
5  compensated and were negotiated at that time.  I
6  don't remember putting that on there.
7      Q   Do you have any reason to believe that
8  you didn't put that on there?
9      A   I don't know, but I will be trying to
10 find it later.
11     Q   Do you know why you sent this e-mail to
12 Mr. Walker?
13     A   That was somebody had called me, yeah.
14 Somebody had called me and said they wanted to know
15 if IFS, which is Boutte, was hired before the --
16     Q   Comer Capital?
17     A   Comer, right.  And I remember when they
18 asked me, that I was, like, "Yeah.  Well, that
19 happened, so, yeah, I'll send an e-mail."
20     Q   Do you recall who contacted you?
21     A   I swear, I don't.  I will look.  I will
22 try to find it; and if I do, I'll make sure that he
23 gets it.
24     Q   Okay.  Do you know why they wanted to
25 know that information?

Page 98

1    A   I don't. I just know that the statement
2  wasn't false, so I didn't mind sending the e-mail.
3    Q   Okay. So going back the bonds issued,
4  and they were issued with the yield of 5.05
5  percent, do you recall that?
6    A   I remember a 4.5, then it went up to 5.
7  Then I remember it jumping up again. So I do
8  remember. The percent fluctuated a couple times on
9  this.
10   Q   So I'll represent to you the interest
11 rate that was -- when the bonds issued was 5.05
12 percent. Did Mr. Comer have an opinion as to
13 whether or not this was a fair rate for the
14 District?
15   A   No one told us that it was robbery and we
16 shouldn't go with it. So I don't remember being
17 advised that, "Hey, this is too much" or "hey" --
18   Q   So you mentioned earlier that issues were
19 raised about this interest rate later on after the
20 bonds issued. Was that accurate?
21   A   Correct.
22   Q   At a February 12th, 2015, Board Meeting?
23   A   I don't remember the exact meeting, but
24 it was at a Board Meeting.
25   Q   Okay.

Page 99

1    A   And it got pretty heated that night, but
2  we had got Mr. Comer Brandon, on the phone, and we
3  had Mr. Boutte was also present, and the Board
4  asked all the questions that they wanted to ask.
5        The accuser who claimed that people had
6  stole -- I can't even remember the amount of money
7  he said, but it may be in the minutes. It may have
8  been not be. But I took high offense to being
9  excused of stealing anything.
10   Q   Do you remember the name of that
11 individual?
12   A   That was Mauzkie. Mauzkie. That's why I
13 was asking who started this so I could sue. That
14 was the whole purpose of me asking that at the
15 beginning.
16   Q   Okay. After that meeting, did you -- did
17 that change your belief as to whether or not the
18 deal the Library District had on the bonds was
19 fair?
20   A   Well, I mean, at that point, we were
21 already in the water. I didn't -- I believed in
22 the people that we hired to do a job to tell us the
23 facts. You have a man that's making all these
24 accusations. I don't I don't know where he was
25 getting it from. I don't I don't know what made him do it.

Page 100

1        And then we have the people on the phone
2  explaining and countering what he was at a meeting.
3  I'm saying, "Damn, I'm going to go with the people
4  that's supposed to be professionals over a guy
5  that's just throwing out wild accusations."
6        MR. BUCK:  My hour kicker has gone off.
7  I don't want to interrupt you in the middle of
8  anything.
9        MS. GARNER:  Yeah, let's take a break.
10 The time is 3:09 p.m. We're off the record.
11       (A brief recess was taken.)
12       MS. GARNER:  We're back on the record.
13 The time is 3:16 p.m.
14       BY MS. GARNER:
15   Q   And, Mr. Price, can you confirm during
16 the break you had no discussions with either myself
17 or Mr. Fagel regarding this investigation?
18   A   None regarding the investigation.
19   Q   Okay, thank you. When you learned or
20 when it was communicated to you by Mr. Boutte that
21 there was difficulty in getting the bonds sold or
22 finding a purchaser of the bonds, did Mr. Comer
23 ever suggest to you or the Board that maybe they
24 should pull the bond offering for now and wait
25 until maybe the flap banding created around the

Page 101

1  article had kind of passed?
2    A   I don't recall them advising us to do
3  that. We, as a Board, we were on a time limit.
4    Q   Okay. What was the time limit?
5    A   From the time that the --
6    Q   Of the ordinance?
7    A   Yeah. So we were, like -- we were right
8  there, like, towards the end, and I guess it was
9  getting kind of hectic.
10       I don't even remember what -- at some
11 point it was, like, talked about, like, if we did
12 not do what the public voted on, it was some type
13 of penalties involved with that.
14   Q   Okay.
15   A   So, no, I don't recall him saying, "Hey,
16 we should pull this down and wait." I don't know
17 if he would have. I don't know if he knew that we
18 had the timeline. I don't know.
19   Q   Okay. Was there -- so Ms. Flowers was
20 the primary contact with Mr. Comer and Mr. Boutte;
21 is that fair to say?
22   A   Yeah, I believe -- yes, I think that's
23 fair to say.
24   Q   Was she under some special directive from
25 the Board to deal with Mr. Boutte and Mr. Comer?

Page 102

1   A   I mean, as the director, she's supposed
2   to take care of the day-to-day operations.
3       Q   Okay.
4       A   So most of that would fall, like, they
5   should be communicating more with her than the
6   Board.
7       Q   Okay.
8       A   She should bring it to us, and then --
9   well, she would bring it to me, and then I would
10  let the Board know what the issue or concerns were,
11  or it would be put on the agenda for that meeting.
12  Like, if she would call me and say,
13  "Hey, they said this," or "They want to raise the
14  fee," I'd say, "Okay, then make sure it's on the
15  agenda for the next meeting and let's discuss it."
16  So --
17      Q   Okay.  To your knowledge, did Ms. Flowers
18  have any more experience with bond issuances than
19  anyone else on the Board at the time?
20      A   Not to my knowledge, no.
21      Q   Okay.
22      A   Not to my knowledge.
23      MS. GARNER:  Joe or John, do you have any
24  other questions?
25      MR. WILCOX:  This is John.  Just one

Page 103

1   question.
2       BY MR. WILCOX:
3       Q   Do you know -- Mr. Price, do you know the
4   fees that Mr. Comer and Mr. Boutte and his firm
5   were getting paid, do you know where they were
6   coming from?
7       A   No, I think earlier she asked did I know
8   about the fees that Boutte was charging and Mr.
9   Comer.  No, he never brought that up to the Board
10  saying that he questioned the amount or anything
11  like that.
12      Q   Right.  No, my question is more do you
13  know where the source of the funds for these people
14  to be paid are coming from?
15      A   Well, I was always under the -- you say
16  you're not supposed to assume, but I thought they
17  would be getting a certain percent to cover their
18  work out of the actual bond.
19      Q   Okay.  And if the bonds were not issued,
20  would they have been paid?
21      A   That's a great question.  I don't believe
22  so.
23      Q   Okay.  Thank you very much.
24      MS. GARNER:  Anything else, Joe?
25      MR. CHIMIENTI:  No, I don't have any

Page 104

1   questions.  Thank you.
2       MS. GARNER:  We don't have any further
3   questions at this time; however, it's always
4   possible, and I say this to all witnesses, that you
5   may be called again to testify.
6       We would ask that you maintain the
7   confidentiality of what was discussed today and
8   not discuss it with anyone other than your
9   attorneys.
10      Is there anything you wish to add or
11  clarify to the statements you've made here today?
12      THE WITNESS:  I hope you all don't call
13  me back.  I hope this is it.
14      MS. GARNER:  All right.
15      THE WITNESS:  I hope I assisted in some
16  type of way.  I can only give you what I know.
17      MR. FAGEL:  Thank you.
18      MS. GARNER:  We are off the record at
19  3:21 p.m.
20      (Whereupon, at 3:21 p.m., the examination
21  was concluded.)
22                *  *  *  *  *
23
24
25

Page 105

1            PROOFREADER'S CERTIFICATE
2
3   In the Matter of:  HARVEY PUBLIC LIBRARY
4                DISTRICT BONDS
5   Witness:        Keith Price
6   File Number:    C-08209-A
7   Date:           Tuesday, January 12, 2016
8   Location:       Chicago, IL  60604
9
10      This is to certify that I, Donna S. Raya,
11  (the undersigned), do hereby swear and affirm that
12  the attached proceedings before the U.S. Securities
13  and Exchange Commission were held according to the
14  record and that this is the original, complete,
15  true and accurate transcript that has been compared
16  to the reporting or recording accomplished at the
17  hearing.
18
19  _____        _____
20  (Proofreader's Name)       (Date)
21
22
23
24
25

**A**

abandoned 46:10
Abatement 24:14
abilities 62:14 75:15
ability 5:9 17:18
able 43:3 70:17
absent 54:22
absolutely 18:22 57:24
accept 79:3
accompanied 6:21
accomplish... 105:16
accuracy 93:1
accurate 41:5 43:8 45:22 82:4 98:20 105:15
accusations 91:17 99:24 100:5
accused 17:1
accuser 99:5
accusers 16:15
accusing 17:2 35:24
achievable 60:9
act 17:13 26:24 74:8 76:12
action 18:8 19:25 27:17
activity 16:11
actual 57:14 60:21 103:18
add 104:10
additional 79:13,16
address 5:21

11:1 96:7
addressed 35:18 93:6
adopt 41:3
adults 69:11
advantage 75:15
advantages 88:16
advice 67:7
advise 60:8 64:23 66:7 66:16 68:13
advised 6:22 65:3 68:16 98:17
advising 56:11 101:2
advisor 29:20,20 35:19,23 58:12,14,23 59:12 60:4 60:7,13 61:19 70:23 71:9,10,11 71:22 72:3 72:10,25 73:7,25 74:2,8,23 76:13 87:15 88:4 94:15 96:12 97:3
advisors 73:14
affirm 5:6 105:11
agency 11:6
agenda 102:11,15
agent 61:20
agent/trustee 61:21
ages 10:14
ago 12:12,15 48:5
agree 37:15 54:17
agreed 57:25

68:9 77:15
79:21 81:13
84:3
agreeing 78:13
agreement 57:12,14 76:7 79:24 84:5
ahead 70:8 79:10
aid 21:15
aim 67:17
Akeriha 10:18
Al 26:23
alderman 27:10 28:13
allegations 16:25
alleging 15:9
alley 41:21
allowance 50:16
Allstate 49:12,13
alternate 42:10
alternatives 42:2 88:5
Alvarez 26:20 27:17
Alvin 29:25
68:23 72:23 81:7,17 84:21 85:11 85:17
ambulance 19:22
amendment 7:15,18 8:4 78:24
amount 41:17,18,22 41:24 45:22 46:2,12 53:20 66:8 67:2 81:14 81:15,16

86:8 99:6
103:10
analysis 70:11 95:5 95:16,16
and/or 4:18
Aneesa 10:19
angry 8:1
Anita 26:20
Annette 41:10
answer 7:15 7:18 8:14 8:19,24 15:15 16:7 56:17 60:22 89:12 92:21
answered 45:1 91:15 94:22
answering 8:17 14:20 43:25
answers 8:10
anybody 73:6
apart 90:15
apostrophe 21:20
appear 35:7
appearance 35:3
APPEARA... 2:1
appeared 50:7
appearing 4:5 34:8
appreciate 14:19
approach 80:12
approval 62:12 63:2
approved 42:16 61:25 62:16
approving 61:18

approximate 70:12
approxima... 32:3
April 61:25
area 48:11 75:10
Arizona 81:17 82:3 82:6,6
Army 20:22 20:23,25 21:3 22:17 22:19,22
article 59:11 59:23,24 67:25 72:14 72:14 90:12 90:16 93:16 101:1
aside 84:18
asked 14:14 35:4,5 37:6 43:22,24 57:7 60:21 65:10 66:11 71:17 72:12 72:13 73:2 84:13 87:1 94:20 97:18 99:4 103:7
asking 13:20 14:2 15:2 31:8 43:13 44:11 46:17 48:4 52:14 53:7 58:11 58:13 80:17 86:9 99:13 99:14
aspect 92:19
Assembly 27:6
assert 7:14 7:18 8:4
assistance 14:20
assisted 104:15

Association 22:11
assume 8:25 76:16,18 103:16
assured 35:24
attached 105:12
attend 20:10 20:14,20 21:7,13 44:10 87:7
attended 22:1 26:8 44:19
attending 56:10 87:20
attention 16:22 19:22 30:10 55:11 78:25 79:1 80:14
attorney 16:5 34:11 49:7 52:14 56:19 59:1,2,5,5,7 59:12 63:3 63:3 64:19 72:2,12 74:9,10,12 74:24,25 77:11,15 87:12
attorney-cl... 36:13 63:9 68:19
attorneys 7:21 36:11 36:11 58:9 104:9
audio 47:14 47:22
audits 29:10 33:17
Authorities 19:3
authority 6:7
aware 31:6

57:1 64:8
87:23,25

**B**

**B** 39:12
67:22 90:14
**back** 19:5,8
23:7 30:5
33:17,25
46:7 51:8
54:10 77:9
77:13,21
78:1 94:5
98:3 100:12
104:13
**backed** 68:2
68:5 69:23
94:7,8
**background**
9:17 20:8
**bad** 75:2
**ballot** 31:8
**banding**
100:25
**bank** 33:3,8
**bank-quali...**
38:12
**barber** 21:18
22:12 24:9
24:10,10,12
24:19 75:13
**Barbers**
22:11
**based** 46:6
47:22 49:9
51:15 62:13
**basically** 6:7
12:16 23:10
23:13 24:9
24:10,17
26:1,7 33:1
36:20 37:11
37:25 42:9
44:19 47:20
53:15,17
59:9,13
60:6,8 65:2
65:11,13
66:9,11,20

71:3 74:18
74:18 75:8
75:9 76:12
83:18 84:15
88:14,19,20
94:22
**Bates** 40:7
61:11
**battery** 19:5
69:16
**beat** 19:6,14
**becoming**
37:12
**beginning**
37:2 99:15
**behalf** 2:3,17
**belief** 99:17
**believe** 11:23
20:2 21:24
29:21 30:17
31:2,21
32:2,2,14
38:20 42:9
44:17,25,25
45:7 52:1,2
44:23 46:1
56:5,8,18
60:14 64:5
64:7,12,18
65:21,21
67:4 69:20
69:21 70:16
70:18 71:19
72:1,7,7
73:1,2 80:8
89:1,2 91:3
91:5 92:21
94:6 97:7
101:22
103:21
**believed**
99:21
**bell** 63:23
**beneficial**
25:3
**benefit** 80:21
**best** 5:9 8:13
8:18 12:16
30:24
**better** 67:14

**beyond** 80:6
**bids** 51:18,24
**bigger** 31:9
**biological**
10:8
**birthday** 6:3
**bit** 52:15
67:5 68:7
**blessing**
95:15
**Blvd** 1:11 2:9
**board** 3:10
25:8,8,11
25:14,19,22
25:25 26:2
26:12,13
27:12 28:24
31:3 32:21
32:21,23
33:11 39:14
42:1 43:10
43:12,13,22
44:1,5,10
44:23 46:1
47:15 51:16
51:21 52:22
52:25 53:2
53:8,11,12
53:16,17
54:20 56:3
56:12,14
57:16 59:5
60:12 61:2
62:24 63:7
63:8,25
65:13 70:3
70:12 71:21
72:9,24
73:6,25
74:5,7,19
75:14,24
78:13 82:14
82:25 83:7
84:3,11
86:4 87:8
87:20,23
88:5 89:15
89:23 90:6

91:7,20
92:7,9 93:8
94:3,16
95:5,12,17
96:6 98:22
98:24 99:3
100:23
101:3,25
102:6,10,19
103:9
**Board's**
94:11
**Boarding**
47:16
**boards** 28:17
28:20
**boards'**
78:17
**Bob** 26:23
**boils** 14:14
**bond** 3:12
28:25 29:14
31:4,12,17
31:18 32:16
32:25 33:9
33:13 37:13
37:13,18
38:19,19
39:17,20,24
40:3,19
41:17,18
42:1,7 43:4
43:7,11,23
53:6,10,12
53:18 55:13
55:22 59:2
59:5,7,12
61:19,20
63:25 64:2
64:24 65:1
65:4,8
66:18 67:7
67:8 87:12
88:16,19,23
88:24,25
95:6 96:13
97:4 100:24
102:18
103:18

**bonds** 1:6
4:12 13:19
14:4 30:13
32:1 37:19
38:5,6,11
38:12 39:7
39:9,10,11
39:25 43:15
43:17 44:3
51:19,22,23
56:13 60:7
61:22 64:10
65:16 66:4
66:8 67:13
67:17,21
68:2 69:22
69:24 74:24
88:6,8,14
89:11,16
90:7,23
91:10 93:17
93:22 94:4
98:3,11,20
99:18
100:21,22
103:19
105:4
**borrowing**
46:2,3
**bottom** 40:22
48:22
**Boulevard**
5:22
**Boutte** 29:25
30:9,18
31:25 35:10
35:19,20
36:1,24
38:25 43:16
44:5,10,22
53:2,10
55:13,21
56:3,9,15
57:1,12,17
58:5 60:15
60:23 62:24
63:12,18,24
64:9,23
65:14 67:6

67:16 68:14
68:23 70:1
70:2,10,24
71:2,15,18
72:8,23,24
73:2 80:16
81:7,11,25
82:12,22
84:21 85:17
87:13 88:21
90:24 91:9
92:1,2 93:4
94:6,12,23
95:17 97:15
99:3 100:20
101:20,25
103:4,8
**Boutte's**
30:25 31:19
31:24 73:9
93:25
**bowling**
41:21
**Brandon**
72:20,22
81:8,12
84:21 85:11
85:23 87:11
87:11,11
95:25 99:2
**break** 39:4
48:1,3,14
54:5,14
67:14 100:9
100:16
**Brian** 2:5 4:4
**brief** 54:9
100:11
**bring** 24:14
26:3 58:1
89:22 91:19
102:8,9
**bringing**
91:21,24
92:11
**broke** 12:20
**brought** 15:5
15:11 16:22
19:25 59:22

73:14 78:25
79:1 80:14
88:3 103:9
**bruising**
19:22
**Buck** 2:18
7:2,2 10:23
15:13 34:5
34:17 35:3
36:9 46:17
46:20 47:24
48:2,13,16
49:19 50:2
50:9,16,22
51:3,5,8
54:6 63:5
63:11,15
68:20 71:13
80:20 85:3
85:7 86:14
86:16,24
100:6
**bump** 85:13
**business**
22:10
**businesses**
46:10
**buy** 67:10
**buyer** 90:19
94:4
**buyers** 90:18
94:7
**buying** 75:6

——— C ———
**C** 3:1 4:1
**C-08209-A**
1:4 105:6
**C-8209** 4:13
**C-a-i-n** 21:20
**C-a-l-d-w-...**
32:14
**Cain's** 21:18
21:19
**Caldwell**
32:7,10,13
**call** 35:10
54:21,24
68:23 69:1

85:19
102:12
104:12
**called** 5:14
11:21 35:6
43:24 73:20
74:18 91:14
97:13,14
104:5
**calls** 64:16,21
**Calumet** 5:22
**candidates**
22:12
**capacity** 7:5
**Capital**
96:12 97:16
**captioned**
4:11
**car** 23:16
**card** 18:21
**care** 102:2
**case** 4:13
12:14,19
19:5 28:4
59:22
**cases** 11:18
**catch** 19:12
85:12
**caused** 69:9
**CCG** 61:11
75:25
**certain** 4:15
14:15,16
15:10 16:10
16:24 18:9
26:2 37:25
46:12 48:5
53:20 61:23
67:18 69:12
69:13 75:16
103:17
**certainly**
36:16 50:11
**certificate**
21:21 105:1
**certify**
105:10
**CFE** 2:12
**chance** 6:9

27:13
**change** 76:20
76:25 77:1
77:2 99:17
**changed**
76:22 77:7
77:8
**charging**
16:21 103:8
**cheaper** 90:7
**check** 74:20
**checked**
74:10
**checking**
56:19
**Chicago** 1:12
2:10,23 4:8
4:9 23:3,6
105:8
**children** 10:5
10:9
**Chimienti**
2:12 4:5
79:9 90:1,4
103:25
**Chris** 49:7
59:6 74:15
**circumstan...**
14:3 18:10
32:4
**citizenship**
9:18
**City** 13:22
20:4 27:22
59:22
**civil** 14:11
**claimed** 99:5
**claiming**
18:18 26:25
**clarify**
104:11
**Clark** 49:7
49:14 59:6
74:15,16
**class** 25:4
**cleaning** 24:3
**clear** 8:22
62:23
**clearly** 27:4

81:13
**Cleveland**
10:4,15
**closed** 17:15
**closing** 54:2
**club** 22:10
**Coie** 2:20 7:3
**collection** 3:8
40:17
**college** 20:21
20:21 21:18
**Colvin** 2:19
7:3
**Comber** 70:1
**come** 14:14
14:19 21:16
30:9 33:2
36:19 37:3
42:22 43:22
53:8,10
57:6 59:17
60:23 65:10
68:11 72:10
73:8,8,11
80:16
**Comer** 68:13
68:16 72:21
72:22 73:5
73:15,18
74:8 76:9
76:21 78:1
79:12 80:12
81:8,11
83:21 84:22
85:23 87:7
87:9,11,17
87:24 88:3
88:15,22
89:7,10,17
90:5,22
91:19,23
92:18 93:7
93:20 94:2
94:9 95:4
95:14,25
96:11,25
97:16,17
98:12 99:2
100:22

101:20,25
103:4,9
**Comer's**
80:19 81:19
82:13,21
83:1 84:3
85:17,24
86:2,3
**comfortable**
5:25 41:24
44:23 45:22
47:3 69:12
**coming** 42:6
44:5 80:22
90:16 91:13
103:6,14
**commentary**
36:14
**Commission**
1:1,10 2:3,7
2:13 4:6
6:14 7:9
105:13
**communic...**
70:2 100:20
**communic...**
69:25 102:5
**community**
15:18,24
46:9,16
60:10
**company**
22:24 24:25
25:5 57:3
57:10 60:21
60:22
**compared**
105:15
**compensated**
97:5
**compensati...**
57:17 76:20
77:25,25
78:9 80:13
81:19 82:22
83:1 84:12
96:13
**competitive**
65:15

**complained**
35:16,18
**complaint**
15:8 35:15
58:25 59:14
59:16
**complaints**
27:3
**complete**
9:14 105:14
**completeness**
86:19
**concern** 15:4
46:4,8 50:9
**concerns**
15:2 45:25
46:6 72:17
92:4 102:10
**concluded**
104:21
**conducted**
11:5
**conducting**
17:16
**conference**
59:18
**confidential**
16:7 17:25
**confidentia...**
104:7
**confirm**
54:13
100:15
**confusion**
52:16
**connection**
4:11,17
7:12 11:10
29:13 37:18
39:9 47:11
61:21 94:11
**cons** 89:10
**conservatory**
51:3
**consider** 10:9
40:2 42:2
44:13 52:22
70:22 73:6
**considerati...**

73:11
considerati...
89:15
considered
17:25 51:17
71:22 79:16
considering
71:24
consolidated
62:3
constitute
4:18
Constitution
27:5
construction
66:24,25
contact 58:3
63:17,21
73:17 81:18
81:23 94:11
95:10
101:20
contacted
44:4 58:7
58:11,13,16
96:24 97:20
context 15:14
18:2
contract
83:21 84:1
contracts
47:21
conversation
83:11 91:13
conversati...
52:18 54:14
63:6 68:20
68:21 87:10
convicted
19:2,15,20
Cook 13:5,6
cooperation
14:20
copies 81:5
copy 6:6,12
34:7
corner 40:22
correct 10:2
25:9,10,18

28:14 51:22
55:23 56:1
56:10,24
60:13 62:9
76:10,14,23
81:9 92:23
98:21
cost 61:23
70:13,13
90:8
Council
27:22
counsel 3:12
6:22 7:1
61:19 63:7
96:13 97:4
countering
100:2
country 9:17
County 13:5
13:6 19:23
couple 23:16
38:21 48:5
64:6 66:14
69:9 75:1,5
84:22 98:8
course 4:24
17:22 21:22
37:6 48:7
61:4
court 8:8
11:6,10,15
13:3 15:11
18:11 26:24
47:21 80:21
cover 4:24
33:9 103:17
covered
72:19
Craig 63:20
63:22 95:24
96:1
crazy 81:4
create 51:5
created
100:25
credit 39:6,8
67:22
crime 19:3

criminal 7:10
11:22 14:12
criteria 53:3
critical 92:19
92:22
currently
24:18 25:11
28:13
cut 24:19
69:13
cuts 69:10
cutting 75:13
cylinders
23:10

D

D 4:1
daily 28:10
damn 87:14
100:3
dancing 55:7
date 1:13
59:19 72:6
73:23 76:11
81:9 83:23
105:7,20
dated 76:9,10
84:20 85:14
96:4
dates 12:6
42:19 76:8
Davis 26:23
day-to-day
102:2
days 27:23
deal 16:2
54:1 99:18
101:25
dealing 7:21
7:23 19:6
69:22 88:19
dealings
31:24
deals 43:15
Dearborn
2:21
December
47:17 76:10
81:9,20

82:8 83:24
decide 15:14
43:12 53:18
decided
41:25 51:21
decides 43:6
43:10
decision
53:13
Dee 64:10
defendant
16:19 19:25
definitely
41:16 49:13
61:15 75:21
75:23 78:4
78:5 79:6
82:7 83:2
83:14,25
85:22 88:13
depend 50:23
depending
18:10
deposed 11:9
12:4,7
deposition
8:6
depositions
11:25 12:1
description
3:6 49:15
descriptive
45:16
deserve
81:14 84:15
deserved
83:4 84:9
despite 15:15
detail 45:2
details 32:18
determinat...
18:7,17
determine
4:14 16:13
56:15 74:7
developed
4:16
Diamond
22:24,24

difference
38:18 58:22
60:3 65:15
65:19 89:24
different
11:13 30:12
38:21 42:24
66:2,14
75:14 86:18
88:23,23
89:5
difficult 8:12
difficulty
93:17
100:21
digging
50:14
digits 40:23
dinner 64:4
direct 55:11
68:21 94:13
directed
88:20 94:20
directive
101:24
directly 33:2
94:20 96:14
director
24:24 26:1
26:4 28:7
70:17 89:18
95:9 102:1
disadvanta...
88:16
disappointed
69:6
disapprove
41:17
disclaimer
5:1
disclose
36:13
discuss 36:6
36:23,25
57:17 64:10
65:14,17
82:11 84:5
89:10,14
102:15

104:8
discussed
7:21 34:23
36:15 42:5
57:18,19,21
57:22,25
58:1 82:21
83:1,2,14
83:18 84:12
89:1,2,5,6
89:21 104:7
discussing
44:3,6
85:17,18
discussion
71:8 82:24
83:20
discussions
44:20 63:12
68:25 89:17
89:23,25
100:16
district 1:6
4:12 7:4,6
11:14,19
12:13 13:19
14:17 25:8
25:9 27:21
27:24 28:20
28:20,21,21
28:24,25
29:9,9,16
29:17,19
30:13,14
31:5,12
32:1,16
33:16 37:14
37:15 39:15
39:16,18,20
40:2,18
44:13,14
47:12,13
50:20 57:11
63:8 64:23
66:7,16,17
67:7 69:2
70:14,22
73:24 74:1
74:6,25

79:21 88:9
90:7 96:6
96:11 98:14
99:18 105:4
**District's**
31:17 36:11
37:13,13,17
56:22
dive 47:24
**Diversified**
1:24
**Division** 2:8
document
34:3 45:5
48:22 61:13
70:17 76:4
86:12
documents
3:8 7:11
40:17
doing 18:15
24:9 40:3
49:8 65:1,7
79:12,18
84:9 88:16
91:4 93:25
94:1 95:4
dollar 33:19
dollars 31:18
domestic
19:5,13
**Dominick's**
24:2,8,11
**Donna**
105:10
double 66:20
66:21
doubled 86:1
drinks 64:4
drive 24:21
due 69:18
duly 5:14
duties 25:24

**E**
E 3:1 4:1,1
e-mail 81:7
84:20,23
85:9 95:23

95:24,25
96:16,18,21
96:22 97:11
97:19 98:2
e-mails 84:22
E3 21:4
earlier 11:1
33:18 34:24
35:4 40:5
52:1 60:20
96:23 98:18
103:7
earn 80:1
ease 13:17
easier 65:25
educated
75:10
education
75:9
educational
20:7
efficiency
48:17
efforts 87:1
93:21 94:3
either 54:14
89:13 90:8
93:11
100:16
elect 25:22
elected 25:18
26:22 27:7
employed
22:17,19
24:12,18
57:1,4
employees
39:16,18
employment
24:22
ended 25:15
42:19 78:13
**Enforcement**
2:8
engagement
80:6
entered
57:12 84:4
entirely

15:20
entities 18:9
entitled 1:15
equity 25:4
**Erica** 10:15
**Esiana** 10:16
**ESQ** 2:4,5,18
2:19
events 14:15
eventually
18:1,6 68:9
everybody
43:13 68:5
exact 30:20
30:21,22
31:22 33:18
42:18,18
44:7 57:3
57:10 59:19
61:5 72:6
73:23 74:20
76:8 82:23
98:23
exactly 12:8
18:16 25:19
42:14 43:1
66:3 72:16
79:5
examination
3:3 5:16
104:20
examined
5:15
example
16:11
exceed 38:1,2
38:3
exceeded
68:8
exceeding
67:20
excerpt 49:16
51:15
**Exchange**
1:1,10 2:3,7
2:13 20:6
105:13
excuse 7:4
excused 99:9

executed
78:23
executive
49:24 50:1
50:4,7
83:16,19
exhibit 3:14
6:13 7:9
33:22 34:1
34:2 40:7,7
40:9,12,16
47:6,10,10
47:15 54:19
61:7,11
75:19,20
77:21 81:2
81:7 84:20
84:20 95:23
exhibits 3:6
9:4,6
expansion
40:1 50:18
expected
69:8
expecting
45:13
expenditure
33:19
experience
28:23 62:13
80:3 102:18
explain 8:7
43:23 45:2
53:10 65:10
65:19 67:9
69:17 88:15
explained
38:20,23
57:8 65:22
70:19 91:18
explaining
43:25 65:13
90:5 100:2
exploring
14:7
expression
73:9
extent 36:9
79:17

extra 56:19

**F**
face 16:14
fact 7:22,24
15:16 17:3
45:13 46:1
65:8 74:21
77:12 85:21
90:11 96:22
fact-finding
18:15
factory 24:5
24:6
facts 4:16
18:3 99:23
factual 50:17
**Fagel** 2:5 4:4
12:12,18
13:15 16:3
16:4 27:15
44:21 46:19
46:22,23
51:1,4,7
54:15 59:20
100:17
104:17
failed 27:7
fair 35:2 38:6
40:16 49:15
51:16 68:25
76:16,18
98:13 99:19
101:21,23
fall 42:13
63:13 102:4
false 7:11,11
68:4 98:2
familiar 53:6
53:12 75:6
far 17:1 91:9
favor 55:25
61:24 62:8
feasible 67:1
**February**
47:17,17
98:22
**Federal** 4:16
4:18,23,25

11:5,6
14:10 19:3
fee 78:24
79:13,14
80:13 81:13
84:3,5
91:20,22,24
92:5 102:14
feel 7:22,23
9:1 15:5
40:15 41:11
fees 57:17,20
80:19 82:13
85:13,17,24
86:3 90:9
96:13 97:4
103:4,8
fell 42:8 43:6
44:9 54:1
65:1,8
90:15
felt 44:23
83:3,5 84:8
**Fields** 84:15
**Fifth** 7:15,18
8:4
fight 50:23
fights 12:2
figure 65:6
68:11 79:25
file 1:4 18:11
105:6
**filed** 18:8
26:24 27:3
fills 17:11
finally 39:22
finance 39:25
83:18
financial
21:15 29:20
35:19,23
52:20 58:11
58:14,22
59:12 60:4
60:7,13
71:11 72:10
72:25 73:7
73:13 74:23
76:13 87:14

88:4 94:14 96:12 97:3

**financially** 60:8

**financing** 32:23 42:2 61:23 88:6 88:10,17

**find** 29:11 44:15 51:18 86:17,20 94:4 97:10 97:22

**finding** 17:4 42:19 100:22

**fine** 6:1 8:21 9:9 48:15 48:16 85:7

**finish** 8:17,18

**finished** 21:22

**fireplaces** 69:11

**firm** 30:23,25 31:20,24 60:24,25 62:15 70:10 93:25 94:17 94:17 103:4

**firms** 60:16 62:25

**first** 5:14 9:22 20:3,5 22:21 40:2 41:9 44:7 54:1 65:1 67:20,22 70:22 71:22 71:23 72:20 73:17 74:22 79:20 90:12

**five** 12:12,15 12:17 25:3 29:10 33:17 53:22,23,23

**flap** 100:25

**flip** 76:20 77:20,21

**flipping** 48:21

**float** 42:21 45:8 51:19 51:22,23 66:22

**floated** 42:6

**floating** 43:3 55:13,22 65:8

**Flowers** 28:7 35:6 36:5 36:25 39:15 64:9,19 78:23 80:15 80:24 101:19 102:17

**fluctuated** 98:8

**focus** 13:18 13:25 55:20 84:23

**focused** 14:9 72:3

**focusing** 72:2

**FOIA** 17:19

**follow** 42:10 58:24 59:13 86:22

**follows** 5:15

**forklift** 23:11 23:13

**form** 6:13,17 7:9 15:25 24:22

**Formal** 6:6,6 6:10

**formally** 56:3 70:11

**former** 7:5

**forth** 7:8

**forward** 42:1 43:7,11 53:18 60:2 61:9 63:16 69:15 70:6,8,21 71:17,20

**forwarded** 95:24

**forwarding** 95:25

**found** 59:4,7 74:25

**four** 5:24 6:1 19:18,19,23 27:2 40:23 42:21 53:23

**frame** 46:21

**free** 9:1,5 27:23 55:7

**freedom** 17:10,11,12

**frequent** 28:10

**front** 13:4 14:16

**frustrations** 15:25

**full** 5:18

**full-time** 24:14

**funding** 42:6 42:12,21 43:6 92:19

**funds** 70:13 103:13

**funny** 87:14

**further** 50:10 50:14 104:2

**G**

**G** 4:1

**Garner** 2:4 4:2,4,22 5:3 5:6,11,17 7:7 10:25 18:25 31:11 32:9 33:24 36:21 40:11 47:8 48:1 48:11,14,18 48:20 49:25 50:3,15,21 50:25 51:10 51:12 54:7 54:10,12 60:2 61:9 63:16 69:15 70:6,8,21 71:17,20

79:10 80:11 80:25 81:5 81:6 85:2,4 85:8 86:11 86:15,23 87:3 88:2 90:3,21 92:16 93:14 95:21 100:9 100:12,14 102:23 103:24 104:2,14,18

**gather** 18:3,3

**general** 5:1 27:6

**getting** 15:3 35:19 53:25 64:2,10 65:24 72:10 82:1,2 89:11 99:25 100:21 101:9 103:5 103:17

**ghost** 91:12

**give** 5:21 8:14 10:13 17:10,14 18:2,22 23:17 78:14 81:3 84:16 85:2 86:8 104:16

**given** 8:6 48:3 86:12

**gives** 6:7,14

**giving** 36:14 40:18 78:14 82:19

**go** 4:2 9:16 14:25 22:11 33:3 37:7 39:23 48:15 60:24 65:7 69:14 70:8 74:15,17 77:13,21 79:10 82:5

89:15 98:16 100:3

**going** 6:12 8:7,25 9:16 33:8,25 35:17 42:20 43:2 47:2 48:4,7,11 48:18 50:10 54:3,18 60:6 63:5 64:1,2 66:2 67:1 69:10 69:16,18 73:13 75:16 81:3,15 84:18 88:8 91:8 95:22 98:3 100:3

**good** 54:4 57:13 63:4 73:4 82:5

**gotten** 11:21

**government** 16:23

**graduate** 20:12,18 21:11

**grant** 42:13 43:5

**great** 14:24 18:20 73:15 84:7 103:21

**greatly** 86:2

**group** 68:23

**guard** 22:25 23:15

**guess** 24:21 36:9 39:12 39:13 41:23 60:9 101:8

**guy** 32:6 82:19 100:4

**guys** 15:14 87:1

**H**

**H-e-i-l** 23:6

**hair** 24:19

75:13

**hand** 5:4 40:6 54:18 70:18

**handing** 47:9 61:10

**hands** 85:6

**happen** 46:13 67:5 95:8

**happened** 18:17 97:19

**happens** 18:1

**happy** 40:24

**hard** 79:5

**Harvey** 1:5 4:12 5:22 7:3,6,24 11:14 13:19 13:22 15:18 15:24 20:4 20:17 26:14 43:17 47:12 59:1,22 69:2 81:8 96:6,10 105:3

**head** 8:12

**hear** 37:7 72:20

**heard** 20:3,5 39:11,12 72:22

**hearing** 1:15 80:23 105:17

**heated** 99:1

**hectic** 101:9

**heightens** 15:25

**Heil** 23:3,6 23:24

**held** 22:6 27:4 105:13

**hell** 36:7

**hesitant** 14:22

**hey** 35:11 65:11 66:12

77:16 82:17
83:5 98:17
98:17
101:15
102:13
**high** 20:10,14
20:15 22:16
92:5 99:8
**higher-ran...**
26:22 27:3
**highest** 21:2
**hire** 53:13
55:13,21
58:11 61:3
71:8 96:24
**hired** 56:3
58:14 60:12
96:11,12
97:15 99:22
**hiring** 70:23
71:22 73:6
96:25
**history** 73:5
73:10
**hit** 59:23,24
67:25 90:12
90:16
**hold** 22:3
28:16
**holding**
26:25 27:6
**home** 5:21
**homes** 45:17
45:19 46:10
75:3,5,7,11
**honest** 7:20
34:5
**Honestly**
7:23
**honor** 53:21
**hope** 104:12
104:13,15
**hoping** 92:12
**hour** 47:25
54:4 100:6
**huge** 41:22
**hunt** 7:22,23
14:8

**I**
**idea** 38:4,6
72:9
**identificati...**
33:23 40:10
47:7 61:8
**IDENTIFI...**
3:6
**IFS** 60:16
61:3 62:15
63:12,18
90:23 91:9
91:25 92:19
93:16,21
96:11,24
97:15
**IFS's** 91:20
93:21
**IL** 1:12 2:10
2:23 105:8
**Illinois** 5:22
21:9,14
22:1 27:5
**importantly**
15:19
**improveme...**
61:23
**inaccurate**
15:20
**inadvertent**
50:19
**inclined** 68:6
**incompatible**
27:1
**increase**
79:13
**incriminate**
7:16
**independent**
95:4,5
**indicted**
11:21 19:2
**individual**
99:11
**individuals**
18:9
**influenced**
73:10
**information**

6:14,15
15:17,20
17:10,11,13
17:13,15
18:3 36:10
36:13 67:7
97:25
**informed**
22:11 35:14
67:25
**initialed**
76:25
**initially** 45:4
50:6 54:21
**initials** 10:24
75:22,23
76:3
**initiate** 16:8
**inside** 69:13
**insider** 16:11
**instance**
68:24
**instinct**
79:20
**insurance**
29:11
**insured**
89:11
**interact** 28:8
**interaction**
26:13 28:6
**interest**
32:24 33:6
37:25 67:18
68:6 69:18
69:19 70:12
90:8,11
98:10,19
**interested**
68:1 94:8
**interfere**
17:17 50:11
**Internet** 28:4
**interrupt**
71:14 100:7
**introduce**
34:1
**investigate**
6:7 14:9

16:24
**investigating**
4:23
**investigation**
4:11,17,24
7:12 13:18
14:1 15:5
15:12,16,19
15:21 16:17
17:15,17,23
20:4 35:5
36:2,6,12
36:15,25
47:11 54:16
100:17,18
**investigati...**
6:15 16:6,8
17:14
**involved**
13:22 15:7
32:17,20,21
32:23 33:11
37:12 39:16
49:22 86:25
101:13
**involvement**
28:25
**involving**
14:3 19:1
**iron** 64:13
**issuance** 14:4
29:1,14
31:5,12,17
33:9 37:18
43:7,11
61:21 64:1
64:11,24
66:18,18
**issuances**
102:18
**issue** 30:14
35:19 37:14
41:19 47:4
50:12 51:6
51:17,24,24
55:8 58:24
64:2 66:8
69:3 72:11
72:17 78:11

91:19 93:6
93:20
102:10
**issued** 47:12
98:3,4,11
98:20
103:19
**issues** 13:21
14:6 26:4
39:9 50:18
74:21 98:18
**issuing** 39:24
44:13

**J**
**Jackson** 1:11
2:9
**January** 1:13
4:3 39:21
78:4 84:21
85:15 96:4
105:7
**Jarad** 64:10
74:13 75:17
**jaw** 12:20
**job** 22:21
91:1 92:12
92:12 99:22
**jobs** 17:18
**Joe** 31:11
90:1 102:23
103:24
**John** 31:11
31:15 70:6
70:7 86:11
87:5 92:14
95:3 102:23
102:25
**join** 60:24
**joined** 22:16
25:17 60:16
**jokes** 41:20
**Jonathan** 2:6
2:18 4:5 7:2
**Jones** 26:23
57:2 58:4,8
**Joseph** 2:12
4:5
**judge** 19:23

**jumped** 79:7
**jumping** 98:7
**junior** 20:21
**junk** 39:11
**justify** 79:13

**K**
**K-e-i-t-h**
5:20
**Kayha** 10:18
**Keith** 1:8 3:4
5:13,20 7:5
10:17 96:14
105:5
**kicker** 100:6
**kind** 16:12
43:17 48:9
74:20 75:6
77:19 79:5
101:1,9
**kinds** 14:1
**Kipling** 57:1
58:4,8
**knew** 36:19
43:15,15
52:24
101:17
**knowing**
46:8
**knowingly**
7:10,11
**knowledge**
12:17 25:6
30:24 31:4
39:5,17,19
58:6 63:19
74:4 102:17
102:20,22
**knows** 43:14
81:13
**Kutak** 96:12
97:4

**L**
**lack** 69:19,22
**Lance** 69:1
87:12
**lapsed** 29:11
**Law** 18:19
**Laws** 4:16,19

4:23,25
14:11
lawsuit 16:18
18:8,18
lawyers
85:14
leaked 15:18
leaning 64:25
learned
100:19
leave 9:7
18:20 25:13
leaving 27:24
46:11 60:24
left 30:6
let's 4:2 20:7
25:7 33:25
43:10 66:16
76:19 100:9
102:15
letter 76:9,11
letting 94:2
library 1:5
4:12 7:4,4,6
13:19 14:17
25:7,9
27:12,19,25
28:7,22
29:5 31:5,9
37:13,15
38:5 39:6
40:13 41:25
42:23 43:6
43:10 46:1
47:12,12
61:23 63:8
66:20 70:14
74:1 75:4
76:13 88:9
96:6,10
99:18 105:3
Library's
39:25
licenses 22:4
22:7
life 19:21
light 92:23
limit 53:19
101:3,4

limited 14:3
line 52:13
55:15 57:7
77:7
list 29:10
42:25 43:1
listening
49:10
listing 50:6
literacy 55:7
little 15:13
23:3 45:2
50:14 52:15
55:2 66:22
67:5,14
68:7 69:12
69:16 70:18
79:21
live 26:14
60:10
LLP 2:20
Location
105:8
long 20:25
23:15 24:7
48:12,19
look 9:5
16:12 33:10
34:5,6
40:15,21
54:23 59:10
62:11 73:13
86:14,21
93:8 97:21
looking
35:14 36:4
42:10 45:5
45:6 79:14
85:1
looks 40:13
53:17 54:21
54:23 76:15
76:22 77:25
lot 33:16 68:1
68:17 75:22
84:14 89:4
89:17,20,23
91:13 92:8
lottery 61:22

M
ma'am 6:20
25:12,23
28:18 38:7
40:20 61:1
maiden 10:3
main 46:8
65:7
maintain
104:6
majority
33:15
making 88:5
91:17 99:23
male 49:6
52:7
man 43:18
49:12,13
99:23
manager
66:24 67:1
March 47:18
47:18 49:16
margins 76:4
marital 9:20
marked 3:14
33:22 34:2
40:6,9 47:6
47:9 54:19
61:7,10
75:19 81:2
84:19 95:23
marking
19:22
marriage
9:22
Married 9:21
material
50:19
materials
34:19,23
matter 1:3,15
4:12 6:8
85:21 96:22
105:3
maturity
32:24
Mauzkie
99:12,12

McComb
21:10
mean 12:1
13:19 15:11
24:9 26:14
28:8 31:22
32:20 33:10
33:18 34:4
34:5 36:7
36:19 37:6
42:18 45:18
46:2,11
47:25 49:12
55:18 64:3
67:8,10
71:14 74:24
77:4 79:4
85:19,25
86:16 88:24
89:2 91:14
92:22 95:7
99:20 102:1
means 15:22
meant 46:15
meet 34:10
34:16 63:24
64:7,13
meeting 3:11
26:16 35:16
35:21 40:14
44:5,7
49:17,20
54:20 55:1
57:19,20,23
61:16 73:20
73:21 75:24
79:6 83:3,7
83:9,13
84:12 87:16
87:24 98:22
98:23,24
99:16 100:2
102:11,15
meetings
26:7,8,10
26:12 44:11
44:19 47:15
47:15 56:10
63:25 64:8

65:18 66:3
68:12 82:16
83:10 87:8
87:20 89:3
89:4,4
Melvin 32:7
32:10
member 22:9
28:24 32:21
32:23
members
26:13 57:16
62:15 82:14
83:1 84:11
87:24 89:15
92:7
Members'
75:15
mention
45:12 82:21
mentioned
16:5 82:25
88:12 98:18
messages
95:11
met 29:25
31:25 32:5
32:6,12
64:3 73:19
73:20
middle 77:24
100:7
Mike 7:2
million 31:18
33:19
mind 48:21
53:3 98:2
minutes
40:13 54:20
56:6 65:18
71:4 78:13
78:17 86:10
99:7
misinform...
15:23
misspoke
71:12
mistaken
50:5

money 23:17
33:8,17
46:2,15
69:7,14
77:4 78:14
79:21 82:18
82:19 84:16
99:6
monitoring
16:10
monthly
26:10
months 19:18
19:19,23
79:22
Mosquito
24:13
motion 55:12
55:21,23,25
56:25 86:5
move 23:10
31:13 41:25
43:7,11
53:18
moved 11:3
multi-term
88:25
multiple
11:25 22:20
27:4 42:24
municipal
29:20 61:19
70:23 71:9
71:10,22
73:25 74:2
74:8
murder 19:7
19:14
mustache
43:19

N
N 3:1,1 4:1
name 4:4
5:18 9:24
10:1,3 15:6
23:7 30:20
30:21,22
43:20 60:20

61:5 63:22
66:23,23
96:5 99:10
105:20
named 19:24
32:6
names 10:13
Natalie 2:4
4:4 13:25
70:4 87:4
92:14 94:25
nature 94:18
nay 41:5
near 55:14
necessarily
50:17
necessary
46:16
need 50:13
59:11,12
85:12,13
87:14
needed 43:12
91:14
negative
92:23
negatively
7:25
negotiated
33:5 65:15
96:14 97:5
negotiating
32:18 33:4
90:23
negotiations
91:8
never 19:20
19:21 62:24
68:8 91:7
92:4 103:9
New 2:15,15
newer 31:9
news 7:24
newspaper
59:24
Nicarrico
10:15
NICHOLAS
2:19

night 99:1
nodding 8:13
non-public
15:16 16:6
18:1
noted 55:4
notice 1:16
number 3:14
5:23 46:10
66:9 68:14
105:6

O

O 3:1 4:1
O.J 19:6,13
obligations
16:24 17:12
17:19
obliged 16:23
obviously
13:21 38:9
45:10 49:8
occur 28:1
occurred
19:9 53:15
79:6
occurring
91:6
offense 99:8
offering
32:17,25
33:13 39:17
39:20 40:3
40:19 42:1
56:23
100:24
officer 24:24
officers 4:6
25:22
Offices 4:8
officially
71:6
officials
26:22 27:3
Oh 48:24
once 13:24
29:2 46:11
57:25
one-term

38:19 88:24
ones 78:18
open 18:11
operations
102:2
opinion
69:21 98:12
opportunity
6:16
options 88:9
order 6:6,7
6:10 44:14
51:18
ordinance
3:9 40:18
41:4,8 45:3
46:25 47:1
101:6
organization
22:10,15
original 44:9
79:24
105:14
originally
42:4 79:19
outlined
79:25
outside 26:12
63:25
over-the-p...
87:10
overall 45:16
owed 33:4,16
owner 25:3

P

P 4:1
P-r-i-c-e 5:20
p.m 1:16 4:3
54:7,11
100:10,13
104:19,20
page 40:21
40:23 48:21
48:22,25
54:24 55:12
55:14 75:25
76:20 77:21
77:24

pages 1:9
51:9
paid 27:6
30:5 103:5
103:14,20
paper 10:24
62:22 72:18
paperwork
75:22
park 11:14
11:19 12:13
27:24 28:20
28:21,24
29:8,9,16
29:16,19
30:12,14
31:12,16
32:1,16
33:16 44:14
56:22
parole 12:25
12:25
part 27:5
46:3 50:20
52:20 64:18
90:25 96:20
participate
64:15
participated
64:21
particular
26:19
pass 55:25
passed 31:10
40:4,18
41:10 56:25
61:4,25
62:5 101:1
passing
26:15 61:2
Patterson
55:6 84:13
pay 33:3 46:7
78:12
paying 61:20
payment
30:6
penalties
7:10 101:13

penalty
12:22
people 16:1
18:4 22:13
30:12 33:16
35:25 42:11
45:11 63:11
68:1 69:23
83:3,5
91:16,17
92:11 94:7
99:5,22
100:1,3
103:13
percent 25:3
31:10 67:20
67:23 90:13
90:13 98:5
98:8,12
103:17
percentage
69:5,6
period 46:10
58:10
Perkins 2:20
7:3
permission
40:19
perpetrating
15:24
person 18:4
28:11,12
32:11 43:14
49:8 60:6,7
87:7,17,24
personal
69:21
personally
59:10 60:22
82:15
personnel
62:15 83:17
86:21
phone 4:5
28:11,12
35:20,24
68:17,18
91:15,18
94:21 99:2

100:1
phrased
51:19
pick 8:12
23:13
picture 87:14
place 1:10
4:8 14:16
59:25 72:5
placement
43:1
plaintiff
16:19
plan 44:9
planned 65:7
please 6:3
point 14:24
18:6,10,14
43:5 53:25
57:7 58:7
60:15 68:5
73:14 74:15
91:16 99:20
101:11
portion 33:3
49:20,23
52:3,6
positions
26:25 27:2
27:4,7,16
28:16
possibility
65:24
possible
104:4
Possibly
42:18
post-high
20:20
potential
30:16 90:17
potentially
93:8
PR 32:11
preparation
34:20
prepare
34:11,16
prepared

42:20
present 35:21
63:12 99:3
presented
75:24 92:20
95:17
presenting
95:5
preserve 63:8
preside 26:6
president 7:5
11:20 25:20
25:25 28:8
29:4,8 63:7
presumption
68:8
pretty 44:23
69:6 99:1
previously
54:19 75:19
81:2 84:19
price 1:8 3:4
3:7 4:21 5:2
5:5,9,13,20
6:19 7:5
10:1,16,17
10:18 32:16
38:6 40:12
54:13,22
61:14 63:5
70:10,11
79:12 81:16
81:16,18,23
85:13 87:7
92:18 95:3
95:22 96:15
100:15
103:3 105:5
price-and-...
95:16
pricing 67:8
67:8,13
89:16 90:23
91:9 93:10
93:25 95:6
primary
94:11
101:20
prior 28:23

31:25 37:12
38:5 39:6
44:11 56:9
57:22,25
96:11,24
private 17:8
17:21,23
privilege
19:12 36:13
63:9
privileged
36:17 50:19
69:3
probably
12:5,11,15
15:19 30:4
42:15 46:9
54:4 57:20
71:7 82:7
89:21,22
probation
13:1
problem 9:3
14:23
procedures
43:23 56:13
proceeding
4:7 11:5,10
11:12,22,24
18:1
proceedings
11:13,15,18
14:12,16
105:12
proceeds
33:13,15
process 38:24
53:6,11,12
55:13,22
64:1 75:6
94:10,12
produced
47:14
product 80:3
professional
22:3,6,10
professionals
100:4
project 46:14

65:6 88:10
Proofreade...
105:1,20
proposal
76:12
proposals
30:15
proposed
62:14
pros 89:10
provide 9:14
15:13 17:13
17:20 67:6
provided 6:5
11:25 49:20
49:21
provides
7:10 96:5
providing
7:10
provisions
4:15
public 1:5
4:12 7:4,6
13:19 14:17
16:9 18:11
47:12 50:13
53:21
101:12
105:3
publicly-he...
24:24 25:4
pull 72:6
100:24
101:16
purchase
69:24
purchased
75:5,11
purchaser
100:22
purchasing
68:2 75:3
purpose 17:3
33:12 39:24
53:7 61:22
66:19 99:14
purposes 4:7
pursuant

1:16 34:8
pushing 55:7
put 13:17
31:8 41:4
41:15 44:24
52:2,2 69:7
69:8 70:17
84:18 97:8
102:11
putting 41:8
45:4 46:21
97:6

**Q**
qualification
62:13
qualificatio...
30:15
qualified
56:15 74:8
qualities
62:14
question 7:16
8:14,17,19
8:23,24
13:7 16:7
17:5 48:9
48:17 51:17
57:6,13
70:5 78:16
79:9 81:21
82:5 84:7
84:14 87:5
90:2 92:15
93:20 95:1
103:1,12,21
questioned
92:7,8,10
93:3,4
94:16
103:10
questioning
35:15 37:4
93:24,25
questions
6:19 7:19
8:10 9:17
13:11,25
14:21 15:2

24:23 26:2
43:14 44:1
47:24 48:4
48:8 50:11
50:17,24
88:20 91:16
94:14,19
99:4 102:24
104:1,3
quicker
70:18
quit 23:18
quite 7:20
28:10 34:4
57:20

**R**
R 2:18 4:1
raise 5:4
79:14 81:13
86:10
102:13
raised 55:12
72:10,16
78:24 85:24
85:25 86:2
86:4 98:19
raising 48:9
80:13,18
82:13 84:5
range 12:9
67:18
rank 21:2
ranking
94:17
rate 33:6
37:25 68:6
98:11,13,19
rates 32:24
65:24 67:18
69:18 70:12
90:11
rating 67:22
90:14
ratings 39:6
39:8
Raya 105:10
reached 65:9
read 6:16

17:9 48:6
48:25 51:9
51:14 52:3
52:6 55:2
55:18 58:25
59:14,15
69:11 72:13
reading
49:10 52:7
55:18 62:21
ready 64:11
real 43:18
really 4:21
11:7 13:20
14:9,14,18
15:4 16:25
17:2,3
18:15 35:13
36:3 43:2
45:7,8,18
45:19,21
58:6,17,19
59:19 66:13
66:15 69:23
78:22 79:15
82:18 84:10
84:16,17
91:11,12
reason 8:16
9:13 26:19
42:8 45:2
73:16 91:3
91:5 97:7
reasons 16:9
recall 11:17
12:3,6
19:17 21:25
30:1,25
31:15,16
33:12,20
44:4 55:1
57:13 58:18
59:15 61:2
63:1 73:22
74:16 76:6
79:12 80:22
82:1,2 83:9
83:14,20
84:11 85:16

85:18 87:16
87:20,22
88:4,11,11
88:13,18
90:10,11
93:2,7,11
93:24 94:1
94:2 95:4,7
95:13 96:16
96:17,17,20
97:20 98:5
101:2,15
**receive** 21:21
42:20
**received**
47:10
**recess** 54:9
100:11
**recognize**
34:3 40:12
61:13 75:20
**recollection**
62:4,18
80:5 87:19
**recommend**
73:4
**recommen...**
72:25
**recommen...**
93:9
**record** 4:2
5:19 6:5
8:22 13:17
14:25 54:8
54:10
100:10,12
104:18
105:14
**recorded**
41:5 50:4
**recording**
41:2 47:14
105:16
**recordings**
3:11 47:16
47:22 83:10
**records**
34:20 50:13
**reelected**

27:23
**reelection**
26:17 27:10
**refer** 37:14
**reference**
46:21
**referendum**
31:8 40:4
41:11,15
47:2 53:21
**referring**
55:17 56:22
74:12 85:9
**reflect** 83:11
**reflected**
78:17
**refresh** 62:18
**refuse** 7:15
7:18
**refused**
26:21
**regarding**
14:9 15:18
17:13 36:12
81:19 85:13
100:17,18
**Regards**
96:14
**Regional** 4:8
**registrar**
61:20
**regular** 22:13
**regularly**
26:8
**relate** 68:21
**relating** 3:9
40:17
**relationship**
73:15
**relay** 63:6
95:11
**relayed** 94:5
**relaying**
36:10
**released**
93:16
**remember**
8:14,18
22:23 30:20

30:21,21
33:1 43:1
43:18 53:19
53:22 55:5
55:10 57:3
57:15 66:2
77:19 78:11
79:4,6
80:23 82:23
83:7 85:22
87:9,10,13
89:24 90:5
91:11,12,21
91:24 93:23
95:14 96:21
97:2,3,4,6
97:17 98:6
98:7,8,16
98:23 99:6
99:10
101:10
**removed**
27:1,17,18
27:21,22,23
28:2
**renovation**
39:25 40:1
42:3 88:10
**repay** 70:15
**repayment**
33:9
**rephrase** 9:1
66:13 81:21
**reporter** 8:8
**reporter's**
80:21
**reporters**
47:21
**reporting**
1:24 105:16
**represent** 7:3
98:10
**represented**
6:22 7:1
45:10
**request** 30:15
30:15 77:2
78:21
**requested**

77:1
**reserve** 69:8
69:8,14
**residence**
11:2
**resident**
35:16
**residents**
41:12
**resolution**
61:3,18
62:9
**resolutions**
61:4
**resolve** 26:4
**respondent**
19:25
**response**
87:2
**responsibil...**
80:1
**rest** 55:19
**restriction**
63:13
**result** 12:21
**retained**
62:16
**retention**
3:12 61:18
62:12
**review** 6:9
34:19
**reviewed**
78:18
**RFP** 30:23
**RFPs** 44:13
51:25
**RFQ** 30:23
**RFQs** 44:14
**Rico** 10:15
**right** 5:4,5
6:21 7:17
15:6,10
16:3,14
17:24 18:14
18:22 28:17
30:8 34:8
39:21 40:25
46:21,22

48:23 51:4
51:7 52:4
52:12 53:16
54:3 58:10
58:19 62:4
62:7 64:14
71:17 75:18
76:17,25
78:2,6,7
80:2 81:4
83:23 85:4
86:2,3 88:3
92:2 93:5
95:22 97:17
101:7
103:12
104:104
**right-hand**
40:22
**rights** 7:14
8:4
**ring** 63:22
**risk** 27:12
**Rita** 26:23
**robbery**
98:15
**Rock** 96:13
97:4
**role** 29:13,15
**roll** 54:21,24
**routes** 38:21
42:10
**rumors** 35:5
**run** 26:17
27:11
**runs** 23:14

**────────**
**S**
**S** 3:1 4:1
21:20
105:10
**sale** 61:22
65:15
**sanction**
12:21
**Sandra** 64:9
95:11
**sat** 64:4
**save** 77:3

79:20
**saw** 75:21
**saying** 4:22
52:18,19
60:20 66:4
66:11 77:11
89:8 93:4
100:3
101:15
103:10
**says** 34:9
61:25 62:12
77:24 78:5
81:10,11,11
84:9 85:12
**scanned** 6:18
**school** 20:10
20:14,15,20
20:21 22:16
27:21 28:19
28:21,25
**schooling**
21:17
**schools** 21:7
**scope** 46:3
80:3,6 84:8
**search** 86:17
**SEC** 6:13
11:5 15:21
20:1,3,5
33:22 36:25
40:9 47:6
47:20 58:25
59:11,15,21
61:7 67:25
90:12
**SEC-HPL...**
40:8
**second** 42:25
54:23 55:12
55:15 81:3
**seconded**
55:22
**secretary**
11:20
**Section** 62:11
62:20,21
**sections** 48:6
**securities** 1:1

1:10 2:3,7
2:13 4:16
4:23 14:11
18:19 25:4
61:3 62:16
96:11
105:12
security 5:23
20:6 22:23
22:24,25
23:15
see 14:1
16:12 23:7
26:15,15,16
34:4 52:12
52:15 55:5
55:16 60:17
62:19 70:12
75:22 76:19
78:23 84:24
85:9,22
86:16 96:2
96:3,8,9
seeing 87:9
87:11,13
seen 61:15
selected 31:1
selecting
52:25
self-available
44:2
sell 60:6
selling 45:19
69:22 93:17
semester
21:15,25
22:1
send 70:11
97:19
sending
96:16,17,21
97:2 98:2
senior 92:8
sensitivity
16:1
sent 15:8
34:6 85:23
95:8,9
97:11

sentence
19:17
separately
50:23
September
62:6,7
76:17 83:25
serial 38:19
serve 25:19
served 25:8
services 1:24
80:4
session 49:24
50:1,4,8
83:17,19
set 7:8 14:3
30:5 33:2
39:22 66:10
82:18 88:14
setting 33:7
seven 10:10
10:11
she'll 95:11
shift 20:7
shops 22:13
short 43:18
84:23
shortly 23:25
44:8 70:24
71:15 72:7
show 75:18
81:1 84:19
95:22
showed 71:4
83:24
showing 9:4
34:2
side 16:17
51:3
sign 63:2
signature
61:16 75:25
signed 76:6
76:16 83:22
84:1
significant
86:25
similar 44:14
Simpson

19:6,13
sir 18:24
79:15 87:18
93:11
sit 39:3
sit-down
64:7
sitting 38:9
situation 8:1
19:1 29:12
79:4
situations
75:16
Six 25:16
size 31:16
skeptical
43:17
skills 62:14
slight 69:10
Social 5:23
sold 93:22
100:21
somebody
58:7,10
96:23 97:13
97:14
sorry 25:15
31:15 48:23
51:24 61:24
70:7 71:11
74:24 77:20
81:25
sort 12:21
14:3 46:3
sounds 49:12
49:13
source
103:13
South 2:21
space 66:20
66:21
speak 22:13
34:22 35:2
44:2 53:8
speaker 49:6
52:7
speaking
8:20 18:5
special 83:13

89:4 101:24
specific
81:15 86:21
specifically
82:20 89:6
speculating
84:17
spell 5:18
21:19 32:13
spend 50:14
spoke 81:12
spoken 53:16
82:12 88:18
spot 24:2
spots 27:13
stage 18:15
stamped 40:7
61:11
stance 41:15
standard
13:11
start 52:3,7
started 17:6
42:10 43:25
44:3 99:13
state 4:18
5:18 11:6,6
19:3 29:9
42:6,22
45:14
stated 33:18
45:7
statement
98:1
statements
104:11
STATES 1:1
status 9:20
statutes 7:8
stay 24:7
77:16
stealing 99:9
step 33:25
steps 10:8
stole 99:6
stolen 23:17
stopped 50:8
store 24:4
straight

22:18 33:3
33:8
street 2:14,21
75:4
structure
32:25 88:23
stuff 21:16
23:8 24:16
48:4 89:5
94:5
stupid 74:19
subject 81:8
submitted
30:23
subpoena 3:7
34:1,7
47:11
subpoenaed
4:10
substance
13:24 54:15
substantially
85:25
sue 15:10
99:13
suggest 88:7
88:22
100:23
suggesting
93:8
suggestion
53:2
suggestions
88:5
suing 18:9
Suite 1:11
2:9,22
supervised
12:25 13:1
Supervision
12:23
supposed
28:9 35:12
42:5,22
64:12,14
67:23 90:13
92:13 100:4
102:1
103:16

sure 17:7
18:16 42:14
46:20 53:23
54:6 57:19
57:20,24
58:2 59:25
61:6 64:13
64:22 68:15
72:5,15,18
74:11 75:23
78:17,19
79:15 80:7
80:8 84:10
89:8,12
92:7,9
97:22
102:14
suspect 13:13
suspended
57:8
swear 5:6
97:21
105:11
swearing 5:3
Sweeney
10:16
switch 25:7
60:19
switched
60:16
switching
62:25
swore 27:20
27:25
sworn 5:15

**T**

T 3:1,1
table 83:8
take 9:8
15:11 22:12
26:3 33:25
48:1,3,14
54:4 86:14
89:22 93:20
100:9 102:2
taken 27:13
30:3 38:22
54:9,22

100:11
talk 14:19
  15:1 36:16
  36:18 44:1
  67:19 75:13
talked 37:7
  44:18 64:6
  72:8,14
  75:2 82:14
  82:16 94:15
  94:16
  101:11
talking 10:8
  13:23 30:12
  35:11 37:15
  44:22 45:17
  55:6,6
  59:21 65:23
  66:22,25
  75:12 91:25
  96:23
talks 73:2
Tamika 9:25
tape 50:8
tapes 49:21
targeting
  26:21
taxed 45:18
taxes 33:2
taxpayers
  31:9
team 62:15
technically
  17:21
Telephone
  2:6,12
tell 5:7 9:2
  25:24 32:3
  32:22 39:4
  41:7 61:17
  77:8 90:17
  90:18,19
  99:22
telling 59:2
  74:22
ten 90:17
tend 7:16
term 25:15
  67:12

terms 14:13
  32:18,24
territory
  51:2
testified 5:15
  11:4
testify 35:7,8
  35:12 104:5
testimony
  4:10 6:23
  7:11 8:6 9:5
  9:6,6,14
  28:19 34:1
  34:12,14,16
  34:20 36:16
Thadeus
  26:23
thank 5:11
  7:7 8:5
  14:24 18:24
  25:7 33:21
  46:22 54:18
  63:15 70:20
  80:10 87:3
  88:1 90:20
  93:12 95:19
  100:19
  103:23
  104:1,17
Thanksgivi...
  81:17 82:3
  82:6,7
thick 43:19
thing 5:24
  13:14 52:19
  65:1
things 7:21
  12:2 14:2
  15:1,3,10
  16:2 17:19
  33:16 46:11
  50:13 59:25
  69:12,13
  75:1 86:18
  86:20 89:21
  94:17
think 12:14
  13:2 14:1
  15:23 16:5

16:16 18:7
  23:16 25:21
  30:11 32:6
  35:20 36:17
  39:22 44:19
  45:15,16,21
  46:8,14
  48:15 49:6
  49:11 50:3
  52:13,13
  53:5,22
  56:11 62:2
  62:5 64:25
  65:5,9,17
  65:17 66:9
  66:10,19
  67:20,21
  68:22,25
  70:24 71:13
  71:14 72:22
  73:1,4,11
  73:19,19,20
  74:9,19
  76:19 77:9
  78:12 83:25
  84:13,15
  85:13 86:11
  86:18 88:20
  90:25 92:11
  94:9 101:22
  103:7
third 42:25
Thornton
  20:15
thorough
  31:23
thoroughly
  41:12
thought
  37:24 43:2
  53:9 71:14
  82:15 84:25
  88:14
  103:16
threatened
  12:20
three 11:2
  12:5 21:1
  27:2,18

30:6
throwing
  100:5
thrown 83:8
thumbed
  17:9
time 4:3
  12:11 19:13
  20:3,3,5
  22:5 27:11
  29:21 30:11
  30:19 41:9
  44:1 45:6
  45:15 46:7
  46:12,17,21
  46:24 47:4
  48:3,3 49:7
  49:10 50:14
  53:19,20
  54:4,7,11
  55:5 56:2,2
  56:19,25
  57:11,15,16
  58:10,21
  60:11 68:5
  70:14 71:23
  74:4,14,21
  75:17 78:6
  85:16 94:19
  95:10 96:14
  97:5 100:10
  100:13
  101:3,4,5
  102:19
  104:3
timeline
  101:18
times 12:3
  42:24 64:6
  68:17 98:8
tips 16:9
title 31:22
  96:5
titles 11:18
today 4:7,10
  6:11,23 8:9
  9:5,14 34:8
  34:12,13,14
  34:15,20

35:3 37:14
  50:18 85:13
  104:7,11
told 35:4,9
  40:5 42:24
  59:6 63:3
  67:21 75:8
  90:14 98:15
top 22:15
  55:14,14
  84:23 85:10
topic 75:3
totally 48:16
touch 82:1,2
town 59:18
Township
  20:15
trading
  16:12
trailers 23:6
  23:8 24:3
training
  16:11
transaction
  93:10
transcript
  3:10 47:10
  51:16
  105:15
transcription
  47:16 49:9
transcripti...
  47:22
transition
  86:20
tree 40:15
trial 19:6,14
tried 75:14
  77:12
triplets 10:20
  10:21
trucks 23:8
true 68:3
  105:15
trustee 61:20
trustees 25:9
  41:3 68:22
  69:2 75:3,5
truth 5:7,7,8

truthful 9:14
try 13:17
  26:4 60:6
  66:20 67:4
  67:17 79:20
  87:1 88:8
  94:4 97:22
trying 16:1
  18:16 29:11
  51:5 53:18
  56:12 59:10
  59:10,13
  60:9 65:6
  66:12 77:3
  79:23 84:2
  97:9
Tuesday 1:13
  105:7
turn 40:21
Turner 41:10
  45:9
twice 3:14
two 25:21
  42:15 43:15
  64:17 65:20
  69:10 81:5
  85:4
type 32:11
  41:20 89:23
  93:23
  101:12
  104:16
types 88:23
  88:24
Typically
  17:14
Tyson 68:17
  68:22,23
  69:1 87:12

U

U.S 9:18
  105:12
Uber 24:21
uh-huh 8:13
  13:8 49:18
  52:11 66:5
ultimately
  17:20 51:21

Page 119

uncertainly 86:19
uncovers 6:15
undersigned 105:11
understand 4:20 6:24 7:8,14,17 8:23 9:2,10 18:16 36:4 41:13 51:7 58:21 60:3 81:22
understan... 15:15 37:23 49:25 56:13 67:11 90:22 93:15,18,19
understood 8:25
undertaking 94:3
underwriter 29:22,24 31:1,21,23 32:1,18 38:24 43:12 51:18 53:1 53:4,14 58:22 60:4 60:5,13 61:19 62:12 62:17 71:2 72:4
underwriters 30:16 44:15 52:23 93:9
underwriti... 32:19 44:6 56:4,16
underwritt... 31:19
unfortunate 19:5,12
UNITED 1:1
use 44:24 75:14
useful 46:16

uses 6:14
usually 10:23 23:7 28:11 63:1 95:10

**V**
various 16:8 18:4
verbal 8:14
verbatim 8:11
versus 38:19 88:24
Vesey 2:14
vetting 95:15
vice-presid... 11:20
view 51:15
viewed 50:18
violating 27:5
violation 14:10
violations 4:15,18,25 18:19
voiced 92:4
vote 29:18,18 31:3 41:4,4 41:8 44:24 86:5
voted 41:3,7 41:14,16 42:11 45:3 45:4,24 46:12,24 47:1,2 55:25 61:24 62:8 71:3 86:5,8,10 101:12
voters 45:4

**W**
wait 80:20,21 100:24 101:16
waiver 50:19
Walker 63:20,22

95:24 96:1 97:12
walls 54:2
want 11:7 14:25 15:14 26:20 27:12 31:9 33:10 45:24 46:20 48:1,3,6,14 50:10,11,12 50:16 55:20 62:23 68:21 75:18 78:12 78:14 80:7 81:16,21 84:16,23 88:8 100:7 102:13
wanted 14:18 44:1 51:9 53:3,6 55:11 66:21 72:4,15 79:1 94:14 97:14,24 99:4
wanting 69:24
wants 82:17
warrant 26:24
warrants 18:18
wasn't 35:25 41:23 45:22 47:3,3 57:9 67:1 75:1 78:5,19 83:6 98:2
watch 29:9
water 99:21
way 29:12 41:12 56:5 65:3,7 93:21 104:16
ways 66:3,14
We'll 5:3
we're 4:14,22

8:19 13:20 14:2,6 15:2 15:3 17:1,3 17:16 18:5 18:13,15 48:11,18 54:7,10 69:16 75:12 85:7 100:10 100:12
we've 14:13 47:25 54:3
weekly 64:8
welcome 93:13 95:20
went 6:5 9:11 20:22,23 21:8 22:18 27:2 47:20 50:7 52:20 64:9 69:6 77:15 78:1 78:9 86:17 90:11 98:6
weren't 42:19 81:15
West 1:11 2:9
Western 21:8 21:9,13 22:1
whiskers 43:19
wife's 9:24
Wilcox 2:6 4:6 31:14 31:16 32:15 70:4,7,9,20 79:11 87:4 87:6 92:14 92:17 94:25 95:2,3 102:25 103:2
wild 100:5
Wiley 37:3 64:20 81:12 82:11,16,20
Williams

12:14,19 19:2,4
wish 16:7 104:10
witch 7:22,23 14:8
withdrawals 33:8
witness 1:8 2:17 3:3 5:14 12:13 13:12 14:15 36:18 51:11 63:10,14 69:4 71:19 80:22 85:6 104:12,15 105:5
witnesses 5:1 104:4
women 92:9
worded 41:11 56:6 65:3
wording 45:10,23
words 90:7
work 23:11 23:13 26:1 29:19,22 38:5 56:22 73:10 74:1 79:3,13,17 80:3 81:14 84:8,14 103:18
worked 23:3 73:3,24
workers 29:10
working 30:19 37:17 38:11 39:6 73:15
works 8:7
wouldn't 23:17 28:9 33:4 64:3,5 65:11

write 96:10
written 57:12 57:14
wrote 74:20 96:5

**X**
X 88:8

**Y**
Y 88:8
yeah 12:1,2 13:2 22:20 32:11 33:10 40:24 41:15 41:23 48:18 49:8 52:20 55:18 56:11 57:9 59:23 69:5 71:19 76:11 78:4 78:4,4 79:6 82:5,8 83:2 83:14 86:7 92:3 93:2 93:19 96:3 97:13,18,19 100:9 101:7 101:22
year 20:18 24:13 30:1 42:15 44:20
years 11:2 12:6,12,15 12:17 21:1 21:13 23:16 25:16,21 29:10 30:6 33:17 38:21 42:15 48:5 53:22,23
yesterday 81:12
yield 37:19 37:24 98:4
York 2:15,15

**Z**
Z 88:8
Zuccarelli

26:23

**0**
0040 61:11
0043 61:12
0051 76:1,2
0690 6:2
08 30:7
09 25:16 30:8

**1**
1 1:9 6:13 7:9
1:58 54:7
10 10:17 30:4
30:8
100-percent
61:6 80:8
89:8,12
100,000
45:17,20
106 1:9
109 48:22,23
52:3,8
11 30:3
12 1:13 42:7
47:17 105:7
12,000,000
45:13
12:58 1:16
4:3
12th 4:3
98:22
13 10:18,18
10:19 27:22
47:17 54:19
131 2:21
14 47:19
52:13
14th 96:4
15 10:18 77:6
77:16,17
79:3,21
83:6
15,000 76:23
79:25 80:1
83:6 84:4
152 27:21
16 76:10
16,000,000
41:19 45:6

46:3
1662 6:13,17
7:9
16th 76:17
1700 2:22
175 1:11 2:9
18 27:22
18th 47:18
1990 20:19
19th 47:19
49:16

**2**
2:11 54:11
20 77:5,5
20,000 76:22
79:20
200 2:14
2000 25:16
2000s 12:10
12:11
2008 30:4
2009 25:17
25:18 30:4
31:7
2011 3:9
25:15 26:24
28:2 31:10
40:4,17
46:18,19
62:1
2013 42:17
47:17
2014 47:17
47:18,18
49:16 54:20
55:1 60:12
62:8 71:9
71:18 76:10
76:17 81:9
81:20
2015 25:16
39:21 84:21
85:15 96:4
98:22
2016 1:13 4:3
105:7
202 1:25
21 10:15

22 10:16
25 77:4
26 81:2,7
84:21,25
26th 85:15
27 84:20,20
84:25 85:6
28 95:23
294 24:5
2nd 81:9 82:8

**3**
3 62:11,20
3:09 100:10
3:16 100:13
3:21 104:19
104:20
30th 62:6,7
312 2:24
324-8400
2:24
33 3:7
3433 40:23
3440 40:8
39 23:19

**4**
4 45:8 62:21
90:13
4-1-72 6:4
4,000,000
42:7 43:4
66:18
4.5 67:23
90:13 98:6
40 3:9
40,000 78:1
78:10 79:2
79:23
408 5:22
432 48:21,25
49:2 52:9
52:10,13
435 48:25
49:3,4
51:10,11,14
467 1:25
47 3:11

**5**

5 3:4 98:6
5,000 85:14
5,000,000
66:18
5.05 98:4,11
50 76:20
52 77:22
56 75:19
5th 61:25

**6**
60604 1:12
2:10 105:8
60606 2:23
61 3:7,8,12
3:14 33:22
34:2 40:7,7
40:9,12,16
62 3:10 47:6
47:10,10,15
63 3:12 61:7
61:11,11
6th 47:18

**7**
7 67:20 68:8
7-percent
68:10,14
70 31:10

**8**
8th 54:20
55:1 57:23
60:12

**9**
90 21:5,6
900 1:11 2:9
90s 12:9 19:8
19:9 21:24
9200 1:25
93 21:5,6
94 22:2 23:21
95 19:10 22:2
23:19,21
96 19:10
23:23
97 23:23