THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:            )

                             )  File No. C-08209-A

HARVEY PUBLIC LIBRARY        )

DISTRICT BONDS      .        )


WITNESS:  Danny Weeks

PAGES:    1 through 185

PLACE:    Securities and Exchange Commission

          175 West Jackson Boulevard, Suite 900

          Chicago, Illinois 60604

DATE:     Wednesday, September 30, 2015


     The above-entitled matter came on for hearing,

pursuant to notice at 9:00 a.m.


Diversified Reporting Services, Inc.

(202) 467 9200

Page 2

APPEARANCES:

On behalf of the Securities and Exchange Commission
    NATALIE GARNER, ESQ.
    JONATHAN WILCOX, ESQ.
    JOSEPH CHIMIENTI, ESQ.
    Securities and Exchange Commission
    Division of Enforcement
    175 West Jackson Boulevard
    Suite 900
    Chicago, Illinois 60604
    312-886-3803
    garner@sec.gov

On behalf of the Witness:
    RICHARD E. BRODSKY, ESQ.
    200 South Biscayne Boulevard
    Suite 1930
    Miami, Florida 33131
    786-220-3328
    RBrodsky@thebrodskylawfirm.com

Page 4

CONTENTS (CONT.)

EXHIBITS DESCRIPTION                IDENTIFIED:
46    E-mail from Kempf to
      Weeks                  151
47    Email from Weeks to
      Schleicher 1/14/15          158
48    Message from Weeks to
      Nash 1/15/15            171
49    E-mail to Vasileios Sfyris      176

Page 3

CONTENTS

WITNESS                 EXAMINATION
Danny Weeks                   6

EXHIBITS DESCRIPTION              IDENTIFIED
36    Subpoena              10
37    Questionnaire           14
38    E-mail from Walker
      To Jarvis 11/18/14        125
39    E-mail 1/12/15           130
40    E-mail from Weeks to
      Greg Davis           132
41    E-mail to Erik Schleicher
      Dated 12/17/14          136
42    Bloomberg message
      Dated 12/18/14          140
43    E-mail to Glen Williams
      Dated 12/18/14          144
44    Response to Charlie Kempf     146
45    E-mail from AG
      Dated 1/12/15           149

Page 5

PROCEEDINGS

MS. GARNER: We're on the record. The time is 9:45 a.m. It is September 30, 2015. My name is Natalie Garner. And with me is John Chimienti and John Wilcox. We are in the Division of Enforcement of the SEC and we are all officers of the Commission for purposes of this testimony. This testimony is taking place at the Chicago Regional Office of the SEC. Your testimony has been subpoenaed today in connection with an investigation called "In the Matter of: Harvey Public Library District Bonds, Case Number C-9209."

We are here to determine whether there has been violations of certain provisions of the federal securities laws. However, you should know that facts developed during the course of our investigation may constitute violations of other federal and/or state laws or regulations.

Do you understand that?

MR. WEEKS: Yes.

MS. GARNER: Let's swear you in. Could you raise your right hand, please?

Whereupon,

DANNY GARLAND WEEKS,

was called as a witness, and after having been first

Page 6

1 duly sworn, was examined and testified as follows:
2 EXAMINATION
3 BY MS. GARNER:
4 Q Can you please state and spell your full
5 name for the record?
6 A Danny, D-A-N-N-Y, Garland, G-A-R-L-A-N-D,
7 Weeks, W-E-E-K-S.
8 Q Can you please state your home address?
9 A 6405 Woodmont W-O-O-D-M-O-N-T Boulevard,
10 Peachtree Corners, Georgia 30092. They created a new
11 city a couple of years ago.
12 Q Could you please state your Social
13 Security Number and birthdate?
14 A ▮▮▮▮▮▮▮▮▮▮
15 Q And before we went on the record, I
16 provided you with a copy of the Formal Order in this
17 investigation. Have you had an opportunity to
18 review it?
19 A As much as necessary.
20 Q And before going on the record, I also
21 handed you a copy of SEC Form 1662, which has been
22 previously marked as Exhibit 1. Have you had an
23 opportunity to read the Form 1662?
24 A Is that this one? (Indicating)
25 Q Yes. I'm asking you did you review it,

Page 7

1 but did you have an opportunity to review it?
2 A I did not review it.
3 Q But you had a chance to?
4 A Since I have sitting here, yes.
5 Q And do you have any questions regarding
6 the Form 1662?
7 A No.
8 MR. BRODSKY: If you have them, ask them.
9 THE WITNESS: I don't know at this point.
10 Can I reserve the right to ask something at a later
11 time?
12 MS. GARNER: Sure.
13 THE WITNESS: Before we get started, I think
14 there needs to be some clarification of an e-mail that
15 was sent to you from Mr. Brodsky stating that I was
16 primarily the person involved in --
17 MS. GARNER: Okay. Well, we can get to
18 that. I just want to get, you know, all the
19 preliminaries out and let you know about your rights
20 and then we can address that.
21 THE WITNESS: That works.
22
23 BY MS. GARNER:
24 Q You have a right to be accompanied,
25 represented by an attorney. You can have your

Page 8

1 attorney present here today to advise you during and
2 after your examination today. Do you understand
3 that?
4 A Yes.
5 Q Are you represented by counsel?
6 A Yes.
7 MS. GARNER: And, Mr. Brodsky, if you could
8 identify yourself for the record?
9 MR. BRODSKY: Richard E. Brodsky from the
10 Brodsky law firm in Miami, Florida.
11 MS. GARNER: And do you represent the
12 witness?
13 MR. BRODSKY: Yes, I do.
14 MS. GARNER: And do you represent any other
15 entity or person in connection with this
16 investigation?
17 MR. BRODSKY: Yes.
18 MS. GARNER: And who are they?
19 MR. BRODSKY: IFS Securities, Inc., Alvin
20 Boutte, Jr. and Craig Walker.
21 BY MS. GARNER:
22 Q And, Mr. Weeks, do you understand that
23 Exhibit 1, Form 1662, sets forth criminal penalties
24 for knowingly providing false testimony or knowingly
25 using false documents in connection with this

Page 9

1 investigation?
2 A Yes.
3 Q Do you understand that you have the right
4 to assert your Fifth Amendment privilege and refuse
5 to answer any question that may incriminate you?
6 A Yes.
7 Q Just to go over some ground rules for the
8 testimony, everything is being recorded today by the
9 Court Reporter, my questions and your answers. I'd
10 ask that you answer audibly and clearly. She can't
11 pick up the shaking of the head and the "huh-huh" or
12 "uh-uhs" are difficult for her?
13 A Okay.
14 Q I'd ask that you wait for me to finish my
15 question before answering. And I'll wait for you to
16 finish answering before I ask my next question. Let
17 me know if you don't understand a question. If I
18 ask you a question and you provide me an answer, I
19 am going to assume you understood my question. If
20 you need to take a break at any time, let me know or
21 let your attorney know and we'll go off the record?
22 A Okay.
23 Q I'm going to be showing exhibits today,
24 like I did with Exhibit 1. You are free to look at
25 them during the testimony today, but when we're done

Page 10

1 today, you have to leave those behind. You can't
2 take them with you.
3 A Okay.
4 Q Do you understand everything that we went
5 over?
6 A Yes.
7 Q Is there any reason why you wouldn't be
8 able to provide complete and truthful testimony
9 today?
10 A No.
11 Q Have you ever testified in another
12 investigation or inquiry brought by the Commission
13 or its staff?
14 A No.
15 Q Have you ever been indicted or convicted
16 of a crime by state or federal authorities?
17 A No.
18 Q And have you ever been named as a
19 Defendant or a Respondent in an action brought by
20 the Commission?
21 A By the SEC specifically?
22 Q Yes.
23 A To my knowledge, no.
24 (SEC Exhibit 36 was marked
25 for identification.)

Page 11

1 BY MS. GARNER:
2 Q I'm handing you what is marked as Exhibit
3 36. This is a copy of the testimony subpoena that
4 you are appearing pursuant to today?
5 A Yes.
6 Q And other than meeting with your attorney,
7 did you do anything to prepare for today's
8 testimony?
9 A No.
10 Q Did you review any materials or records in
11 preparation for your testimony today?
12 A I really did not.
13 Q Did you speak with anyone other than your
14 attorney about your appearance here today?
15 A I did not. Well, my wife.
16 Q Did you discuss what your testimony would
17 be today?
18 A No, I just told her that I had to come here.
19 Q I think this is probably a good time to
20 take a break. Let's go off the record. It's
21 9:52 a.m.
22 (A brief recess was taken.)
23 BY MS. GARNER:
24 Q We're back on the record. The time is
25 10:18 a.m. And Mr. Weeks, can you confirm that

Page 12

1 during the break that you had no conversations with
2 either myself or Mr. Chimienti or Mr. Wilcox
3 regarding the substance of the investigation?
4 A I did not.
5 Q Thank you. And did you speak with anyone
6 other than your attorney during the break?
7 A No.
8 Q All right. Before we go forward, I
9 understand you wanted to clarify --
10 A Yes. The e-mail that Mr. Brodsky sent you
11 saying that I was primarily --
12 Q This is a production document that was
13 produced.
14 MR. BRODSKY: No. An e-mail that I sent you
15 about ten days ago. I'll get you the date in a
16 second. Here it is. I'll read you the notes. It is
17 September 24, 2015 and it says from my end,
18 9:23 a.m. it says, "I assume..." I'm quoting. "I
19 assume that the term 'underwriting desk' refers to
20 the persons within IFS responsible for the sale of
21 bonds of which the firm is the lead or sole
22 underwriter. Testimony in this matter indicates
23 that the person primarily involved in this activity
24 for Harvey Library Bonds was Mr. Weeks. Telephone
25 calls made by the underwriting desk are not

Page 13

1 recorded."
2 Danny wants -- Mr. Weeks wanted to clarify
3 or comment on my statement that was made frankly
4 without consultation with him.
5 THE WITNESS: First of all, I'm not an
6 underwriter. I'm not the underwriter at IFS. I am a
7 salesman and we wear different hats there to a degree.
8 Do I participate occasionally and give my thoughts on
9 something? Yes. Do I comment on trading? Yes. But
10 you have as far as the attempted sale of these bonds,
11 you had Keith Wakefield. You had Charles Knox. You
12 had a young guy by the name of Will Scribbin.
13 Everybody that was doing anything as it related to
14 institutional fixed income at IFS was making an effort
15 to sell these bonds. So to say that I was -- the way
16 I took that, I was the sole person there doing that,
17 is incorrect.
18 MR. BRODSKY: I'll say by commentary, I was
19 not intending to represent that he was solely
20 responsible and we can debate that. He and I suppose
21 could debate as to whether or not it is fair to
22 characterize him as being "primarily responsible". I
23 want you to know he did not adopt that e-mail in the
24 sense of having proofed it. So this was my
25 representation. I'm not going to modify the

Page 14

1　representation, but he has a right, I think, to
2　clarify it in his instance.
3　　　MS. GARNER: Okay.
4　　　MR. BRODSKY: Thanks.
5　　　　(SEC Exhibit 37 was marked
6　　　　for identification.)
7　　　BY MS. GARNER:
8　　Q　I'm handing you what has been marked as
9　Exhibit 37. You have a copy of the background
10　questionnaire?
11　　　MR. BRODSKY: I'll take it.
12　　　BY MS. GARNER:
13　　Q　Is this the questionnaire that you
14　provided to the SEC at our request, Mr. Weeks?
15　　A　Yes.
16　　Q　And to the best of your knowledge is the
17　information that you provided in the questionnaire
18　complete and accurate?
19　　A　Yes. But on the wives it is in the wrong
20　order. I just noticed that. I think this was on the
21　first one, but not the second one.
22　　Q　Other than the order of your spouses, is
23　there anything else that you wish to change or
24　clarify in your responses?
25　　A　Not that I know of.

Page 15

1　　Q　So let's -- I want to take a minute to go
2　through this. Going to Page 3 under "Educational
3　History", is that the University of Chattanooga?
4　　A　It is.
5　　Q　And what degree did you receive there?
6　　A　I didn't get a degree. As I never could get
7　pass the History of Western Civilization. And I
8　finally just got tired of taking it.
9　　Q　What did you study there?
10　　　MR. BRODSKY: History of Western
11　Civilization.
12　　　THE WITNESS: A lot. Business and Economics
13　is what I was studying there.
14　　　BY MS. GARNER:
15　　Q　And how long did you attend?
16　　A　Five years, off and on.
17　　Q　And what years were those?
18　　A　19 -- started in '65 and I think it was --
19　'69 was the last. I think at that point I said
20　enough.
21　　Q　And you hold your Series 7 license?
22　　A　I do.
23　　Q　And your Series 24, is that right?
24　　A　When I took -- I believe at the time I took
25　it, it was Series 8, the Branch Managers examination

Page 16

1　which I think later became 24. And after Prescott
2　Ball & Turben, even though I passed it, it didn't seem
3　to get picked up. As a matter of fact, I'm trying to
4　get it reinstated.
5　　Q　And do you have any other licenses?
6　　A　I guess the all states 63.
7　　Q　Series 63?
8　　A　Yes.
9　　Q　All right. And you're currently employed
10　at IFS, correct?
11　　A　Correct.
12　　Q　I'm going to go through your employment
13　history. You started at '90. So I guess what I
14　want to ask, what were you doing between -- when did
15　you hold your first job, your first full-time job?
16　　A　Probably 19 -- late '69 or early '70s.
17　　Q　What were you doing between May or
18　December '89 and 1970?
19　　A　Let me clarify something here. On the U4,
20　and I don't know why, because everything was put in
21　there, it doesn't pick up. It doesn't go back further
22　than this. Although, I started in the business --
23　excuse my exact memory. I believe it was September or
24　October of '77 with a firm called Henderson Few.
25　　Q　How do you spell "Few"?

Page 17

1　　A　F-E-W.
2　　Q　They were -- it was purely a bond firm at
3　that time. And I was in the Atlanta office and I
4　passed the state securities test. And the
5　requirements -- they were not a full line broker
6　dealer. So I didn't have a Series 7. I left there
7　and went to Arch W. Roberts & Co.
8　　Q　And when was that?
9　　A　It was about six or seven months after I
10　started with Henderson Few. Henderson Few was a --
11　primarily high yield to retail at the time and I just
12　didn't like doing that. And I started calling on
13　small institutions. Arch Roberts & Co. was a bond
14　firm also, not a full licensed firm. They had opened
15　an office in Atlanta and they were interviewing or
16　looking for institutional salespeople. And as Jeff
17　Foxworthy says, "I are one" or at least thought I was
18　at the time. So I would join them. And I was with
19　Arch W. Roberts for four years. I went with
20　Interstate Securities in Atlanta. I was with them --
21　honestly I can't remember the exact timetable. I went
22　back to Arch Roberts. And then a year or so later I
23　went back to Interstate.
24　　Q　Okay.
25　　A　And then from Interstate I went to Prescott

Page 18

1   Ball and Turben where I opened an office in Atlanta
2   for Prescott Ball & Turben.
3       Q   All right. Let's take a step back. So
4   you were at Henderson Few from about September or
5   October '77 to what you say early '78?
6       A   Yes.
7       Q   And you were at Arch, is that A-R-C-H W.
8   Roberts & Co.
9       A   W. Roberts & Co.
10      Q   And then from there you went to Interstate
11  Securities?
12      A   Securities.
13      Q   About when was that?
14      A   About four years. So I was with Arch right
15  about four years.
16      Q   So when did you go to Interstate
17  Securities? You were at Arch for four years?
18      A   Yes.
19      Q   So about '82?
20      A   About '81, '82 I went to Interstate and then
21  I went back to Arch Roberts for about a year and then
22  I went back to Interstate.
23      Q   Okay. So how long were you at Interstate?
24      MR. BRODSKY: Which time?
25      THE WITNESS: Which time?

Page 19

1       BY MS. GARNER:
2       Q   The first time.
3       A   I'm trying to remember exactly. I want to
4   say -- I don't believe -- I'm trying --
5       MR. BRODSKY: Slow down. If you have a
6   memory, tell it. If you don't, say so. If you could
7   approximate, say so. Do your best, but slow down.
8       THE WITNESS: Approximately one year.
9       BY MS. GARNER:
10      Q   So about '83ish you went to Arch W.
11  Roberts for the second time?
12      A   I believe it was sometime in '82, late '82.
13      Q   And then from Arch W. Roberts you went
14  back to Interstate?
15      A   I went back to Interstate.
16      Q   Okay. We've got to be careful not to talk
17  over each other.
18      A   I'm sorry.
19      Q   It's okay. And how long were you at
20  Interstate Securities the second time?
21      A   I believe I would have to go back and check.
22  I believe it was about three and a half years or so.
23      Q   So you left in about '85 or '86?
24      A   I believe that's about right, '84, '85.
25      Q   So where did you go after that?

Page 20

1       A   Prescott Ball & Turben.
2       Q   Could you spell that for the Court
3   Reporter, please?
4       A   P-R-E-S-C-O-T-T, B-A-L-L, T-U-R-B-I-N, I
5   believe.
6       Q   And where did you go -- and we're going to
7   go back. And I have questions about each of them.
8   I just want to figure out where you were.
9           So where were you -- how long were you at
10  Prescott Ball & Turben?
11      A   Three plus years.
12      Q   So there about '88 to '89?
13      A   Yeah.
14      Q   '87 to '88 you left?
15      A   '88 I believe it was.
16      Q   And where did you go after that?
17      A   A Webster Dougherty.
18      Q   W-E-B-S-T-E-R? And how do you spell
19  D-O-U-G-H-E-R-T-Y, I believe.
20      A   D-O-U-G-H-E-R-T-Y, I believe.
21      Q   And how long were you there?
22      A   Not quite a year.
23      Q   I'm sorry?
24      A   About that. There is reasons for that, but
25      --

Page 21

1       Q   We'll get to that. So after A Webster
2   Dougherty, where did you go?
3       A   Williams Capital.
4       Q   Are these all in Atlanta?
5       A   Dougherty was in Philadelphia as was
6   Williams Capital.
7       Q   Were you located in Philadelphia too?
8       A   Yes, I was.
9       Q   And where is Prescott Ball?
10      A   They were originally out of Cleveland. They
11  had a huge office in Cleveland and a huge office in
12  New York and I had opened the Atlanta office.
13      Q   How long were you at Williams Capital?
14      A   Can I refer to my notes?
15      Q   That is good. We'll stop there. I just
16  want to get an idea of what you were doing between
17  '69 and '77?
18      A   Well, I was with 3M Company and then I -- a
19  friend of mine's father was in the carpet business and
20  told me that I should come to work in the carpet
21  business, so I did that. And did that between
22  manufacturers and then having a retail store in
23  Cartersville. Then it was about a two-year time
24  period there. After we sold the business in
25  Carterville, then I went to work for Henderson Few.

Page 22

1    Q   And what did you do at 3M?
2    A   I was in sales.
3    Q   And were you also in sales in the carpet
4  business?
5    A   Yes.
6    Q   Thank you. Okay. Let's go back to
7  Henderson Few. That's a bond firm you said?
8    A   Yes.
9    Q   What was your position there?
10   A   I was a salesman.
11   Q   So you were selling bonds?
12   A   Yes.
13   Q   Was the firm underwriting bonds?
14   A   Yes.
15       MR. WILCOX: Municipal bonds?
16       THE WITNESS: Yes.
17       BY MS. GARNER:
18   Q   And how many offerings were you working on
19  when you were selling the bonds, do you recall?
20   A   I honestly don't.
21   Q   And then at Arch Roberts, were you also a
22  salesperson?
23   A   Yes.
24   Q   Were you selling municipal bonds?
25   A   Yes.

Page 23

1        MR. WILCOX: To institutions or to retail
2  investors?
3        THE WITNESS: Institutions.
4        BY MS. GARNER:
5    Q   What about at Henderson, was that
6  institutions or retail investors?
7    A   I was hired initially to sell to retail and
8  I honestly didn't like it, didn't want to do it. I
9  started on my own calling on small regional type
10  insurance companies.
11   Q   And then Interstate Securities, where was
12  Interstate Securities?
13   A   They were out of Charlotte, North Carolina.
14  That is where there office is.
15   Q   And were you doing sales there?
16   A   Yes.
17   Q   And were you underwriting bonds?
18   A   Yes.
19   Q   Muni bonds?
20   A   Among other things, yes.
21   Q   And so were you sell muni bonds?
22   A   Yes.
23   Q   Were you selling other bonds, corporate
24  bonds?
25   A   I did on a couple of occasions, yes.

Page 24

1    Q   Would you say your work was primarily
2  selling muni bonds?
3    A   Yes.
4    Q   Institutional investors?
5    A   Yes.
6        MR. WILCOX: You were selling both newly
7  issued as well as secondary market bonds?
8        THE WITNESS: Yes.
9        BY MS. GARNER:
10   Q   Why did you leave Henderson Few
11   A   They were, as I said, they were primarily
12  selling higher yield paper to individuals. I didn't
13  particularly like that. That was the nature of their
14  business.
15   Q   And then why did you leave Arch W. Roberts
16  to go to Interstate Securities?
17   A   Seemed like a better offer at the time.
18   Q   Did it turn out not to be?
19   A   Initially, yes.
20   Q   So why did you leave Interstate Securities
21  and go back to Arch W. Roberts?
22   A   Because as I said, it appeared to be better.
23  At the time it wasn't. I went back to Arch.
24   Q   And at Arch were you still selling muni
25  bonds --

Page 25

1    A   Yes.
2    Q   To institutional investors?
3    A   Yes.
4    Q   So why did you go from Arch back to
5  Interstate?
6    A   It got better.
7    Q   And were you doing the same thing --
8    A   Yes.
9    Q   -- the second time around at Interstate?
10   A   Yes.
11   Q   So why did you leave Interstate to go to
12  Prescott Ball & Turben?
13   A   We had a sales manager at Interstate by the
14  name of Wally Coker, a nice guy but he and I kind of
15  butted heads. Our loan revenue trader was a a
16  gentleman by the name of Lou Salter who was in
17  New York. Lou left Interstate and went to Prescott
18  Ball & Turben and they made a hard rush to get me to
19  come to work for them and I finally did.
20   Q   And you opened the Atlanta office?
21   A   Yes.
22   Q   And how many people are in that office?
23   A   I think at -- I think at its largest point
24  between -- we had a couple of -- I think at the
25  largest point maybe ten. I'm honestly -- I can't

Page 26

1 remember exactly. But when we started, when we first
2 opened the office, it was myself, a guy by the name of
3 Jim Means. I believe it was Charley Hill. I'm trying
4 to remember the young girl that came as the assistant.
5 I can't remember her name right now. And then shortly
6 after that hired a couple of other people. And then
7 Prescott or Jack Lukehart who ran a portion of
8 Prescott, hired a couple of guys that were on the
9 government side and they were -- I can't remember who
10 they were with, but they were in the Atlanta area with
11 someone and they hired them and they were there.
12 So -- and then they brought one or two other people
13 with them. So at that time I was spending a lot of
14 time in New York with Prescott. They wanted me more
15 on the institutional desk in New York. So I would go
16 from Atlanta to New York and I spent more time there
17 than I did in Atlanta.
18 Q So you were again selling muni bonds to
19 institutional investors?
20 A Yes.
21 Q Were you doing anything else?
22 A Some corporates, yes.
23 BY MR. WILCOX:
24 Q Were you managing other salespeople at
25 Prescott?

Page 27

1 A Initially, I was in Atlanta, but as I was
2 more -- spending more time in New York I really
3 wasn't. And when they hired the government guys, they
4 actually took over the manager's position there.
5 Q And what types of institutional accounts
6 did you sell to?
7 A Mutual funds, managed funds, insurance
8 companies.
9 BY MS. GARNER:
10 Q Why did you leave Prescott Ball?
11 A They wanted me to move to New York. So I
12 showed them. I moved to Philadelphia.
13 Q And what were you doing at A Webster?
14 A Selling municipal bonds to institutions.
15 Q And who did you primarily sell the muni
16 bonds to when you were there?
17 A Institutions.
18 Q What type of institutions?
19 A Same people I have been talking to, mutual
20 funds, managed funds, insurance companies.
21 Q And why did you leave A Webster?
22 A The gentleman that hired me as the sales
23 manager at the time was a gentleman named of Al
24 Williams. And the gentleman that owned or ran
25 Dougherty was a gentleman by the name of Tino Allio, I

Page 28

1 believe.
2 Q Can you spell --
3 A I can't. I'm sorry.
4 Q And when Al left, he started his own firm
5 and he and I -- he was the reason I went there and I
6 liked him and his son was a trader and needless to
7 say, I went over with him.
8 Q And were you selling muni bonds too?
9 A Yes.
10 Q To institutional investors?
11 A Yes.
12 Q Mutual bonds?
13 A Same people.
14 Q Same people?
15 A Yes.
16 BY MR. WILCOX:
17 Q The size of the accounts that you covered,
18 were they large insurance companies or smaller ones?
19 A Well, doing business with Guardian Life. I
20 was doing business with Fidelity Funds, with Mass
21 Financial, with Scudder Stevens & Clark.
22 S-C-U-D-D-E-R. It is now Deutsche Bank I think is who
23 bought them. At the time I was doing business with
24 Crum & Forster, Ohio Casualty. There may have been a
25 few more.

Page 29

1 MR. WILCOX: Any bank portfolios that you
2 would place bonds with?
3 A I never really talked to banks. I will
4 clarify that. I did business with banks one time in
5 my career and that was at Arch W. Roberts & Co. we
6 were doing invested sinking fund bonds at the time and
7 you always had a little strip of special ops and I
8 used to sell those to Wachovia in Winston-Salem.
9 That's the extent. And after we didn't do that
10 anymore, I didn't talk to the bank anymore. The
11 dealer desk I would talk to. Occasionally, I would do
12 business with the dealer desk, not with the portfolios
13 or the Trust Departments.
14 BY MS. GARNER:
15 Q 'and why did you move from A Webster to
16 Williams Capital. I'm sorry. I think you just
17 answered that, but I --
18 A Al Williams --
19 Q Oh, that's right.
20 A -- started his own firm.
21 Q Okay. So you were doing the same thing at
22 Williams Capital?
23 A Yes.
24 Q And you were there from December '89 to
25 May '90. And why did you leave there after only a

Page 30

1 few months?
2    A   Because the firm kind of blew up and they
3 were sold to Commonwealth Securities.
4    Q   Okay.  Did you continue to do the same
5 thing at Commonwealth?
6    A   Yes, but that didn't, as you can see that
7 wasn't very long, because I was in Pittsburgh and I
8 didn't Like Pittsburgh and I didn't like the guy that
9 was running Commonwealth and I tucked my tail between
10 my legs and went back to Georgia.
11    Q   And you are going to have to maybe read
12 this for me.
13    A   Yeah, I think this is the second copy, not
14 the first one, I think.
15    MR. BRODSKY:  No, this is the legible one.
16    THE WITNESS:  Okay.  All right.  Sorry
17 about that.
18    BY MS. GARNER:
19    Q   I think it is maybe Holcolmb?
20    A   Holcolmb Stevens.
21    Q   Holcolmb Stevens.  Can you spell that for
22 the record?
23    A   H-O-L-C-O-L-M-B Stevens, S-T-E-V-E-N-S
24 Securities.
25    MR. BRODSKY:  What page is that on?  Oh, I

Page 31

1 see last page.
2    THE WITNESS:  Yeah, last page.
3    BY MS. GARNER:
4    Q   What were you doing at Holcolmb Stevens?
5    A   Selling institutions, fixed income.
6    Q   And why did you leave Holcolmb?
7    A   They were sold to Bell Haven or they were
8 sold to some guys that changed the name to Bell Haven.
9    Q   And did you do the same thing at Bell
10 Haven?
11    A   I did.
12    Q   And you were there for a couple of years?
13    A   Yes.
14    Q   And you moved to Fidelity National?
15    A   Mark Stephens who was one of the principals
16 in Holcolmb Stevens went to Fidelity National to start
17 a fixed income, a bond operation.  And they told me
18 that I -- you guys would know better than me.  I can't
19 remember.  You had to get -- banks had to get a
20 certain license to sell revenue bonds.  They had to
21 get some sort of waiver and they told me they had that
22 and they didn't, so I immediately left and went back
23 to Bell Haven.
24    MR. WILCOX:  Your primary focus at Bell
25 Haven was selling municipal bonds to institutions?

Page 32

1    THE WITNESS:  Yes.
2    MS. GARNER:  And from Bell Haven you went
3 to -- I'm sorry.  You are going to have to read this
4 for me on Page 6?
5    A   I hope I can.  Crews & Associates.
6    Q   Could you spell that, please?
7    A   C-R-E-W-S & Associates.
8    Q   And you did fixed income sales?
9    A   Yes.
10    Q   And were selling to institutional
11 investors?
12    A   Yes.
13    Q   The same type of institutional investors
14 that you were —
15    A   Yes.
16    Q   And you were there for six months?
17    A   Yes. ·
18    Q   And then why did you leave to move to
19 Southwick?
20    A   I really didn't like Little Rock, Arkansas.
21    Q   You were in Little Rock?
22    A   Yes.  And Southwick Investments was started
23 by a gentleman by the name of Mark Stevens who had
24 been a principal in Holcolmb Stevens.  And Fidelity
25 Bank started Southwick.

Page 33

1    Q   Okay.
2    A   And he wanted me to come back and go to work
3 for him.  I wasn't that enamored with Little Rock, so
4 I moved back to Atlanta.
5    Q   Fixed income sales, still do the same
6 thing?
7    A   Yes.
8    BY MR. WILCOX:
9    Q   Covering the same accounts?
10    A   A lot of the same accounts -- most of the
11 same accounts.  By that time most -- some of my
12 relationships that I have been doing business with for
13 years were still there.  Some had moved on.  The
14 complexities of some of the accounts had changed, and
15 we didn't have quite enough net capital to qualify to
16 do business with a lot of folks that I knew.
17    Q   So did you adjust your account base or
18 target other types of accounts?
19    A   I tried to -- I did business with most of
20 the people that I could do business with and developed
21 a few others, but all in the same institutional scale.
22
23    BY MS. GARNER:
24    Q   Why did you leave Southwick?
25    A   They got sold to Morgan Keegan.

Page 34

1    Q   Could you spell that, please?
2    A   M-O-R-G-A-N, I believe it is K-E-E-G-A-N.
3    Q   And then you went to?
4    A   Tejas.
5    Q   T-E-J-A-S.
6    A   J-A-S, yes.
7    Q   Tejas Securities. And where was that?
8    A   Well, they are out of Austin, Texas. They
9    had an office in Alpharetta which is the northern
10   suburb of Atlanta.
11   Q   And what were you doing there?
12   A   Selling institutional bonds, fixed income.
13   Q   Is that what that says by your title?
14   What was your title there?
15   A   Institutional sales.
16   Q   And why did you leave Tejas?
17   A   They had in my opinion, a guy that was very
18   unethical.
19   Q   In what way?
20   A   Do I need to name names or can I just tell
21   you what I think?
22        MS. GARNER: Answer the question.
23        MR. BRODSKY: If you could answer the
24   question truthfully without naming names, you should
25   do so. On the other hand, if they ask you the name,

Page 35

1    you will have to face the question of whether or not
2    you want to provide the name.
3        THE WITNESS: He was a guy that initially,
4    as I understand it, had started that office or one of
5    the people instrumental in starting the office with
6    Tejas. And he was primarily a trader. And he was not
7    getting along or doing some things. I don't know all
8    the things. I can't get into all -- I don't know all
9    of the politics involved. But all I know is he was
10   using the conference room at Tejas to bring in
11   potential people to try to move the whole Tejas office
12   to another firm. To me I thought that was highly
13   unethical. And I told him so and he and I obviously
14   didn't get along well after that. So that was the way
15   that was.
16   Q   So you went to --
17   A   Municipaltrade.com.
18   Q   What is that?
19   A   This was during that time there were a
20   number of different firms that were trying to start
21   up. They were trying to do platform offerings. You
22   know, go to munitrade.com and they would post -- they
23   would get people to give them bonds. Other dealers
24   put an offering up there and they would put it up and
25   mark it up and do that sort of thing. A guy that was

Page 36

1    consulting there was a gentleman by the name of Peter
2    Allegreni. And Peter I had known from his days at
3    Fidelity and he had been a client and become a friend.
4    He was advising municipal trade and asked me -- he was
5    in Atlanta and said "Hey, what are you doing?" I
6    said, "Not much right this minute." He said, "Well,
7    you ought to come over here and maybe you could help
8    us."
9        Anyway, the long and the short of it is it
10   just didn't work.
11   Q   You were only there for a couple of
12   months?
13   A   Yeah. It just wasn't, you know, it
14   wasn't -- it wasn't working. And the reason I went
15   there was because of Peter and Peter was in the
16   process of saying I've had enough of this dealing with
17   the guy who was trying to start it, who seemingly
18   didn't know -- I didn't know him that well. I met him
19   a few times. Similarly, Peter didn't know a whole lot about
20   what he was trying to do.
21   Q   Did he even get off the ground?
22   A   You know, they hung around for a while. I
23   can't really tell you how good or bad they did. I
24   honestly lost contact and never really paid a whole
25   lot of attention.

Page 37

1    Q   What was your title when you were there?
2    A   I just -- I was kind of there to see if I
3    could help sell -- do -- find bonds in some capacity.
4    Q   Okay. Were you working from home during
5    that period?
6    A   No. They actually had an office. They were
7    municipal trade. They were going through, you know,
8    people were putting angel investors or whatever were
9    putting anything related to dot-com people were
10   putting money into. And they had an incredible burn
11   rate on the funds that they were getting. And it just
12   didn't seem like something that was going to be around
13   that long. Like I said, I really don't know what
14   happened to them. I don't know if they sold it or
15   went under. I just don't know.
16   Q   What is this notation here under
17   municipaltrades.com where it has employer's street
18   address?
19   A   I don't remember.
20   Q   What this is?
21   A   The street address?
22   Q   You are saying you do not remember?
23   A   I do not remember. I do not remember the
24   street.
25        MR. BRODSKY: It says "DNR"?

Page 38

1  THE WITNESS: DNR.
2  BY MS. GARNER:
3  Q  And so from there you went to -- you would
4  have to tell me the name?
5  A  Berthel, B-E-R-T-H-E-L Fisher, F-I-S-H-E-R &
6  Company.
7  Q  Thank you. And you don't recall your
8  title there?
9  A  I was -- I'm sorry. That was my error. I
10  was hired to do institutional fixed income sales.
11  Q  Mostly munis?
12  A  Whatever I could sell.
13  Q  Anything besides bonds there?
14  A  No. Only fixed income bonds. And only
15  municipals and corporates.
16  MR. WILCOX: To institutions?
17  THE WITNESS: Yes.
18  BY MS. GARNER:
19  Q  Was Berthel underwriting bonds?
20  A  I don't remember any underwritings that they
21  did.
22  Q  Why did you leave Berthel?
23  A  They were sold to Mid South Capital right
24  after 9/11.
25  Q  And you did institutional fixed income

Page 39

1  sales. Were you still doing the exact same thing
2  with the exact same people?
3  A  Yes.
4  MR. WILCOX: Did they underwrite municipal
5  bonds?
6  THE WITNESS: No.
7  BY MS. GARNER:
8  Q  Were they in Atlanta?
9  A  Yes or the metro Atlanta area. Their main
10  office was in Cobb County and then they moved into
11  Dunwoody.
12  Q  And from there you went to IFS?
13  A  Yes.
14  Q  And your title there is Institutional
15  Sales Manager?
16  A  That was a title I think Alex bestowed upon
17  me a year or so ago. It doesn't pay anything, but
18  it's a title.
19  Q  So why did you leave Mid South to go to
20  IFS?
21  A  Alex got my name -- I'm not exactly sure
22  where or how. But anyway, I got a call and wanted to
23  know if I would consider having lunch or would I be
24  interested in making a move or would I consider it. I
25  said well, I have been with Mid South for, as you can

Page 40

1  see, for a fair amount of while. I was kind of doing
2  what I wanted to do there. It is not a very
3  structured firm. But if you could do a trade, you did
4  a trade. And I just kind of liked -- when I met Alex,
5  i liked him. I thought I liked what he saw as the
6  future and the way he wanted to take the firm. And
7  needless to say, I'm such a young guy that I figured
8  I've got a huge career in front of me, many, many
9  years to stay in business.
10  So anyway we talked two or three times and
11  he asked me what was it going to take and I told him
12  and we offered -- counteroffered back and forth and
13  I went to work for him.
14  Q  And when you first started, what was your
15  title?
16  A  Employee.
17  Q  Are you a contract employee?
18  A  No, I have always been an in-house employee.
19  Q  Salaried?
20  A  No, not salaried. Commission only, but I'm
21  considered in-house. I'm on the insurance plan, that
22  sort of thing. And my payout is not the same as those
23  that are commissioned or what you call, contract I
24  guess is the word that you call it. I call them
25  "independents". You call them "contract".

Page 41

1  Q  You have a written agreement with IFS?
2  A  I did. Yes.
3  MR. WILCOX: What was Alex's last name?
4  THE WITNESS: McKenzie.
5  MS. GARNER: M-C-K-E --
6  THE WITNESS: M-C-K-E-N-Z-I-E.
7  MR. WILCOX: And his title?
8  THE WITNESS: President, CEO. I guess. I
9  believe that is his title.
10  MR. BRODSKY: That is it.
11  BY MS. GARNER:
12  Q  What was your income from IFS in 2014?
13  A  Trying to remember. I think there was a
14  gross number of 200 something and then I took an
15  $80,000 loss off of that. So I came out with about
16  120 or 130. I have to go back to my tax returns or W2
17  to be 100 percent sure about that.
18  Q  Ballpark is fine.
19  So you became an Institutional Sales
20  Manager in 2014?
21  A  Yes.
22  Q  And are -- does anyone report to you?
23  A  What do you mean by "report"?
24  Q  Do you supervise anyone?
25  A  Not really. I have discussed accounts with

Page 42

1  some of the guys. The plan was that I would, but that
2  authority has not been relinquished to me.
3     Q   By whom?
4     A   The powers of the company, by
5  Mr. McKenzie.
6     Q   And who do you report to?
7     A   Mr. McKenzie.
8     Q   And the people -- are there people on the
9  sales desk? Who do they report to?
10    A   Mr. McKenzie.
11    Q   So are you just -- I'm trying to
12 understand what your role is as a Sales Manager?
13    A   Well, in January of '14 Alex and I were
14 talking and I said, "You know, we need to get some
15 sort of coordinated effort. We need to try to bring
16 people in here that know what they're doing. And you
17 want more coverage, you want more sales, you want more
18 people doing this." I said, "Make me Sales Manager.
19 Give me the authority to do what I need to do and
20 we'll go."
21      So he made an announcement, "From this
22 point on Danny Weeks is now the Institutional Sales
23 Manager." I mean technically they have not told --
24 he hasn't told anyone that I'm not. But in the same
25 respect, there is nothing -- I don't really -- I

Page 43

1  tried to do certain things and nobody seem to pay
2  attention. So at that point I said, hey, enough is
3  enough. I'll do what I need to do. I'll do what I
4  know how to do and let everybody else do what they
5  want to do.
6      BY MR. WILCOX:
7     Q   The Institutional Sales Manager role, is
8  that just for municipal bonds or is it more broadly
9  for fixed income securities?
10    A   Well, I sell municipals and I sell
11 corporates. I have got some customers that do a
12 little bit of both. I sell taxables. I probably do
13 more taxable munis than I do corporates. I do some
14 esoteric type paper. A lot of GLA leases. I do
15 military housings. I do Chicago Skyways, things along
16 that line. But -- so technically those were
17 corporate bonds. But they are not corporate in the
18 sense that I'm selling Dow Chemical and I'm selling
19 Pitney Bowes and I'm selling John Deere or
20 Caterpillar. I'm not doing that. That's not what I
21 do.
22    Q   And how many other fixed incomes
23 salespeople are there at IFS Securities?
24    A   Right this minute we have, I believe, it is
25 four.

Page 44

1     Q   In addition to yourself?
2     A   Yes.
3     Q   Can you list those names?
4     A   Charles Knox, Bill Guilshan, G-U-I-L-S-H-A-N
5  Keith Wakefield. And we hired a guy not too long ago,
6  Paul Luchess. I can't remember, L-U-C-H-E-S-S,
7  something like that.
8     Q   And they are all salespeople?
9     A   Yes. That's what I understand them all to
10 be. Keith does more than just sell, but he is the
11 municipal principal.
12      BY MS. GARNER:
13    Q   Is he in Evanston?
14    A   Yes.
15    Q   What about Mr. Knox and Mr. Guilshan?
16    A   They are in Atlanta. And Mr. Luchess is
17 here in Chicago. I'm not exactly sure where.
18      BY MR. WILCOX:
19    Q   Does IFS have a Chicago office?
20    A   As a physical office like here no. Keith
21 works out of his home in Evanston. And I believe so
22 does Paul Luchess. I believe -- I think, I think the
23 plan is to try to get an office, whether it's an
24 office suites of some kind or something like that to
25 kind of put everybody together.

Page 45

1      MS. GARNER: Is it Mr. Luchess or --
2     A   Paul Luchess.
3     Q   Is he here in Chicago?
4     A   Somewhere.
5     Q   Okay. And when did he join exactly?
6     A   He's in fixed income sales. I don't know --
7      MR. BRODSKY: She asked when he joined.
8      THE WITNESS: I thought she said what does
9  he do exactly. Maybe a month or so ago. If you are
10 asking, he was not around at the time of the Harvey.
11      BY MR. WILCOX:
12    Q   As the municipal principal, Mr. Wakefield,
13 you have no reporting lines to him.
14    A   I'm not sure I understand exactly what you
15 are talking about when you say "reporting lines".
16    Q   Is he the managed municipal effort there
17 as the principal? I'm just trying to get an idea of
18 the structure of the --
19    A   The structure of IFS is that you have
20 Mr. Wakefield. You have myself. You have Mr. Knox.
21 You have Mr. Guilshan. Now you have Mr. Luchess.
22 There was a young guy there by the name of William or
23 Will Scribbin at the time. Now he is no longer with
24 the firm. A couple of guys that have been there are
25 no longer with the firm. But Keith and I -- Keith and

Page 46

1  I talked yes, about what we're doing about, you know,
2  sales, about what we think about what the market -- he
3  and I probably just -- we talk everyday concerning
4  various and other things, whether it is bonds that we
5  might want to bid on and buy, syndicates that we
6  might -- competitive sales that we might be working
7  on, things like that.
8      It's -- I guess we all basically report to
9  Alex in some capacity. But we don't -- we're not as
10  structured. We just don't have enough people that,
11  you know, you said boom, boom, boom here and you got
12  four different layers of managerial
13  responsibilities. I mean everybody is managing
14  themselves at that point. Each one has got the
15  manager of themselves. Supervision to the sense
16  that nobody to my knowledge does anything that's
17  whacko or wrong. If they do, they are gone. They
18  would not put up with it.
19     Q   And in terms of your account base at IFS,
20  can you describe what type of accounts you cover
21  there?
22     A   Yeah. I talked to a company called Geneve
23  Corp. I manage money for insurance companies. I
24  talked to Wells Capital Management, a mutual fund
25  company. I talked to Ziegler & Company here, which is

Page 47

1  out of Chicago and they have a platform or a
2  management side that I have done some business with.
3  I talked to John Nuveen & Company.
4      MS. GARNER: How do you spell Nuveen?
5      THE WITNESS: N-U-V-E-E-N. They are a small
6  firm here in Chicago. I say that jokingly. I talked
7  to -- did I say BMO?
8      MS. GARNER: No.
9      THE WITNESS: Okay. BMO. I talked to --
10      MR. WILCOX: Is BMO a dealer or --
11      THE WITNESS: It's a combination. It's a --
12  Mellon Bank here they have a dealer side. They have a
13  portfolio side. And quite honestly the guy that I was
14  talking to at BMO, he's now gone to Baird, was on the
15  portfolio side, the managed money side. I'm not
16  exactly sure how that structure goes. Not to go back
17  and change anything that I said, but when I started
18  talking to BMO, I did not realize exactly that was
19  part of the bank. Because BMO was kind of a Canadian
20  conglomerate sort of thing. I just wasn't that
21  familiar with it. I called a guy because he happened
22  to hold bonds that I was trying to buy and sell, which
23  was some ARS paper. But to go further, I talk to
24  Watermill Asset Management. They are a hedge fund in
25  New York.

Page 48

1      MS. GARNER: Can you say that one more time?
2      THE WITNESS: Watermill. W-A-T-E-R-M-I-L-L.
3  I talk on occasion to Allstate. I talk on occasion,
4  haven't done business with him in years, but I do make
5  a call every now and then to Guardian Life. People
6  that I do business with that are long since gone.
7      We have made efforts to talk with Black
8  Rock, to talk with Mass Financial, to talk with
9  Stein Rowe -- or T. Rowe, excuse me, T. Rowe not
10  Stein Rowe, with Deutsche Bank. I do talk to the
11  managed funds there, just the old Scudder folks.
12      MR. WILCOX: In terms of the other
13  salespeople, do they have any specific focus in terms
14  of the account basis they're divvying up of account
15  types to certain salespeople?
16      THE WITNESS: Charles Knox tries to develop
17  kind of accounts across the grand spectrum of things.
18  He talks to the banks and tries to talk to RAs. He's
19  tried to talk to insurance companies, few other
20  things.
21      BY MS. GARNER:
22      Q   What about Bill Guilshan?
23      A   Bill Guilshun has for all intents and
24  purposes one major account. It's a bank in Arkansas.
25  And Bill for the last year or so has really been

Page 49

1  handling the fixed income sales for our retail
2  operation.
3      Q   What about Mr. Wakefield?
4      A   Keith does the underwriting. Keith's
5  primary focus or his background is really more of the
6  money market, the real short end of the market. He
7  trades -- he does a lot of Fannie Maes and agency
8  discount paper, real short money market type stuff.
9  That's -- Keith is a very, very smart guy. He is very
10  knowledgeable and he has written and done some
11  platforms at other places. He is a smart guy.
12      BY MR. WILCOX:
13      Q   These folks on the short end, is that on
14  underwriting or is that on sales?
15      A   That's on his personal -- that's on his sale
16  side. He and I or Keith we started bidding
17  competitively with Robert Baird in their account. And
18  we are like 20 members or more, various sundry dealers
19  that bid competitive deals, the smaller deals
20  generally. They are not -- we do bid -- there has
21  been some, you know, 70 or $80 million deals that we
22  competitively bid in that account. We take a minimum
23  liability.
24      Q   Smaller deals to you means what size?
25      A   Well, you have a lot of -- anywhere from

## Page 50

1  5 million to 15 million to 20 million, things like
2  that.
3  **Q  When did you start at IFS?**
4  A  2010.
5  **Q  Was there a municipal presence at IFS when**
6  **you joined in terms of sales and trading?**
7  A  No.
8  **Q  Did you help start that effort?**
9  A  I guess you could say so.
10  **Q  Was Mr. Wakefield at IFS when you joined?**
11  A  He came afterwards.
12  **Q  And when did IFS start participating**
13  **underwritings for municipal bonds?**
14  A  Do you have the date that Mr. Walker started
15  with the firm? I think it was 2013, I believe.
16  '12 or '13, maybe late '12.
17  **Q  That is when IFS started participating in**
18  **underwriting?**
19  A  Yes.
20  **Q  And in what capacity did they participate?**
21  A  We were the lead underwriters on a couple of
22  small deals.
23  **Q  And did you help develop the underwriting**
24  **effort?**
25  A  No.

## Page 51

1  **Q  Who was spearheading that effort?**
2  A  Mr. McKenzie.
3  **Q  Does Mr. McKenzie have any underwriting**
4  **experience?**
5  A  Well, not to my knowledge. But let me go
6  back. When you say "who was spearheading", basically
7  Alex would like to see the firm grow. And, you know,
8  he's hired bankers, people that had backgrounds,
9  pretty extensive backgrounds as I understand it.
10  Mr. Walker has been in business. We have a guy in
11  Dallas, Wiley Simmons, I don't know with all the
12  firms, but he deals with a number of larger firms
13  and he has been on the underwriting side. You've
14  got a guy in Cleveland, Eric Small, Alvin Boutte in
15  Chicago. And, you know, he's looking obviously.
16  That's an area we would like to see the firm grow
17  into. As a matter of fact, we're talking at this
18  point in time and probably will hire another
19  gentleman that's a banker that will probably come in
20  and run the banking operation.
21  He has ran that -- he was the head of
22  banking going back some years ago. I believe it
23  was -- started out I believe it was C&S Bank in
24  Atlanta. That's going back some years. And I've
25  got the information. I just don't have it right on

## Page 52

1  the top of my head right now. But he's currently
2  for the last nine or ten years been with
3  Pennsylvania Economy League working with distressed
4  cities, which there are a lot in Pennsylvania. So
5  he's looking -- his daughter lives in the Metro
6  Atlanta area. He wants to come south. He's tired
7  of the cold and snow in Pennsylvania. So we've been
8  talking to him and I think he's coming on board with
9  us.
10  **Q  So when IFS started underwriting municipal**
11  **bonds in the 2012 and 2013 timeframe, you were not**
12  **involved in bringing in in any business or selling**
13  **any of the municipal bonds?**
14  A  No. I have sold some of them, yes.
15  **Q  And was Mr. Wakefield in charge of**
16  **managing the underwriting effort at that time?**
17  A  I believe Keith did all the filings and that
18  sort of thing. He handled it from that standpoint.
19  He would get the CUSIPs and he would do what the
20  filings that needed to be done in that respect. He
21  would do that, yes.
22  **Q  And how about in terms of pricing or**
23  **managing the risk of the underwriting?**
24  MR. BRODSKY: What do you mean by "how".
25  How can what?

## Page 53

1  BY MR. WILCOX:
2  **Q  Would Mr. McKenzie price the new issue**
3  **bonds?**
4  A  I thought we were talking about
5  Mr. Wakefield?
6  **Q  You are correct. I am sorry.**
7  **Mr. Wakefield, would he price the new issues?**
8  A  No.
9  **Q  Who would do that at IFS?**
10  A  Generally the customers that we were trying
11  to sell it to.
12  **Q  Can you explain that a little bit?**
13  A  Well, the first underwriting we did was the
14  City of Compton, California Tran. I don't know how
15  familiar you are with the City of Compton, California,
16  but it is not what you would call a stellar name. And
17  they have had some problems, needless to say the City
18  has. And they needed to do a financing. And we found
19  a buyer that would do it. We had numerous calls with
20  the City, with the Financial City Manager, with the
21  Finance Director of the City, with everyone else. We
22  got all their financial information. We set up a
23  structure with a lockbox situation that the City agreed
24  to along with the buyer, and the buyer said, "We'll
25  buy at this level", and the City said "Done."

Page 54

1  Q   And when was that transaction?
2  A   I think the first Compton deal I believe --
3  I think it was -- the first deal was in either late
4  '12, maybe. I would have to go back and look to be
5  honest with you. I'm not 100 percent sure.
6  Q   And those were trends?
7  A   Yes.
8  Q   Do you recall how long the maturity of
9  them?
10  A   The first one I believe was six months.
11  Q   And that was your first -- that was IFS's
12  first underwriting as a lead manager?
13  A   We did a little small -- we were working on
14  a little small USDA deal, a sewer deal in Alabama.
15  And I honestly can't remember which one was first. I
16  just don't remember.
17  Q   And the City of Compton was a negotiated
18  transaction?
19  A   Yes.
20  BY MS. GARNER:
21  Q   Is it rated?
22  A   No.
23  Q   Not insured?
24  A   No.
25  BY MR. WILCOX:

Page 55

1  Q   Was there a syndicate?
2  A   No.
3  Q   So you were sold?
4  A   Yes.
5  Q   And do you recall how large that
6  transaction was?
7  A   I believe it was 5 million.
8  MS. GARNER: Do you recall how IFS got that
9  business?
10  THE WITNESS: I don't know.
11  BY MR. WILCOX:
12  Q   Do you recall account and purchase?
13  A   Wells Capital.
14  Q   It was one account?
15  A   Yes.
16  Q   And that was a direct sell by IFS to
17  Wells?
18  A   One off at the time.
19  Q   Can you explain what you mean by "one
20  off"?
21  A   We were not open with Wells at the time.
22  The transaction was done through First Tennessee.
23  Q   Was that a combination trade by First
24  Tennessee?
25  A   What do you mean by "combination trade"?

Page 56

1  Q   Was Wells -- did First Tennessee bring
2  Wells to your attention to purchase the bonds? Did
3  you know who was purchasing the bonds?
4  A   Oh, yes, yes. We were -- had -- in other
5  words the analyst for Wells was on the phone with the
6  people from Compton.
7  MR. BRODSKY: He wanted to know who brought
8  Wells to the table?
9  THE WITNESS: I did.
10  BY MR. WILCOX:
11  Q   But you weren't allowed to transact
12  directly with them?
13  A   No, we were not open with Wells. You know,
14  initially at that time I believe the First Tennessee
15  salesperson actually called them before I did. But we
16  weren't opened with them at the time. A lot of your
17  major funds require certain net capital to do
18  business. And I think at that time our net capital
19  was still relatively low, still low, but higher than
20  it was then.
21  Q   So you sold the bonds or IFS sold the
22  bonds to First Tennessee?
23  A   Yes.
24  Q   And First Tennessee sold them to Wells?
25  A   Yes.

Page 57

1  Q   Did they mark the bonds up?
2  A   Yes.
3  Q   Do you know how much they marked the bonds
4  up?
5  MR. BRODSKY: You're asking if FTN marked
6  them up?
7  MR. WILCOX: Yes.
8  THE WITNESS: I don't remember the exact
9  structure of how that worked. I know they were
10  compensated for the transaction. I think it was -- I
11  believe it was all built in. It was a yield price and
12  a dollar price and it was all set. The City
13  understood that. Everyone understood that. That was
14  a negotiated deal directly with the City and with
15  Wells with intermediaries as IFS and First Tennessee.
16  Q   How was First Tennessee brought in on that
17  transaction?
18  A   I have a friend of mine that I had bought
19  and sold bonds to who was a trader there. And we were
20  not having any great success finding anybody who
21  wanted to buy Compton. And I said can I call another
22  dealer first and see. And he said okay, that would be
23  fine. So I did.
24  Q   Who is your contact at First Tennessee?
25  A   Kevin Fitzpatrick.

Page 58

1    Q   He's an institutional trader?
2    A   Yes, strictly.
3    Q   Do you know how many accounts IFS went out
4    to try to place the Compton bonds?
5        MR. BRODSKY: What does this have to do with
6    the Harvey Public Library District case?
7        MS. GARNER: We don't have to explain that.
8        MR. BRODSKY: Well, I'm not going to let him
9    answer that question.
10       MS. GARNER: You don't have a basis not to
11   let him answer the question.
12       MR. BRODSKY: It is outside the scope of the
13   Formal Order. You do not have unlimited scope. You
14   have the authority under this Formal Order to
15   investigate whether such acts and practices, if true,
16   constitute violations. You do not have the authority
17   to investigate details of another bond offering. You
18   want to amend the Formal Order, I'll let him answer.
19   This is not reasonable background. This is getting
20   information about another deal. And according to this
21   Formal Order that you probably wrote, it doesn't have
22   that scope. So I'm not going to let him --
23       MS. GARNER: That is not a proper basis for
24   instructing the witness not to answer.
25       MR. BRODSKY: Out of curiosity, what if you

Page 59

1    asked him whether he had cheated on his wife this
2    month. Do you think that you would be entitled to an
3    answer to that question?
4        MS. GARNER: I'm not going to debate this
5    with you. Are you instructing the witness not to
6    answer.
7        MR. BRODSKY: Of course I am.
8        MS. GARNER: Okay. That's an improper
9    basis. And I know you will consider whether or not we
10   need to seek intervention here to get him to answer
11   our questions.
12       MR. BRODSKY: I understand that. If you
13   don't want to debate it and all you want to say nah,
14   nah, you can't make that objection. Then that is not
15   very lawyerlike. That's simply saying I'm more
16   powerful than you and I'll seek a remedy. If you want
17   to have a discussion then we can discuss it off the
18   record, on the record or the like. I have a reason
19   for asking -- for making that objection and that is I
20   don't think the SEC should or can ask any question
21   under the sun that it wants to. That's not the law.
22   SEC vs. Wheeling Pittsburgh Steel Company.
23       MS. GARNER: We are investigating a bond
24   offering that he sold. We're investigating the manner
25   in which he sold it. How he has sold other bond

Page 60

1    offerings could have revealed information that bears
2    upon how he acted in this instance. That is why it is
3    relevant.
4        MR. BRODSKY: You needn't raise your voice.
5        MS. GARNER: I am not raising my voice.
6        MR. BRODSKY: Yes, you are.
7        MS. GARNER: I am not.
8        MR. BRODSKY: Well, now you are not. But
9    you did when you said the last sentence.
10       MS. GARNER: Anyway, I am going to say what
11   I have to say. It is relevant to this investigation
12   and I would like the witness to answer.
13       MR. BRODSKY: Just a second. Your claim of
14   relevance is that it could have to do with
15   something -- it could bear on this -- on the acts and
16   practices that you are actually investigating. Is
17   that what are you saying?
18       MS. GARNER: That's exactly what I'm saying.
19       MR. BRODSKY: How. How in theory?
20       MR. WILCOX: I don't think we have to
21   explain it.
22       MR. BRODSKY: Well, of course you don't.
23   You want me to relent. It would be helpful to
24   understand your rationale. If you simply want to say
25   I have the power to force Mr. Weeks to answer the

Page 61

1    question, that's not reasonably calculated to lead me
2    to consider as a bona fide -- in all bona fides
3    whether my objection is well taken. I could
4    reconsider it because I may be wrong or you could
5    convince me, but you are not going to --
6        MS. GARNER: Let's go off the record. The
7    time is 11:30.
8        (A brief recess was taken.)
9        BY MS. GARNER:
10       Q   We're back on the record and the time is
11   11:45 a.m.
12       And Mr. Weeks, can you confirm that during
13   the break you didn't speak to myself or the other
14   members of the staff here about the substance of the
15   investigation?
16       A   I did not.
17       Q   Thank you.
18       Can you please read back the last question
19   by Mr. Wilcox?
20       (Whereupon, the record was read as follows:
21       "Q Do you know how many accounts IFS
22       went out to try to place the Compton
23       bonds?")
24       MR. BRODSKY: I will withdraw my objection
25   to this question without the principle asserted before

Page 62

1 in the objection.
2 THE WITNESS: No.
3 BY MR. WILCOX:
4 Q How many accounts did you reach out to
5 personally sell the Compton bonds?
6 MR. BRODSKY: Same statement.
7 A I didn't have anyone at the time of the bond
8 that bought non-ready paper.
9 BY MR. CHIMIENTI:
10 Q So you didn't reach out to anybody else?
11 A I called a couple of people that I'm close
12 to and they kind of laughed too and said no.
13 Q Do you remember who that was?
14 A I talked to Geneve Corp was one. And I
15 don't -- I don't know who the other ones were.
16 Q So you think it was Geneve Corp and a few
17 others, three others tops?
18 A I had no one that bought non-ready paper.
19 MR. CHIMIENTI: Okay. Thank you.
20 BY MR. WILCOX:
21 Q Did other salespeople have accounts that
22 purchased non-ready paper?
23 MR. BRODSKY: Objection. Lack of
24 foundation. You can answer.
25 THE WITNESS: I don't know.

Page 63

1 BY MR. WILCOX:
2 Q Do you know how IFS was selected as an
3 underwriter for that transaction?
4 MR. BRODSKY: Objection. Asked and
5 answered.
6 MR. WILCOX: Ask it again.
7 MR. BRODSKY: He is asking you either know
8 from personal observation or have you heard tell,
9 correct?
10 MR. WILCOX: Yes.
11 THE WITNESS: It is my understanding it was
12 a relationship from one of the bankers.
13 MS. GARNER: Do you recall which banker?
14 THE WITNESS: I believe it was Mr. Walker.
15 BY MR. WILCOX:
16 Q How many municipal bankers does IFS have
17 that are out looking for underwriting business?
18 MR. BRODSKY: Today?
19 MR. WILCOX: At the time of the Harvey deal
20 let's say from November 2014 to February of '15.
21 MR. BRODSKY: He has already gone over this,
22 but you could answer this.
23 THE WITNESS: Craig Walker, Alvin Boutte,
24 Eric Small and Riley Simmons.
25 BY MR. WILCOX:

Page 64

1 Q So that was the first transaction where
2 City of Compton TRAN was the first transaction where
3 IFS was lead underwriter?
4 A First or second.
5 Q And in addition to other small
6 transactions that you mentioned, what was the follow
7 on the lead underwriter by IFS the lead of municipal
8 securities?
9 A What?
10 MR. WILCOX: I'm looking for the next
11 transaction --
12 A The next transaction --
13 Q -- where IFS acted as a lead underwriter.
14 A I believe it was -- we were working on one,
15 which we didn't get. Then I believe the next
16 transaction we actually did was about six months later
17 when we did another Compton TRAN for one year.
18 MS. GARNER: What do you mean by "TRAN"?
19 THE WITNESS: Tax Revenue Anticipation Note.
20 BY MR. WILCOX:
21 Q And did you participate in the effort to
22 sell that issuance?
23 A Yes, I did.
24 Q Did you sell any of those securities?
25 A Yes, I did.

Page 65

1 Q Who did you sell those to?
2 A Wells Capital.
3 Q And that was a direct sell?
4 A Direct sell, yes.
5 Q Do you recall the size of that issuance,
6 approximately?
7 A I believe it was $10 million.
8 Q And were they still unrated at that time?
9 A Yes.
10 MR. CHIMIENTI: Was that a refunding of the
11 first six months TRAN?
12 THE WITNESS: No.
13 BY MR. WILCOX:
14 Q And they were uninsured?
15 A Yes.
16 Q And the next transaction for IFS acted as
17 the lead or sole?
18 A I think it was City of Scranton TRAN.
19 Q And that is Scranton, Pennsylvania?
20 A Yes.
21 Q And the approximate size of that
22 transaction?
23 A I believe it was 12.5.
24 MS. GARNER: $12.5 million?
25 THE WITNESS: Yes.

Page 66

1    BY MR. WILCOX:
2    Q   And maturity?
3    A   One year. It was a TRAN.
4    Q   And was that security rated?
5    A   No.
6    Q   Or insured?
7    A   No.
8    Q   Did you place any of that paper?
9    A   Yes.
10   Q   Who did you place that with?
11   A   Wells Capital.
12   Q   You placed all of it?
13   A   Yes.
14       MS. GARNER:  Directly with Wells?
15       THE WITNESS:  Yes.
16       BY MR. CHIMIENTI:
17   Q   Can we go back to that earlier transaction
18   before you could place directly with Wells, it was
19   with First Tennessee, right?  I just want to make
20   sure I have that correct?
21   A   Yes.
22   Q   On that next transaction that you worked
23   on, which was the Compton one year TRAN, did First
24   Tennessee receive any compensation for that?
25   A   No.

Page 67

1    Q   For the Scranton TRAN, did First Tennessee
2    receive any compensation for that?
3    A   No.
4        BY MR. WILCOX:
5    Q   And the next transaction where IFS was
6    lead in a municipal underwriting?
7    A   Solely?
8    Q   Yes.
9    A   I'm not sure.
10   Q   And for the transactions where IFS was
11   lead, how was the price determined for those
12   transactions, the yield of those securities that
13   were bought to market?
14       MR. BRODSKY:  Which ones?
15       MR. WILCOX:  Let's start with -- back to the
16   six month City of Compton --
17       MR. BRODSKY:  He's already --
18       BY MR. WILCOX:
19   Q   Okay.  We'll go with the one-year City of
20   Compton deal insurance.
21   A   We negotiated that with Wells along with the
22   City.  But the Finance Director or everyone that we
23   could get from an informational standpoint.  Wells had
24   had good success.  They like the structure on the
25   first six-month deal, and they did the next deal at a

Page 68

1    better rate, much better rate actually.
2        BY MR. CHIMIENTI:
3    Q   By a "better rate", do you mean that the
4    interest rate for the one-year TRAN was lower than
5    the interest rate for the six-month TRAN?
6    A   Yes.
7    Q   In your participation in the pricing of
8    the one-year TRAN, did you reach out to the people
9    that you knew to look for what we call comparables,
10   comparable pricing?
11   A   I don't know who would have looked to get a
12   comparable pricing.  There weren't too many cities
13   that were in that bad of shape at the time or that I
14   knew of anyway.  There are a lot, but I didn't know.
15   Q   So is it safe to say you didn't look to
16   any other City's pricing as a result of that?
17   A   No.
18   Q   Do you recall which cities you may have
19   looked at?
20   A   No.
21   Q   Do you recall if there were any that you
22   looked at, not specifically, but overall?
23   A   We tried to look at the general market to
24   see what was available.  We also were dealing with a
25   highly distressed piece of paper that we had virtually

Page 69

1    no buyers for.  We had one who was willing to take it
2    under a specific structure.  And because of that
3    structure and because of the way we had structured it,
4    they felt secured and did it at a much better rate.
5    You got to understand, they couldn't go to the market.
6    Nobody would buy their paper.
7        BY MR. WILCOX:
8    Q   So Wells was the only interested buyer of
9    the Compton TRAN?
10   A   That I knew of.
11   Q   So they kind of dictated the pricing for
12   the transaction where they were willing to accept
13   where they would buy the paper?
14       MR. BRODSKY:  Is that a question or a
15   statement?
16       MR. WILCOX:  It's a question.
17       MR. BRODSKY:  So you want to know whether he
18   agrees with the statement that they kind of dictated
19   the price, Wells?
20       MR. WILCOX:  Yes.
21       THE WITNESS:  It was a negotiated price.
22
23       BY MR. WILCOX:
24   Q   Did you suggest a price or yield for the
25   transaction?

18  (Pages 66 to 69)

## Page 70

1  A  Yes.

2  Q  Was that the ultimate price or yield where

3  the transaction was done?

4  A  No.

5  BY MS. GARNER:

6  Q  How did you come up with the yield that

7  you suggested?

8  A  We were trying to do a better job for the

9  City. We were trying to get a better rate.

10  Q  I understand that, but how did you come up

11  with a specific number to propose when you are

12  beginning your negotiations?

13  A  We were looking at what might be in the

14  marketplace and trying to determine what would be a

15  fair and reasonable request or offer.

16  MR. WILCOX: And you said "we"? Who would

17  that include?

18  THE WITNESS: Myself and Mr. Walker at that

19  time. He was the banker.

20  BY MS. GARNER:

21  Q  Would you have looked at other TRANS that

22  were in the market at that time?

23  A  Yes.

24  Q  Unrated?

25  A  Yes.

## Page 71

1  Q  And insured?

2  A  Yes.

3  BY MR. WILCOX:

4  Q  Was Mr. Wakefield involved at all in that

5  pricing?

6  A  I don't think so.

7  Q  Any other salespeople?

8  A  Other salespeople tried to find a buyer.

9  Q  And let's move on to the City of Scranton

10  TRANs which you also placed with Wells. How was the

11  price for that transaction determined?

12  A  On a negotiated basis.

13  Q  Again directly with the customer and the

14  issuer?

15  A  Yes.

16  Q  Did you go out to any other clients

17  looking to place the City of Scranton bonds?

18  A  No.

19  Q  Why not?

20  A  Because the financial advisor for Scranton

21  brought -- came to me and said, "I've got a TRAN deal

22  for the City of Scranton and I need to do it. I need

23  to close it in less than 30 days. Do you think you

24  can do it? The only account that we knew, that I knew

25  of that could react that fast and come to a decision

## Page 72

1  that quickly and close it that fast was Wells.

2  Q  Did any other salespeople make inquiries

3  about trying to place the City of Scranton —

4  A  Yes.

5  Q  And the next transaction could have been

6  the Harvey Library transaction that IFS was the

7  lead?

8  A  It could have been.

9  MR. BRODSKY: Objection to the form of the

10  question.

11  BY MR. WILCOX:

12  Q  It could have been the Harvey transaction?

13  MR. BRODSKY: Objection to the form of the

14  question. It is not asking for a probative fact. It

15  could have been anything. If the recollection --

16  BY MR. WILCOX:

17  Q  It is your recollection that the Harvey

18  Library transaction was the next transaction at

19  IFS —

20  A  I'm not sure.

21  Q  — underwrote?

22  MR. CHIMIENTI: Let's not talk over each

23  other.

24  MR. BRODSKY: That's fine. Sorry. I was

25  responsible. I apologize.

## Page 73

1  BY MR. WILCOX:

2  Q  Any other transactions that you can recall

3  where IFS has been the lead?

4  A  Sole?

5  Q  Sole.

6  A  Up to what date?

7  Q  February 1st of 2015.

8  A  I believe that would be Harvey.

9  Q  And in addition to Harvey, there was none

10  that you can recall?

11  A  That we were solely, I don't recall.

12  Q  In terms of co-managing, has IFS

13  co-managed a lot of municipal transactions from the

14  period of November 2014 to February 1st of 2015?

15  A  What do you mean by "a lot".

16  Q  How many in that time period would you say

17  IFS approximately was the co-manager as an

18  underwriter?

19  A  We were a co-manager in Shreveport, Indiana.

20  I believe during that time we were a co-manager in a

21  Texas TRAN, which one of many. We had nothing to do

22  with the pricing or anything like that or even the

23  selling of it actually. There may have been another.

24  I don't remember.

25  Q  Were you the book runner on those

Page 74

1  transactions?
2  A  No.
3  MR. BRODSKY: "Those transactions"?
4  BY MR. WILCOX:
5  Q  On the transactions that you mentioned,
6  were you the book runner?
7  A  No.
8  MR. BRODSKY: Just so we know, does that
9  include Shreveport? Do you mean to include Shreveport
10  in that question?
11  MR. WILCOX: Yes.
12  THE WITNESS: No.
13  MS. GARNER: This might be a good time to
14  break before we shift. Let's go off the record. It
15  is 12:05.
16  (Whereupon, a luncheon recess was taken.)
17  A F T E R N O O N  S E S S I O N
18  BY MS. GARNER:
19  Q  Back on the record. It is 1:30 p.m.
20  Can you confirm during the break you
21  didn't speak to myself or other members of the staff
22  regarding the substance of this investigation.
23  A  I did not.
24  Q  Thank you. And other than your attorney,
25  did you speak with anyone over the break?

Page 75

1  A  No. Oh, yes. A customer that I just talked
2  to.
3  Q  You didn't discuss your testimony?
4  A  No.
5  Q  Going back to Exhibit 37, which is your
6  questionnaire —
7  A  Oh, okay.
8  Q  — I need to direct your attention to Page
9  2, Question 9. In response to Number 9, you listed
10  an arbitration?
11  A  Yes.
12  Q  What does that refer to?
13  A  An arbitration.
14  Q  Involving what? What arbitration?
15  A  Raymond James sold me some bonds that had
16  been called and we took them to arbitration.
17  Amazingly the Arbitrator rules in Raymond James'
18  favor.
19  Q  It wasn't anything before the NASD —
20  A  Well, it was a NASD arbitration, I guess
21  where broker dealers —
22  MS. GARNER: You brought the action or did
23  Raymond James?
24  THE WITNESS: We filed an arbitration
25  against Raymond James.

Page 76

1  MR. WILCOX: Who were you with then?
2  THE WITNESS: Mid South Capital.
3  MS. GARNER: Okay. Thank you.
4  BY MR. WILCOX:
5  Q  Mr. Weeks, we talked about the municipal
6  bankers and the municipal sales force of IFS. Is
7  there a municipal trading desk at IFS?
8  A  We have a desk and I sit on it along with
9  Mr. Guilshan and Mr. Knox. I guess you could
10  technically call that a trading desk.
11  Q  Do you take an inventory from customers?
12  A  Occasionally.
13  Q  Occasionally. When you take in the
14  inventory from customers, who would put a price on
15  the transaction price for that security?
16  A  Myself or Keith.
17  Q  And how often does that occur?
18  A  Rarely.
19  Q  So you have no — IFS does not have a
20  dedicated full-time trading staff municipals in
21  securities?
22  A  No.
23  Q  How — when you are taking in securities,
24  do you usually have them cross to another account?
25  A  Well, we do riskless transactions.

Page 77

1  Q  Could you explain what you mean?
2  A  I have an order before I buy it. I buy them
3  based on my customer's order.
4  Q  Does that usually initiate from the buy
5  side or the sell side?
6  A  If I have a customer offer some bonds
7  specifically, or if I have got somebody that is
8  looking for something specifically, then I have
9  somebody that — someone else that owns it, then I
10  will make the call and say, "Hey, I have got somebody
11  looking at this. Would you care to sell?" And they
12  generally say, "Well, what's the price?" So that
13  starts the negotiations.
14  Q  And on the rare times that you mentioned
15  where you do take an inventory, are there specific
16  limits to the inventory that you are allowed to take
17  on?
18  A  Yes. We generally will not buy more than a
19  million and usually it's less than that.
20  Q  And is that limit determined by the
21  maturity of those bonds as well?
22  A  Yes.
23  Q  Can you describe that?
24  A  Well, if we're in a competitive syndicate
25  and we see a maturity range that I think relative to

Page 78

1  MMD or something like that the bonds are trading
2  cheap, then we'll look at taking some of those down
3  out of syndicate. It's rare if ever that I will buy
4  directly from a customer as such, because generally
5  they want too much for the bonds. They want the offer
6  side of the market and it is hard to make money on the
7  offer side of the market. But what we will do, we do
8  take some risk on competitive sales. And we look at
9  where we think or what I think and we talk about it
10  and what he thinks, what we think the best part of the
11  curve is.
12      Q  So you position those securities then?
13      A  Yes.
14      Q  For a short period of time?
15      A  Hopefully.
16      Q  Are you allowed to carry those positions
17  overnight?
18      A  Oh, yes.
19      BY MR. CHIMIENTI:
20      Q  How rare would you say this instance is
21  where you would be buying and holding on an
22  inventory basis under a million?
23      A  On competitive sales, we will buy -- there
24  is a lot of times we'll buy 500 or we'll buy 750. A
25  lot of that's dictated on the number of bonds and the

Page 79

1  maturity. If we see something that we think is very
2  attractive or we like the way the market is moving, we
3  think that we would buy a million or 1 million, two or
4  three, depending on what it is.
5      Q  Now would you say that would occur weekly?
6      A  No.
7      Q  Monthly?
8      A  Oh, yeah. I mean it's more than once a
9  month, but it's not necessarily -- I mean we could buy
10  five items in a week. We could buy no items in a
11  week. It's purely dictated by what we see as relative
12  value. You see a value in the market, that's what you
13  look for.
14      BY MR. WILCOX:
15      Q  On a regular -- nightly basis, are you
16  usually holding some securities in inventory for the
17  other -- for the sales force?
18      A  There are times, yes.
19      Q  And you mentioned "we" and that would be
20  just yourself and Mr. Wakefield?
21      A  Yes.
22      Q  In terms of a dedicated underwriting desk
23  personnel, there wouldn't be anyone else with IFS
24  other than the people you mentioned?
25      A  Well, we have a young lady that works with

Page 80

1  Keith named Tammy Payton and she now works with Keith
2  on the underwritings, as far as getting out scales,
3  listening on the calls, that sort of thing.
4      Q  When did she join IFS?
5      A  She was working as an assistant I want to
6  say for about a year and then she got licensed and now
7  her duties have expanded since she got licensed.
8      Q  Does she price any --
9      A  No.
10      Q  In terms of pricing for underwritings or
11  secondary market transactions, there is no one else
12  in IFS Securities or municipal securities that does
13  that?
14      A  I like a little clarification of your
15  question, please.
16      Q  There is no additional secondary market,
17  trader or underwriter other than Mr. Wakefield and
18  at times yourself?
19    · A  No.
20      BY MS. GARNER:
21      Q  How much experience or do you have any
22  experience selling rated insured bonds?
23      A  Yes.
24      Q  How much experience?
25      A  Most of my career.

Page 81

1      Q  Most of most of your career?
2      A  Well, it's rated bonds.
3      Q  Rated.
4      A  There was a period -- well, if you want to
5  talk about insurance, there was a period of time where
6  Ambac and MBI, they insured everything. AAA bonds got
7  insured. Why? I don't know. They didn't want to pay
8  MBI or Ambac any money, I guess.
9      Q  Were all those mini bonds or were some of
10  those corporate?
11      A  Were you around in '08?
12      Q  Yeah.
13      A  Well, if you remember it was a little bit of
14  everything.
15      MR. BRODSKY: The question is, do you have
16  experience in rated bonds other than muni bonds? I
17  think that was her question.
18      THE WITNESS: Was that your question?
19      BY MS. GARNER:
20      Q  I was asking -- so let me ask you. Do you
21  have experience on rated insured muni bonds?
22      A  Yes.
23      BY MR. CHIMIENTI:
24      Q  What you were getting at there was a
25  portion of time, a good portion of the time where

Page 82

1   almost every bond was insured. Is that what were
2   you saying?
3       A   Yes.
4       Q   And since '08 that is not the case?
5       A   Yes.
6       Q   And there has been probably in the last
7   few years would this be correct, there is a
8   re-emergence of insurance into the marketplace?
9   Does that sound accurate?
10      A   I'm not sure I would say re-emergence. I
11  would say you've had a few other players come in and
12  you've had MBIA becoming -- and you've had Ambac
13  trying to come out of bankruptcy and that sort of
14  thing. So you've got some of the ratings restored,
15  but you've had BAM and obviously AGM has taken a lot
16  to rule.
17      BY MS. GARNER:
18      Q   Let's focus on a time post 2008. Would
19  you say generally speaking it's easier to sell a
20  rated insured bond versus an unrated uninsured bond?
21      A   Yes.
22      Q   And why is that?
23      A   It's rated and insured.
24      Q   It is more desirable by people purchasing
25  bonds?

Page 83

1       A   There's a lot more buyers as a general rule
2   for rated paper than it is for non-rated paper.
3       Q   Do you know what a bank qualified bond is?
4       A   Yes.
5       Q   What is that?
6       A   A bond that has been qualified.
7       Q   What do you understand "bank qualified" to
8   mean?
9       A   You only issue one time a year and it is
10  less than 10 million, 10 million or less I should say.
11      Q   And how are bank qualified bonds -- how do
12  they benefit the issuer?
13      A   I really rarely ever trade bank qualified
14  paper other than if we were in a syndicate and it's
15  stupid cheap.
16      MR. WILCOX: Is there any reason that you
17  rarely trade bank qualified --
18      THE WITNESS: I don't deal with banks.
19      MR. CHIMIENTI: I think the question that
20  Natalie was asking, do you know of the benefits to the
21  issuer to be able to issue bank qualified bonds?
22      A   In theory, sometimes you can get a better
23  rate.
24      MR. CHIMIENTI: Thank you.
25      BY MS. GARNER:

Page 84

1       Q   And do you know any benefit to the buyer
2   for purchasing such bonds being qualified bonds?
3       A   Only if he's a bank.
4       Q   Right.
5       MR. WILCOX: What is the benefit to the
6   bank?
7       THE WITNESS: I honestly don't know. I
8   don't actively trade or pay a whole lot of attention
9   to bank qualified paper.
10      BY MS. GARNER:
11      Q   So for a bond you are looking to sell in a
12  primary offering, how do you identify potential
13  buyers?
14      A   What kind of primary offer?
15      Q   Let's say just, you know, a bond -- bonds
16  being issued by a Park District, let's say. How
17  would you go about identifying buyers? Do you have
18  different methods of identifying buyers for
19  different types of bonds?
20      A   No.
21      Q   No. Okay. Well, how do you identify
22  potential buyers for bonds that you are trying to
23  sell?
24      MR. BRODSKY: Are you talking about at IFS?
25      MS. GARNER: Yes.

Page 85

1       THE WITNESS: I generally know what my
2   clients purchase. Not all the time, but I have a
3   pretty good idea. And I try to find items that fit in
4   that sector or their maturity or their yield levels or
5   their rating requirements.
6       BY MS. GARNER:
7       Q   How far in advance of a pricing or an
8   issuance would you reach out to potential buyers?
9       MR. BRODSKY: Are you asking if he has a
10  general practice, or are you asking in any one case?
11      MS. GARNER: Typically.
12      MR. BRODSKY: The first question is, do you
13  have a general practice?
14      THE WITNESS: I have no general practice in
15  that respect.
16      BY MS. GARNER:
17      Q   How many buyers would you usually contact
18  for bonds you are looking to sell, just generally
19  speaking?
20      MR. BRODSKY: Object to the form of the
21  question. You may answer.
22      A   Repeat the question. I mean I want to
23  understand what you are saying.
24      BY MS. GARNER:
25      Q   I'm asking when you're looking to sell

Page 86

1  bonds, how many buyers do you reach out to usually?
2      A   The customers that I cover.
3      Q   All of them?
4      A   Sometimes. Not all the time.
5      BY MR. WILCOX:
6      Q   Why would you not reach out to a certain
7  customer?
8      A   Because it doesn't fit.
9      Q   It doesn't fit what the client is looking
10  for?
11     A   Yes.
12     Q   So -- can you give me an example of like
13  you have certain accounts that are only looking for
14  certain types of bonds?
15     A   Yes.
16     Q   Is that based upon maturity? Is it based
17  upon ratings? Is it based upon sector?
18     A   It could be based upon all of those.
19     Q   When you have identified potential buyers,
20  how do you communicate information to them about the
21  bonds you're trying to sell?
22     MR. BRODSKY:  Objection to the form of the
23  question. The reason I'm objecting is I don't know
24  whether you are asking if he has a customer practice
25  or it varies. So when you say how does he do it, it

Page 87

1  is almost impossible to answer. However, if you
2  understand it, you may answer.
3      THE WITNESS:  I'm not sure I know what you
4  are asking for. Excuse me.
5      BY MS. GARNER:
6      Q   Let's say you are looking to sell bonds
7  for a particular issuance, what information do you
8  communicate to the buyers about the bonds and how do
9  you communicate it to them?
10     MR. BRODSKY:  Are you asking if he has a
11  custom and practice or ever? I'm suggesting --
12     MS. GARNER:  Generally speaking.
13     MR. BRODSKY:  If I might suggest this, ask
14  him if he has a different custom and practice. If he
15  does, he will give you an answer. I'm not trying to
16  be difficult. I'm trying help, to focus. If you
17  don't mind. I'm sorry. I don't mean to be offensive.
18     BY MS. GARNER:
19     Q   That's fine. Generally speaking, do you
20  have a practice for communicating information to
21  potential buyers about bonds?
22     A   Yes.
23     Q   And what is that practice?
24     A   I pick up the phone and call them.
25     Q   And what do you usually tell them about

Page 88

1  the bonds, typically?
2      A   Before or after it's priced?
3      Q   Before?
4      A   I will tell them that we're going to be
5  involved in XYZ deal and we anticipate it to be A or
6  whatever the rating may be. And we -- these are the
7  maturity ranges. Would you have interest? Should I
8  give you a call when we are ready to sell?
9      Q   And what do you communicate to them after
10  the bonds have been priced?
11     A   What the price is.
12     Q   That's it. Is that it?
13     A   Yeah.
14     BY MR. WILCOX:
15     Q   Would that only be if they had shown
16  interest in the bonds?
17     A   Not necessarily. I may go back because I
18  think it looks good or I think that he ought to take
19  another look at it. That's --
20     Q   In that initial call before the price, is
21  there an indicative range, yield range that they may
22  be priced at?
23     A   Excuse me. Not really. No. I mean we'll
24  just talk about the bonds that are going to be coming.
25  And is this a name that you want to see or you care

Page 89

1  about.
2      Q   So it's the initial call may be more about
3  the credit, the issuer, the rating maturity, not
4  about the price?
5      A   Right.
6      Q   And then they would indicate whether they
7  have interest in the bond?
8      A   Yes.
9      Q   And if they had interest, would they give
10  you an order at a certain yield or would they just
11  say I have interest, keep me informed?
12     A   Let me know what you are talking about when
13  you're ready to sell it.
14     BY MR. CHIMIENTI:
15     Q   Are you familiar with what a "sales
16  memorandum" is? Have you ever heard that term?
17     A   A sales memorandum.
18     Q   Yes?
19     A   In relation to what?
20     Q   The primary offering of municipal
21  securities?
22     A   You mean like a term sheet or a prospectus?
23     Q   Not a prospectus. Say a term sheet?
24     A   An offering memorandum?
25     Q   Are you familiar with a sales memorandum,

Page 90

1 let's start there. If you know, that's okay. If
2 that's not the term your familiar with —
3    A  It's not the term I'm familiar with.
4    Q  Are you familiar with a "term sheet" then?
5    A  Yes.
6    Q  Can you explain that?
7    A  It's the term of the bonds. I mean it's how
8 many, the name, potential rating, what we are trying
9 to get, that sort of thing. It gives you the rating,
10 what we anticipate the rating to be, the maturity, any
11 pertinent facts that may be involved.
12    Q  While you were at IFS, did you prepare
13 what you would call, what you just discussed which
14 is a term sheet?
15    A  No.
16    Q  Do you know anybody that did prepare term
17 sheets?
18    A  Yes.
19     MS. GARNER: At IFS?
20    A  Yes.
21    Q  Who?
22    A  The bankers would prepare the term sheets.
23     MR. CHIMIENTI: Thank you.
24     BY MR. WILCOX:
25    Q  Is that on every transaction?

Page 91

1    A  What do you mean by "every transaction"?
2    Q  Every municipal transaction, would they
3 prepare a term sheet for a primary transaction?
4    A  Yes.
5    Q  For a certain subset, only term sheets
6 were —
7     MR. CHIMIENTI: So is it fair to say, based
8 on the short discussion here concerning "term sheets",
9 that under an initial offering where the banker —
10 where IFS was the lead, the banker prepared a term
11 sheet for you to use to communicate with potential
12 buyers?
13     THE WITNESS: Yes, a guideline as such.
14     MR. CHIMIENTI: Thank you.
15     BY MR. WILCOX:
16    Q  When would that term sheet be provided to
17 you?
18     MR. BRODSKY: You mean in relation to, for
19 example, pricing?
20     MR. WILCOX: Yeah, in relation to pricing?
21     THE WITNESS: Term sheet doesn't
22 automatically mean pricing. Term sheet could mean
23 indication of interest at a level.
24     MR. BRODSKY: He's asking you if you could
25 generalize. In the course of a deal from the first

Page 92

1 germination of the idea through the closing of
2 transactions, when typically, if there is a typical
3 standard, does the term sheet end up in your hands?
4 That is what you are asking, correct?
5     MR. WILCOX: Yes.
6     MR. BRODSKY: If you can, you can. If you
7 can't, you can't.
8     BY MR. WILCOX:
9    Q  Is it a month before pricing or is that
10 like in a certain amount of time?
11    A  I think a certain amount of time.
12    Q  A week before pricing?
13    A  It could be a week, yes.
14     BY MR. CHIMIENTI:
15    Q  Is it coterminous with the offering
16 memorandum or the preliminary efficiency?
17    A  To my recollection, we've had — by the time
18 we do a term sheet, we've had credit calls and that
19 information has been determined.
20    Q  So the POS is already completed?
21    A  Not necessarily.
22     MR. CHIMIENTI: Thank you.
23     BY MS. GARNER:
24    Q  Does IFS have a methodology for pricing
25 bonds?

Page 93

1     MR. BRODSKY: In what context? New issues
2 in which they're the sole or lead underwriter?
3     MS. GARNER: Yes.
4     MR. BRODSKY: Of municipal bonds?
5     MS. GARNER: Yes.
6     THE WITNESS: No.
7     BY MS. GARNER:
8    Q  And for an offering where you are the
9 primary or IFS is the lead or co-manager of an
10 underwriting, how does IFS price the bonds?
11    A  We will — if we're a co-manager, we will
12 typically put together what we think is a scale,
13 depending on the structure of the bond issue. And we
14 will have pricing calls with Senior Manager or the
15 other co-manager. And we'll — everybody will give
16 their ideas and thoughts and come to a consensus.
17    Q  And when you say "scale", do you mean a
18 range of yields?
19    A  Yes.
20    Q  And how do you come up with that scale?
21    A  You price it based on the MMD on a spread to
22 MMD.
23     BY MR. WILCOX:
24    Q  What are the factors that would influence
25 the spread to MMD that you would take into account?

Page 94

1  A  How good or bad the credit may be. How bad
2  the state may be that it is in. What sort of factors
3  affect how this bond is going to trade. What, you
4  know, if you -- you're asking us about generalities on
5  bond issues. The bond issues that we have solely led,
6  you can't generalize. They are distressed credits.
7  They're, pardon the expression, crappy, extremely
8  crappy credit. You don't price it and go into the
9  marketplace. It's a negotiated sale period.
10  Q  What do you mean you don't price it and go
11  into the marketplace?
12  A  Just what I said. It's a negotiated sale.
13  You find someone who will buy this crappy credit and
14  you negotiate a level at which they will buy it.
15  Q  Does IFS specialize in this sector of the
16  market?
17  A  We have done a number of them, yes. I don't
18  know -- we are not trying to do only distressed
19  credits, but we have done a number. And we've been
20  able to get things done that no one else has been able
21  to get done, because no one else wants to do it.
22  Q  So what risk are you taking in bringing
23  that bond to market then?
24  A  I don't understand your question.
25  Q  You're not taking the bonds on to IFS's

Page 95

1  balance sheet or anything like that and then
2  reselling them?
3  A  No.
4  Q  It is a best efforts negotiated sale
5  period. I mean that's it.
6  Q  And --
7  MR. BRODSKY: Excuse me a second.
8  THE WITNESS: Well, it is until we sign the
9  Bond Purchase Agreement. But I do not know of a
10  situation that we are going to buy bonds that we
11  haven't had them sold.
12  MR. WILCOX: Is there a difference in your
13  professional opinion between rated, non-rated and
14  rated securities?
15  MR. BRODSKY: Is there a difference between
16  "rated" and "non-rated" besides the fact that one is
17  rated and the other is non-rated?
18  MR. CHIMIENTI: Just asking.
19  MR. BRODSKY: Do you recognize that there is
20  a thing called "rated" and there is a thing called
21  "non-rated"?
22  THE WITNESS: Yes. There is rated bonds and
23  non-rated bonds.
24  BY MR. CHIMIENTI:
25  Q  Let's back up a little to get to this.

Page 96

1  A  Okay.
2  Q  What is your definition?
3  MR. BRODSKY: Just one second.
4  THE WITNESS: I am sorry.
5  MR. CHIMIENTI: Does he want to restate the
6  prior answer?
7  MR. BRODSKY: No.
8  BY MR. CHIMIENTI:
9  Q  So you had mentioned earlier these were
10  distressed credits. We're still having a general
11  conversation where, a general discussion under time
12  at IFS. So can you give us a definition of what a
13  distressed municipal credit is to you?
14  A  A credit that has severe adverse financial
15  problem within the city or the county or the state. A
16  city that has defaulted in some respects. A city that
17  has not met or community or county or whatever has not
18  met their filing requirements. A city that is
19  perceived by the general marketplace to be an absolute
20  terrible place. Generally, it's because they don't
21  have any money. They have a very low or bad tax base.
22  They have very poor tax collections. They have in
23  most cases defaulted in some respect on their debt.
24  That's distressed.
25  Q  Okay. So thank you. In terms of a

Page 97

1  rating, can you -- we are just talking about
2  distressed credits while you were at IFS. In terms
3  of a rating, are distressed credits generally rated
4  investment grade?
5  A  No.
6  Q  What are they usually rated?
7  A  They're not, or if they get something in a C
8  or B or whatever. I mean they are not investment
9  grade rated, no.
10  Q  And just so we have it on the record, in
11  terms of investment grade rating, do you know the
12  lowest investment grade rating from Moody's and
13  Standard & Poor's? Can you tell me what that rating
14  is?
15  A  BBB or BBB- for Standard & Poor's. I
16  believe it is BAA3 for Moody's. It is the last knot
17  before it goes to BB or BA.
18  Q  Correct. Okay. So a distressed credit is
19  one that is generally not rated, is that correct? I
20  think that is what you just testified. I want to
21  make sure. If it is a distressed credit, it's
22  generally not rated. But if it is rated, it's below
23  BBB- or BAA3. In other words --
24  MR. BRODSKY: Typical.
25  MR. CHIMIENTI: Typically.

Page 98

1    THE WITNESS: It's not necessarily true
2    typically.
3        BY MR. CHIMIENTI:
4        Q   Okay.
5        A   Scranton is a distressed credit. Scranton
6    has some bonds in the marketplace that are BAM
7    insured. They have AA. They don't trade like a AA
8    insured piece of paper. They have no underlying
9    rating. The City -- I mean the city has had a default
10   problem. They've got a pension problem and the bonds
11   trade like dirt.
12       Q   When you say "they have no underlying
13   rating", did they have an underlying rating and it
14   was withdrawn?
15       A   Yes.
16       Q   So they no longer have an underlying
17   rating, but they did at one point?
18       A   Yes.
19       Q   And when you say "default", can you give
20   me your definition of what a default is in the
21   municipal marketplace?
22       A   Failed to make a payment.
23       MR. CHIMIENTI: Thank you.
24       MS. GARNER: For bond offerings --
25       THE WITNESS: Excuse me. To expand, or a

Page 99

1    required filing that puts them in a technical default
2    situation.
3        MR. CHIMIENTI: Understood.
4        BY MS. GARNER:
5        Q   For bond offerings that IFS is
6    underwriting, primary bond offerings, do you usually
7    participate in prepricing calls, or are there --
8    first let me ask, are there prepricing calls?
9        A   To who? I'm not trying to be smart, I'm
10   just trying to determine who you are asking if their
11   pricing calls to.
12       Q   With the issuer, prepricing calls.
13       A   I have not participated in any prepricing
14   calls to the issuer to the best of my recollection.
15       Q   And I mentioned "issuer", but also the
16   bond counsel could be on the line, MA, if there is
17   an MA.
18       A   We have customer calls with the City, with
19   the Financial Director of the City, sometimes the
20   Mayor, sometimes the City Attorney. It depends on the
21   structure that the City has and the way they determine
22   what or how they want to do it. And at that point in
23   time we are trying to get the best price that we can
24   for the City. Now that's with the -- that is with the
25   potential buyer. Now we talked -- we talked to the

Page 100

1    buyer, or at least my situation has been we talk to
2    the buyer say the City and then we may go back and say
3    we have this. If we don't have the buyer and the City
4    on the line. I don't do that. I don't make those
5    calls. I make the buyer calls. I do not make the
6    calls with the City or the issuer.
7        Q   And who does the call with the issuer?
8        A   That's the banker.
9        Q   At some point did you learn that Harvey
10   Public Library was going to be doing a bond
11   offering?
12       A   Uh-huh. Yes, ma'am.
13       Q   And when did you learn about that?
14       A   I think the first time I heard about that
15   was two or three months before the deal was done.
16       Q   So the deal was done in January 2015,
17   correct?
18       A   Correct.
19       Q   And so you would have heard it two or
20   three months before. Would that be November or
21   October of 2014?
22       A   That's when -- as I remember correctly, it
23   was initially thought that the deal was going to come
24   in maybe the end of October or in November, I believe.
25       Q   And when you say when the deal was going

Page 101

1    to come in, what did you mean by that?
2        A   When it was initially going to come to
3    market.
4        Q   Got it.
5        A   And then it was delayed, as I understand it.
6        Q   What were you told initially about the
7    bonds, the District's bonds?
8        A   That we were doing a Harvey Library District
9    and we were going for a rating and we thought we were
10   going to go to an investment grade rating.
11       Q   So in October or early November you were
12   told that the District was going for a rating?
13       A   I think that was sometime in there.
14       Q   Was there ever any consideration given to
15   try to sell the bonds unrated and uninsured?
16       MR. BRODSKY: By him or by anybody at IFS?
17       MS. GARNER: By him or anybody at IFS.
18       THE WITNESS: I don't know.
19       BY MS. GARNER:
20       Q   So explain to us what you did in
21   connection with the Harvey Library bonds, the
22   offering?
23       A   I was asked what I thought I believe BBB. I
24   believe Harvey was BBB. I believe it was BBB.
25       Q   The library?

26 (Pages 98 to 101)

Page 102

1    A   Yes, I think it was BBB underlying. And I
2    said, "What do you think a BBB underlying bank
3    qualified possibly insured deal in Illinois would sell
4    for?" And I started researching what I thought was a
5    reasonable spread to MMD and gave them what I thought
6    my suggestions were.
7    Q   And whose "them"?
8    A   It was Craig primarily, who was the
9    underwriter? No, I'm sorry. Excuse me, Alvin Boutte,
10   the underwriter. I keep thinking about Compton.
11   Sorry.
12   Q   And since you were researching the spread
13   to MMD, correct?
14   A   Correct.
15   Q   What did that research consist of?
16   A   I would call brokers' brokers who were
17   seeing bonds actively in the marketplace. I looked on
18   the Bloomberg picks to see what similar type of
19   Illinois bonds were trading, that sort of thing.
20   Q   Did you create a research file?
21   A   No.
22   Q   How did you keep track of your research?
23   I'm sorry you have to --
24   A   I'm sorry. I just looked at what seemed to
25   be comparables with my initial information and

Page 103

1    understanding about Harvey.
2    BY MR. WILCOX:
3    Q   And comparables would have what criteria?
4    A   Small little issuers. Only come to market
5    occasionally, that sort of thing.
6    Q   You would be looking at other BBB credits?
7    A   Yes.
8    Q   Other insured BBB credits?
9    A   Yes.
10   BY MS. GARNER:
11   Q   I just want to get clear on the record
12   your response to my earlier question. You said you
13   didn't keep a research file, correct?
14   A   No.
15   Q   And how did you keep track of the research
16   you did?
17   MR. BRODSKY: And you pointed to your head?
18   THE WITNESS: I go and look in the
19   marketplace to make a determination.
20   MR. BRODSKY: She's asking you a different
21   question. If I might? She asked did you record in
22   notes or in a file?
23   THE WITNESS: No.
24   MR. BRODSKY: And then you said no. And
25   then she said how did you keep track of it. And you

Page 104

1    pointed to your head. You have to say something
2    verbally, because the Court Reporter can't --
3    THE WITNESS: In my head.
4    BY MS. GARNER:
5    Q   You kept track of the research in your
6    head?
7    A   Yes.
8    Q   Thank you.
9    MR. WILCOX: Would you be -- did you look at
10   that time, were you looking at short-term bonds,
11   long-term bonds, bonds across the entire maturity
12   spectrum to come up with this scale?
13   A   I was told initially that we were going to
14   do I believe it was 17-year paper with a ten-year
15   call, level EBIT amortization.
16   Q   Seventeen year final material?
17   A   Yes.
18   BY MS. GARNER:
19   Q   Did you have any contact with anyone from
20   the District?
21   A   No.
22   Q   Did you have any contact with the
23   District's municipal advisor, Brandon Comer?
24   A   No, not directly.
25   Q   Did you communicate with him through

Page 105

1    another IFS employee?
2    A   I was told information that Brandon had
3    passed on to other IFS employees, yes.
4    BY MR. WILCOX:
5    Q   So who did you give the scale to?
6    A   Alvin.
7    Q   And approximately what time frame, if you
8    can recall?
9    A   I don't remember exactly when he asked me
10   for what my price thoughts might be, my pricing ideas
11   might be. And I said, "I'm not sure. Let me take a
12   look."
13   Q   Was there multiple instances over the
14   course of the October time frame to the January
15   underwriting that he came back to you for additional
16   input or adjusted pricing?
17   A   Initially that it was postponed. And then
18   when it came back again, and he said, we're looking.
19   I said I think this is going to be coming to market
20   probably towards the end of the month or something
21   like that.
22   Q   And do you know what he would do with
23   this -- with the levels of the scale that you came
24   up with?
25   A   I am assuming that he's having conversations

Page 106

1   with the financial advisor and with the City.
2       MR. BRODSKY: His question was not what you
3   assume. Do you know?
4       THE WITNESS: No, I do not.
5       BY MR. WILCOX:
6       Q   Was there a third party that would be
7   running analytics for IFS? Are you aware of a third
8   party that was running analytics for IFS for their
9   municipal securities offerings?
10      A   I believe at that time David Corbin's
11  company, I believe, was doing the analytics.
12      BY MS. GARNER:
13      Q   Did you provide them any information for
14  them to do the analytics?
15      A   What type of information?
16      MR. BRODSKY: Did you provide information to
17  David Corbin's company to do the analytics? That's
18  the question.
19      THE WITNESS: Did I provide direct
20  information to Dave Corbin's company, no.
21      BY MS. GARNER:
22      Q   Did you provide information through
23  another employee at IFS?
24      A   When I gave them an order for the bonds and
25  they ran the analytics based on that order.

Page 107

1       Q   What do you mean by "order"?
2       A   When we had an order for the bonds.
3       Q   After the bonds had been priced and sold?
4       A   After the bonds -- once we had an order for
5   the bonds, we had a specific structure that we had to
6   accommodate. May I back up for one second?
7       Q   Sure.
8       A   You were asking me how I determined or how I
9   came up with a price. I didn't know Harvey, the City
10  of Harvey or anything when I initially gave a price.
11  I was looking for comparable items. Harvey Library
12  District is not a comparable item to other credits out
13  there. It may be a wonderful little library district,
14  but the City of Harvey is a disaster. I think you
15  guys may have clamped down on it in some respects.
16  But they hadn't filed -- and I honestly didn't --
17  well, I shouldn't say. I did not find out that they
18  had not filed financials for five years until I got
19  involved in trying to find somebody to buy this. This
20  was a question that came from BMO asking me. I said,
21  Well, the District..." They said, "We don't care about
22  the District. We want the information about -- from
23  the City of Harvey." As far as they were concerned,
24  it was the same tax base, the same people. They
25  didn't care. Once --

Page 108

1       MR. BRODSKY: They didn't care what?
2       THE WITNESS: They didn't care to see
3   necessarily the financials of Harvey Library District.
4   They wanted to know about the City of Harvey. Had
5   anything changed. As we got involved in it, that's
6   when I learned how bad Harvey was and how bad it was
7   tainted and how bad -- how many customers I had that
8   would laugh when I would mention the name.
9       BY MS. GARNER:
10      Q   I want to go back to my original question.
11  Asking if you had provided any information or data
12  to the third party contractor who is doing the
13  quantitative analysis for IFS for these bonds?
14      A   And I answered that question.
15      Q   You said -- I asked did you say direct
16  information and you said no. And then I asked did
17  you provide any information through another IFS
18  employee to that third party contractor?
19      MR. BRODSKY: And he said he did it when
20  there was an order.
21      BY MR. WILCOX:
22      Q   Prior to that?
23      A   No.
24      Q   When you were looking at comparables to
25  determine your spread to MMD, do you recall any of

Page 109

1   the comparables that came up?
2       A   Well, there were some similar -- well, I
3   have to rephrase that. There were credits that on
4   their appearance would have been comparable, but
5   really weren't, as I found out later. So when I'm
6   looking at something that's seemingly is trading at
7   120 or 125 or so to MMD, I'm not taking into
8   consideration the overall picture and the way
9   potential buyers looked at the overall picture.
10      Q   So initially you were looking at those
11  comparables. Do you recall any of the names of
12  those comparable issuers?
13      A   No.
14      Q   Would they have been other recent bank
15  qualified transactions?
16      A   There would have been other transactions or
17  other BBB underlying type transactions in Illinois or
18  other City, states or that were under fire. Let's put
19  it that way.
20      Q   And would you be looking at secondary
21  market trades only or primary transactions only?
22      A   Well, the best way to gauge it is to look at
23  the current secondary transactions, in my opinion.
24      Q   And how would you find those?
25      A   I would talk to -- I would go to brokers'

## Page 110

1  brokers and I would ask them if they were familiar
2  with anything in that area or that sector that they
3  traded. They would give me names or they would give
4  me CUSIPs. I could punch the CUSIPs up on Bloomberg
5  and I could see how the bonds traded. And I could
6  calculate the spread over MMD by the price and the
7  yield on the bond.
8      Q   And so initially that's how you derived
9  the spread to MMD that you gave to Mr. Boutte?
10     A   Yes.
11         BY MR. CHIMIENTI:
12     Q   So if I could, the City of Harvey's
13  credit, the City of Harvey versus the Library
14  District, do those two credits share a revenue
15  source?
16     A   They share the same tax base. I guess in
17  that respect they do share the same revenue source.
18     Q   What is the rating, if you recall, at that
19  time on the deal we're talking, December/January
20  2015, December 2014 to 2015, what was or is the
21  rating of the City of Harvey at that point?
22     A   To my knowledge they have no rating. It was
23  withdrawn four or five years ago.
24     Q   Because? Do you know why?
25     A   No.

## Page 111

1      Q   But the City of Harvey -- the Harvey
2  Library District did have a rating, correct?
3      A   They had just gotten a rating, yes.
4      Q   And that rating was or is --
5      A   I believe it was BBB.
6      Q   BBB negative block or BBB stable?
7      A   I don't know.
8      Q   I'll represent to you that it was BBB
9  stable.
10     A   Okay.
11     Q   And the City of Harvey, was that -- were
12  they able to get insurance by your estimation, bond
13  insurance?
14     A   The City?
15     Q   Right.
16     A   I don't think the City was allowed to issue
17  bonds at that time to the best of my recollection from
18  what I was told after the fact.
19     Q   I understand. But the Harvey Library
20  District was able to get AA rated bond insurance,
21  correct? In others word, this deal that IFS was the
22  Senior Manager, sole manager, it wasn't insured?
23     A   Yes.
24     Q   We talked earlier about the sales
25  memorandum. I think you said it was called a term

## Page 112

1  sheet at IFS, is that correct?
2      A   Correct.
3      Q   Was there a term sheet on this
4  transaction?
5      A   Yes.
6      Q   And did that term sheet discuss the credit
7  of the Harvey Public Library District?
8      A   Of the District, yes.
9      Q   And do you recall if it discussed the
10  credit strengths?
11     A   The District had, you know, decent numbers.
12     Q   Decent enough to get a BBB stable rating?
13     A   Yeah.
14     Q   Which is -- are you familiar -- let me ask
15  you this question. Do you know right now the State
16  of Illinois' rating?
17     A   I believe it's -- I have not seen the latest
18  check, but I think it was getting downgraded, I
19  believe. I don't know what it is. I haven't looked.
20     Q   Is it in the BBB range? I'll represent to
21  you it is in the BBB range.
22     A   Okay.
23     Q   Would it be uncommon in a State like
24  Illinois -- now, I'm talking about your experience
25  in general. Your decades of experience in the

## Page 113

1  municipal market as a salesman, correct? So in your
2  experience when you have a BBB rated State, is it
3  uncommon to have a BBB rated municipal entities?
4      A   I'm not sure I understand what you're
5  asking.
6          MR. CHIMIENTI: I'll strike the question.
7  Forget it. Go ahead.
8          BY MS. GARNER:
9      Q   Did you have any input into how the Harvey
10  Public Library District bonds were ultimately
11  structured?
12     A   No.
13         BY MR. WILCOX:
14     Q   Do you recall the approximate yield level
15  for your initial scale for Harvey with the structure
16  that you were talking about, the 17-year final ten
17  year call?
18     A   To the best of my recollection, I believe I
19  was -- I indicated something around the four and a
20  half range.
21     Q   Do you know if that was communicated to
22  the client?
23     A   To which client?
24     Q   To Harvey, the Harvey Library?
25     A   I don't know. I don't know.

Page 114

1    Q   And you transmitted that scale to
2    Mr. Boutte?
3        A   I gave him what I thought my indications
4    were, yes.
5        Q   Okay.  Did you also give that to
6    Mr. Walker?
7        A   I think so.
8        Q   Who was your primary contact from the
9    banking side that you dealt with at IFS Securities?
10       MR. BRODSKY:  Object to the form of the
11   question.  Lack of foundation.  You can answer if you
12   can.
13       THE WITNESS:  Alvin Boutte was the primary
14   banker.  He may have been talking with Craig, only
15   because Craig was in Atlanta and he had a little more
16   direct pipeline to David Corbin to run the numbers.
17       BY MR. WILCOX:
18       Q   And you were in Atlanta as well?
19       A   Yes.
20       Q   So did you have regular interaction with
21   Mr. Walker on the Harvey transaction?
22       A   We talked, yes.
23       BY MS. GARNER:
24       Q   When did you start reaching out to your
25   client base for potential buyers for the Harvey

Page 115

1    Library bonds?
2        A   I think -- I believe it was around the 8th
3    or 9th or something.
4        Q   Of November?
5        A   It was November or January.  The deal came
6    in January, right?  So it would have been in January.
7        Q   You mentioned that you thought that the
8    deal -- that the deal was going to go to market in
9    October 2014 or early November 2014?
10       A   I believed that was initially it was going
11   to come before it actually came.  I can't tell you
12   exactly when it was going to come, but I know it was
13   scheduled to come before it came.
14       Q   Do you know why it ended up not going to
15   market in October or November of 2014?
16       A   I do not.
17       Q   You didn't reach out — you didn't contact
18   potential buyers before January, is that what you
19   are saying?
20       A   I didn't have anything to contact them with.
21       MR. BRODSKY:  Just answer her question.
22       THE WITNESS:  No.
23       BY MS. GARNER:
24       Q   Did you reach out to potential buyers in
25   November?

Page 116

1    A   No.
2    Q   Did you contact any bank qualified buyers
3    in connection with the Library's bonds?
4    A   No.
5    Q   Why not?
6    A   I don't cover bank qualified people.
7    Q   Does IFS — and I'm talking about not just
8    you, but everybody there.  Does IFS have bank
9    qualified buyers in their client base?
10   A   Yes.
11   Q   And do you know whose clients they are
12   specifically?
13   A   Charles Knox has a — I think a couple of
14   banks, some bank qualified customers.  I'm really not
15   sure who else.
16       BY MR. WILCOX:
17   Q   Is there any — do you have to be a bank
18   to buy bank qualified paper bonds?
19   A   No.
20   Q   Is there any disadvantage for a non-bank
21   to buy bank qualified paper?
22   A   Not that I know of.
23   Q   Did you reach out to your client base for
24   Harvey bonds?
25   A   Yes.

Page 117

1        MS. GARNER:  Did you think it would be
2    difficult to sell the Library bonds?
3        MR. BRODSKY:  When?  At what point?
4        MS. GARNER:  At any point that he learned
5    that he would be selling the bonds.
6        MR. BRODSKY:  I ask you to rephrase the
7    question.  He's already — I think — can you — if
8    you don't mind, can you answer the question, was it
9    difficult to sell the bonds.  Do you mind if he
10   answers that question?  Was it difficult —
11       MS. GARNER:  No, I don't want him to answer
12   that.
13       BY MS. GARNER:
14   Q   When you first learned about the bonds,
15   did you think it would be difficult to sell them?
16   A   I didn't think it would be easy, but I
17   didn't know the scope and the depth of how bad the
18   situation was.
19       BY MR. WILCOX:
20   Q   And in the December timeframe, your spread
21   to MMD or into October or November timeframe when
22   you initially gave the spread to MMD to Mr. Boutte,
23   you took into account other comparable bonds based
24   upon rating and insurance?
25       MR. BRODSKY:  Object to the form.  You may

Page 118

1  answer.
2  THE WITNESS: Based on the rating, excuse
3  me. Yes. At that time I had no basis to look at the
4  severity of the situation. I did not know about the
5  severity of the situation. That changed dramatically.
6  MR. CHIMIENTI: When did that change?
7  A  When I found out about it.
8  Q  Do you remember when that was? Was it
9  October, November, December?
10  A  It was in January, when we really were
11  making -- the deal was getting ready to come. We got
12  information. We're sending it out and I'm getting
13  laughed at by customers literally.
14  BY MR. WILCOX:
15  Q  Do you remember who specifically laughed
16  at you?
17  A  Watermill Asset Management. Allstate
18  chuckled. They were very kindly. They said we don't
19  think this fits into what we want to do. Levine
20  wouldn't even return my calls. I talked to Ziegler
21  here in town. He laughed. I even tried my better
22  account, Geneve Corp, and he said "Really? No thank
23  you." That was what I got from everybody. The only
24  person that showed any remote interest in Harvey was
25  BMO, Eric Schleicher.

Page 119

1  And I believe we sent you e-mails that --
2  with e-mail correspondence that questions that Eric
3  and AG, I believe is her last name, were asking
4  concerning the credit. And as I repeated before,
5  BMO wanted financials on the City. BMO wanted all
6  the information that they could get. And I couldn't
7  get them to pull the trigger. Plus they wanted us
8  to structure a shorter term at, you know, it was a
9  little less rate, but not dramatically less. But
10  considering it was going to be for a partial amount
11  of the bonds, and it was going to be seven to ten
12  year maturity. I gave it an average life of
13  somewhere between three and six years, depending on
14  the maturity. It wasn't that good. Nobody wanted
15  to steal. No banker, no firm would touch this deal.
16  An authorization since 2011. Nobody would do this.
17  When I gave them the order, the only order that I
18  could get, it is my understanding that the financial
19  advisor tried to take it to a bank to see if he
20  could get a bank to do it at a better deal. And he
21  couldn't find a bank that would do it. Nobody would
22  touch this deal.
23  BY MR. CHIMIENTI:
24  Q  Do you remember ever reading the ratings
25  report on the Harvey Library?

Page 120

1  A  I looked at the report that I was sent.
2  Q  Did any of the buyers ask for the ratings
3  report?
4  A  I sent it to all of them. I'm telling you
5  they didn't care.
6  Q  I understand.
7  A  I mean --
8  Q  You can keep going.
9  A  I'm just saying they did not care. It was
10  irrelevant to the situation.
11  BY MR. WILCOX:
12  Q  When you were getting this feedback from
13  customers, that was approximately early January when
14  you reached out to them?
15  A  It was between -- I believe the date was the
16  8th or 9th and when we finally got the, you know, the
17  finalized order, I believe it was on the 15th or 16th.
18  Q  So what did you do with the feedback that
19  you were getting from your clients?
20  A  I was informing everyone.
21  Q  Everyone internally at IFS?
22  A  Yes.
23  Q  Could you specifically name the people
24  that you were informing?
25  A  Well, Alvin, Craig, Alex.

Page 121

1  Q  Was there a new scale that was put out
2  based upon this information?
3  A  At that point, no. At that point before we
4  did anything, we were trying to find someone that
5  would entertain buying the deal at some type of a
6  negotiated price. And Harvey had a lot of interesting
7  requirements in it.
8  First of all, it had to generate 8 or
9  $900,000 in premium, because I believe the State of
10  Illinois doesn't allow you to -- you got to put the
11  cost of issuance and fees and everything else after
12  you go into the bond issue. I believe that is the
13  law that they made. It had a ten-year call. Bonds
14  had to be priced to the call. And you had to create
15  a coupon large enough based on the order to generate
16  that kind of premium. So it wasn't necessarily an
17  easy sale or easy structure. If everything was nice
18  about it, it would have been a tough sale. But
19  there is nothing nice about it. It was a walking
20  disaster.
21  Q  Has IFS ever underwritten that type of
22  structure or that type of bond before as a lead?
23  A  We had -- no, not as a lead. We had
24  comanaged Shreveport which had some premiums in it and
25  different things like that. But compare apples to the

## Page 122

1 apples, and not apples to peaches or grapes. I mean it
2 is a totally different situation.
3     BY MS. GARNER:
4     Q  Did any of the buyers who laughed at you
5 when you bought them the Library bonds, articulate
6 the reason why they found the bonds so unattractive?
7     A  It was Harvey, Illinois.
8     Q  It was the concern that the bonds wouldn't
9 be paid, that the sufficient taxes wouldn't be
10 collected?
11     A  Yes. The tax collections I think are 70
12 percent or less.
13     Q  Did they understand that the bonds were
14 insured?
15     A  Yes.
16     Q  So the bonds being insured means that if
17 the City is unable to pay on the bonds that the
18 insurance company will pay for the City, right?
19     A  That's correct.
20     Q  Did they understand that the bonds were
21 insured?
22     A  Yes.
23     Q  So even if there's concerns about being
24 paid out on the bond, if they understood that they
25 are going to be paid anyway, they still had a

## Page 123

1 problem with Harvey?
2     A  If you buy something knowing that it is a
3 bad credit, I don't care what kind of insurance it's
4 got, the hassle that you have to go through if the
5 insurance has to kick in. I mean there's a lot of,
6 you know, buyers have a lot of repercussions. Plus
7 depending on who the buyer is, they have to answer to
8 a Board or to an investment committee or somebody, and
9 it is just not worth sitting there trying to explain
10 to them why they bought the Harvey Library District.
11 It's Harvey, Illinois period. They don't want to go
12 through the hassle. It's not worth their time. It is
13 not -- if you want to buy AGN, go out and buy AGN.
14 You don't need to wrap Harvey around it.
15     BY MR. WILCOX:
16     Q  Why was there not a second pricing scale
17 done with this information that you received from --
18     A  Because we had no one that cared at all on
19 the initial pricing and we had nobody that would give
20 us an indication of where they would care. It would
21 have been somewhat -- I mean you could put anything
22 you want out there and say, "Yeah, we tried to sell
23 it." Nobody care.
24     Q  Do you recall any conversations you had
25 with Mr. Boutte or Mr. Walker about the reactions of

## Page 124

1 clients?
2     A  I said nobody cared. So the only person
3 that I have that has remotely expressed any interest
4 in this bond is BMO. And the question back to me, "Do
5 they want it all?" I said, "I don't know. I don't
6 think so." I can't get them to tell much of anything,
7 except they are still asking questions.
8     Q  Did BMO ever give you a yield level that
9 they were interested in the Harvey --
10     A  BMO came back after the fact and said they
11 would take 2 million bonds at four and three-quarters
12 with a ten-year maturity.
13     Q  Were -- to your knowledge, were other IFS
14 salesmen contacting their sales accounts to try to
15 sell the Harvey bonds?
16     A  To my knowledge, yes.
17     Q  And any reaction from their clients that
18 you are aware of?
19     A  The only order that we got on Harvey Library
20 District was an order from First Tennessee after I
21 asked -- I said, "Look, I don't know what BMO is going
22 to do. I got nobody that cares. Half the people
23 won't even return my phone calls. I can go -- you
24 want me to go to the street?" They said, "Yeah, give
25 it a try."

## Page 125

1     Q  Who did you have that conversation with?
2     A  Craig and Alvin and Alex and everybody at
3 that point.
4     Q  Was Mr. Wakefield involved in that
5 conversation?
6     A  I can't say with certainty. I think he was
7 on one or more of the discussions or we had him on a
8 speakerphone at some point. I can't tell you exactly
9 when or how or what. I can't give you the minute or
10 the timeline exactly. But Keith had the same. He had
11 nobody that cared. And he lives in Illinois. He has
12 got some Illinois-based clients, but nobody cared.
13     Q  And do you know how this information
14 was -- if this information was transferred back to
15 Harvey?
16     A  I don't know.
17     Q  Typically, would you expect that
18 information to go back to your client, the issuer?
19     A  That would be pure speculation on my part.
20       (SEC Exhibit 38 was marked
21         for identification)
22
23     BY MS. GARNER:
24     Q  Let me show you what has been marked as
25 Exhibit 38.

Page 126

1　　　Do you recognize this document?
2　　　A　I can't say with certainty. When was I
3　supposed to have gotten this?
4　　　Q　For the record, Exhibit 38 is Bates
5　stamped IFS C-8209-0013672 through 138720.
6　　　And it's an e-mail, correct?
7　　　A　Yeah, I'm sure that I got this. I can't say
8　with a certainty that I read through the whole thing.
9　　　Q　And it's dated November 18, 2014, correct?
10　　　A　Yes.
11　　　Q　And it's from Mr. Walker to Jervis —
12　　　A　Hough.
13　　　Q　— Hough. Thank you. Keith Wakefield,
14　and Danny Weeks and a copy to Allen McKenzie, right?
15　　　A　Yes.
16　　　Q　And you're Danny Weeks?
17　　　A　I am.
18　　　Q　And attached to this e-mail is a POS for
19　Harvey Library, correct?
20　　　A　Yes.
21　　　MR. BRODSKY: A draft.
22　　　THE WITNESS: A draft.
23　　　BY MS. GARNER:
24　　　Q　And in the e-mail Mr. Walker states,
25　"We're posting this for the public on December 1 for

Page 127

1　a December 4th pricing."
2　　　When he said "we'll be posting this", did
3　you read this e-mail to mean that you would be
4　posting the POS?
5　　　A　Yes.
6　　　Q　Was this posted on December 1st?
7　　　A　I don't know, because the deal wasn't done
8　then. It was postponed. I don't know if it was
9　posted or not.
10　　　Q　And there was no December 4th pricing,
11　correct?
12　　　A　No.
13　　　Q　Do you know why the deal was postponed?
14　　　A　I do not.
15　　　Q　Is this the first time — this e-mail, is
16　this the first time you got something regarding the
17　Library bonds in writing?
18　　　A　I would have to go back and check my e-mails
19　to say with 100 percent of certainty.
20　　　Q　In November, did you contact anyone
21　outside of IFS to determine interest in the bonds?
22　　　MR. BRODSKY: Objection. Asked and
23　answered.
24　　　MS. GARNER: Did you — you can still answer
25　the question.

Page 128

1　　　Did you contact anyone on November 2014
2　after receiving this e-mail?
3　　　A　After this e-mail?
4　　　Q　Yes.
5　　　A　No. Because it was almost simultaneous not
6　going to happen.
7　　　BY MR. CHIMENTI:
8　　　Q　If I could direct you to Bates stamped
9　Page 13675. It is about the third page in.
10　　　A　Okay.
11　　　Q　Does this page speak to a potential
12　structure for the bonds?
13　　　A　Yes.
14　　　Q　And what does it say to you?
15　　　A　It says that they are going to have bonds
16　maturing from 15 to 34.
17　　　Q　And potential term bond also, the last
18　little blurb on page has dollar sign —
19　　　A　It says "term bond", yes. You could look at
20　this and say yes, but you could also look at it and
21　say we could term it or we can do whatever we could do
22　with it. I don't know that you can 100 percent with
23　certainty assume that everything was going to be in
24　this structure.
25　　　Q　Thank you.

Page 129

1　　　BY MR. WILCOX:
2　　　Q　Do you know if this is coming from Mr.
3　Walker and not Mr. Boutte?
4　　　A　I do not.
5　　　BY MR. CHIMENTI:
6　　　Q　If I could direct you — this is all the
7　way in the back to Bates stamp 13719. It's
8　headlined "Exhibit 3"?
9　　　A　Okay.
10　　　Q　And what does that look like to you? I'm
11　sorry. What do you see on this page?
12　　　A　Nothing.
13　　　Q　13719.
14　　　A　I'm looking at 15 to 34. It has no amounts.
15　I mean it's someone that just, you know, it's a
16　potential structure. That's all it is.
17　　　Q　If you were to receive serial bonds years
18　to maturity 2015 to 2034, would you be required to
19　have CUSIP numbers for each maturity?
20　　　A　Yes.
21　　　Q　And if I could direct you to Appendices
22　which is the next page Bates stamp 13720?
23　　　A　Okay.
24　　　Q　Can you read the bold print at the top?
25　　　A　"— financial statements of the District for

Page 130

1 the fiscal year ending June 30, 2015."
2    Q   Do you recall that Harvey Library District
3 had its own financials?
4    A   Yes.
5    Q   Not the same as the City of Harvey?
6    A   It had separate numbers, yes.
7    Q   Separate orders and financials?
8    A   Yes.
9        MR. CHIMIENTI:  Thank you.
10       (SEC Exhibit 39 was marked
11       for identification)
12       BY MS. GARNER:
13   Q   I hand you what is marked as Exhibit 39.
14 Exhibit 39 is Bates stamped IFS C-08209-0013342.
15       Do you recognize this exhibit, Mr. Weeks?
16   A   No.
17   Q   It's an e-mail, correct?
18   A   Yes.
19   Q   Dated January 12, 2015?
20   A   Yes.
21   Q   Do you know who Darrell Reed is?
22   A   Yes.
23   Q   Who is he?
24   A   He is a salesman with IFS in California.
25   Q   Is he still with IFS?

Page 131

1    A   He is.
2    Q   And what is his — he is a salesman, so he
3 was — was he reaching out to potential buyers for
4 Harvey Library bonds?
5    A   Yes.
6    Q   Do you know he refers to — addresses the
7 "Stephanie".  Do you know who she is?
8    A   I do not.
9    Q   Did you ever discuss with him his efforts
10 to identify potential buyers for the bonds?
11   A   We talked about an account that he had kind
12 of helped start out with Rosemart and I think he had
13 spoken with them and they said no thank you.
14   Q   And do you know who Stephanie —
15   A   I do not.
16   Q   And in the e-mail he states that he
17 contacted — he states, "A few months ago I let you
18 know this new deal was in the works."
19       Were you aware of him contacting potential
20 investors back in November of 2014?
21   A   I was not aware of what he was doing, no.
22
23       MR. WILCOX:  Is he a municipal bond
24 salesperson?
25       THE WITNESS:  Yes.

Page 132

1        MS. GARNER:  You can put that aside unless
2 you guys have something else?
3        (SEC Exhibit 40 was marked
4        for identification.)
5        BY MS. GARNER:
6    Q   I'm handing you what has been marked as
7 Exhibit 40.  Exhibit 40 is Bates stamped IFS
8 C-08209-001-2861 through 12912.
9        And do you recognize this e-mail,
10 Mr. Weeks?
11       MR. BRODSKY:  Talking about the top one?
12       MS. GARNER:  Yes, it's forwarding another
13 e-mail, yes.
14       THE WITNESS:  Yes.
15       BY MS. GARNER:
16   Q   Is "Danny" you?
17   A   I'm assuming so.
18   Q   And do you know the e-mail address — do
19 you recognize that e-mail address?
20   A   Yes.
21   Q   And whose e-mail address is that?
22   A   It is Greg David.  He is one of the traders
23 at Wells Capital in Menominee Falls, Wisconsin.
24   Q   You testified earlier that you didn't
25 reach out — did you contact him to engage interest

Page 133

1 in the Harvey Library bonds?
2    A   I had sent the information to Wells.  I
3 honestly had forgotten.  I did not remember sending
4 this to Greg David.  I knew I sent it to Thomas
5 Steckman and Gil -- but I do not remember sending it
6 to Greg David.  I may have been told to send to Greg,
7 I can't say that with certainty.
8    Q   So is it fair to say that you reached out
9 to potential buyers of the bonds as early as mid
10 December 2014?
11   A   From this I would say yes.  If -- the only
12 time I sent anything out is when they told me that the
13 deal was ready to come.  And then when the deal wasn't
14 ready to come, I said it's not coming.
15   Q   So do you read the fact that you sent
16 this out has the deal coming how soon if you are
17 sending it out December 17th?
18   A   I don't know.
19   Q   Did you receive a response from Mr. David?
20   A   I don't remember.  To my knowledge, no.
21   Q   Do you recall speaking to him by phone
22 about the Harvey bonds?
23   A   I'm sure I did.  I called everyone when I
24 talk about something and they said send me up
25 something or forward me something if they want to take

Page 134

1　a look or if they will take a look. My first contact
2　which is what I have always done is picked up the
3　phone and call.
4　　Q　So this was probably a follow up to a
5　phone call?
6　　A　Probably.
7　　Q　You know if you contacted him before
8　sending this e-mail, do you know what you told
9　Mr. David about the bonds?
10　　A　Probably that this is something we were
11　looking to do.
12　　Q　At the time that you sent this to him, was
13　it your understanding that the bonds were going to
14　be rated and possibly insured?
15　　A　I don't -- I can't say with certainty what
16　the timeline is that I was told. I knew that they
17　were trying. I was told they were going to try to get
18　a rating. And then I was told that if they got a
19　rating they were going to try to get it insured. And
20　they couldn't do one. They knew they couldn't go to
21　the insured without getting S&P.
22　　As I later was told, I think they had to
23　jump through a lot of hoops and separate structures
24　in order to get a rating from S&P and then they had
25　to do more to get AT to insure it. I don't know

Page 135

1　exactly what that was. I wasn't part of that
2　discussion.
3　　Q　And looking at the POS that's attached to
4　the e-mail, is there any indication that the bonds
5　are rated?
6　　A　From what I see here, I don't see any
7　indication that they are rated. I'll go through and
8　see anywhere it says that, but I don't -- I think that
9　they were trying to get a rating. I know they were
10　trying to get a rating. I don't think the rating came
11　in until sometime in January, I believe is when S&P
12　signed off on it. Whenever the rating came in, one of
13　them took a long time to decide. Whether it was AGM
14　to insure it or S&P to rate it. I don't know the
15　timeline for either one of those.
16　　Q　And is there any indication looking at the
17　attachment to the e-mail that the bonds are insured
18　yet?
19　　A　I don't see anything on here that says it,
20　but I haven't looked at the entire POS. Well, it says
21　right here "Standard & Poor's has assigned this
22　municipal bond rating of nothing to the bonds." So
23　I'm guessing it was not insured at that point.
24　　MR. BRODSKY: You mean to say "of blank".
25　It doesn't have the word N-O-T-H-I-N-G?

Page 136

1　　THE WITNESS: Just blank. I'm sorry.
2　　MR. BRODSKY: You're referring to Page 1286,
3　numbered Page 17?
4　　THE WITNESS: Yes.
5　　BY MR. CHIMIENTI:
6　　Q　In your experience of multiple decades of
7　experience in the municipal market --
8　　MR. BRODSKY: You really want to make him
9　feel bad, don't you?
10　　MR. CHIMIENTI: Anyway, if there were no bond
11　rating on this deal, would that section have been
12　included in the preliminary official statement?
13　　MR. BRODSKY: Object to the form of the
14　question, but you can answer.
15　　THE WITNESS: I don't know. I have never in
16　my career put together OSs. I have never put
17　documents NOs ever.
18　　MS. GARNER: Put Exhibit 40 aside.
19　　　(SEC Exhibit 41 was marked
20　　　for identification)
21　　BY MS. GARNER:
22　　Q　I am handing you what has been marked as
23　Exhibit 41?
24　　A　Yes. This one went to Erik Schleicher.
25　　Q　Exhibit 41 is Bates stamped IFS

Page 137

1　C-08209-0012913 through 129964.
2　　Do you recognize this exhibit, Mr. Weeks?
3　　A　No, but I know that I did it, yes.
4　　Q　And so this is an e-mail that you sent to
5　Erik Schleicher?
6　　A　Schleicher.
7　　Q　Schleicher. S-C-H-L-E-I-C-H-E-R. And he
8　works at BMO?
9　　A　He did.
10　　Q　He did at the time this e-mail was sent?
11　　A　Yes.
12　　Q　Which was December 17, 2014?
13　　A　Yes.
14　　MR. BRODSKY: Can I make one thing clear,
15　because he said two different things. Would you mind
16　if I clarify very briefly?
17　　MS. GARNER: Sure.
18　　　EXAMINATION
19　　BY MR. BRODSKY
20　　Q　Do you have an actual recollection of this
21　e-mail?
22　　A　I honestly do not.
23　　Q　So when you say it's an e-mail from you to
24　Mr. Schleicher or Schleicher, however his name is
25　pronounced, what you mean is, and correct me if I am

Page 138

1  wrong, you see it and you know that Erik was one of
2  your customers and therefore you assume that it is
3  what it looks like, is that fair?
4      A   That's fair. That's correct.
5          EXAMINATION
6      BY MS. GARNER:
7      Q   So on December 17, you sent Mr. Schleicher
8  a copy of the draft POS for the Harvey bonds?
9      MR. BRODSKY: Do you remember doing that?
10  That's what she's asking.
11      MS. GARNER: I'm asking if you remember.
12  According to this document you sent him an e-mail on
13  December 17th that attached a draft POS for the Harvey
14  bonds, Harvey Library bonds.
15      MR. BRODSKY: She wants to know if you
16  remember doing that because it's obvious, but that
17  isn't - this is what she is asking.
18      THE WITNESS: As I said before, and there
19  was a conversation that the deal was going to come and
20  then the deal was not -- was pulled. I honestly -- I
21  do not remember sending these e-mails on the 17th.
22  Quite honestly after this thing was determined that it
23  wasn't going to come, I really didn't think about it
24  again until they said let's go with it, which was in
25  January. I apologize, but I forgot. I didn't

Page 139

1  remember sending these out. But it is consistent with
2  what I said, that I at least -- I'm trying -- I talked
3  to people, but when it was pulled I didn't care about
4  it anymore until I knew it was coming.
5      BY MS. GARNER:
6      Q   Who told you the deal wasn't going to
7  come?
8      A   I was told it had been postponed.
9      Q   By whom?
10      A   I believe by both Alvin and Craig.
11      MR. WILCOX: In your experience, is that
12  common for a deal to be postponed?
13      THE WITNESS: It's not uncommon. It was in
14  December. Like I said, the one thing that I remember
15  being told, and it was either the rating they were
16  waiting on or it was the rating to get to apply for
17  the insurance or one of the other, and they weren't
18  going to do anything until that was resolved. I
19  cannot sit here and give you an exact timeline. I
20  just can't. I'm sorry.
21      BY MS. GARNER:
22      Q   And BMO later in January expressed
23  interest in the bonds, correct?
24      A   Yes.
25      Q   And again that was for a portion of the

Page 140

1  bonds, correct, not the entire --
2      A   You are asking two different questions.
3      Q   How so. Well, you said BMO expressed an
4  interest?
5      A   Yes. What time did they -- when --
6      Q   So at some point in January did they
7  express interest in the bonds?
8      A   BMO expressed interest. They kept asking
9  questions concerning the credit worthiness and they
10  kept asking a lot of different questions and we kept
11  supplying them with everything that we could supply
12  them with. The last thing they asked for was the last
13  three years audited financials for the City of Harvey.
14  They said they hadn't filed financials. i called
15  Alvin and Alvin said they haven't filed financials in
16  five years. So I told that -- I relayed that to Erik.
17  And they could not pull the trigger. And finally when
18  they did, the commitment had been made to sell the
19  whole deal. They never came in and never wanted to
20  buy the whole bond issue.
21          (SEC Exhibit 42 was marked
22          for identification)
23      BY MS. GARNER:
24      Q   I'm handing you what is marked as
25  Exhibit 42. Exhibit 42 is Bates stamped

Page 141

1  IFS-C-08209-0011940.
2      Mr. Weeks, do you recognize this exhibit?
3      A   Vaguely.
4      Q   Looking -- just looking at it, if you
5  recall what -- sending this, but what type of
6  communication is this?
7      A   It's a Bloomberg message.
8      Q   And it's a Bloomberg message you sent to
9  Mr. Schleicher on December 18, 2014, is that
10  correct?
11      A   That's correct.
12      Q   And you said in your subject, "Erik, good
13  morning. I'm thinking about pricing Harvey
14  Library."
15      A   Correct.
16      Q   And what did you mean by that statement?
17      A   I meant that I was told by the bankers that
18  they were thinking about ready to go.
19      Q   Okay. So at this point you still thought
20  maybe it was going to move forward?
21      A   I did what the bankers asked me to do. And
22  as I repeated or said before, I cannot remember the
23  exact timeline. Once they said the deal wasn't
24  coming, I literally didn't pay any attention to it
25  until January when they told me it was coming. I mean

Page 142

1  I can't do anything. I can't sell it. I can't tell
2  them when it is going to be. I can't, you know. The
3  only issue was we were trying to get a better price.
4     Q   And in your e-mail you are discussing the
5  Harvey Library bonds, correct?
6     A   Correct.
7     Q   And a couple of lines down you state "DIS
8  has five percent." Can you just explain -- and then
9  "120134". Can you explain to us what you meant by
10 that phrase?
11    A   Well, "five percent to 120134 is the
12 maturity. And a four and a quarter is priced to the
13 call and it as has a 12.6 year average life.
14    Q   And by "BQ", did you mean "being
15 qualified"?
16    A   Yes.
17    Q   And then you said "Not that it matters to
18 you, but maybe for trading later, it might add some
19 value? Were you referring to the being qualified
20 aspect of the deal?
21    A   Yes.
22    Q   And why did you think it might add some
23 value later?
24    A   Because it may have added some value later.
25    Q   Do you recall how many conversations you

Page 143

1  had with Mr. Schleicher regarding the bonds?
2     A   I had a lot of conversations. I can't
3  remember exactly how many.
4     Q   Do you have any protocol or any sort of
5  practice in place at IFS about recording your calls
6  or logging your calls with clients?
7     A   No.
8     Q   The calls are not recorded and we don't
9  have call logs that I know of.
10       BY MR. WILCOX:
11    Q   The "DIS", do you know what that stands
12 for?
13    A   I was looking at that. I'm trying to --
14 Harvey Library District, the "DIS" is District.
15    Q   And the five percent would be the coupon?
16    A   Yes.
17    Q   And the four and a quarter would be the
18 yield?
19    A   Yes.
20    Q   So at this time in December, according to
21 the e-mail, you were thinking or pricing it looking
22 to price it at around four and a quarter?
23    A   Yes.
24    Q   Would that be from -- would this have been
25 from your looking in the marketplace for the

Page 144

1  comparable credits or would that have also
2  incorporated customer input or feedback?
3     A   That would have been information. I'm
4  trying to remember something here. I believe at one
5  point, this would have been looking around to see what
6  sort of comparables there might be out there or
7  something. At that point you are also kind of
8  fishing. You are trying to find an account that would
9  say they care or whether they would care.
10       (SEC Exhibit 43 was marked
11       for identification)
12       BY MS. GARNER:
13    Q  · I hand you what has been marked as Exhibit
14 43. Exhibit 43 is Bates stamped IFS,
15 C-08209-0012965 through 12966.
16       Do you recognize this exhibit, Mr. Weeks?
17    A   Yes, sent to Glen Williams at Williams
18 Capital. That is one of the customers I forgot to
19 tell you about earlier.
20    Q   Did you also work at Williams Capital at
21 one point?
22    A   Different company. Some of the same people,
23 but Williams Capital was a broker dealer. This is now
24 a -- they are not a broker dealer. They are a money
25 manager.

Page 145

1     MR. WILCOX: They focus on municipal bonds?
2     THE WITNESS: Yes.
3     BY MS. GARNER:
4     Q   In the e-mail, which is dated December 18,
5  2014, you state, "We are going to price today. I'm
6  thinking about five 120134 at 4.25 and that's AGM
7  and also BQ. I guess you are giving me what you
8  think is going to be the coupon, maturity, the
9  yield?
10    A   Yes.
11    Q   And "AGM" refers to AGM the insurer?
12    A   Yes.
13       BY MR. WILCOX:
14    Q   So you would have had insurance at this
15 time?
16    A   Well, see that's where I'm not sure,
17 because we were talking. The initial conversation was
18 that they were going to try to get it insured. Then
19 the deal was postponed and it was my understanding it
20 was because they didn't have the insurance. That's
21 what was my understanding. I -- you know, to the best
22 of my recollection that is what I understand it to be
23 best. But we -- all I know is we were definitely
24 trying to do it at a higher level.
25       BY MS. GARNER:

Page 146

1    Q   What do you mean by higher level?
2    A   Better yield.
3    Q   Well, you got to remember, I'm an attorney
4  here. I don't always know all the lingo.
5    A   Me neither.
6    MR. BRODSKY:  Now you tell me.
7    BY MS. GARNER:
8    Q   Now, did Mr. Williams express any interest
9  in the bonds?
10   A   No.
11   Q   Did he receive a response from him either
12  by phone or e-mail?
13   A   Nope.  Not that I remember.  I think I may
14  have called Glen and he just said he didn't care.  I
15  called a lot of people that didn't care.
16       (SEC Exhibit 44 was marked for
17       identification)
18       BY MS. GARNER:
19   Q   I hand you what has been marked as
20  Exhibit 44.  Exhibit 44 is Bates stamped
21  IFS-08209-0016150 through 16151.
22       And do you recognize this exhibit,
23  Mr. Weeks?
24   A   Yes.
25   Q   Can you tell us what it is?

Page 147

1    A   This is my response to Mr. Charlie Kempf who
2  sent me a deal that was being priced that he received
3  from Mike Lawrence at Cabrera Capital. C-A-B-R-E-R-A
4  Capital.
5    Q   Kempf is spelled K-E-M-P-F.
6    A   I'm sorry.
7    Q   So Mr. Kempf forwarded you a message from
8  Mr. Lawrence regarding what?  I'm sorry.
9    A   No, Mr. Kempf had sent me this scale or this
10  offering that he had received from Michael Lawrence
11  from Cabrera Capital Markets asking my opinion of it.
12  And I said it's a bigger deal and it's a better name.
13  But we were doing a little $6 million Harvey Library
14  District.
15   Q   AGM insured?  It goes on to say "AGM
16  insured"?
17   A   Yes.
18   Q   Were you trying to get — to who does
19  Mr. Kempf work for?
20   A   Himself.
21   Q   And was he based out of Great Britain?
22   A   Yes.
23   Q   And is he a trader?
24   A   He was.
25   Q   How about the time that —

Page 148

1    A   He was then, yes.
2    Q   — the time of this message?  Did you
3  gauge his interest in the Harvey Library bonds?
4    A   He had none.
5    BY MR. WILCOX:
6    Q   Is he trading for his own account?
7    A   Yes.  He's a hedge fund.
8    Q   Was this — it was a Bolingbrook deal he
9  was sending a message about, right?
10   A   Yes.
11   Q   And it says it was "negative underlying"?
12   A   Yes.  It says "negative underlying".
13   Q   But the Harvey bonds weren't negative
14  underlying, were they?
15   MR. BRODSKY:  Eventually.  At the time they
16  weren't rated.
17   BY MS. GARNER:
18   Q   Eventually?
19   A   Yes, eventually.
20   Q   Did you have any discussions with
21  Mr. Kempf by phone?
22   A   I may have.  I may have.  We talked and he
23  sent me a lot of e-mails and we corresponded back and
24  forth that way a lot also.
25   Q   Do you know if you told Mr. Kempf that the

Page 149

1  District was looking to get a rating?
2    A   I don't know.  Probably.  But I'm not sure.
3    MR. WILCOX:  If they were insured at this
4  time, would they have had a rating?
5    THE WITNESS:  Possibly.  I don't know.  I
6  don't remember the timeline here.
7       (SEC Exhibit 45 was marked for
8       identification)
9       BY MS. GARNER:
10   Q   I'm handing you what's been marked as
11  Exhibit 45.  Do you recognize this e-mail?
12   A   Yes.
13   Q   Exhibit 45 is Bates stamped
14  IFS-C-08209-0013138.
15       And you say you recognize this exhibit?
16   A   Yes.  It was an e-mail from AG wanting to
17  know the information.
18   Q   So this e-mail is dated January 12, 2015?
19   A   It is.
20   Q   And do you recall between December 18,
21  2014 and the time that this e-mail was sent, if you
22  had any contact with any potential buyers?
23   A   I can't sit here and say with a certainty
24  exactly when or what date or what time of the day I
25  contacted potential buyers.  I'm sorry.  When the deal

Page 150

1  was postponed, I basically forget about it until I was
2  told it was back on again. I believe, if my memory is
3  correct, that we first started back on this around the
4  9th, I think. But I'm not 100 percent sure. And the
5  conversation with AG came because Erik Schleicher said
6  he wanted me to start having conversations with AG
7  also, that they would be talking about it. So we
8  started doing that.
9      Q  And who is "AG"?
10     A  She's the Senior Credit Analyst.
11     Q  And those are her initials, AG. Last name
12 is Anglum?
13     A  Anglum.
14     Q  It's spelled A-N-G-L-U-M.
15     A  I believe that's correct.
16     Q  So AG contacted you by an e-mail dated
17 January 12, 2015 according to this exhibit?
18     A  Yes.
19     Q  And she asked when the deal was coming,
20 correct?
21     A  Yes.
22     Q  And she asked you several questions?
23     A  Yes.
24     Q  Were you able to fill these questions,
25 respond to these questions?

Page 151

1      A  To the best of my knowledge, I got the
2  answers to those questions so I sent it to Craig. I
3  sent it to Erik and he was coordinating at that point.
4  And I got the information or either he -- either he
5  sent it to me or he told me to call Alvin, one or the
6  other.
7      Q  Okay. And these questions are specific to
8  the Harvey Library District, correct, in those
9  bonds?
10     A  Yes.
11     Q  Not the City of Harvey?
12     A  That came later. I need to go to the rest
13 room.
14     MS. GARNER: Let's go off the record. The
15 time is 2:50 p.m.
16     BY MS. GARNER:
17     Q  Back on the record. It is
18 3:02 p.m. Mr. Weeks, can you confirm that during the
19 break that you had no discussions with either myself
20 or the members of the staff regarding this
21 investigation?
22     A  I did not.
23     Q  Thank you. All right.
24         (SEC Exhibit 46 was marked for
25          identification)

Page 152

1      BY MS. GARNER:
2      Q  I want to now show you what I'm marking as
3  Exhibit 46.
4      Do you recognize this exhibit?
5      A  This was Mr. Kempf's answer back to me,
6  yes.
7      Q  This is a series of Bloomberg messages
8  between yourself and Mr. Kempf?
9      A  That's correct.
10     Q  So on December 18th you wrote to him "We
11 are underwriting a $6 million Harvey Library
12 District and we are going to cheapen it quite a bit.
13 I'll let you know." And then this copy cuts off for
14 some reason.
15     Why were you -- how -- why were you going
16 to cheapen it quite a bit at this point?
17     A  Because nobody cared.
18     Q  And this is December 18th. You are
19 getting this already from potential buyers?
20     A  I guess.
21
22     BY MR. BRODSKY
23     Q  Well, do you remember this e-mail, this
24 message?
25     A  I don't remember it exactly, no. I do not.

Page 153

1      MR. BRODSKY: May I ask another follow-up,
2  if you don't mind. I'm going to make the record more
3  complete.
4      MS. GARNER: Okay.
5      MR. BRODSKY: You can read it where you --
6  apparently somebody sent an e-mail with your name on
7  it or a message saying "we are underwriting a
8  $6 million hardware Harvey Library District and we're
9  going to cheapen it quite a bit. I'll let you know."
10 And then some more words.
11     Do you have any recollection of the
12 subject in or around December 18th of cheapening the
13 Harvey Library District offering? And if so, tell
14 the SEC and further explain what "cheapens" means if
15 you have an understanding of what this means here?
16     THE WITNESS: I don't -- as I stated before,
17 I don't remember the exact timeline of everything from
18 one time we tried to sell it to the other time when
19 we actually tried to sell it and sold it. The only
20 thing that I can say with certainty is the only person
21 that I had that expressed any interest other than the
22 ultimate buyer was BMO. And there was a period there,
23 I don't know whether it was the 17th, 18th or 19th
24 that there was a hold put on the deal for whatever
25 reason. It had been my understanding that it was due

Page 154

1    to -- it was -- not to be redundant, something to do
2    with the rating or the insurance. If that was my
3    understanding, if that is incorrect, then I don't know
4    what it was. But I know it was delayed. That is all
5    I know. And I know that, you know, all I did was try
6    to sell the thing to anybody that I could possibly
7    sell it to.
8        BY MS. GARNER:
9        Q  When you said that you were going to
10   cheapen it, are you --
11      A  The yield was going to get cheaper.
12      Q  The yield was going to go up or the
13   interest rate was going to go up?
14      A  Yes.
15      Q  And then he responds "Which deal?" And
16   you respond to his message and you say, "We're going
17   to cheapen our deal at least 50 basis points",
18   correct?
19      MR. BRODSKY: That's what it says.
20      THE WITNESS: Yes, that's what it says.
21
22      BY MS. GARNER:
23      Q  Would that be cheapening it by you know,
24   50 basis points starting at the 4.25 you were
25   letting investors know what the yield in -- you were

Page 155

1    telling investors you were looking for 4.25?
2      A  475, yes.
3      Q  4.25 I think it might have been.
4      A  4.25 is what we initially talked about.
5      Q  And going up to 4.75?
6      A  We were trying to find a level at which the
7   water would come to.
8      BY MR. WILCOX:
9      Q  Do you think it was because of lack of
10   buyers that the deal was pulled in December? Does
11   this e-mail bring back any recollections?
12      A  I'm not sure if was lack of buyers. I know
13   that we didn't really have a buyer as such at that
14   point in time. And I had not been authorized, I don't
15   believe at that time, to go out in the street or go
16   anywhere else. I just couldn't get anybody to care.
17   And we were trying at a level, at a price to get
18   somebody that would say something. Where will you
19   buy it? I mean will you buy it and where will you buy
20   it? When all you get is no and you are trying to get
21   something done because you are being told that the
22   City -- that the District really needs it, that it's
23   for a great cause, you know, you are trying to get
24   something, and nobody will even realistically take a
25   look at it. So it's a very frustrating situation.

Page 156

1      Q  Do you know who at IFS made the call to
2   cheapen the deal by at least 50 basis points?
3      A  I can't say with certainty who said what. I
4   think it was what do you think it takes, 50, 25, that
5   sort of thing. Let's try this. I can't say with
6   certainty who said it. I just don't remember.
7      Q  Do you recall any conversations in
8   December after you were unable to find any buyers
9   for the transaction about canceling the transaction
10   all together?
11      A  I think I made some comments, but quite
12   honestly would not want to repeat them here.
13      MR. CHIMIENTI: Comments to whom?
14      THE WITNESS: In conversations with
15   Mr. Walker and Mr. Boutte and maybe Mr. McKenzie. I
16   would prefer not to repeat those.
17      BY MR. WILCOX:
18      Q  Can you tell us the gist of the comments?
19      A  I don't think anybody in the bleeping world
20   would buy this bleeping deal.
21      Q  Do you remember their comments, their --
22      A  Not exactly.
23      Q  Do you recall at that time Mr. Boutte or
24   Mr. Comer going back to the issuer with this
25   information that you couldn't find any buyers at

Page 157

1    that time for the transaction?
2      A  I don't know. I can't say with certainty
3   that they went back to the issuer. I can't say with
4   100 percent of certainty that Mr. Boutte and Mr. Comer
5   had conversations. I feel like they probably did, but
6   I can't say with a certainty that they did.
7      Q  Were your comments about the difficulty in
8   selling the transaction, were they given directly to
9   Mr. Comer by you?
10      A  No.
11      Q  Just internal IFS staff?
12      A  Yes.
13      Q  So in December after you couldn't find any
14   buyers, was there an internal discussion about how
15   we're going to sell this deal?
16      A  I can't say to you with 100 percent. I'm
17   sure there was. I just can't tell you exactly what
18   was said and who said it, but I'm sure we had
19   conversations.
20      Q  Was there a different strategy that was
21   put in place, larger accounts, new accounts, show
22   the deal to anything along those lines?
23      A  I think it was pretty much everyone was told
24   show it to anybody you can. I think you have a
25   message for Mr. Knox. I think shot out a blast. I

Page 158

1   don't know how many different potential buyers. And
2   to my knowledge we got no responses back from anybody.
3       MS. GARNER: Do you have anything else on
4   that?
5       MR. WILCOX: No, I don't.
6       (SEC Exhibit 47 was marked
7       for identification.)
8     BY MS. GARNER:
9     Q  Showing you Exhibit 47. Exhibit 47 is
10  IFS-08209-0016147.
11      Do you recognize this exhibit, Mr. Weeks?
12    A  Yes.
13    Q  Can you please tell us what it is?
14    A  I'm trying to get BMO to come up with an
15  order.
16    Q  So it's an e-mail from you to
17  Mr. Schleicher?
18    A  Schleicher, Erik Schleicher.
19    Q  Schleicher. Dated January 14, 2015,
20  correct?
21    A  Yes. And you asked him if he could do a
22  conference call with a banker on Harvey, correct?
23    A  Yes
24    Q  And who is the banker you were referring
25  to?

Page 159

1    A  Mr. Boutte and or Mr. Walker, but I'm sure
2  Mr. Boutte.
3    Q  Did such a call happen?
4    A  You know, I don't think so. I think we
5  got -- he wanted -- I talked to him and he wanted --
6  he and I talked and I think he wanted more information
7  before he could really talk to him or else -- I mean
8  we -- things are running a little bit together because
9  we had a lot of conversations with a lot of people
10  trying to find somebody. I hate to keep saying the
11  same thing, trying to find somebody to buy this deal.
12    Q  Does IFS keep contact with who was
13  contacted regarding the bonds?
14    A  I don't know that they have a separate call
15  log of everybody that was contacted. If anything, it
16  was sent an e-mail or anything that was sent out on
17  Bloomberg, we have copies of all that. So we know who
18  everybody sent things to.
19    BY MR. WILCOX:
20    Q  And at this time in January, were you
21  offering the bonds to customers at 4.75?
22    A  I was trying to get someone to tell me where
23  they would buy the bonds. I was trying to get an
24  order level. We had offering -- yes, I did say, I
25  believe we could get 475. Nobody said yes.

Page 160

1    Q  And you were saying that to the customers?
2    A  Yes. Nobody cared.
3    BY MS. GARNER:
4    Q  So IFS ultimately sold the bonds to FTN,
5  right?
6    A  Yes.
7    Q  So can you explain to me how that came
8  about?
9    A  We cannot get a commitment at that point in
10  time from BMO to do whatever, anything. We just, you
11  know, they would not pull the trigger. And I said
12  look, "Do you want me to go to the street?" They
13  said, "Who are you talking about?" I said, Go to
14  First Tennessee and go to BB&T, they trade a lot of
15  junk. And I said, you know, try FTN.
16    And so I talked to Kevin Fitzpatrick who
17  is a trader there, an institutional trader and I
18  sent him all the documents. And I may have sent
19  him -- I don't know exactly what minute or time I
20  sent the documents, but anyway, I got the documents.
21  And he came back to me later and said, "We have a
22  private equity firm that will buy it and here is
23  their level."
24    Q  And by "level" do you mean what they were
25  willing to pay?

Page 161

1    A  Yes.
2    Q  And what do you recall what that was?
3    A  Five percent.
4    Q  And do you know — I am sorry. This
5  was -- if you addressed this in your answer, how
6  long of a period of time elapsed between the time
7  you contacted FTN and the time they let you know
8  they had a buyer?
9    A  I'm not sure.
10    Q  Was it the same day?
11    A  It may have been from the evening to the
12  next afternoon. It may have been from that morning
13  until afternoon. I can't say. They got the
14  documents. They talked to -- they got a private
15  equity guy. They came back and he said "I have an
16  order of five percent. I'll give you an order for the
17  whole deal out of 505. I said let me reflect it in,
18  so that is what I did.
19    MR. WILCOX: Did you offer him the bonds at
20  four and three-quarters or did you -- I mean how did
21  you approach him and say, I can't sell this deal or --
22    THE WITNESS: I told him that I could sell
23  the bonds at four and three-quarters and he said, "I
24  don't care." I said, "Where do you care", which is
25  kind of the standard answer in this business. He

Page 162

1  said, "I don't know. Let me see what we can do. I'll
2  come back." That's the level that he came back with.
3  And then he said, "Will you sell them?" I said, "I'll
4  reflect it into the bankers and see what they want to
5  do." That I did. And that's the first time I knew
6  of any analytics being run, because they had to run
7  the order level versus the coupon to generate the
8  premium.
9      BY MS. GARNER:
10     Q  If you look back at — I think there was
11  an earlier exhibit that had some analytics run.
12  Maybe I'm confusing with — maybe we are talking
13  about two different things.
14     A  Which one? Do I have that?
15     Q  Let's say Exhibit 40. There is the POS
16  and then there was some —
17     MR. WILCOX: You are right.
18     THE WITNESS: Very back? Is that the one
19  you were asking about?
20     MR. WILCOX: No, Joe was asking you about
21  that.
22     THE WITNESS: The bond summary statistics?
23     BY MS. GARNER:
24     Q  Yes. Are those the kind of analytics you
25  are referring to?

Page 163

1      A  No.
2      Q  Well, what are you referring to?
3      A  I'm referring to the yield, price to the the
4  call. What coupon it takes to generate $900,000 in
5  premiums.
6      BY MR. CHIMIENTI:
7      Q  Do you know why they needed $900,000 in
8  premiums?
9      A  As I said before, it's my understanding the
10  State of Illinois requires you to put all cost of
11  issuance and all fees and everything else into the
12  bond issue. I believe that's the way it's stated.
13  There was something to that effect. And the City or
14  the District needed that sort of premium.
15     Q  So you mean that the City couldn't use
16  bond proceeds to pay the cost of issuance?
17     A  Yes.
18     Q  They had to get it another way?
19     MR. BRODSKY: Couldn't use the par value to
20  do it.
21     THE WITNESS: Couldn't use the par value to
22  do it.
23     MR. CHIMIENTI: Thank you.
24     BY MR. WILCOX:
25     Q  So you reflected back the interest level

Page 164

1  from First Tennessee's client back to whom?
2      A  Gave it to Mr. Walker and Mr. Boutte or Mr.
3  Walker, I think he at that point gave it to Mr. Boutte
4  and Mr. Comer or -- everyone got it. Put it that way.
5      Q  And do you recall what they came back to
6  you with?
7      A  Let's run the numbers. I believe at that
8  time is when Mr. Comer said he wanted to try and take
9  it to a bank to see if he could get a bank to do the
10  financing or loan.
11     Q  Did you hear that directly or indirectly?
12     A  Indirectly.
13     Q  And then what happened?
14     A  They took the 505 order and the first
15  analytics that were run. It was run to maturity. And
16  I think it had a five and a half or a five and
17  three-quarters coupon. I can't remember for sure. I
18  said you don't -- you can't price a premium bond to
19  maturity. You have to price it to the call. So then
20  they went back and started running it again and I
21  think they tried it at six and a half and they tried
22  it at six and three-quarters. And they finally got --
23  I think it was 6.8 or 6.95 or something like that that
24  worked. And then to my understanding kind of after
25  the fact, I learned that the attorney raised -- Kutak

Page 165

1  Rock raised their fee by $30,000. So in order to
2  generate that $30,000, they had to change the coupon
3  again to generate that $30,000. So then that is why
4  the coupon changed again, but the yield remained the
5  same.
6      Q  Did the client understand or care that it
7  was going to be a large premium security?
8      A  The client didn't care. They were rolling
9  the dice. They figured they made their six points,
10  big deal. Take the shot.
11     MR. BRODSKY: When you say "client", are
12  you talking about the same person? Are you talking
13  about --
14     THE WITNESS: Talking about First Tennessee.
15     MR. WILCOX: I'm talking about the buy side
16  client, the private equity firm to date.
17     A  Obviously, they didn't care. I mean they --
18     MR. WILCOX: How do you know there if there
19  was any back and forth -- no, we don't want that --
20     A  No, no, no, no. The only back and forth was
21  what's the coupon going to be, was the only back and
22  forth. They knew it was going to be a premium. I had
23  already given that information. I told everyone you
24  got to generate -- I think initially it was 800 and
25  some odd thousand and then it went up to $30,000.

Page 166

1  And he said that's not a problem. This is my order
2  level. This is where we'll buy it. And I still don't
3  know who the end buyer was. I have no idea. They
4  wouldn't tell me.
5      Q   And approximately how long did it take for
6  when you transmitted the order level internally to
7  the numbers to be generated and for IFS to go back
8  to First Tennessee and say we're going to accept the
9  order?
10     A   I think there was three, maybe two to four
11 hours. Somewhere in that neighborhood. Because as I
12 said, the first analytic was wrong. Had to redo that.
13 At that point, Brandon Comer, as I was told, was
14 trying to get a bank to do the deal. And then I think
15 it was late that afternoon when Brandon came back or I
16 was told he said he couldn't get it done. Nobody
17 cared. They wouldn't do it. And let's sell it to
18 First Tennessee. And it's my understanding that that
19 conversation, as to what it was going to be and
20 everything, was had with the District, whoever the
21 people are in charge of the District who makes the
22 decisions.
23     Q   Were there any conversations that, you
24 know, we can't -- let's not issue these bonds?
25     A   Not with me. To my knowledge there were

Page 167

1  none. It was my understanding that the District
2  wanted to do this and had been trying to get it done
3  for four or five years. And that nobody would do it
4  or even attempt to do it. And they had authorization
5  to go to 16, but they only wanted -- they were going
6  to build -- as I understand it, they were initially
7  going to build a new library. And then they had no
8  chance of getting that done. And then they decided
9  okay, we'll do 6 million and we will refurbish or add
10 to, or whatever, to redo the library that we have,
11 which from what I have been told and what I understand
12 for the children in that area, it was a fantastic
13 thing to get done.
14     BY MR. CHIMIENTI:
15     Q   Do you recall any conversation to have
16 First Tennessee be a co-manager?
17     A   No.
18     Q   Do you recall any conversation to have a
19 deal become a group net deal where First Tennessee
20 would also be a Senior Manager?
21     A   No.
22     BY MR. WILCOX:
23     Q   Was there any conversation about IFS
24 taking the bonds into inventory, positioning the
25 bonds?

Page 168

1      A   There was some casual conversation about we
2  need to underwrite this loan. And the answer back
3  was, if we got nobody to buy it now, what makes you
4  think you could sell it if we underwrite it?
5      Q   And do you know what that came from?
6      A   I can't say with certainty, but I'm taking a
7  fairly reasonable guess that it came from Alex
8  McKenzie. It's his money.
9      MR. BRODSKY: So are you saying while you
10 don't know, you would say it was probably Alex
11 McKenzie based on the fact that he's the owner?
12     THE WITNESS: Yes.
13     BY MR. WILCOX:
14     Q   Would the $6 million loan term bond, would
15 that have been over your authority, your trading
16 limit to purchase and hold the inventory?
17     A   You mean me personally or is the company?
18     Q   The firm, when you were talking about
19 before you would put in for bonds and competitive
20 sales. You thought they were cheap and new position
21 bonds, would this deal by itself been over your
22 trading limit for the desk?
23     A   We could have done it. I'm pretty
24 confident. I think at that time our net capital was
25 right around 3 million. And I'm pretty sure that we

Page 169

1  could have. I don't think that was the problem. I
2  think the problem was what do we do with this? What's
3  our downside potential? What can we reasonably lose
4  on this thing. You know, we have one order, period.
5  As it turns out we could have sold 2 million bonds to
6  BMO, but what would we have done with the other
7  $4.9 million?
8      Q   And did you present -- are you aware of an
9  option presented to the District, let's hold off,
10 let's pull the deal again and wait for a better time
11 to try to sell it?
12     A   I don't know if that conversation --
13     MR. BRODSKY: If you know, say so. If you
14 are guessing it is not worth anything.
15     MR. CHIMIENTI: So you didn't have that
16 conversation?
17     THE WITNESS: No. I don't make those calls.
18     BY MR. WILCOX:
19     Q   Would IFS have gotten paid for all its
20 effort if the bonds had not been issued?
21     MR. BRODSKY: Objection. You can answer.
22 Well, it's hypothetical and there is no foundational
23 basis for it, but if you can answer, you can answer
24 it.
25     THE WITNESS: I don't know what the

Page 170

1    agreement was.
2           BY MR. WILCOX::
3       Q   How was IFS compensated for this
4    transaction, this underwriting by the initial —
5       A   We got an underwriting fee.
6       Q   Do you know what that was?
7       A   I believe it was — I think it was three
8    points, 2. something.
9       Q   So on a $6 million deal that would be
10   approximately $180,000?
11      A   120, well, 180 if it was three, yeah.
12          MR. CHIMIENTI: In your experience, is that a
13   large fee percentage wise for a municipal deal,
14   three percent.
15          THE WITNESS: Well, see, I don't think it
16   was — you can't say it was three percent, because it
17   was — you are looking at 6 million. If you factor in
18   the total amount of the sale, it goes up 6.9 million.
19   So it's under three percent. I don't think personally
20   for this credit, for the type credit that it is, I
21   don't think that's an exorbitant fee. I have seen
22   bigger firms work for a whole lot more on better
23   names.
24          BY MR. WILCOX:
25      Q   From your experience in the past, if a

Page 171

1    deal doesn't get issued, does the underwriter get
2    paid?
3       A   Well, it depends on the contract. I mean
4    you have certain firms that put a clause -- put a
5    contract in there. It is on a -- what is the old
6    saying, "what as and if issued". But we get "x"
7    number of dollars no matter what. If nobody will buy,
8    you are going to pay us this for our efforts and work
9    and whatever. I do not know if that was in -- if that
10   was part of the contract or not.
11          MS. GARNER: Why don't we go off the record.
12   The time is 3:40 p.m.
13          (A brief recess was taken.)
14          BY MS. GARNER:
15      Q   We're back on the record. The time is
16   3:41 p.m.
17          Mr. Weeks, can you confirm during the
18   break that we had no conversations with members of
19   of the staff?
20      A   I did not.
21          (SEC Exhibit 48 was marked
22           for identification)
23          MS. GARNER: Exhibit 48 is Bates stamped
24   IFS-C-8209 --
25      A   Right. I'm sorry. I was thinking out loud.

Page 172

1       Q   It is IFS C-08209-0013790.
2           Mr. Weeks, do you recognize Exhibit 48?
3       A   Yes.
4       Q   And can you please tell us what it is?
5       A   Craig Nash is with Ziegler. I was trying
6    anything.
7       Q   And so this is a Bloomberg message from
8    you to Mr. Nash?
9       A   Yes.
10      Q   And it's dated Thursday, January 15, 2015?
11      A   Yes.
12      Q   Okay. And in the message you say, "I
13   don't know if you are getting e-mails, but I can do
14   Harvey Library District at 5.30 at a 4.30 to 12-year
15   average life and make final mats in 2013."
16      A   Maturity in '13.
17      Q   Right. Was this around the time that you
18   were negotiating the FTN?
19      A   No, this was before.
20      Q   I think — let me show you another exhibit
21   to refresh your recollection.
22      A   I think it was before. I'm not sure.
23      Q   Is it possible it was after?
24      A   It's possible.
25      Q   And is this the first time you contacted

Page 173

1    Mr. Nash about the Harvey Library bonds?
2       A   No, I talked to him. I had talked to him.
3       Q   Did he express any interest in Harvey
4    bonds?
5       A   He was one of the ones that laughed and
6    chuckled.
7       Q   Okay.
8           BY MR. WILCOX:
9       Q   So BC Ziegler, that's a dealer?
10      A   They are a dealer, but Craig does some
11   platform trading and I'm not exactly sure how that
12   works. But he positions and will buy and hold stuff.
13   I had some trades with him for -- got a few people to
14   buy auction rights. And so he traffics in floaters
15   and auction rights.
16      Q   Any other dealers that when you couldn't
17   sell it to customers, that you — that were
18   contacted?
19          MR. BRODSKY: Objection. Form of the
20   question.
21
22          BY MR. WILCOX:
23      Q   On January 15th when you went out to First
24   Tennessee, were there other dealers that were
25   contacted at that time in addition to First

Page 174

1    Tennessee about the Harvey bonds?

2    A  I don't consider Craig to be a dealer as

3    such -- I mean Ziegler.

4    Q  Besides Ziegler and First Tennessee, were

5    there other dealers that were contacted --

6    MR. BRODSKY: Object to the form of the

7    question.

8    MR. WILCOX: -- on Thursday afternoon?

9    THE WITNESS: I'm not -- I can't remember if

10    I talked to -- I had a friend of mine at BB&T and I

11    can't remember if I talked to him or not. He's a

12    salesman there. And I know that he -- I know that he

13    has some EFTs, high yield ETFs with his clients. I

14    can't remember if I talked to him about it or not. I

15    may have, but honestly I can't remember.

16    BY MR. WILCOX:

17    Q  Are there any other salespeople that were

18    contacting other dealers to try to find buyers for

19    Harvey bonds?

20    A  Not to my knowledge.

21    Q  Any reason why you would be offering to

22    him, to Mr. Nash, at 4.30 around the same time that

23    you were offering it to First Tennessee at 4.75?

24    MR. BRODSKY: He wasn't offering 4.30.

25    That's not what this says. At least as I --

Page 175

1    BY MR. WILCOX:

2    Q  Harvey Library District at 5.30 coupon at

3    a 4.30 to 12-year average life.

4    A  If you priced it at 5.30 to maturity, that's

5    going to lower the yield to the 12-year average life.

6    Q  You also sold it at 5.05 yield to the

7    12-year average life?

8    A  No, to the call, 10-year call. I'm not

9    exactly sure what this was. Maybe it was a change in

10    structure that I was told to check on or possible

11    change in structure. Because all the conversations

12    that I've had initially with Craig was that we were

13    going to do a 32 maturity with a 10-year call. And

14    the only thing that we can do, we can break up terms.

15    We can take the sinking fund amounts out and term and

16    break that up and say 15, 16, 17, 18 or whatever.

17    Take that and term it up in 10 years gives it a five

18    and a half, six-year average life. We have got

19    structure we can do that within the confines of the

20    sinking fund.

21    Q  And the order that you received from BMO,

22    was that prior to you selling it to First Tennessee?

23    A  No, it was after. And like I said it was

24    only for 2 million.

25    MR. BRODSKY: He already testified that it

Page 176

1    was after the deal.

2    BY MR. WILCOX:

3    Q  And did you inform BMO that the deal had

4    been sold?

5    A  I did.

6    Q  Did they ask at what level?

7    A  He asked.

8    Q  And did you --

9    A  I told him we had one maturity. We did one

10    term.

11    Q  At 5 --

12    A  5.05.

13    Q  Any response from him?

14    A  Okay.

15    (SEC Exhibit 49 was marked

16    for identification.)

17    BY MS. GARNER:

18    Q  I'm handing you what is marked as

19    Exhibit 49.

20    Do you recognize this exhibit?

21    A  I do.

22    Q  For the record, Exhibit 49 is

23    IFS-08209-0016149.

24    Can you tell us what Exhibit 49 is,

25    please?

Page 177

1    A  I'm asking Vasileios -- they do high yield

2    junk to individuals.

3    Q  Who is Vasileios --

4    A  Vasileios Sfyris.

5    Q  That is spelled V-A-S-I-L-E-I-O-S

6    S-F-Y-R-I-S. Who is he?

7    A  He's with First Southern.

8    Q  Is First Southern a dealer?

9    A  Yes.

10    Q  And he sent -- it looks like it is a

11    message from him to you, anything on the Harvey --

12    A  Yeah. I told him we were -- he asked what

13    we were doing and I said "We're working on a deal."

14    And he said, "Can you show it to me?" And I said,

15    "When I can, I will."

16    Q  Did you show it to him?

17    A  I don't remember. I don't think I did. I

18    think at that point we were committed pretty much to

19    First Tennessee.

20    Q  When you were trying to sell these bonds,

21    during this whole process did you ever consider the

22    supply of these types of bonds in the market as a

23    factor?

24    A  What type of bonds?

25    Q  Insured rated BBB bonds?

Page 178

1    MR. WILCOX: Bank qualified.
2    BY MS. GARNER:
3    Q   Bank qualified.
4    A   Standard bonds. I mean they are in the
5    market like that almost everyday in some capacity,
6    whether it is a competitive sale or a small negotiated
7    sale or something.
8    Q   So did you consider the supply in the
9    market at the time that you were trying to get these
10   bonds sold as a factor?
11   A   I didn't, no.
12   MR. WILCOX: Do you recall there being an
13   oversupply of these types of bonds at the time?
14   THE WITNESS: I do not.
15   BY MS. GARNER:
16   Q   Did you follow the trading of these bonds
17   after they were sold to FTN?
18   A   I did not.
19   Q   You never looked into it?
20   A   I never did.
21
22   BY MR. WILCOX:
23   Q   Are you aware of them? Have you heard of
24   them retrading at any level?
25   A   I heard that 30 or 45 days later the guy

Page 179

1    that bought it retraded it.
2    Q   Did you hear at what level?
3    A   I heard he traded them up.
4    Q   Of how much?
5    A   I don't know.
6    BY MS. GARNER:
7    Q   Did you receive any compensation in
8    connection with your work on the bonds?
9    A   Yes.
10   Q   And do you recall how much you got?
11   A   The structure -- you want to know the
12   structures of payouts at IFS?
13   Q   Sure.
14   A   Fifteen percent was taken of all negotiated
15   underwritings, was taken off the top for expenses.
16   That goes to the house. Seventy percent of the 85
17   goes to banking. And 30 percent of the 85 goes to
18   sales.
19   Q   And is that the structure that was
20   followed in in case?
21   A   In every case to my knowledge. If it is
22   different from that, somebody has been holding out on
23   me.
24   BY MR. WILCOX:
25   Q   Did you receive 100 percent of the sales,

Page 180

1    the money portion that was allocated towards the
2    Harvey bonds?
3    A   Yes.
4    Q   You mentioned earlier that your
5    compensation of 2014, there was a loss of $80,000
6    that was taken out of your compensation?
7    A   (Shaking head).
8    Q   Was that related at all to the Harvey
9    transaction?
10   A   No.
11   MS. GARNER: I'm showing you what's
12   previously been marked as Exhibit 35. Exhibit 35 is
13   a Certification of Underwrite the IFS filed with the
14   State of Illinois. And if I could direct your
15   attention on the first page to Paragraph 4?
16   A   Okay.
17   Q   It says that, "On the sale date, based
18   upon the underwriter's assessment of then prevailing
19   market conditions, the price for the bonds of each
20   maturity was not less than the fair market value to
21   the public of the bonds of such maturity as of the
22   sale date."
23   Did you conduct the assessment of the then
24   prevailing market conditions as set forth in
25   Paragraph 4?

Page 181

1    A   Did I?
2    Q   Yes.
3    A   No.
4    Q   Do you know who would have at IFS?
5    MR. BRODSKY: Who did or who would in the
6    ordinary course?
7    MS. GARNER: Who would have in the ordinary
8    course?
9    THE WITNESS: I'm not sure if that falls
10   under Keith or if that falls under Craig or the
11   banking. I'm not sure who would do that. Keith is
12   the municipal principal. Maybe it would be Keith.
13   BY MS. GARNER:
14   Q   And in this specific instance, you don't
15   know who did it actually?
16   A   I can't say with certainly, no.
17   Q   But Mr. Wakefield might have?
18   A   He might have, yes.
19   Q   If he didn't do it, would he know who did
20   do it?
21   A   I'm sure.
22   Q   Are you aware of a written statement done
23   by an individual named Justin Marlo discussing his
24   thoughts on the Harvey Library bond deal?
25   A   No. I never heard that name ever.

Page 182

1    Q  You never reviewed a document prepared by
2  Justin Marlo discussing the Harvey Library bonds?
3    A  No, ma'am. Who is Justin Marlo?
4    MR. BRODSKY: It's none of your business.
5  She is not here to answer your questions.
6    THE WITNESS: Oh, okay.
7    MS. GARNER: We don't have any other
8  questions at this time. However, it's possible we
9  will call you again to testify. That is always a
10  possibility. We'd ask that you maintain the
11  confidentiality of what was discussed here today and
12  not discuss it with anyone other than your attorney.
13    Is there anything that you would like to
14  add or clarify to the statements you've made today?
15    THE WITNESS: The only thing I would, you
16  know, clarify somewhat is that my non-remembrance of
17  the exact time lines. But other than that, I don't
18  know of anything else I could say.
19    MS. GARNER: Okay.
20    MR. BRODSKY: What do you mean you want to
21  clarify your non-remembrance?
22    A  Well, when you talk about sending, you know,
23  it seems like I sent stuff out on January or
24  December 17th or 18th or whatever.
25    MR. BRODSKY: Are you apologizing for not

Page 183

1  remembering or do you want to say something about why
2  you didn't remember?
3    THE WITNESS: I'm old. I forgot.
4    MR. BRODSKY: But I mean do they need to
5  know something beyond the facts that you had a lack
6  of recollection of showing the documents?
7    THE WITNESS: The only thing I was going to
8  do was sell this thing.
9    MS. GARNER: Anything else? We're off the
10  record. The time is 3:56 p.m.
11    (Whereupon, at 3:56 p.m., the examination
12  was concluded.)
13    * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 184

1          PROOFREADER'S CERTIFICATE
2
3  In the Matter of: HARVEY PUBLIC LIBRARY
4         DISTRICT BONDS
5  Witness:    Danny Weeks
6  File Number:   File No. C-8209
7  Date:       September 30, 2015
8  Location:    Chicago, Illinois
9
10    This is to certify that I, Nicholas Wagner,
11  (the undersigned), do hereby swear and affirm that
12  the attached proceedings before the U.S. Securities
13  and Exchange Commission were held according to the
14  record and that this is the original, complete,
15  true, and accurate transcript that has been compared
16  to the reporting or recording accomplished at the
17  hearing.
18
19
20  (Proofreader's Name)     (Date)
21
22
23
24
25

**A**

A-N-G-L-U-M
150:14
A-R-C-H 18:7
a.m 1:16 5:3
11:21,25 12:18
61:11
AA 98:7,7
111:20
AAA 81:6
able 10:8 83:21
94:20,20
111:12,20
150:24
above-entitled
1:15
absolute 96:19
accept 69:12
166:8
accommodate
107:6
accompanied
7:24
accomplished
184:16
account 33:17
46:19 48:14,14
48:24 49:17,22
55:12,14 71:24
76:24 93:25
117:23 118:22
131:11 144:8
148:6
accounts 27:5
28:17 33:9,10
33:11,14,18
41:25 46:20
48:17 58:3
61:21 62:4,21
86:13 124:14
157:21,21
accurate 14:18
82:9 184:15
acted 60:2 64:13
65:16
action 10:19
75:22
actively 84:8
102:17

activity 12:23
acts 58:15 60:15
actual 137:20
add 142:18,22
167:9 182:14
added 142:24
addition 44:1
64:5 73:9
173:25
additional 80:16
105:15
address 6:8 7:20
37:18,21
132:18,19,21
addressed 161:5
addresses 131:6
adjust 33:17
adjusted 105:16
adopt 13:23
advance 85:7
adverse 96:14
advise 8:1
advising 36:4
advisor 71:20
104:23 106:1
119:19
affect 94:3
affirm 184:11
afternoon
161:12,13
166:15 174:8
AG 3:21 119:3
149:16 150:5,6
150:9,11,16
agency 49:7
AGM 82:15
135:13 145:6
145:11,11
147:15,15
AGN 123:13,13
ago 6:11 12:15
39:17 44:5
45:9 51:22
110:23 131:17
agreed 53:23
agreement 41:1
95:9 170:1
agrees 69:18
ahead 113:7

AI 27:23 28:4
29:18
Alabama 54:14
Alex 39:16,21
40:4 42:13
46:9 51:7
120:25 125:2
168:7,10
Alex's 41:3
Allegreni 36:2
Allen 126:14
Allio 27:25
allocated 180:1
allow 121:10
allowed 56:11
77:16 78:16
111:16
Allstate 48:3
118:17
Alpharetta 34:9
Alvin 8:19 51:14
63:23 102:9
105:6 114:13
120:25 125:2
139:10 140:15
140:15 151:5
Amazingly
75:17
Ambac 81:6,8
82:12
amend 58:18
Amendment 9:4
amortization
104:15
amount 40:1
92:10,11
119:10 170:18
amounts 129:14
175:15
analysis 108:13
analyst 56:5
150:10
analytic 166:12
analytics 106:7
106:8,11,14,17
106:25 162:6
162:11,24
164:15
and/or 5:18

angel 37:8
Anglum 150:12
150:13
announcement
42:21
answer 9:5,10
9:18 34:22,23
58:9,11,18,24
59:3,6,10
60:12,25 62:24
63:22 85:21
87:1,2,15 96:6
114:11 115:21
117:8,11 118:1
123:7 127:24
136:14 152:5
161:5,25 168:2
169:21,23,23
182:5
answered 29:17
63:5 108:14
127:23
answering 9:15
9:16
answers 9:9
117:10 151:2
anticipate 88:5
90:10
Anticipation
64:19
anybody 57:20
62:10 90:16
101:16,17
154:6 155:16
156:19 157:24
158:2
anymore 29:10
29:10 139:4
anyway 36:9
39:22 40:10
60:10 68:14
122:25 136:10
160:20
apologize 72:25
138:25
apologizing
182:25
apparently
153:6

appearance
11:14 109:4
APPEARAN...
2:1
appeared 24:22
appearing 11:4
Appendices
129:21
apples 121:25
122:1
apples,and
122:1
apply 139:16
approach
161:21
approximate
19:7 65:21
113:14
approximately
19:8 65:6
73:17 105:7
120:13 166:5
170:10
April 6:14
arbitration
75:10,13,14,16
75:20,24
Arbitrator
75:17
Arch 17:7,13,19
17:22 18:7,14
18:17,21 19:10
19:13 22:21
24:15,21,23,24
25:4 29:5
area 26:10 39:9
51:16 52:6
110:2 167:12
Arkansas 32:20
48:24
ARS 47:23
articulate 122:5
aside 132:1
136:18
asked 36:4
40:11 45:7
59:1 63:4
101:23 103:21
105:9 108:15

108:16 124:21
127:22 140:12
141:21 150:19
150:22 158:21
176:7 177:12
**asking** 6:25
45:10 57:5
59:19 63:7
72:14 81:20
83:20 85:9,10
85:25 86:24
87:4,10 91:24
92:4 94:4
95:18 99:10
103:20 107:8
107:20 108:11
113:5 119:3
124:7 138:10
138:11,17
140:2,8,10
147:11 162:19
162:20 177:1
**aspect** 142:20
**assert** 9:4
**asserted** 61:25
**assessment**
180:18,23
**Asset** 47:24
118:17
**assigned** 135:21
**assistant** 26:4
80:5
**Associates** 32:5
32:7
**assume** 9:19
12:18,19 106:3
128:23 138:2
**assuming**
105:25 132:17
**Atlanta** 17:3,15
17:20 18:1
21:4,12 25:20
26:10,16,17
27:1 33:4
34:10 36:5
39:8,9 44:16
51:24 52:6
114:15,18
**attached** 126:18

135:3 138:13
184:12
**attachment**
135:17
**attempt** 167:4
**attempted** 13:10
**attend** 15:15
**attention** 36:25
43:2 56:2 75:8
84:8 141:24
180:15
**attorney** 7:25
8:1 9:21 11:6
11:14 12:6
74:24 99:20
146:3 164:25
182:12
**attractive** 79:2
**auction** 173:14
173:15
**audibly** 9:10
**audited** 140:13
**Austin** 34:8
**authorities**
10:16
**authority** 42:2
42:19 58:14,16
168:15
**authorization**
119:16 167:4
**authorized**
155:14
**automatically**
91:22
**available** 68:24
**average** 119:12
142:13 172:15
175:3,5,7,18
**aware** 106:7
124:18 131:19
131:21 169:8
178:23 181:22

———— **B** ————
**B** 97:8
**B-A-L-L** 20:4
**B-E-R-T-H-E-L**
38:5
**BA** 97:17

**BAA3** 97:16,23
**back** 11:24
16:21 17:22,23
18:3,21,22
19:14,15,21
20:7 22:6
24:21,23 25:4
30:10 31:22
33:2,4 40:12
41:16 47:16
51:6,22,24
54:4 61:10,18
66:17 67:15
74:19 75:5
88:17 95:25
100:2 105:15
105:18 107:6
108:10 124:4
124:10 125:14
125:18 127:18
129:7 131:20
148:23 150:2,3
151:17 152:5
155:11 156:24
157:3 158:2
160:21 161:15
162:2,2,10,18
163:25 164:1,5
164:20 165:19
165:20,21
166:7,15 168:2
171:15
**background**
14:9 49:5
58:19
**backgrounds**
51:8,9
**bad** 36:23 68:13
94:1,1 96:21
108:6,6,7
117:17 123:3
136:9
**Baird** 47:14
49:17
**balance** 95:1
**Ball** 16:2 18:1,2
20:1,10 21:9
25:12,18 27:10
**Ballpark** 41:18

**BAM** 82:15 98:6
**bank** 28:22 29:1
29:10 32:25
47:12,19 48:10
48:24 51:23
83:3,7,11,13
83:17,21 84:3
84:6,9 102:2
109:14 116:2,6
116:8,14,17,18
116:21 119:19
119:20,21
164:9,9 166:14
178:1,3
**banker** 51:19
63:13 70:19
91:9,10 100:8
114:14 119:15
158:22,24
**bankers** 51:8
63:12,16 76:6
90:22 141:17
141:21 162:4
**banking** 51:20
51:22 114:9
179:17 181:11
**bankruptcy**
82:13
**banks** 29:3,4
31:19 48:18
83:18 116:14
**base** 33:17 46:19
96:21 107:24
110:16 114:25
116:9,23
**based** 77:3
86:16,16,17,18
91:7 93:21
106:25 117:23
118:2 121:2,15
147:21 168:11
180:17
**basically** 46:8
51:6 150:1
**basis** 48:14
58:10,23 59:9
71:12 78:22
79:15 118:3
154:17,24

156:2 169:23
**Bates** 126:4
128:8 129:7,22
130:14 132:7
136:25 140:25
144:14 146:20
149:13 171:23
**BB** 97:17
**BB&T** 160:14
174:10
**BBB** 97:15
101:23,24,24
102:1,2 103:6
103:8 109:17
111:5,6,6,8
112:12,20,21
113:2,3 177:25
**BBB-** 97:15,23
**BC** 173:9
**bear** 60:15
**bears** 60:1
**becoming** 82:12
**beginning** 70:12
**behalf** 2:3,15
**believe** 15:24
16:23 19:4,12
19:21,22,24
20:5,15,19,20
26:3 28:1 34:2
41:9 43:24
44:21,22 50:15
51:22,23 52:17
54:2,10 55:7
56:14 57:11
63:14 64:14,15
65:7,23 73:8
73:20 97:16
100:24 101:23
101:24,24
104:14 106:10
106:11 111:5
112:17,19
113:18 115:2
119:1,3 120:15
120:17 121:9
121:12 135:11
139:10 144:4
150:2,15
155:15 159:25

163:12 164:7
170:7
**believed** 115:10
**Bell** 31:7,8,9,23
31:24 32:2
**benefit** 83:12
84:1,5
**benefits** 83:20
**Berthel** 38:5,19
38:22
best 14:16 19:7
78:10 95:4
99:14,23
109:22 111:17
113:18 145:21
145:23 151:1
bestowed 39:16
better 24:17,22
25:6 31:18
68:1,1,3 69:4
70:8,9 83:22
118:21 119:20
142:3 146:2
147:12 169:10
170:22
**beyond** 183:5
**bid** 46:5 49:19
49:20,22
**bidding** 49:16
**big** 165:10
**bigger** 147:12
170:22
Bill 44:4 48:22
48:23,25
**birthdate** 6:13
**Biscayne** 2:17
bit 43:12 53:12
81:13 152:12
152:16 153:9
159:8
**Black** 48:7
**blank** 135:24
136:1
**blast** 157:25
**bleeping** 156:19
156:20
**blew** 30:2
**block** 111:6
**Bloomberg** 3:16

102:18 110:4
141:7,8 152:7
159:17 172:7
**blurb** 128:18
**BMO** 47:7,9,10
47:14,18,19
107:20 118:25
119:5,5 124:4
124:8,10,21
137:8 139:22
140:3,8 153:22
158:14 160:10
169:6 175:21
176:3
**board** 52:8
123:8
**bold** 129:24
**Bolingbrook**
148:8
**bona** 61:2,2
**bond** 17:2,13
22:7 31:17
58:17 59:23,25
62:7 82:1,20
82:20 83:3,6
84:11,15 89:7
93:13 94:3,5,5
94:23 95:9
98:24 99:5,6
99:16 100:10
110:7 111:12
111:20 121:12
121:22 122:24
124:4 128:17
128:19 131:23
135:22 136:10
140:20 162:22
163:12,16
164:18 168:14
181:24
**bonds** 1:6 5:11
12:21,24 13:10
13:15 22:11,13
22:15,19,24
23:17,19,21,23
23:24 24:2,7
24:25 26:18
27:14,16 28:8
28:12 29:2,6

31:20,25 34:12
35:23 37:3
38:13,14,19
39:5 43:8,17
46:4 47:22
50:13 52:11,13
53:3 56:2,3,21
56:22 57:1,3
57:19 58:4
61:23 62:5
71:17 75:15
77:6,21 78:1,5
78:25 80:22
81:2,6,9,16,16
81:21 82:25
83:11,21 84:2
84:2,15,19,22
85:18 86:1,14
86:21 87:6,8
87:21 88:1,10
88:16,24 90:7
92:25 93:4,10
94:25 95:10,22
95:23 98:6,10
101:7,7,15,21
102:17,19
104:10,11,11
106:24 107:2,3
107:4,5 108:13
110:5 111:17
113:10 115:1
116:3,18,24
117:2,5,9,14
117:23 119:11
121:13 122:5,6
122:8,13,16,17
122:20 124:11
124:15 127:17
127:21 128:12
128:15 129:17
131:4,10 133:1
133:9,22 134:9
134:13 135:4
135:17,22
138:8,14,14
139:23 140:1,7
142:5 143:1
145:1 146:9
148:3,13 151:9

159:13,21,23
160:4 161:19
161:23 166:24
167:24,25
168:19,21
169:5,20 173:1
173:4 174:1,19
177:20,22,24
177:25 178:4
178:10,13,16
179:8 180:2,19
180:21 182:2
184:4
**book** 73:25 74:6
**boom** 46:11,11
46:11
**bought** 28:23
57:18 62:8,18
67:13 122:5
123:10 179:1
**Boulevard** 1:11
2:9,17 6:9
**Boutte** 8:20
51:14 63:23
102:9 110:9
114:2,13
117:22 123:25
129:3 156:15
156:23 157:4
159:1,2 164:2
164:3
**Bowes** 43:19
**BQ** 142:14
145:7
**Branch** 15:25
**Brandon** 104:23
105:2 166:13
166:15
**break** 9:20
11:20 12:1,6
61:13 74:14,20
74:25 151:19
171:18 175:14
175:16
**brief** 11:22 61:8
171:13
**briefly** 137:16
**bring** 35:10
42:15 56:1

155:11
**bringing** 52:12
94:22
**Britain** 147:21
**broadly** 43:8
**Brodsky** 2:16
7:8,15 8:7,9,9
8:10,13,17,19
12:10,14 13:18
14:4,11 15:10
18:24 19:5
30:15,25 34:23
37:25 41:10
45:7 52:24
56:7 57:5 58:5
58:8,12,25
59:7,12 60:4,6
60:8,13,19,22
61:24 62:6,23
63:4,7,18,21
67:14,17 69:14
69:17 72:9,13
72:24 74:3,8
81:15 84:24
85:9,12,20
86:22 87:10,13
91:18,24 92:6
93:1,4 95:7,15
95:19 96:3,7
97:24 101:16
103:17,20,24
106:2,16 108:1
108:19 114:10
115:21 117:3,6
117:25 126:21
127:22 132:11
135:24 136:2,8
136:13 137:14
137:19 138:9
138:15 146:6
148:15 152:22
153:1,5 154:19
163:19 165:11
168:9 169:13
169:21 173:19
174:6,24
175:25 181:5
182:4,20,25
183:4

broker 17:5
 75:21 144:23
 144:24
brokers 102:16
 110:1
brokers' 102:16
 109:25
brought 10:12
 10:19 26:12
 56:7 57:16
 71:21 75:22
build 167:6,7
built 57:11
burn 37:10
business 15:12
 16:22 21:19,21
 21:24 22:4
 24:14 28:19,20
 28:23 29:4,12
 33:12,16,19,20
 40:9 47:2 48:4
 48:6 51:10
 52:12 55:9
 56:18 63:17
 161:25 182:4
butted 25:15
buy 46:5 47:22
 53:25 57:21
 69:6,13 77:2,2
 77:4,18 78:3
 78:23,24,24
 79:3,9,10
 94:13,14 95:10
 107:19 116:18
 116:21 123:2
 123:13,13
 140:20 155:19
 155:19,19
 156:20 159:11
 159:23 160:22
 165:15 166:2
 168:3 171:7
 173:12,14
buyer 53:19,24
 53:24 69:8
 71:8 84:1
 99:25 100:1,2
 100:3,5 123:7
 153:22 155:13

161:8 166:3
buyers 69:1 83:1
 84:13,17,18,22
 85:8,17 86:1
 86:19 87:8,21
 91:12 109:9
 114:25 115:18
 115:24 116:2,9
 120:2 122:4
 123:6 131:3,10
 133:9 149:22
 149:25 152:19
 155:10,12
 156:8,25
 157:14 158:1
 174:18
buying 78:21
 121:5

_____
      C
_____
C 3:1 4:1 5:1
 97:7
C-08209-001-...
 132:8
C-08209-0012...
 137:1
C-08209-0012...
 144:15
C-08209-0013...
 130:14
C-08209-0013...
 172:1
C-08209-A 1:4
C-8209 184:6
C-8209-0013672
 126:5
C-9209 5:12
C-A-B-R-E-R-...
 147:3
C-R-E-W-S
 32:7
C&S 51:23
Cabrera 147:3
 147:11
calculate 110:6
calculated 61:1
California 53:14
 53:15 130:24
call 39:22 40:23

40:24,24,25
 48:5 53:16
 57:21 68:9
 76:10 77:10
 87:24 88:8,20
 89:2 90:13
 100:7 102:16
 104:15 113:17
 121:13,14
 134:3,5 142:13
 143:9 151:5
 156:1 158:22
 159:3,14 163:4
 164:19 175:8,8
 175:13 182:9
called 5:10,25
 16:24 46:22
 47:21 56:15
 62:11 75:16
 95:20,20
 111:25 133:23
 140:14 146:14
 146:15
calling 17:12
 23:9
calls 12:25 53:19
 80:3 92:18
 93:14 99:7,8
 99:11,12,14,18
 100:5,5,6
 118:20 124:23
 143:5,6,8
 169:17
Canadian 47:19
canceling 156:9
capacity 37:3
 46:9 50:20
 178:5
capital 21:3,6,13
 29:16,22 33:15
 38:23 46:24
 55:13 56:17,18
 65:2 66:11
 76:2 132:23
 144:18,20,23
 147:3,4,11
 168:24
care 77:11 88:25
 107:21,25

108:1,2 120:5
 120:9 123:3,20
 123:23 139:3
 144:9,9 146:14
 146:15 155:16
 161:24,24
 165:6,8,17
cared 123:18
 124:2 125:11
 125:12 152:17
 160:2 166:17
career 29:5 40:8
 80:25 81:1
 136:16
careful 19:16
cares 124:22
Carolina 23:13
carpet 21:19,20
 22:3
carry 78:16
Cartersville
 21:23
Carterville
 21:25
case 5:12 58:6
 82:4 85:10
 179:20,21
cases 96:23
casual 168:1
Casualty 28:24
Caterpillar
 43:20
cause 155:23
CEO 41:8
certain 5:14
 31:20 43:1
 48:15 56:17
 86:6,13,14
 89:10 91:5
 92:10,11 171:4
certainly 181:16
certainty 125:6
 126:2,8 127:19
 128:23 133:7
 134:15 149:23
 153:20 156:3,6
 157:2,4,6
 168:6
CERTIFICA...

184:1
Certification
 180:13
certify 184:10
chance 7:3
 167:8
change 14:23
 47:17 118:6
 165:2 175:9,11
changed 31:8
 33:14 108:5
 118:5 165:4
characterize
 13:22
charge 52:15
 166:21
Charles 13:11
 44:4 48:16
 116:13
Charley 26:3
Charlie 3:20
 147:1
Charlotte 23:13
Chattanooga
 15:3
cheap 78:2
 83:15 168:20
cheapen 152:12
 152:16 153:9
 154:10,17
 156:2
cheapening
 153:12 154:23
cheapens 153:14
cheaper 154:11
cheated 59:1
check 19:21
 112:18 127:18
 175:10
Chemical 43:18
Chicago 1:12
 2:11 5:8 43:15
 44:17,19 45:3
 47:1,6 51:15
 184:8
children 167:12
Chimienti 2:6
 5:4 12:2 62:9
 62:19 65:10

66:16 68:2
72:22 78:19
81:23 83:19,24
89:14 90:23
91:7,14 92:14
92:22 95:18,24
96:5,8 97:25
98:3,23 99:3
110:11 113:6
118:6 119:23
128:7 129:5
130:9 136:5,10
156:13 163:6
163:23 167:14
169:15 170:12
chuckled 118:18
173:6
cities 52:4 68:12
68:18
city 6:11 53:14
53:15,17,20,20
53:21,23,25
54:17 57:12,14
64:2 65:18
67:16,19,22
70:9 71:9,17
71:22 72:3
96:15,16,16,18
98:9,9 99:18
99:19,20,21,24
100:2,3,6
106:1 107:9,14
107:23 108:4
109:18 110:12
110:13,21
111:1,11,14,16
119:5 122:17
122:18 130:5
140:13 151:11
155:22 163:13
163:15
City's 68:16
Civilization 15:7
15:11
claim 60:13
clamped 107:15
clarification
7:14 80:14
clarify 12:9 13:2

14:2,24 16:19
29:4 137:16
182:14,16,21
Clark 28:21
clause 171:4
clear 103:11
137:14
clearly 9:10
Cleveland 21:10
21:11 51:14
client 36:3 86:9
113:22,23
114:25 116:9
116:23 125:18
164:1 165:6,8
165:11,16
clients 71:16
85:2 116:11
120:19 124:1
124:17 125:12
143:6 174:13
close 62:11
71:23 72:1
closing 92:1
co-managed
73:13
co-manager
73:17,19,20
93:9,11,15
167:16
co-managing
73:12
Cobb 39:10
Coker 25:14
cold 52:7
collected 122:10
collections 96:22
122:11
comanaged
121:24
combination
47:11 55:23,25
come 11:18
21:20 25:19
33:2 36:7
51:19 52:6
70:6,10 71:25
82:11,13 93:16
93:20 100:23

101:1,2 103:4
104:12 115:11
115:12,13
118:11 133:13
133:14 138:19
138:23 139:7
155:7 158:14
162:2
Comer 104:23
156:24 157:4,9
164:4,8 166:13
coming 52:8
88:24 105:19
129:2 133:14
133:16 139:4
141:24,25
150:19
comment 13:3,9
commentary
13:18
comments
156:11,13,18
156:21 157:7
Commission 1:1
1:10 2:3,7 5:6
10:12,20 40:20
184:13
commissioned
40:23
commitment
140:18 160:9
committed
177:18
committee 123:8
common 139:12
Commonwealth
30:3,5,9
communicate
86:20 87:8,9
88:9 91:11
104:25
communicated
113:21
communicating
87:20
communication
141:6
community
96:17

companies
23:10 27:8,20
28:18 46:23
48:19
company 21:18
38:6 42:4
46:22,25,25
47:3 59:22
106:11,17,20
122:18 144:22
168:17
comparable
68:10,12
107:11,12
109:4,12
117:23 144:1
comparables
68:9 102:25
103:3 108:24
109:1,11 144:6
compare 121:25
compared
184:15
compensated
57:10 170:3
compensation
66:24 67:2
179:7 180:5,6
competitive 46:6
49:19 77:24
78:8,23 168:19
178:6
competitively
49:17,22
complete 10:8
14:18 153:3
184:14
completed 92:20
complexities
33:14
Compton 53:14
53:15 54:2,17
56:6 57:21
58:4 61:22
62:5 64:2,17
66:23 67:16,20
69:9 102:10
concern 122:8
concerned

107:23
concerning 46:3
91:8 119:4
140:9
concerns 122:23
concluded
183:12
conditions
180:19,24
conduct 180:23
conference
35:10 158:22
confident
168:24
confidentiality
182:11
confines 175:19
confirm 11:25
61:12 74:20
151:18 171:17
confusing
162:12
conglomerate
47:20
connection 5:10
8:15,25 101:21
116:3 179:8
consensus 93:16
consider 39:23
39:24 59:9
61:2 174:2
177:21 178:8
consideration
101:14 109:8
considered
40:21
considering
119:10
consist 102:15
consistent 139:1
constitute 5:17
constitutes
58:16
consultation
13:4
consulting 36:1
CONT 4:1
contact 36:24
57:24 85:17

104:19,22
114:8 115:17
115:20 116:2
127:20 128:1
132:25 134:1
149:22 159:12
contacted
131:17 134:7
149:25 150:16
159:13,15
161:7 172:25
173:18,25
174:5
contacting
124:14 131:19
174:18
context 93:1
continue 30:4
contract 40:17
40:23,25 171:3
171:5,10
contractor
108:12,18
conversation
96:11 125:1,5
138:19 145:17
150:5 166:19
167:15,18,23
168:1 169:12
169:16
conversations
12:1 105:25
123:24 142:25
143:2 150:6
156:7,14 157:5
157:19 159:9
166:23 171:18
175:11
convicted 10:15
convince 61:5
coordinated
42:15
coordinating
151:3
copies 159:17
copy 6:16,21
11:3 14:9
30:13 126:14
138:8 152:13

Corbin 114:16
Corbin's 106:10
106:17,20
Corners 6:10
Corp 46:23
62:14,16
118:22
corporate 23:23
43:17,17 81:10
corporates
26:22 38:15
43:11,13
correct 16:10,11
53:6 63:9
66:20 82:7
92:4 97:18,19
100:17,18
102:13,14
103:13 111:2
111:21 112:1,2
113:1 122:19
126:6,9,19
127:11 130:17
137:25 138:4
139:23 140:1
141:10,11,15
142:5,6 150:3
150:15,20
151:8 152:9
154:18 158:20
158:22
correctly 100:22
corresponded
148:23
correspondence
119:2
cost 121:11
163:10,16
coterminous
92:15
counsel 8:5
99:16
counteroffered
40:12
county 39:10
96:15,17
couple 6:11
23:25 25:24
26:6,8 31:12

36:11 45:24
50:21 62:11
116:13 142:7
coupon 121:15
143:15 145:8
162:7 163:4
164:17 165:2,4
165:21 175:2
course 5:16 59:7
60:22 91:25
105:14 181:6,8
Court 9:9 20:2
104:2
cover 46:20 86:2
116:6
coverage 42:17
covered 28:17
Covering 33:9
Craig 8:20
63:23 102:8
114:14,15
120:25 125:2
139:10 151:2
172:5 173:10
174:2 175:12
181:10
crappy 94:7,8
94:13
create 102:20
121:14
created 6:10
credit 89:3
92:18 94:1,8
94:13 96:13,14
97:18,21 98:5
110:13 112:6
112:10 119:4
123:3 140:9
150:10 170:20
170:20
credits 94:6,19
96:10 97:2,3
103:6,8 107:12
109:3 110:14
144:1
Crews 32:5
crime 10:16
criminal 8:23
criteria 103:3

cross 76:24
Crum 28:24
curiosity 58:25
current 109:23
currently 16:9
52:1
curve 78:11
CUSIP 129:19
CUSIPs 52:19
110:4,4
custom 87:11,14
customer 71:13
75:1 77:6 78:4
86:7,24 99:18
144:2
customer's 77:3
customers 43:11
53:10 76:11,14
86:2 108:7
116:14 118:13
120:13 138:2
144:18 159:21
160:1 173:17
cuts 152:13

———————
    D
———————
D 5:1
D-A-N-N-Y 6:6
D-O-U-G-H-E...
20:19,20
Dallas 51:11
Danny 1:8 3:4
5:24 6:6 13:2
42:22 126:14
126:16 132:16
184:5
Darrell 130:21
data 108:11
date 1:13 12:15
50:14 73:6
120:15 149:24
165:16 180:17
180:22 184:7
184:20
dated 3:15,17,19
3:22 126:9
130:19 145:4
149:18 150:16
158:19 172:10

daughter 52:5
Dave 106:20
David 106:10,17
114:16 132:22
133:4,6,19
134:9
Davis 3:13
day 149:24
161:10
days 12:15 36:2
71:23 178:25
deal 54:2,3,14
54:14 57:14
58:20 63:19
67:20,25,25
71:21 83:18
88:5 91:25
100:15,16,23
100:25 102:3
110:19 111:21
115:5,8,8
118:11 119:15
119:20,22
121:5 127:7,13
131:18 133:13
133:13,16
136:11 138:19
138:20 139:6
139:12 140:19
141:23 142:20
145:19 147:2
147:12 148:8
149:25 150:19
153:24 154:15
154:17 155:10
156:2,20
157:15,22
159:11 161:17
161:21 165:10
166:14 167:19
167:19 168:21
169:10 170:9
170:13 171:1
176:1,3 177:13
181:24
dealer 17:6
29:11,12 47:10
47:12 57:22
144:23,24

173:9,10 174:2
177:8
**dealers** 35:23
49:18 75:21
173:16,24
174:5,18
**dealing** 36:16
68:24
**deals** 49:19,19
49:21,24 50:22
51:12
**dealt** 114:9
**debate** 13:20,21
59:4,13
**debt** 96:23
**decades** 112:25
136:6
**December** 16:18
29:24 110:20
117:20 118:9
126:25 127:1,6
127:10 133:10
133:17 137:12
138:7,13
139:14 141:9
143:20 145:4
149:20 152:10
152:18 153:12
155:10 156:8
157:13 182:24
**December/Jan...**
110:19
**decent** 112:11
112:12
**decide** 135:13
**decided** 167:8
**decision** 71:25
**decisions** 166:22
**dedicated** 76:20
79:22
**Deere** 43:19
**default** 98:9,19
98:20 99:1
**defaulted** 96:16
96:23
**Defendant** 10:19
**definitely**
145:23
**definition** 96:2

96:12 98:20
**degree** 13:7 15:5
15:6
**delayed** 101:5
154:4
**Departments**
29:13
**depending** 79:4
93:13 119:13
123:7
**depends** 99:20
171:3
**depth** 117:17
**derived** 110:8
**describe** 46:20
77:23
**DESCRIPTI...**
3:6 4:3
**desirable** 82:24
**desk** 12:25
26:15 29:11,12
42:9 76:7,8,10
79:22 168:22
**desk'** 12:19
**details** 58:17
**determination**
103:19
**determine** 5:13
70:14 99:10,21
108:25 127:21
**determined**
67:11 71:11
77:20 92:19
107:8 138:22
**Deutsche** 28:22
48:10
**develop** 48:16
50:23
**developed** 5:16
33:20
**dice** 165:9
**dictated** 69:11
69:18 78:25
79:11
**difference** 95:12
95:15
**different** 13:7
35:20 46:12
84:18,19 87:14

103:20 121:25
122:2 137:15
140:2,10
144:22 157:20
158:1 162:13
179:22
**difficult** 9:12
87:16 117:2,9
117:10,15
**difficulty** 157:7
**direct** 55:16
65:3,4 75:8
106:19 108:15
114:16 128:8
129:6,21
180:14
**directly** 56:12
57:14 66:14,18
71:13 78:4
104:24 157:8
164:11
**Director** 53:21
67:22 99:19
**dirt** 98:11
**DIS** 142:7
143:11,14
**disadvantage**
116:20
**disaster** 107:14
121:20
**discount** 49:8
**discuss** 11:16
59:17 75:3
112:6 131:9
182:12
**discussed** 41:25
90:13 112:9
182:11
**discussing** 142:4
181:23 182:2
**discussion** 59:17
91:8 96:11
135:2 157:14
**discussions**
125:7 148:20
151:19
**distressed** 52:3
68:25 94:6,18
96:10,13,24

97:2,3,18,21
98:5
**district** 1:6 5:11
58:6 84:16
101:8,12
104:20 107:12
107:13,21,22
108:3 110:14
111:2,20 112:7
112:8,11
113:10 123:10
124:20 129:25
130:2 143:14
143:14 147:14
149:1 151:8
152:12 153:8
153:13 155:22
163:14 166:20
166:21 167:1
169:9 172:14
175:2 184:4
**District's** 101:7
104:23
**Diversified** 1:24
**Division** 2:8 5:5
**divvying** 48:14
**DNR** 37:25 38:1
**document** 12:12
126:1 138:12
182:1
**documents** 8:25
136:17 160:18
160:20,20
161:14 183:6
**doing** 13:13,16
16:14,17 17:12
21:16 23:15
25:7 26:21
27:13 28:19,20
28:23 29:6,21
31:4 33:12
34:11 35:7
36:5 39:1 40:1
42:16,18 43:20
46:1 100:10
101:8 106:11
108:12 131:21
138:9,16
147:13 150:8

177:13
**dollar** 57:12
128:18
**dollars** 171:7
**dot-com** 37:9
**Dougherty**
20:17 21:2,5
27:25
**Dow** 43:18
**downgraded**
112:18
**downside** 169:3
**draft** 126:21,22
138:8,13
**dramatically**
118:5 119:9
**due** 153:25
**duly** 6:1
**Dunwoody**
39:11
**duties** 80:7

---

**E**

**E** 2:16 3:1 4:1
5:1,1 8:9 74:17
74:17
**e-mail** 3:9,11,12
3:14,18,21 4:4
4:10 7:14
12:10,14 13:23
119:2 126:6,18
126:24 127:3
127:15 128:2,3
130:17 131:16
132:9,13,18,19
132:21 134:8
135:4,17 137:4
137:10,21,23
138:12 142:4
143:21 145:4
146:12 149:11
149:16,18,21
150:16 152:23
153:6 155:11
158:16 159:16
**e-mails** 119:1
127:18 138:21
148:23 172:13
**earlier** 66:17

96:9 103:12
111:24 132:24
144:19 162:11
180:4
**early** 16:16 18:5
101:11 115:9
120:13 133:9
**easier** 82:19
**easy** 117:16
121:17,17
**EBIT** 104:15
**Economics**
15:12
**Economy** 52:3
**Educational**
15:2
**effect** 163:13
**efficiency** 92:16
**effort** 13:14
42:15 45:16
50:8,24 51:1
52:16 64:21
169:20
**efforts** 48:7 95:4
131:9 171:8
**EFTs** 174:13
**either** 12:2 54:3
63:7 135:15
139:14 146:11
151:4,4,19
**elapsed** 161:6
**Email** 4:6
**employed** 16:9
**employee** 40:16
40:17,18 105:1
106:23 108:18
**employees** 105:3
**employer's**
37:17
**employment**
16:12
**enamored** 33:3
**ended** 115:14
**Enforcement**
2:8 5:5
**engage** 132:25
**entertain** 121:5
**entire** 104:11
135:20 140:1

**entities** 113:3
**entitled** 59:2
**entity** 8:15
**equity** 160:22
161:15 165:16
**Eric** 51:14 63:24
118:25 119:2
**Erik** 3:14
136:24 137:5
138:1 140:16
141:12 150:5
151:3 158:18
**error** 38:9
**esoteric** 43:14
**ESQ** 2:4,5,6,16
**estimation**
111:12
**ETFs** 174:13
**Evanston** 44:13
44:21
**evening** 161:11
**eventually**
148:15,18,19
**everybody** 13:13
43:4 44:25
46:13 93:15
116:8 118:23
125:2 159:15
159:18
**everyday** 46:3
178:5
**exact** 16:23
17:21 39:1,2
57:8 139:19
141:23 153:17
182:17
**exactly** 19:3
26:1 39:21
44:17 45:5,9
45:14 47:16,18
60:18 105:9
115:12 125:8
125:10 135:1
143:3 149:24
152:25 156:22
157:17 160:19
173:11 175:9
**examination** 3:3
6:2 8:2 15:25

137:18 138:5
183:11
**examined** 6:1
**example** 86:12
91:19
**Exchange** 1:1,10
2:3,7 184:13
**excuse** 16:23
48:9 87:4
88:23 95:7
98:25 102:9
118:2
**exhibit** 6:22
8:23 9:24
10:24 11:2
14:5,9 75:5
125:20,25
126:4 129:8
130:10,13,14
130:15 132:3,7
132:7 136:18
136:19,23,25
137:2 140:21
140:25,25
141:2 144:10
144:13,14,16
146:16,20,20
146:22 149:7
149:11,13,15
150:17 151:24
152:3,4 158:6
158:9,9,11
162:11,15
171:21,23
172:2,20
176:15,19,20
176:22,24
180:12,12
**exhibits** 3:6 4:3
9:23
**exorbitant**
170:21
**expand** 98:25
**expanded** 80:7
**expect** 125:17
**expenses** 179:15
**experience** 51:4
80:21,22,24
81:16,21

112:24,25
113:2 136:6,7
139:11 170:12
170:25
**explain** 53:12
55:19 58:7
60:21 77:1
90:6 101:20
123:9 142:8,9
153:14 160:7
**express** 140:7
146:8 173:3
**expressed** 124:3
139:22 140:3,8
153:21
**expression** 94:7
**extensive** 51:9
**extent** 29:9
**extremely** 94:7

———————
**F**
**F** 74:17
**F-E-W** 17:1
**F-I-S-H-E-R**
38:5
**face** 35:1
**fact** 16:3 51:17
72:14 95:16
111:18 124:10
133:15 164:25
168:11
**factor** 170:17
177:23 178:10
**factors** 93:24
94:2
**facts** 5:16 90:11
183:5
**Failed** 98:22
**fair** 13:21 40:1
70:15 91:7
133:8 138:3,4
180:20
**fairly** 168:7
**falls** 132:23
181:9,10
**false** 8:24,25
**familiar** 47:21
53:15 89:15,25
90:2,3,4 110:1

112:14
**Fannie** 49:7
**fantastic** 167:12
**far** 13:10 80:2
85:7 107:23
**fast** 71:25 72:1
**father** 21:19
**favor** 75:18
**February** 63:20
73:7,14
**federal** 5:15,18
10:16
**fee** 165:1 170:5
170:13,21
**feedback** 120:12
120:18 144:2
**feel** 136:9 157:5
**fees** 121:11
163:11
**felt** 69:4
**fide** 61:2
**Fidelity** 28:20
31:14,16 32:24
36:3
**fides** 61:2
**Fifteen** 179:14
**Fifth** 9:4
**figure** 20:8
**figured** 40:7
165:9
**file** 1:4 102:20
103:13,22
184:6,6
**filed** 75:24
107:16,18
140:14,15
180:13
**filing** 96:18 99:1
**filings** 52:17,20
**fill** 150:24
**final** 104:16
113:16 172:15
**finalized** 120:17
**finally** 15:8
25:19 120:16
140:17 164:22
**Finance** 53:21
67:22
**financial** 28:21

48:8 53:20,22
71:20 96:14
99:19 106:1
119:18 129:25
**financials**
107:18 108:3
119:5 130:3,7
140:13,14,15
**financing** 53:18
164:10
**find** 37:3 71:8
85:3 94:13
107:17,19
109:24 119:21
121:4 144:8
155:6 156:8,25
157:13 159:10
159:11 174:18
**finding** 57:20
**fine** 41:18 57:23
72:24 87:19
**finish** 9:14,16
**fire** 109:18
**firm** 8:10 12:21
16:24 17:2,14
17:14 22:7,13
28:4 29:20
30:2 35:12
40:3,6 45:24
45:25 47:6
50:15 51:7,16
119:15 160:22
165:16 168:18
**firms** 35:20
51:12,12
170:22 171:4
**first** 5:25 13:5
14:21 16:15,15
19:2 26:1
30:14 40:14
53:13 54:2,3
54:10,11,12,15
55:22,23 56:1
56:14,22,24
57:15,16,22,24
64:1,2,4 65:11
66:19,23 67:1
67:25 85:12
91:25 99:8

100:14 117:14
121:8 124:20
127:15,16
134:1 150:3
160:14 162:5
164:1,14
165:14 166:8
166:12,18
167:16,19
172:25 173:23
173:25 174:4
174:23 175:22
177:7,8,19
180:15
**fiscal** 130:1
**Fisher** 38:5
**fishing** 144:8
**fit** 85:3 86:8,9
**fits** 118:19
**Fitzpatrick**
57:25 160:16
**five** 15:16 79:10
107:18 110:23
140:16 142:8
142:11 143:15
145:6 161:3,16
164:16,16
167:3 175:17
**fixed** 13:14 31:5
31:17 32:8
33:5 34:12
38:10,14,25
43:9,22 45:6
49:1
**floaters** 173:14
**Florida** 2:19
8:10
**focus** 31:24
48:13 49:5
82:18 87:16
145:1
**folks** 33:16
48:11 49:13
**follow** 64:6
134:4 178:16
**follow-up** 153:1
**followed** 179:20
**follows** 6:1
61:20

**force** 60:25 76:6
79:17
**forget** 113:7
150:1
**forgot** 138:25
144:18 183:3
**forgotten** 133:3
**form** 6:21,23 7:6
8:23 72:9,13
85:20 86:22
114:10 117:25
136:13 173:19
174:6
**Formal** 6:16
58:13,14,18,21
**Forster** 28:24
**forth** 8:23 40:12
148:24 165:19
165:20,22
180:24
**forward** 12:8
133:25 141:20
**forwarded**
147:7
**forwarding**
132:12
**found** 53:18
109:5 118:7
122:6
**foundation**
62:24 114:11
**foundational**
169:22
**four** 17:19 18:14
18:15,17 43:25
46:12 110:23
113:19 124:11
142:12 143:17
143:22 161:20
161:23 166:10
167:3
**Foxworthy**
17:17
**frame** 105:7,14
**frankly** 13:3
**free** 9:24
**friend** 21:19
36:3 57:18
174:10

**front** 40:8
**frustrating**
155:25
**FTN** 57:5 160:4
160:15 161:7
172:18 178:17
**full** 6:4 17:5,14
**full-time** 16:15
76:20
**fund** 29:6 46:24
47:24 148:7
175:15,20
**funds** 27:7,7,20
27:20 28:20
37:11 48:11
56:17
**further** 16:21
47:23 153:14
**future** 40:6

_____
G
_____

**G** 5:1
**G-A-R-L-A-N...**
6:6
**G-U-I-L-S-H-...**
44:4
**Garland** 5:24
6:6
**Garner** 2:4 5:2,4
5:21 6:3 7:12
7:17,23 8:7,11
8:14,18,21
11:1,23 14:3,7
14:12 15:14
19:1,9 22:17
23:4 24:9 27:9
29:14 30:18
31:3 32:2
33:23 34:22
38:2,18 39:7
41:5,11 44:12
45:1 47:4,8
48:1,21 54:20
55:8 58:7,10
58:23 59:4,8
59:23 60:5,7
60:10,18 61:6
61:9 63:13
64:18 65:24

66:14 70:5,20
74:13,18 75:22
76:3 80:20
81:19 82:17
83:25 84:10,25
85:6,11,16,24
87:5,12,18
90:19 92:23
93:3,5,7 98:24
99:4 101:17,19
103:10 104:4
104:18 106:12
106:21 108:9
113:8 114:23
115:23 117:1,4
117:11,13
122:3 125:23
126:23 127:24
130:12 132:1,5
132:12,15
136:18,21
137:17 138:6
138:11 139:5
139:21 140:23
144:12 145:3
145:25 146:7
146:18 148:17
149:9 151:14
151:16 152:1
153:4 154:8,22
158:3,8 160:3
162:9,23
171:11,14,23
176:17 178:2
178:15 179:6
180:1 181:7
181:13 182:7
182:19 183:9
**garner@sec.gov**
2:13
**gauge** 109:22
148:3
**general** 68:23
83:1 85:10,13
85:14 96:10,11
96:19 112:25
**generalities** 94:4
**generalize** 91:25
94:6

**generally** 49:20
53:10 77:12,18
78:4 82:19
85:1,18 87:12
87:19 96:20
97:3,19,22
**generate** 121:8
121:15 162:7
163:4 165:2,3
165:24
**generated** 166:7
**Geneve** 46:22
62:14,16
118:22
**gentleman** 25:16
27:22,23,24,25
32:23 36:1
51:19
**Georgia** 6:10
30:10
**germination**
92:1
**getting** 35:7
37:11 58:19
80:2 81:24
112:18 118:11
118:12 120:12
120:19 134:21
152:19 167:8
172:13
**Gil** 133:5
**girl** 26:4
**gist** 156:18
**give** 13:8 35:23
42:19 86:12
87:15 88:8
89:9 93:15
96:12 98:19
105:5 110:3,3
114:5 123:19
124:8,24 125:9
139:19 161:16
**given** 101:14
157:8 165:23
**gives** 90:9
175:17
**giving** 145:7
**GLA** 43:14
**Glen** 3:18

144:17 146:14
**go** 9:7,21 11:20
12:8 15:1
16:12,21 18:16
19:21,25 20:6
20:7,16 21:2
22:6 24:16,21
25:4,11 26:15
33:2 35:22
39:19 41:16
42:20 47:16,23
51:5 54:4 61:6
66:17 67:19
69:5 71:16
74:14 84:17
88:17 94:8,10
100:2 101:10
103:18 108:10
109:25 113:7
115:8 121:12
123:4,11,13
124:23,24
125:18 127:18
134:20 135:7
138:24 141:18
151:12,14
154:12,13
155:15,15
160:12,13,14
166:7 167:5
171:11
**goes** 47:16 97:17
147:15 170:18
179:16,17,17
**going** 6:20 9:19
9:23 13:25
15:2 16:12
20:6 30:11
32:3 37:7,12
40:11 51:22,24
58:8,22 59:4
60:10 61:5
75:5 88:4,24
94:3 95:10
100:10,23,25
101:2,9,10,12
104:13 105:19
115:8,10,12,14
119:10,11

120:8 122:25
124:21 128:6
128:15,23
134:13,17,19
138:19,23
139:6,18
141:20 142:2
145:5,8,18
152:12,15
153:2,9 154:9
154:11,12,13
154:16 155:5
156:24 157:15
165:7,21,22
166:8,19 167:5
167:7 171:8
175:5,13 183:7
**good** 11:19
21:15 36:23
67:24 74:13
81:25 85:3
88:18 94:1
119:14 141:12
**gotten** 111:3
126:3 169:19
**government**
26:9 27:3
**grade** 97:4,9,11
97:12 101:10
**grand** 48:17
**grapes** 122:1
**great** 57:20
147:21 155:23
**Greg** 3:13
132:22 133:4,6
133:6
**gross** 41:14
**ground** 9:7
36:21
**group** 167:19
**grow** 51:7,16
**Guardian** 28:19
48:5
**guess** 16:6,13
40:24 41:8
46:8 50:9
75:20 76:9
81:8 110:16
145:7 152:20

168:7
**guessing** 135:23
169:14
**guideline** 91:13
**Guilshan** 44:4
44:15 45:21
48:22 76:9
**Guilshun** 48:23
**guy** 13:12 25:14
26:2 30:8
34:17 35:3,25
36:17 40:7
44:5 45:22
47:13,21 49:9
49:11 51:10,14
161:15 178:25
**guys** 26:8 27:3
31:8,18 42:1
45:24 107:15
132:2

―――――――――――
**H**
―――――――――――
**H-O-L-C-O-L...**
30:23
**half** 19:22
113:20 124:22
164:16,21
175:18
**hand** 5:22 34:25
130:13 144:13
146:19
**handed** 6:21
**handing** 11:2
14:8 132:6
136:22 140:24
149:10 176:18
**handled** 52:18
**handling** 49:1
**hands** 92:3
**happen** 128:6
159:3
**happened** 37:14
47:21 164:13
**hard** 25:18 78:6
**hardware** 153:8
**Harvey** 1:5 5:11
12:24 45:10
58:6 63:19
72:6,12,17

73:8,9 100:9
101:8,21,24
103:1 107:9,10
107:11,14,23
108:3,4,6
110:13,21
111:1,1,11,19
112:7 113:9,15
113:24,24
114:21,25
116:24 118:24
119:25 121:6
122:7 123:1,10
123:11,14
124:9,15,19
125:15 126:19
130:2,5 131:4
133:1,22 138:8
138:13,14
140:13 141:13
142:5 143:14
147:13 148:3
148:13 151:8
151:11 152:11
153:8,13
158:22 172:14
173:1,3 174:1
174:19 175:2
177:11 180:2,8
181:24 182:2
184:3
**Harvey's** 110:12
**hassle** 123:4,12
**hate** 159:10
**hats** 13:7
**Haven** 31:7,8,10
31:23,25 32:2
**head** 9:11 51:21
52:1 103:17
104:1,3,6
180:7
**headlined** 129:8
**heads** 25:15
**hear** 164:11
179:2
**heard** 63:8
89:16 100:14
100:19 178:23
178:25 179:3

181:25
hearing 1:15
  184:17
hedge 47:24
  148:7
held 184:13
help 36:7 37:3
  50:8,23 87:16
helped 131:12
helpful 60:23
Henderson
  16:24 17:10,10
  18:4 21:25
  22:7 23:5
  24:10
hey 36:5 43:2
  77:10
high 17:11
  174:13 177:1
higher 24:12
  56:19 145:24
  146:1
highly 35:12
  68:25
Hill 26:3
hire 51:18
hired 23:7 26:6
  26:8,11 27:3
  27:22 38:10
  44:5 51:8
history 15:3,7
  15:10 16:13
Holcolmb 30:19
  30:20,21 31:4
  31:6,16 32:24
hold 15:21 16:15
  47:22 153:24
  168:16 169:9
  173:12
holding 78:21
  79:16 179:22
home 6:8 37:4
  44:21
honest 54:5
honestly 17:21
  22:20 23:8
  25:25 36:24
  47:13 54:15
  84:7 107:16

133:3 137:22
138:20,22
  156:12 174:15
hoops 134:23
hope 32:5
Hopefully 78:15
Hough 126:12
  126:13
hours 166:11
house 179:16
housings 43:15
huge 21:11,11
  40:8
huh-huh 9:11
hung 36:22
hypothetical
  169:22

——————
                 I
idea 21:16 45:17
  85:3 92:1
  166:3
ideas 93:16
  105:10
identification
  10:25 14:6
  125:21 130:11
  132:4 136:20
  140:22 144:11
  146:17 149:8
  151:25 158:7
  171:22 176:16
identified 3:6
  4:3 86:19
identify 8:8
  84:12,21
  131:10
identifying
  84:17,18
IFS 8:19 12:20
  13:6,14 16:10
  39:12,20 41:1
  41:12 43:23
  44:19 45:19
  46:19 50:3,5
  50:10,12,17
  52:10 53:9
  55:8,16 56:21
  57:15 58:3

61:21 63:2,16
  64:3,7,13
  65:16 67:5,10
  72:6,19 73:3
  73:12,17 76:6
  76:7,19 79:23
  80:4,12 84:24
  90:12,19 91:10
  92:24 93:9,10
  94:15 96:12
  97:2 99:5
  101:16,17
  105:1,3 106:7
  106:8,23
  108:13,17
  111:21 112:1
  114:9 116:7,8
  120:21 121:21
  124:13 126:5
  127:21 130:14
  130:24,25
  132:7 136:25
  143:5 144:14
  156:1 157:11
  159:12 160:4
  166:7 167:23
  169:19 170:3
  172:1 179:12
  180:13 181:4
IFS's 54:11
  94:25
IFS-08209-00...
  158:10
IFS-08209-00...
  176:23
IFS-08209-00...
  146:21
IFS-C-08209-...
  141:1
IFS-C-08209-...
  149:14
IFS-C-8209
  171:24
Illinois 1:12
  2:11 102:3,19
  109:17 112:24
  121:10 122:7
  123:11 125:11
  163:10 180:14

184:8
Illinois' 112:16
Illinois-based
  125:12
immediately
  31:22
impossible 87:1
improper 59:8
in-house 40:18
  40:21
include 70:17
  74:9,9
included 136:12
income 13:14
  31:5,17 32:8
  33:5 34:12
  38:10,14,25
  41:12 43:9
  45:6 49:1
incomes 43:22
incorporated
  144:2
incorrect 13:17
  154:3
incredible 37:10
incriminate 9:5
independents
  40:25
Indiana 73:19
indicate 89:6
indicated 113:19
indicates 12:22
Indicating 6:24
indication 91:23
  123:20 135:4,7
  135:16
indications
  114:3
indicative 88:21
indicted 10:15
indirectly
  164:11,12
individual
  181:23
individuals
  24:12 177:2
influence 93:24
inform 176:3
information

14:17 51:25
  53:22 58:20
  60:1 86:20
  87:7,20 92:19
  102:25 105:2
  106:13,15,16
  106:20,22
  107:22 108:11
  108:16,17
  118:12 119:6
  121:2 123:17
  125:13,14,18
  133:2 144:3
  149:17 151:4
  156:25 159:6
  165:23
informational
  67:23
informed 89:11
informing
  120:20,24
initial 88:20
  89:2 91:9
  102:25 113:15
  123:19 145:17
  170:4
initially 23:7
  24:19 27:1
  35:3 56:14
  100:23 101:2,6
  104:13 105:17
  107:10 109:10
  110:8 115:10
  117:22 155:4
  165:24 167:6
  175:12
initials 150:11
initiate 77:4
input 105:16
  113:9 144:2
inquiries 72:2
inquiry 10:12
instance 14:2
  60:2 78:20
  181:14
instances 105:13
institutional
  13:14 17:16
  24:4 25:2

Page 196

26:15,19 27:5
28:10 32:10,13
33:21 34:12,15
38:10,25 39:14
41:19 42:22
43:7 58:1
160:17
**institutions**
17:13 23:1,3,6
27:14,17,18
31:5,25 38:16
**instructing**
58:24 59:5
**instrumental**
35:5
**insurance** 23:10
27:7,20 28:18
40:21 46:23
48:19 67:20
81:5 82:8
111:12,13,20
117:24 122:18
123:3,5 139:17
145:14,20
154:2
**insure** 134:25
135:14
**insured** 54:23
66:6 71:1
80:22 81:6,7
81:21 82:1,20
82:23 98:7,8
102:3 103:8
111:22 122:14
122:16,21
134:14,19,21
135:17,23
145:18 147:15
147:16 149:3
177:25
**insurer** 145:11
**intending** 13:19
**intents** 48:23
**interaction**
114:20
**interest** 68:4,5
88:7,16 89:7,9
89:11 91:23
118:24 124:3

127:21 132:25
139:23 140:4,7
140:8 146:8
148:3 153:21
154:13 163:25
173:3
**interested** 39:24
69:8 124:9
**interesting**
121:6
**intermediaries**
57:15
**internal** 157:11
157:14
**internally**
120:21 166:6
**Interstate** 17:20
17:23,25 18:10
18:16,20,22,23
19:14,15,20
23:11,12 24:16
24:20 25:5,9
25:11,13,17
**intervention**
59:10
**interviewing**
17:15
**inventory** 76:11
76:14 77:15,16
78:22 79:16
167:24 168:16
**invested** 29:6
**investigate**
58:15,17
**investigating**
59:23,24 60:16
**investigation**
5:10,17 6:17
8:16 9:1 10:12
12:3 60:11
61:15 74:22
151:21
**investment** 97:4
97:8,11,12
101:10 123:8
**Investments**
32:22
**investors** 23:2,6
24:4 25:2

26:19 28:10
32:11,13 37:8
131:20 154:25
155:1
**involved** 7:16
12:23 35:9
52:12 71:4
88:5 90:11
107:19 108:5
125:4
**Involving** 75:14
**irrelevant**
120:10
**issuance** 64:22
65:5 85:8 87:7
121:11 163:11
163:16
**issue** 53:2 83:9
83:21 93:13
111:16 121:12
140:20 142:3
163:12 166:24
**issued** 24:7
84:16 169:20
171:1,6
**issuer** 71:14
83:12,21 89:3
99:12,14,15
100:6,7 125:18
156:24 157:3
**issuers** 103:4
109:12
**issues** 53:7 93:1
94:5,5
**item** 107:12
**items** 79:10,10
85:3 107:11

_____
**J**
_____
**J-A-S** 34:6
**Jack** 26:7
**Jackson** 1:11
2:9
**James** 75:15,23
75:25
**James'** 75:17
**January** 42:13
100:16 105:14
115:5,6,6,18

118:10 120:13
130:19 135:11
138:25 139:22
140:6 141:25
149:18 150:17
158:19 159:20
172:10 173:23
182:23
**Jarvis** 3:10
**Jeff** 17:16
**Jervis** 126:11
**Jim** 26:3
**job** 16:15,15
70:8
**Joe** 162:20
**John** 5:4,5 43:19
47:3
**join** 17:18 45:5
80:4
**joined** 45:7 50:6
50:10
**jokingly** 47:6
**JONATHAN**
2:5
**JOSEPH** 2:6
**Jr** 8:20
**jump** 134:23
**June** 130:1
**junk** 160:15
177:2
**Justin** 181:23
182:2,3

_____
**K**
_____
**K-E-E-G-A-N**
34:2
**K-E-M-P-F**
147:5
**Keegan** 33:25
**keep** 89:11
102:10,22
103:13,15,25
120:8 159:10
159:12
**Keith** 13:11 44:5
44:10,20 45:25
45:25 49:4,9
49:16 52:17
76:16 80:1,1

125:10 126:13
181:10,11,12
**Keith's** 49:4
**Kempf** 3:20 4:4
147:1,5,7,9,19
148:21,25
152:8
**Kempf's** 152:5
**kept** 104:5 140:8
140:10,10
**Kevin** 57:25
160:16
**kick** 123:5
**kind** 25:14 30:2
37:2 40:1,4
44:24,25 47:19
48:17 62:12
69:11,18 84:14
121:16 123:3
131:11 144:7
161:25 162:24
164:24
**kindly** 118:18
**knew** 33:16 68:9
68:14 69:10
71:24,24 133:4
134:16,20
139:4 162:5
165:22
**knot** 97:16
**know** 5:15 7:9
7:18,19 9:17
9:20,21 13:23
14:25 16:20
31:18 35:7,8,9
35:22 36:13,18
36:18,19,22
37:7,13,14,15
39:23 42:14,16
43:4 45:6 46:1
46:11 49:21
51:7,11,15
53:14 55:10
56:3,7,13 57:3
57:9 58:3 59:9
61:21 62:15,25
63:2,7 68:11
68:14 69:17
74:8 81:7 83:3

83:20 84:1,7
84:15 85:1
86:23 87:3
89:12 90:1,16
94:4,18 95:9
97:11 101:18
105:22 106:3
107:9 108:4
110:24 111:7
112:11,15,19
113:21,25,25
115:12,14
116:11,22
117:17 118:4
119:8 120:16
123:6 124:5,21
125:13,16
127:7,8,13
128:22 129:2
129:15 130:21
131:6,7,14,18
132:18 133:19
134:7,8,25
135:9,14
136:15 137:3
138:1,15 142:2
143:9,11
145:21,23
146:4 148:25
149:2,5,17
152:13 153:9
153:23 154:3,4
154:5,5,5,23
154:25 155:12
155:23 156:1
157:2 158:1
159:4,14,17
160:11,15,19
161:4,7 162:1
163:7 165:18
166:3,24 168:5
168:10 169:4
169:12,13,25
170:6 171:9
172:13 174:12
174:12 179:5
179:11 181:4
181:15,19
182:16,18,22

183:5
**knowing** 123:2
**knowingly** 8:24
8:24
**knowledge**
10:23 14:16
46:16 51:5
110:22 124:13
124:16 133:20
151:1 158:2
166:25 174:20
179:21
**knowledgeable**
49:10
**known** 36:2
**Knox** 13:11 44:4
44:15 45:20
48:16 76:9
116:13 157:25
**Kutak** 164:25

— **L** —
**L-U-C-H-E-S-S**
44:6
**lack** 62:23
114:11 155:9
155:12 183:5
**lady** 79:25
**large** 28:18 55:5
121:15 165:7
170:13
**larger** 51:12
157:21
**largest** 25:23,25
**late** 16:16 19:12
50:16 54:3
166:15
**latest** 112:17
**laugh** 108:8
**laughed** 62:12
118:13,15,21
122:4 173:5
**law** 8:10 59:21
121:13
**Lawrence** 147:3
147:8,10
**laws** 5:15,18
**lawyerlike** 59:15
**layers** 46:12

**lead** 12:21 50:21
54:12 61:1
64:3,7,7,13
65:17 67:6,11
72:7 73:3
91:10 93:2,9
121:22,23
**League** 52:3
**learn** 100:9,13
**learned** 108:6
117:4,14
164:25
**leases** 43:14
**leave** 10:1 24:10
24:15,20 25:11
27:10,21 29:25
31:6 32:18
33:24 34:16
38:22 39:19
**led** 94:5
**left** 17:6 19:23
20:14 25:17
28:4 31:22
**legible** 30:15
**legs** 30:10
**let's** 5:21 11:20
15:1 18:3 22:6
61:6 63:20
67:15 71:9
72:22 74:14
82:18 84:15,16
87:6 90:1
95:25 109:18
138:24 151:14
156:5 162:15
164:7 166:17
166:24 169:9
169:10
**letting** 154:25
**level** 53:25
91:23 94:14
104:15 113:14
124:8 145:24
146:1 155:6,17
159:24 160:23
160:24 162:2,7
163:25 166:2,6
176:6 178:24
179:2

**levels** 85:4
105:23
**Levine** 118:19
**liability** 49:23
**library** 1:5 5:11
12:24 58:6
72:6,18 100:10
101:8,21,25
107:11,13
108:3 110:13
111:2,19 112:7
113:10,24
115:1 117:2
119:25 122:5
123:10 124:19
126:19 127:17
130:2 131:4
133:1 138:14
141:14 142:5
143:14 147:13
148:3 151:8
152:11 153:8
153:13 167:7
167:10 172:14
173:1 175:2
181:24 182:2
184:3
**Library's** 116:3
**license** 15:21
31:20
**licensed** 17:14
80:6,7
**licenses** 16:5
**life** 28:19 48:5
119:12 142:13
172:15 175:3,5
175:7,18
**liked** 28:6 40:4,5
40:5
**limit** 77:20
168:16,22
**limits** 77:16
**line** 17:5 43:16
99:16 100:4
**lines** 45:13,15
142:7 157:22
182:17
**lingo** 146:4
**list** 44:3

**listed** 75:9
**listening** 80:3
**literally** 118:13
141:24
**little** 29:7 32:20
32:21 33:3
43:12 53:12
54:13,14 80:14
81:13 95:25
103:4 107:13
114:15 119:9
128:18 147:13
159:8
**lives** 52:5 125:11
**loan** 25:15
164:10 168:2
168:14
**located** 21:7
**Location** 184:8
**lockbox** 53:23
**log** 159:15
**logging** 143:6
**logs** 143:9
**long** 15:15 18:23
19:19 20:9,21
21:13 30:7
36:9 37:13
44:5 48:6 54:8
135:13 161:6
166:5
**long-term**
104:11
**longer** 45:23,25
98:16
**look** 9:24 54:4
68:9,15,23
78:2,8 79:13
88:19 103:18
104:9 105:12
109:22 118:3
124:21 128:19
128:20 129:10
134:1,1 155:25
160:12 162:10
**looked** 68:11,19
68:22 70:21
102:17,24
109:9 112:19
120:1 135:20

178:19
**looking** 17:16
51:15 52:5
63:17 64:10
70:13 71:17
77:8,11 84:11
85:18,25 86:9
86:13 87:6
103:6 104:10
105:18 107:11
108:24 109:6
109:10,20
129:14 134:11
135:3,16 141:4
141:4 143:13
143:21,25
144:5 149:1
155:1 170:17
**looks** 88:18
138:3 177:10
**lose** 169:3
**loss** 41:15 180:5
**lost** 36:24
**lot** 15:12 26:13
33:10,16 36:19
36:25 43:14
49:7,25 52:4
56:16 68:14
73:13,15 78:24
78:25 82:15
83:1 84:8
121:6 123:5,6
134:23 140:10
143:2 146:15
148:23,24
159:9,9 160:14
170:22
**Lou** 25:16,17
**loud** 171:25
**low** 56:19,19
96:21
**lower** 68:4 175:5
**lowest** 97:12
**Luchess** 44:6,16
44:22 45:1,2
45:21
**Lukehart** 26:7
**lunch** 39:23
**luncheon** 74:16

**M**
**M-C-K-E** 41:5
**M-C-K-E-N-Z...**
41:6
**M-O-R-G-A-N**
34:2
**MA** 99:16,17
**ma'am** 100:12
182:3
**Maes** 49:7
**main** 39:9
**maintain** 182:10
**major** 48:24
56:17
**making** 13:14
39:24 59:19
118:11
**manage** 46:23
**managed** 27:7
27:20 45:16
47:15 48:11
**management**
46:24 47:2,24
118:17
**manager** 25:13
27:23 39:15
41:20 42:12,18
42:23 43:7
46:15 53:20
54:12 93:14
111:22,22
144:25 167:20
**manager's** 27:4
**managerial**
46:12
**Managers** 15:25
**managing** 26:24
46:13 52:16,23
**manner** 59:24
**manufacturers**
21:22
**mark** 31:15
32:23 35:25
57:1
**marked** 6:22
10:24 11:2
14:5,8 57:3,5
125:20,24
130:10,13

132:3,6 136:19
136:22 140:21
140:24 144:10
144:13 146:16
146:19 149:7
149:10 151:24
158:6 171:21
176:15,18
180:12
**market** 24:7
46:2 49:6,6,8
67:13 68:23
69:5 70:22
78:6,7 79:2,12
80:11,16 94:16
94:23 101:3
103:4 105:19
109:21 113:1
115:8,15 136:7
177:22 178:5,9
180:19,20,24
**marketplace**
70:14 82:8
94:9,11 96:19
98:6,21 102:17
103:19 143:25
**Markets** 147:11
**marking** 152:2
**Marlo** 181:23
182:2,3
**Mass** 28:20 48:8
**material** 104:16
**materials** 11:10
**mats** 172:15
**matter** 1:3,15
5:11 12:22
16:3 51:17
171:7 184:3
**matters** 142:17
**maturing**
128:16
**maturity** 54:8
66:2 77:21,25
79:1 85:4
86:16 88:7
89:3 90:10
104:11 119:12
119:14 124:12
129:18,19

142:12 145:8
164:15,19
172:16 175:4
175:13 176:9
180:20,21
**Mayor** 99:20
**MBI** 81:6,8
**MBIA** 82:12
**McKenzie** 41:4
42:5,7,10 51:2
51:3 53:2
126:14 156:15
168:8,11
**mean** 41:23
42:23 46:13
52:24 55:19,25
64:18 68:3
73:15 74:9
77:1 79:8,9
83:8 85:22
87:17 88:23
89:22 90:7
91:1,18,22,22
93:17 94:10
95:5 97:8 98:9
101:1 107:1
120:7 122:1
123:5,21 127:3
129:15 135:24
137:25 141:16
141:25 142:14
146:1 155:19
159:7 160:24
161:20 163:15
165:17 168:17
171:3 174:3
178:4 182:20
183:4
**means** 26:3
49:24 122:16
153:14,15
**meant** 141:17
142:9
**meeting** 11:6
**Mellon** 47:12
**members** 49:18
61:14 74:21
151:20 171:18
**memorandum**

89:16,17,24,25
92:16 111:25
**memory** 16:23
19:6 150:2
**Menominee**
132:23
**mention** 108:8
**mentioned** 64:6
74:5 77:14
79:19,24 96:9
99:15 115:7
180:4
**message** 3:16
4:8 141:7,8
147:7 148:2,9
152:24 153:7
154:16 157:25
172:7,12
177:11
**messages** 152:7
**met** 36:18 40:4
96:17,18
**methodology**
92:24
**methods** 84:18
**metro** 39:9 52:5
**Miami** 2:19 8:10
**Michael** 147:10
**mid** 38:23 39:19
39:25 76:2
133:9
**Mike** 147:3
**military** 43:15
**million** 49:21
50:1,1,1 55:7
65:7,24 77:19
78:22 79:3,3
83:10,10
124:11 147:13
152:11 153:8
167:9 168:14
168:25 169:5,7
170:9,17,18
175:24
**mind** 87:17
117:8,9 137:15
153:2
**mine** 57:18
174:10

mine's 21:19
mini 81:9
minimum 49:22
minute 15:1
  36:6 43:24
  125:9 160:19
MMD 78:1
  93:21,22,25
  102:5,13
  108:25 109:7
  110:6,9 117:21
  117:22
modify 13:25
money 37:10
  46:23 47:15
  49:6,8 78:6
  81:8 96:21
  144:24 168:8
  180:1
month 45:9 59:2
  67:16 79:9
  92:9 105:20
Monthly 79:7
months 17:9
  30:1 32:16
  36:12 54:10
  64:16 65:11
  100:15,20
  131:17
Moody's 97:12
  97:16
Morgan 33:25
morning 141:13
  161:12
move 27:11
  29:15 32:18
  35:11 39:24
  71:9 141:20
moved 27:12
  31:14 33:4,13
  39:10
moving 79:2
multiple 105:13
  136:6
muni 23:19,21
  24:2,24 26:18
  27:15 28:8
  81:16,21
municipal 22:15

22:24 27:14
31:25 36:4
37:7 39:4 43:8
44:11 45:12,16
50:5,13 52:10
52:13 63:16
64:7 67:6
73:13 76:5,6,7
80:12 89:20
91:2 93:4
96:13 98:21
104:23 106:9
113:1,3 131:23
135:22 136:7
145:1 170:13
181:12
municipals
38:15 43:10
76:20
Municipaltra...
35:17
municipaltrad...
37:17
munis 38:11
43:13
munitrade.com
35:22
mutual 27:7,19
28:12 46:24

_____
          N
N 3:1,1 4:1,1 5:1
74:17,17,17
N-O-T-H-I-N-G
135:25
N-U-V-E-E-N
47:5
nah 59:13,14
name 5:3 6:5
13:12 25:14,16
26:2,5 27:25
31:8 32:23
34:20,25 35:2
36:1 38:4
39:21 41:3
45:22 53:16
88:25 90:8
108:8 119:3
120:23 137:24

147:12 150:11
153:6 181:25
184:20
named 10:18
27:23 80:1
181:23
names 34:20,24
44:3 109:11
110:3 170:23
naming 34:24
NASD 75:19,20
Nash 4:9 172:5,8
173:1 174:22
Natalie 2:4 5:4
83:20
National 31:14
31:16
nature 24:13
necessarily 79:9
88:17 92:21
98:1 108:3
121:16
necessary 6:19
need 9:20 34:20
42:14,15,19
43:3 59:10
71:22,22 75:8
123:14 151:12
168:2 183:4
needed 52:20
53:18 163:7,14
needless 28:6
40:7 53:17
needn't 60:4
needs 7:14
155:22
negative 111:6
148:11,12,13
negotiate 94:14
negotiated 54:17
57:14 67:21
69:21 71:12
94:9,12 95:4
121:6 178:6
179:14
negotiating
172:18
negotiations
70:12 77:13

neighborhood
166:11
neither 146:5
net 33:15 56:17
56:18 167:19
168:24
never 15:6 29:3
36:24 136:15
136:16 140:19
140:19 178:19
178:20 181:25
182:1
new 6:10 21:12
25:17 26:14,15
26:16 27:2,11
47:25 53:2,7
93:1 121:1
131:18 157:21
167:7 168:20
newly 24:6
nice 25:14
121:17,19
Nicholas 184:10
nightly 79:15
nine 52:2
non-bank
116:20
non-rated 83:2
95:13,16,17,21
95:23
non-ready 62:8
62:18,22
non-remembr...
182:16,21
Nope 146:13
North 23:13
northern 34:9
NOs 136:17
notation 37:16
Note 64:19
notes 12:16
21:14 103:22
notice 1:16
noticed 14:20
November 63:20
73:14 100:20
100:24 101:11
115:4,5,9,15
115:25 117:21

118:9 126:9
127:20 128:1
131:20
number 5:12
6:13 35:20
41:14 51:12
70:11 75:9
78:25 94:17,19
171:7 184:6
numbered 136:3
numbers 112:11
114:16 129:19
130:6 164:7
166:7
numerous 53:19
Nuveen 47:3,4

_____
          O
O 3:1 4:1 5:1
74:17,17,17
Object 85:20
114:10 117:25
136:13 174:6
objecting 86:23
objection 59:14
59:19 61:3,24
62:1,23 63:4
72:9,13 86:22
127:22 169:21
173:19
observation
63:8
obvious 138:16
obviously 35:13
51:15 82:15
165:17
occasion 48:3,3
occasionally
13:8 29:11
76:12,13 103:5
occasions 23:25
occur 76:17 79:5
October 16:24
18:5 100:21,24
101:11 105:14
115:9,15
117:21 118:9
odd 165:25
offensive 87:17

**offer** 24:17
70:15 77:6
78:5,7 84:14
161:19
**offered** 40:12
**offering** 35:24
58:17 59:24
84:12 89:20,24
91:9 92:15
93:8 100:11
101:22 147:10
153:13 159:21
159:24 174:21
174:23,24
**offerings** 22:18
35:21 60:1
98:24 99:5,6
106:9
**office** 5:8 17:3
17:15 18:1
21:11,11,12
23:14 25:20,22
26:2 34:9 35:4
35:5,11 37:6
39:10 44:19,20
44:23,24
**officers** 5:6
**official** 136:12
**Oh** 29:19 30:25
56:4 75:1,7
78:18 79:8
182:6
**Ohio** 28:24
**okay** 7:17 9:13
9:22 10:3 14:3
17:24 18:23
19:16,19 22:6
29:21 30:4,16
33:1 37:4 45:5
47:9 57:22
59:8 62:19
67:19 75:7
76:3 84:21
90:1 96:1,25
97:18 98:4
111:10 112:22
114:5 128:10
129:9,23
141:19 151:7

153:4 167:9
172:12 173:7
176:14 180:16
182:6,19
**old** 48:11 171:5
183:3
**once** 79:8 107:4
107:25 141:23
**one-year** 67:19
68:4,8
**ones** 28:18 62:15
67:14 173:5
**open** 55:21
56:13
**opened** 17:14
18:1 21:12
25:20 26:2
56:16
**operation** 31:17
49:2 51:20
**opinion** 34:17
95:13 109:23
147:11
**opportunity**
6:17,23 7:1
**ops** 29:7
**option** 169:9
**order** 6:16 14:20
14:22 58:13,14
58:18,21 77:2
77:3 89:10
106:24,25
107:1,2,4
108:20 119:17
119:17 120:17
121:15 124:19
124:20 134:24
158:15 159:24
161:16,16
162:7 164:14
165:1 166:1,6
166:9 169:4
175:21
**orders** 130:7
**ordinary** 181:6
181:7
**original** 108:10
184:14
**originally** 21:10

**OSs** 136:16
**ought** 36:7
88:18
**outside** 58:12
127:21
**overall** 68:22
109:8,9
**overnight** 78:17
**oversupply**
178:13
**owned** 27:24
**owner** 168:11
**owns** 77:9

**P**

**P** 5:1
**P-R-E-S-C-O-...**
20:4
**p.m** 74:19
151:15,18
171:12,16
183:10,11
**page** 15:2 30:25
31:1,2 32:4
75:8 128:9,9
128:11,18
129:11,22
136:2,3 180:15
**PAGES** 1:9
**paid** 36:24 122:9
122:24,25
169:19 171:2
**paper** 24:12
43:14 47:23
49:8 62:8,18
62:22 66:8
68:25 69:6,13
83:2,2,14 84:9
98:8 104:14
116:18,21
**par** 163:19,21
**Paragraph**
180:15,25
**pardon** 94:7
**Park** 84:16
**part** 47:19 78:10
125:19 135:1
171:10
**partial** 119:10

**participate** 13:8
50:20 64:21
99:7
**participated**
99:13
**participating**
50:12,17
**participation**
68:7
**particular** 87:7
**particularly**
24:13
**party** 106:6,8
108:12,18
**pass** 15:7
**passed** 16:2 17:4
105:3
**Paul** 44:6,22
45:2
**pay** 39:17 43:1
81:7 84:8
122:17,18
141:24 160:25
163:16 171:8
**payment** 98:22
**payout** 40:22
**payouts** 179:12
**Payton** 80:1
**peaches** 122:1
**Peachtree** 6:10
**penalties** 8:23
**Pennsylvania**
52:3,4,7 65:19
**pension** 98:10
**people** 25:22
26:6,12 27:19
28:13,14 33:20
35:5,11,23
37:8,9 39:2
42:8,8,16,18
46:10 48:5
51:8 56:6
62:11 68:8
79:24 82:24
107:24 116:6
120:23 124:22
139:3 144:22
146:15 159:9
166:21 173:13

**perceived** 96:19
**percent** 41:17
54:5 122:12
127:19 128:22
142:8,11
143:15 150:4
157:4,16 161:3
161:16 170:14
170:16,19
179:14,16,17
179:25
**percentage**
170:13
**period** 21:24
37:5 73:14,16
78:14 81:4,5
94:9 95:5
123:11 153:22
161:6 169:4
**person** 7:16 8:15
12:23 13:16
118:24 124:2
153:20 165:12
**personal** 49:15
63:8
**personally** 62:5
168:17 170:19
**personnel** 79:23
**persons** 12:20
**pertinent** 90:11
**Peter** 36:1,2,15
36:15
**Philadelphia**
21:5,7 27:12
**phone** 56:5
87:24 124:23
133:21 134:3,5
146:12 148:21
**phrase** 142:10
**physical** 44:20
**pick** 9:11 16:21
87:24
**picked** 16:3
134:2
**picks** 102:18
**picture** 109:8,9
**piece** 68:25 98:8
**pipeline** 114:16
**Pitney** 43:19

**Pittsburgh** 30:7
30:8 59:22
**place** 1:10 5:8
29:2 58:4
61:22 66:8,10
66:18 71:17
72:3 96:20
143:5 157:21
**placed** 66:12
71:10
**places** 49:11
**plan** 40:21 42:1
44:23
**platform** 35:21
47:1 173:11
**platforms** 49:11
**players** 82:11
**please** 5:22 6:4,8
6:12 20:3 32:6
34:1 61:18
80:15 158:13
172:4 176:25
**plus** 20:11 119:7
123:6
**point** 7:9 15:19
25:23,25 42:22
43:2 46:14
51:18 98:17
99:22 100:9
110:21 117:3,4
121:3,3 125:3
125:8 135:23
140:6 141:19
144:5,7,21
151:3 152:16
155:14 160:9
164:3 166:13
177:18
**pointed** 103:17
104:1
**points** 154:17,24
156:2 165:9
170:8
**politics** 35:9
**poor** 96:22
**Poor's** 97:13,15
135:21
**portfolio** 47:13
47:15

**portfolios** 29:1
29:12
**portion** 26:7
81:25,25
139:25 180:1
**POS** 92:20
126:18 127:4
135:3,20 138:8
138:13 162:15
**position** 22:9
27:4 78:12
168:20
**positioning**
167:24
**positions** 78:16
173:12
**possibility**
182:10
**possible** 172:23
172:24 175:10
182:8
**possibly** 102:3
134:14 149:5
154:6
**post** 35:22 82:18
**posted** 127:6,9
**posting** 126:25
127:2,4
**postponed**
105:17 127:8
127:13 139:8
139:12 145:19
150:1
**potential** 35:11
84:12,22 85:8
86:19 87:21
90:8 91:11
99:25 109:9
114:25 115:18
115:24 128:11
128:17 129:16
131:3,10,19
133:9 149:22
149:25 152:19
158:1 169:3
**power** 60:25
**powerful** 59:16
**powers** 42:4
**practice** 85:10

85:13,14 86:24
87:11,14,20,23
143:5
**practices** 58:15
60:16
**prefer** 156:16
**preliminaries**
7:19
**preliminary**
92:16 136:12
**premium** 121:9
121:16 162:8
163:14 164:18
165:7,22
**premiums**
121:24 163:5,8
**preparation**
11:11
**prepare** 11:7
90:12,16,22
91:3
**prepared** 91:10
182:1
**prepricing** 99:7
99:8,12,13
**Prescott** 16:1
17:25 18:2
20:1,10 21:9
25:12,17 26:7
26:8,14,25
27:10
**presence** 50:5
**present** 8:1
169:8
**presented** 169:9
**President** 41:8
**pretty** 51:9 85:3
157:23 168:23
168:25 177:18
**prevailing**
180:18,24
**previously** 6:22
180:12
**price** 53:2,7
57:11,12 67:11
69:19,21,24
70:2 71:11
76:14,15 77:12
80:8 88:11,20

89:4 93:10,21
94:8,10 99:23
105:10 107:9
107:10 110:6
121:6 142:3
143:22 145:5
155:17 163:3
164:18,19
180:19
**priced** 88:2,10
88:22 107:3
121:14 142:12
147:2 175:4
**pricing** 52:22
68:7,10,12,16
69:11 71:5
73:22 80:10
85:7 91:19,20
91:22 92:9,12
92:24 93:14
99:11 105:10
105:16 123:16
123:19 127:1
127:10 141:13
143:21
**primarily** 7:16
12:11,23 13:22
17:11 24:1,11
27:15 35:6
102:8
**primary** 31:24
49:5 84:12,14
89:20 91:3
93:9 99:6
109:21 114:8
114:13
**principal** 32:24
44:11 45:12,17
181:12
**principals** 31:15
**principle** 61:25
**print** 129:24
**prior** 96:6
108:22 175:22
**private** 160:22
161:14 165:16
**privilege** 9:4
**probably** 11:19
16:16 43:12

46:3 51:18,19
58:21 82:6
105:20 134:4,6
134:10 149:2
157:5 168:10
**probative** 72:14
**problem** 96:15
98:10,10 123:1
166:1 169:1,2
**problems** 53:17
**proceedings**
184:12
**proceeds** 163:16
**process** 36:16
177:21
**produced** 12:13
**production**
12:12
**professional**
95:13
**pronounced**
137:25
**proofed** 13:24
**Proofreader's**
184:1,20
**proper** 58:23
**propose** 70:11
**prospectus**
89:22,23
**protocol** 143:4
**provide** 9:18
10:8 35:2
106:13,16,19
106:22 108:17
**provided** 6:16
14:14,17 91:16
108:11
**providing** 8:24
**provisions** 5:14
**public** 1:5 5:11
58:6 100:10
112:7 113:10
126:25 180:21
184:3
**pull** 119:7
140:17 160:11
169:10
**pulled** 138:20
139:3 155:10

**punch** 110:4
**purchase** 55:12
  56:2 85:2 95:9
  168:16
**purchased** 62:22
**purchasing** 56:3
  82:24 84:2
**pure** 125:19
**purely** 17:2
  79:11
**purposes** 5:7
  48:24
**pursuant** 1:16
  11:4
**put** 16:20 35:24
  35:24 44:25
  46:18 76:14
  93:12 109:18
  121:1,10
  123:21 132:1
  136:16,16,18
  153:24 157:21
  163:10 164:4
  168:19 171:4,4
**puts** 99:1
**putting** 37:8,9
  37:10

———————
**Q**
**qualified** 83:3,6
  83:7,11,13,17
  83:21 84:2,9
  102:3 109:15
  116:2,6,9,14
  116:18,21
  142:15,19
  178:1,3
**qualify** 33:15
**quantitative**
  108:13
**quarter** 142:12
  143:17,22
**question** 9:5,15
  9:16,17,18,19
  34:22,24 35:1
  58:9,11 59:3
  59:20 61:1,18
  61:25 69:14,16
  72:10,14 74:10

75:9 80:15
  81:15,17,18
  83:19 85:12,21
  85:22 86:23
  94:24 103:12
  103:21 106:2
  106:18 107:20
  108:10,14
  112:15 113:6
  114:11 115:21
  117:7,8,10
  124:4 127:25
  136:14 173:20
  174:7
**questionnaire**
  3:8 14:10,13
  14:17 75:6
**questions** 7:5
  9:9 20:7 59:11
  119:2 124:7
  140:2,9,10
  150:22,24,25
  151:2,7 182:5
  182:8
**quickly** 72:1
**quite** 20:22
  33:15 47:13
  138:22 152:12
  152:16 153:9
  156:11
**quoting** 12:18

———————
**R**
**R** 5:1 74:17
**raise** 5:22 60:4
**raised** 164:25
  165:1
**raising** 60:5
**ran** 26:7 27:24
  51:21 106:25
**range** 77:25
  88:21,21 93:18
  112:20,21
  113:20
**ranges** 88:7
**rare** 77:14 78:3
  78:20
**rarely** 76:18
  83:13,17

**RAs** 48:18
**rate** 37:11 68:1
  68:1,3,4,5 69:4
  70:9 83:23
  119:9 135:14
  154:13
**rated** 54:21 66:4
  80:22 81:2,3
  81:16,21 82:20
  82:23 83:2
  95:13,14,16,17
  95:20,22 97:3
  97:6,9,19,22
  97:22 111:20
  113:2,3 134:14
  135:5,7 148:16
  177:25
**rating** 85:5 88:6
  89:3 90:8,9,10
  97:1,3,11,12
  97:13 98:9,13
  98:13,17 101:9
  101:10,12
  110:18,21,22
  111:2,3,4
  112:12,16
  117:24 118:2
  134:18,19,24
  135:9,10,10,12
  135:22 136:11
  139:15,16
  149:1,4 154:2
**ratings** 82:14
  86:17 119:24
  120:2
**rationale** 60:24
**Raymond** 75:15
  75:17,23,25
**RBrodsky@th...**
  2:21
**re-emergence**
  82:8,10
**reach** 62:4,10
  68:8 85:8 86:1
  86:6 115:17,24
  116:23 132:25
**reached** 120:14
  133:8
**reaching** 114:24

131:3
**react** 71:25
**reaction** 124:17
**reactions** 123:25
**read** 6:23 12:16
  30:11 32:3
  61:18,20 126:8
  127:3 129:24
  133:15 153:5
**reading** 119:24
**ready** 88:8
  89:13 118:11
  133:13,14
  141:18
**real** 49:6,8
**realistically**
  155:24
**realize** 47:18
**really** 11:12
  27:2 29:3
  32:20 36:23,24
  37:13 41:25
  42:25 48:25
  49:5 83:13
  88:23 109:5
  116:14 118:10
  118:22 136:8
  138:23 155:13
  155:22 159:7
**reason** 10:7 28:5
  36:14 59:18
  83:16 86:23
  122:6 152:14
  153:25 174:21
**reasonable**
  58:19 70:15
  102:5 168:7
**reasonably** 61:1
  169:3
**reasons** 20:24
**recall** 22:19 38:7
  54:8 55:5,8,12
  63:13 65:5
  68:18,21 73:2
  73:10,11 105:8
  108:25 109:11
  110:18 112:9
  113:14 123:24
  130:2 133:21

141:5 142:25
  149:20 156:7
  156:23 161:2
  164:5 167:15
  167:18 178:12
  179:10
**receive** 15:5
  66:24 67:2
  129:17 133:19
  146:11 179:7
  179:25
**received** 123:17
  147:2,10
  175:21
**receiving** 128:2
**recess** 11:22
  61:8 74:16
  171:13
**recognize** 95:19
  126:1 130:15
  132:9,19 137:2
  141:2 144:16
  146:22 149:11
  149:15 152:4
  158:11 172:2
  176:20
**recollection**
  72:15,17 92:17
  99:14 111:17
  113:18 137:20
  145:22 153:11
  172:21 183:6
**recollections**
  155:11
**reconsider** 61:4
**record** 5:2 6:5
  6:15,20 8:8
  9:21 11:20,24
  30:22 59:18,18
  61:6,10,20
  74:14,19 97:10
  103:11,21
  126:4 151:14
  151:17 153:2
  171:11,15
  176:22 183:10
  184:14
**recorded** 9:8
  13:1 143:8

**recording** 143:5 184:16
**records** 11:10
**redo** 166:12 167:10
**redundant** 154:1
**Reed** 130:21
**refer** 21:14 75:12
**referring** 136:2 142:19 158:24 162:25 163:2,3
**refers** 12:19 131:6 145:11
**reflect** 161:17 162:4
**reflected** 163:25
**refresh** 172:21
**refunding** 65:10
**refurbish** 167:9
**refuse** 9:4
**regarding** 7:5 12:3 74:22 127:16 143:1 147:8 151:20 159:13
**regional** 5:8 23:9
**regular** 79:15 114:20
**regulations** 5:18
**reinstated** 16:4
**related** 13:13 37:9 180:8
**relation** 89:19 91:18,20
**relationship** 63:12
**relationships** 33:12
**relative** 77:25 79:11
**relatively** 56:19
**relayed** 140:16
**relent** 60:23
**relevance** 60:14
**relevant** 60:3,11
**relinquished**

42:2
**remained** 165:4
**remedy** 59:16
**remember** 17:21 19:3 26:1,4,5,9 31:19 37:19,22 37:23,23 38:20 41:13 44:6 54:15,16 57:8 62:13 73:24 81:13 100:22 105:9 118:8,15 119:24 133:3,5 133:20 138:9 138:11,16,21 139:1,14 141:22 143:3 144:4 146:3,13 149:6 152:23 152:25 153:17 156:6,21 164:17 174:9 174:11,14,15 177:17 183:2
**remembering** 183:1
**remote** 118:24
**remotely** 124:3
**repeat** 85:22 156:12,16
**repeated** 119:4 141:22
**repercussions** 123:6
**rephrase** 109:3 117:6
**report** 41:22,23 42:6,9 46:8 119:25 120:1,3
**Reporter** 9:9 20:3 104:2
**reporting** 1:24 45:13,15 184:16
**represent** 8:11 8:14 13:19 111:8 112:20
**representation** 13:25 14:1

**represented** 7:25 8:5
**request** 14:14 70:15
**require** 56:17
**required** 99:1 129:18
**requirements** 17:5 85:5 96:18 121:7
**requires** 163:10
**research** 102:15 102:20,22 103:13,15 104:5
**researching** 102:4,12
**reselling** 95:2
**reserve** 7:10
**resolved** 139:18
**respect** 42:25 52:20 85:15 96:23 110:17
**respects** 96:16 107:15
**respond** 150:25 154:16
**Respondent** 10:19
**responds** 154:15
**response** 3:20 75:9 103:12 133:19 146:11 147:1 176:13
**responses** 14:24 158:2
**responsibilities** 46:13
**responsible** 12:20 13:20,22 72:25
**rest** 151:12
**restate** 96:5
**restored** 82:14
**result** 68:16
**retail** 17:11 21:22 23:1,6,7 49:1
**retraded** 179:1

**retrading** 178:24
**return** 118:20 124:23
**returns** 41:16
**revealed** 60:1
**revenue** 25:15 31:20 64:19 110:14,17
**review** 6:18,25 7:1,2 11:10
**reviewed** 182:1
**Richard** 2:16 8:9
**right** 5:22 7:10 7:24 9:3 12:8 14:1 15:23 16:9 18:3,14 19:24 26:5 29:19 30:16 36:6 38:23 43:24 51:25 52:1 66:19 84:4 89:5 111:15 112:15 115:6 122:18 126:14 135:21 148:9 151:23 160:5 162:17 168:25 171:25 172:17
**rights** 7:19 173:14,15
**Riley** 63:24
**risk** 52:23 78:8 94:22
**riskless** 76:25
**Robert** 49:17
**Roberts** 17:7,13 17:19,22 18:8 18:9,21 19:11 19:13 22:21 24:15,21 29:5
**Rock** 32:20,21 33:3 48:8 165:1
**role** 42:12 43:7
**rolling** 165:8
**room** 35:10

151:13
**Rosemart** 131:12
**Rowe** 48:9,9,9 48:10
**rule** 82:16 83:1
**rules** 9:7 75:17
**run** 51:20 114:16 162:6,6 162:11 164:7 164:15,15
**runner** 73:25 74:6
**running** 30:9 106:7,8 159:8 164:20
**rush** 25:18

**S**

**S** 3:1 4:1 5:1 74:17,17,17
**S-C-H-L-E-I-...** 137:7
**S-C-U-D-D-E-R** 28:22
**S-F-Y-R-I-S** 177:6
**S-T-E-V-E-N-S** 30:23
**S&P** 134:21,24 135:11,14
**safe** 68:15
**salaried** 40:19 40:20
**sale** 12:20 13:10 49:15 94:9,12 95:4 121:17,18 170:18 178:6,7 180:17,22
**sales** 22:2,3 23:15 25:13 27:22 32:8 33:5 34:15 38:10 39:1,15 41:19 42:9,12 42:17,18,22 43:7 45:6 46:2 46:6 49:1,14 50:6 76:6 78:8

78:23 79:17
89:15,17,25
111:24 124:14
168:20 179:18
179:25
**salesman** 13:7
22:10 113:1
130:24 131:2
174:12
**salesmen** 124:14
**salespeople**
17:16 26:24
43:23 44:8
48:13,15 62:21
71:7,8 72:2
174:17
**salesperson**
22:22 56:15
131:24
**Salter** 25:16
**saw** 40:5
**saying** 12:11
36:16 37:22
59:15 60:17,18
82:2 85:23
115:19 120:9
153:7 159:10
160:1 168:9
171:6
**says** 12:17,18
17:17 34:13
37:25 128:15
128:19 135:8
135:19,20
148:11,12
154:19,20
174:25 180:17
**scale** 33:21
93:12,17,20
104:12 105:5
105:23 113:15
114:1 121:1
123:16 147:9
**scales** 80:2
**scheduled**
115:13
**Schleicher** 3:14
4:7 118:25
136:24 137:5,6

137:7,24,24
138:7 141:9
143:1 150:5
158:17,18,18
158:19
**scope** 58:12,13
58:22 117:17
**Scranton** 65:18
65:19 67:1
71:9,17,20,22
72:3 98:5,5
**Scribbin** 13:12
45:23
**Scudder** 28:21
48:11
**SEC** 5:6,9 6:21
10:21,24 14:5
14:14 59:20,22
125:20 130:10
132:3 136:19
140:21 144:10
146:16 149:7
151:24 153:14
158:6 171:21
176:15
**second** 12:16
14:21 19:11,20
25:9 30:13
60:13 64:4
95:7 96:3
107:6 123:16
**secondary** 24:7
80:11,16
109:20,23
**section** 136:11
**sector** 85:4
86:17 94:15
110:2
**secured** 69:4
**securities** 1:1,10
2:3,7 5:15 8:19
17:4,20 18:11
18:12,17 19:20
23:11,12 24:16
24:20 30:3,24
34:7 43:9,23
64:8,24 67:12
76:21,23 78:12
79:16 80:12,12

89:21 95:14
106:9 114:9
184:12
**security** 6:13
66:4 76:15
165:7
**see** 30:6 31:1
37:2 40:1 51:7
51:16 57:22
68:24 77:25
79:1,11,12
88:25 102:18
108:2 110:5
119:19 129:11
135:6,6,8,19
138:1 144:5
145:16 162:1,4
164:9 170:15
**seeing** 102:17
**seek** 59:10,16
**seemingly** 36:17
109:6
**seen** 112:17
170:21
**selected** 63:2
**sell** 13:15 23:7
23:21 27:6,15
29:8 31:20
37:3 38:12
43:10,10,12
44:10 47:22
53:11 55:16
62:5 64:22,24
65:1,3,4 77:5
77:11 82:19
84:11,23 85:18
85:25 86:21
87:6 88:8
89:13 101:15
102:3 117:2,9
117:15 123:22
124:15 140:18
142:1 153:18
153:19 154:6,7
157:15 161:21
161:22 162:3
166:17 168:4
169:11 173:17
177:20 183:8

**selling** 22:11,19
22:24 23:23
24:2,6,12,24
26:18 27:14
28:8 31:5,25
32:10 34:12
43:18,18,19
52:12 73:23
80:22 117:5
157:8 175:22
**send** 133:6,24
**sending** 118:12
133:3,5,17
134:8 138:21
139:1 141:5
148:9 182:22
**Senior** 93:14
111:22 150:10
167:20
**sense** 13:24
43:18 46:15
**sent** 7:15 12:10
12:14 119:1
120:1,4 133:2
133:4,12,15
134:12 137:4
137:10 138:7
138:12 141:8
144:17 147:2,9
148:23 149:21
151:2,3,5
153:6 159:16
159:16,18
160:18,18,20
177:10 182:23
**sentence** 60:9
**separate** 130:6,7
134:23 159:14
**September** 1:13
5:3 12:17
16:23 18:4
184:7
**serial** 129:17
**series** 15:21,23
15:25 16:7
17:6 152:7
**Services** 1:24
**set** 53:22 57:12
180:24

**sets** 8:23
**seven** 17:9
119:11
**Seventeen**
104:16
**Seventy** 179:16
**severe** 96:14
**severity** 118:4,5
**sewer** 54:14
**Sfyris** 4:10
177:4
**shaking** 9:11
180:7
**shape** 68:13
**share** 110:14,16
110:17
**sheet** 89:22,23
90:4,14 91:3
91:11,16,21,22
92:3,18 95:1
112:1,3,6
**sheets** 90:17,22
91:5,8
**shift** 74:14
**short** 36:9 49:6
49:8,13 78:14
91:8
**short-term**
104:10
**shorter** 119:8
**shortly** 26:5
**shot** 157:25
165:10
**show** 125:24
152:2 157:21
157:24 172:20
177:14,16
**showed** 27:12
118:24
**showing** 9:23
158:9 180:11
183:6
**shown** 88:15
**Shreveport**
73:19 74:9,9
121:24
**side** 26:9 47:2,12
47:13,15,15
49:16 51:13

77:5,5 78:6,7
114:9 165:15
sign 95:8 128:18
signed 135:12
similar 102:18
109:2
Similarly 36:19
Simmons 51:11
63:24
simply 59:15
60:24
simultaneous
128:5
sinking 29:6
175:15,20
sit 76:8 139:19
149:23
sitting 7:4 123:9
situation 53:23
95:10 99:2
100:1 117:18
118:4,5 120:10
122:2 155:25
six 17:9 32:16
54:10 64:16
65:11 67:16
119:13 164:21
164:22 165:9
six-month 67:25
68:5
six-year 175:18
size 28:17 49:24
65:5,21
Skyways 43:15
slow 19:5,7
small 17:13 23:9
47:5 50:22
51:14 54:13,14
63:24 64:5
103:4 178:6
smaller 28:18
49:19,24
smart 49:9,11
99:9
snow 52:7
Social 6:12
sold 21:24 30:3
31:7,8 33:25
37:14 38:23

52:14 55:3
56:21,21,24
57:19 59:24,25
59:25 75:15
95:11 107:3
153:19 160:4
169:5 175:6
176:4 178:10
178:17
sole 12:21 13:16
65:17 73:4,5
93:2 111:22
solely 13:19 67:7
73:11 94:5
somebody 77:7
77:9,10 107:19
123:8 153:6
155:18 159:10
159:11 179:22
somewhat
123:21 182:16
son 28:6
soon 133:16
sorry 19:18
20:23 28:3
29:16 30:16
32:3 38:9 53:6
72:24 87:17
96:4 102:9,11
102:23,24
129:11 136:1
139:20 147:6,8
149:25 161:4
171:25
sort 31:21 35:25
40:22 42:15
47:20 52:18
80:3 82:13
90:9 94:2
102:19 103:5
143:4 144:6
156:5 163:14
sound 82:9
source 110:15
110:17
south 2:17 38:23
39:19,25 52:6
76:2
Southern 177:7

177:8
Southwick
32:19,22,25
33:24
speak 11:13
12:5 61:13
74:21,25
128:11
speakerphone
125:8
speaking 82:19
85:19 87:12,19
133:21
spearheading
51:1,6
special 29:7
specialize 94:15
specific 48:13
69:2 70:11
77:15 107:5
151:7 181:14
specifically
10:21 68:22
77:7,8 116:12
118:15 120:23
spectrum 48:17
104:12
speculation
125:19
spell 6:4 16:25
20:2,18 28:2
30:21 32:6
34:1 47:4
spelled 147:5
150:14 177:5
spending 26:13
27:2
spent 26:16
spoken 131:13
spouses 14:22
spread 93:21,25
102:5,12
108:25 110:6,9
117:20,22
stable 111:6,9
112:12
staff 10:13 61:14
74:21 76:20
151:20 157:11

171:19
stamp 129:7,22
stamped 126:5
128:8 130:14
132:7 136:25
140:25 144:14
146:20 149:13
171:23
standard 92:3
97:13,15
135:21 161:25
178:4
standpoint
52:18 67:23
stands 143:11
start 31:16
35:20 36:17
50:3,8,12
67:15 90:1
114:24 131:12
150:6
started 7:13
15:18 16:13,22
17:10,12 23:9
26:1 28:4
29:20 32:22,25
35:4 40:14
47:17 49:16
50:14,17 51:23
52:10 102:4
150:3,8 164:20
starting 35:5
154:24
starts 77:13
state 5:18 6:4,8
6:12 10:16
17:4 94:2
96:15 112:15
112:23 113:2
121:9 142:7
145:5 163:10
180:14
stated 153:16
163:12
statement 13:3
62:6 69:15,18
136:12 141:16
181:22
statements

129:25 182:14
states 1:1 16:6
109:18 126:24
131:16,17
stating 7:15
statistics 162:22
stay 40:9
steal 119:15
Steckman 133:5
Steel 59:22
Stein 48:9,10
stellar 53:16
step 18:3
Stephanie 131:7
131:14
Stephens 31:15
Stevens 28:21
30:20,21,23
31:4,16 32:23
32:24
stop 21:15
store 21:22
strategy 157:20
street 37:17,21
37:24 124:24
155:15 160:12
strengths 112:10
strictly 58:2
strike 113:6
strip 29:7
structure 45:18
45:19 47:16
53:23 57:9
67:24 69:2,3
93:13 99:21
107:5 113:15
119:8 121:17
121:22 128:12
128:24 129:16
175:10,11,19
179:11,19
structured 40:3
46:10 69:3
113:11
structures
134:23 179:12
study 15:9
studying 15:13
stuff 49:8

173:12 182:23
**stupid** 83:15
**subject** 141:12
153:12
**subpoena** 3:7
11:3
**subpoenaed** 5:9
**subset** 91:5
**substance** 12:3
61:14 74:22
**suburb** 34:10
**success** 57:20
67:24
**sufficient** 122:9
**suggest** 69:24
87:13
**suggested** 70:7
**suggesting** 87:11
**suggestions**
102:6
**Suite** 1:11 2:10
2:18
**suites** 44:24
**summary**
162:22
**sun** 59:21
**sundry** 49:18
**supervise** 41:24
**Supervision**
46:15
**supply** 140:11
177:22 178:8
**supplying**
140:11
**suppose** 13:20
**supposed** 126:3
**sure** 7:12 39:21
41:17 44:17
45:14 47:16
54:5 66:20
67:9 72:20
82:10 87:3
97:21 105:11
107:7 113:4
116:15 126:7
133:23 137:17
145:16 149:2
150:4 155:12
157:17,18

159:1 161:9
164:17 168:25
172:22 173:11
175:9 179:13
181:9,11,21
**swear** 5:21
184:11
**sworn** 6:1
**syndicate** 55:1
77:24 78:3
83:14
**syndicates** 46:5

---
**T**

**T** 3:1,1 4:1,1
48:9,9 74:17
**T-E-J-A-S** 34:5
**T-U-R-B-I-N**
20:4
**table** 56:8
**tail** 30:9
**tainted** 108:7
**take** 9:20 10:2
11:20 14:11
15:1 18:3 40:6
40:11 49:22
69:1 76:11,13
77:15,16 78:8
88:18 93:25
105:11 119:19
124:11 133:25
134:1 155:24
164:8 165:10
166:5 175:15
175:17
**taken** 11:22 61:3
61:8 74:16
82:15 171:13
179:14,15
180:6
**takes** 156:4
163:4
**talk** 19:16 29:10
29:11 46:3
47:23 48:3,3,7
48:8,8,10,18
48:19 72:22
78:9 81:5
88:24 100:1

109:25 133:24
159:7 182:22
**talked** 29:3
40:10 46:1,22
46:24,25 47:3
47:6,9 62:14
75:1 76:5
99:25,25
111:24 114:22
118:20 131:11
139:2 148:22
155:4 159:5,6
160:16 161:14
173:2,2 174:10
174:11,14
**talking** 27:19
42:14 45:15
47:14,18 51:17
52:8 53:4
84:24 89:12
97:1 110:19
112:24 113:16
114:14 116:7
132:11 145:17
150:7 160:13
162:12 165:12
165:12,14,15
168:18
**talks** 48:18
**Tammy** 80:1
**target** 33:18
**tax** 41:16 64:19
96:21,22
107:24 110:16
122:11
**taxable** 43:13
**taxables** 43:12
**taxes** 122:9
**technical** 99:1
**technically**
42:23 43:16
76:10
**Tejas** 34:4,7,16
35:6,10,11
**Telephone** 12:24
**tell** 19:6 34:20
36:23 38:4
63:8 87:25
88:4 97:13

115:11 124:6
125:8 142:1
144:19 146:6
146:25 153:13
156:18 157:17
158:13 159:22
166:4 172:4
176:24
**telling** 120:4
155:1
**ten** 12:15 25:25
52:2 113:16
119:11
**ten-year** 104:14
121:13 124:12
**Tennessee** 55:22
55:24 56:1,14
56:22,24 57:15
57:16,24 66:19
66:24 67:1
124:20 160:14
165:14 166:8
166:18 167:16
167:19 173:24
174:1,4,23
175:22 177:19
**Tennessee's**
164:1
**term** 12:19
89:16,22,23
90:2,3,4,7,14
90:16,22 91:3
91:5,8,10,16
91:21,22 92:3
92:18 111:25
112:3,6 119:8
128:17,19,21
168:14 175:15
175:17 176:10
**terms** 46:19
48:12,13 50:6
52:22 73:12
79:22 80:10
96:25 97:2,11
175:14
**terrible** 96:20
**test** 17:4
**testified** 6:1
10:11 97:20

132:24 175:25
**testify** 182:9
**testimony** 5:7,7
5:9 8:24 9:8,25
10:8 11:3,8,11
11:16 12:22
75:3
**Texas** 34:8
73:21
**thank** 12:5 22:6
38:7 61:17
62:19 74:24
76:3 83:24
90:23 91:14
92:22 96:25
98:23 104:8
118:22 126:13
128:25 130:9
131:13 151:23
163:23
**Thanks** 14:4
**theory** 60:19
83:22
**thing** 25:7 29:21
30:5 31:9 33:6
35:25 39:1
40:22 47:20
52:18 80:3
82:14 90:9
95:20,20
102:19 103:5
126:8 137:14
138:22 139:14
140:12 153:20
154:6 156:5
159:11 167:13
169:4 175:14
182:15 183:7,8
**things** 23:20
35:7,8 43:1,15
46:4,7 48:17
48:20 50:1
94:20 121:25
137:15 159:8
159:18 162:13
**think** 7:13 11:19
14:1,20 15:18
15:19 16:1
25:23,23,24

28:22 29:16
30:13,14,19
34:21 39:16
41:13 44:22,22
46:2 50:15
52:8 54:2,3
56:18 57:10
59:2,20 60:20
62:16 65:18
71:6,23 77:25
78:9,9,10 79:1
79:3 81:17
83:19 88:18,18
92:11 93:12
97:20 100:14
101:13 102:1,2
105:19 107:14
111:16,25
112:18 114:7
115:2 116:13
117:1,7,15,16
118:19 122:11
124:6 125:6
131:12 134:22
135:8,10
138:23 142:22
145:8 146:13
150:4 155:3,9
156:4,4,11,19
157:23,24,25
159:4,4,6
162:10 164:3
164:16,21,23
165:24 166:10
166:14 168:4
168:24 169:1,2
170:7,15,19,21
172:20,22
177:17,18
**thinking** 102:10
141:13,18
143:21 145:6
171:25
**thinks** 78:10
**third** 106:6,7
108:12,18
128:9
**Thomas** 133:4
**thought** 17:17

35:12 40:5
45:8 53:4
100:23 101:9
101:23 102:4,5
114:3 115:7
141:19 168:20
**thoughts** 13:8
93:16 105:10
181:24
**thousand**
165:25
**three** 19:22
20:11 40:10
62:17 79:4
100:15,20
119:13 140:13
166:10 170:7
170:11,14,16
170:19
**three-quarters**
124:11 161:20
161:23 164:17
164:22
**Thursday**
172:10 174:8
**time** 5:2 7:11
9:20 11:19,24
15:24 17:3,11
17:18 18:24,25
19:2,11,20
21:23 24:17,23
25:9 26:13,14
26:16 27:2,23
28:23 29:4,6
33:11 35:19
45:10,23 48:1
51:18 52:16
55:18,21 56:14
56:16,18 61:7
61:10 62:7
63:19 65:8
68:13 70:19,22
73:16,20 74:13
78:14 81:5,25
81:25 82:18
83:9 85:2 86:4
92:10,11,17
96:11 99:23
100:14 104:10

105:7,14
106:10 110:19
111:17 118:3
123:12 127:15
127:16 133:12
134:12 135:13
137:10 140:5
143:20 145:15
147:25 148:2
148:15 149:4
149:21,24
151:15 153:18
153:18 155:14
155:15 156:23
157:1 159:20
160:10,19
161:6,6,7
162:5 164:8
168:24 169:10
171:12,15
172:17,25
173:25 174:22
178:9,13 182:8
182:17 183:10
**timeframe** 52:11
117:20,21
**timeline** 125:10
134:16 135:15
139:19 141:23
149:6 153:17
**times** 36:19
40:10 77:14
78:24 79:18
80:18
**timetable** 17:21
**Tino** 27:25
**tired** 15:8 52:6
**title** 34:13,14
37:1 38:8
39:14,16,18
40:15 41:7,9
**today** 5:9 8:1,2
9:8,23,25 10:1
10:9 11:4,11
11:14,17 63:18
145:5 182:11
182:14
**today's** 11:7
**told** 11:18 21:20

31:17,21 35:13
40:11 42:23,24
101:6,12
104:13 105:2
111:18 133:6
133:12 134:8
134:16,17,18
134:22 139:6,8
139:15 140:16
141:17,25
148:25 150:2
151:5 155:21
157:23 161:22
165:23 166:13
166:16 167:11
175:10 176:9
177:12
**top** 52:1 129:24
132:11 179:15
**tops** 62:17
**total** 170:18
**totally** 122:2
**touch** 119:15,22
**tough** 121:18
**town** 118:21
**track** 102:22
103:15,25
104:5
**trade** 36:4 37:7
40:3,4 55:23
55:25 83:13,17
84:8 94:3 98:7
98:11 160:14
**traded** 110:3,5
179:3
**trader** 25:15
28:6 35:6
57:19 58:1
80:17 147:23
160:17,17
**traders** 132:22
**trades** 49:7
109:21 173:13
**trading** 13:9
50:6 76:7,10
76:20 78:1
102:19 109:6
142:18 148:6
168:15,22

173:11 178:16
**traffics** 173:14
**Tran** 53:14 64:2
64:17,18 65:11
65:18 66:3,23
67:1 68:4,5,8
69:9 71:21
73:21
**TRANs** 70:21
71:10
**transact** 56:11
**transaction** 54:1
54:18 55:6,22
57:10,17 63:3
64:1,2,11,12
64:16 65:16,22
66:17,22 67:5
69:12,25 70:3
71:11 72:5,6
72:12,18,18
76:15 90:25
91:1,2,3 112:4
114:21 156:9,9
157:1,8 170:4
180:9
**transactions**
64:6 67:10,12
73:2,13 74:1,3
74:5 76:25
80:11 92:2
109:15,16,17
109:21,23
**transcript**
184:15
**transferred**
125:14
**transmitted**
114:1 166:6
**trends** 54:6
**tried** 33:19 43:1
48:19 68:23
71:8 118:21
119:19 123:22
153:18,19
164:21,21
**tries** 48:16,18
**trigger** 119:7
140:17 160:11
**true** 58:15 98:1

184:15
**Trust** 29:13
**truthful** 10:8
**truthfully** 34:24
**try** 35:11 42:15
44:23 58:4
61:22 85:3
101:15 124:14
124:25 134:17
134:19 145:18
154:5 156:5
160:15 164:8
169:11 174:18
**trying** 16:3 19:3
19:4 26:3
35:20,21 36:17
36:20 41:13
42:11 45:17
47:22 53:10
70:8,9,14 72:3
82:13 84:22
86:21 87:15,16
90:8 94:18
99:9,10,23
107:19 121:4
123:9 134:17
135:9,10 139:2
142:3 143:13
144:4,8 145:24
147:18 155:6
155:17,20,23
158:14 159:10
159:11,22,23
166:14 167:2
172:5 177:20
178:9
**tucked** 30:9
**Turben** 16:2
18:1,2 20:1,10
25:12,18
**turn** 24:18
**turns** 169:5
**two** 26:12 40:10
79:3 100:15,19
110:14 137:15
140:2 162:13
166:10
**two-year** 21:23
**type** 23:9 27:18

32:13 43:14
46:20 49:8
102:18 106:15
109:17 121:5
121:21,22
141:5 170:20
177:24
**types** 27:5 33:18
48:15 84:19
86:14 177:22
178:13
**typical** 92:2
97:24
**typically** 85:11
88:1 92:2
93:12 97:25
98:2 125:17

— U —
**U.S** 184:12
**U4** 16:19
**Uh-huh** 100:12
**uh-uhs** 9:12
**ultimate** 70:2
153:22
**ultimately**
113:10 160:4
**unable** 122:17
156:8
**unattractive**
122:6
**uncommon**
112:23 113:3
139:13
**underlying** 98:8
98:12,13,16
102:1,2 109:17
148:11,12,14
**undersigned**
184:11
**understand** 5:19
8:2,22 9:3,17
10:4 12:9 35:4
42:12 44:9
45:14 51:9
59:12 60:24
69:5 70:10
83:7 85:23
87:2 94:24

101:5 111:19
113:4 120:6
122:13,20
145:22 165:6
167:6,11
**understanding**
63:11 103:1
119:18 134:13
145:19,21
153:15,25
154:3 163:9
164:24 166:18
167:1
**understood** 9:19
57:13,13 99:3
122:24
**underwrite** 39:4
168:2,4
**underwriter**
12:22 13:6,6
63:3 64:3,7,13
73:18 80:17
93:2 102:9,10
171:1 180:13
**underwriter's**
180:18
**underwriters**
50:21
**underwriting**
12:19,25 22:13
23:17 38:19
49:4,14 50:18
50:23 51:3,13
52:10,16,23
53:13 54:12
63:17 67:6
79:22 93:10
99:6 105:15
152:11 153:7
170:4,5
**underwritings**
38:20 50:13
80:2,10 179:15
**underwritten**
121:21
**underwrote**
72:21
**unethical** 34:18
35:13

**uninsured** 65:14
82:20 101:15
**UNITED** 1:1
**University** 15:3
**unlimited** 58:13
**unrated** 65:8
70:24 82:20
101:15
**USDA** 54:14
**use** 91:11 163:15
163:19,21
**usually** 76:24
77:4,19 79:16
85:17 86:1
87:25 97:6
99:6

— V —
**V-A-S-I-L-E-I-...**
177:5
**Vaguely** 141:3
**value** 79:9,12,12
142:19,23,24
163:19,21
180:20
**varies** 86:25
**various** 46:4
49:18
**Vasileios** 4:10
177:1,3,4
**verbally** 104:2
**versus** 82:20
110:13 162:7
**violations** 5:14
5:17 58:16
**virtually** 68:25
**voice** 60:4,5
**vs** 59:22

— W —
**W** 17:7,19 18:7
18:9 19:10,13
24:15,21 29:5
**W-A-T-E-R-...**
48:2
**W-E-B-S-T-E-...**
20:18
**W-E-E-K-S** 6:7
**W-O-O-D-M-...**
6:9

**W2** 41:16
**Wachovia** 29:8
**Wagner** 184:10
**wait** 9:14,15
169:10
**waiting** 139:16
**waiver** 31:21
**Wakefield** 13:11
44:5 45:12,20
49:3 50:10
52:15 53:5,7
71:4 79:20
80:17 125:4
126:13 181:17
**Walker** 3:9 8:20
50:14 51:10
63:14,23 70:18
114:6,21
123:25 126:11
126:24 129:3
156:15 159:1
164:2,3
**walking** 121:19
**Wally** 25:14
**want** 7:18 13:23
15:1 16:14
19:3 20:8
21:16 23:8
35:2 42:17,17
42:17 43:5
46:5 58:18
59:13,13,16
60:23,24 66:19
69:17 78:5,5
80:5 81:4,7
85:22 88:25
96:5 97:20
99:22 103:11
107:22 108:10
117:11 118:19
123:11,13,22
124:5,24
133:25 136:8
152:2 156:12
160:12 162:4
165:19 179:11
182:20 183:1
**wanted** 12:9
13:2 26:14

27:11 33:2
39:22 40:2,6
56:7 57:21
108:4 119:5,5
119:7,14
140:19 150:6
159:5,5,6
164:8 167:2,5
**wanting** 149:16
**wants** 13:2 52:6
59:21 94:21
138:15
**wasn't** 24:23
27:3 30:7 33:3
36:13,14,14
47:20 75:19
111:22 119:14
121:16 127:7
133:13 135:1
138:23 139:6
141:23 174:24
**water** 155:7
**Watermill** 47:24
48:2 118:17
**way** 13:15 34:19
35:14 40:6
69:3 79:2
99:21 109:8,19
109:22 129:7
148:24 163:12
163:18 164:4
**we'll** 9:21 21:1
21:15 42:20
53:24 67:19
78:2,24,24
88:23 93:15
127:2 166:2
167:9
**we're** 5:2 9:25
11:24 20:6
46:1,9 51:17
59:24 61:10
77:24 88:4
93:11 96:10
105:18 110:19
118:12 126:25
153:8 154:16
157:15 166:8
171:15 177:13

183:9
**we've** 19:16 52:7
92:17,18 94:19
**wear** 13:7
**Webster** 20:17
21:1 27:13,21
29:15
**Wednesday** 1:13
week 79:10,11
92:12,13
**weekly** 79:5
**Weeks** 1:8 3:4
3:12 4:5,6,8
5:20,24 6:7
8:22 11:25
12:24 13:2
14:14 42:22
60:25 61:12
76:5 126:14,16
130:15 132:10
137:2 141:2
144:16 146:23
151:18 158:11
171:17 172:2
184:5
**Wells** 46:24
55:13,17,21
56:1,2,5,8,13
56:24 57:15
65:2 66:11,14
66:18 67:21,23
69:8,19 71:10
72:1 132:23
133:2
**went** 6:15 10:4
17:7,19,21,23
17:25 18:10,20
18:21,22 19:10
19:13,15 21:25
24:23 25:17
28:5,7 30:10
31:16,22 32:2
34:3 35:16
36:14 37:15
38:3 39:12
40:13 58:3
61:22 136:24
157:3 164:20
165:25 173:23

**weren't** 56:11
56:16 68:12
109:5 139:17
148:13,16
**West** 1:11 2:9
**Western** 15:7,10
**whacko** 46:17
**Wheeling** 59:22
**wife** 11:15 59:1
**Wilcox** 2:5 5:5
12:2 22:15
23:1 24:6
26:23 28:16
29:1 31:24
33:8 38:16
39:4 41:3,7
43:6 44:18
45:11 47:10
48:12 49:12
53:1 54:25
55:11 56:10
57:7 60:20
61:19 62:3,20
63:1,6,10,15
63:19,25 64:10
64:20 65:13
66:1 67:4,15
67:18 69:7,16
69:20,23 70:16
71:3 72:11,16
73:1 74:4,11
76:1,4 79:14
83:16 84:5
86:5 88:14
90:24 91:15,20
92:5,8 93:23
95:12 103:2
104:9 105:4
106:5 108:21
113:13 114:17
116:16 117:19
118:14 120:11
123:15 129:1
131:23 139:11
143:10 145:1
145:13 148:5
149:3 155:8
156:17 158:5
159:19 161:19

162:17,20
163:24 165:15
165:18 167:22
168:13 169:18
170:2,24 173:8
173:22 174:8
174:16 175:1
176:2 178:1,12
178:22 179:24
**Wiley** 51:11
**William** 45:22
**Williams** 3:18
21:3,6,13
27:24 29:16,18
29:22 144:17
144:17,20,23
146:8
**willing** 69:1,12
160:25
**Winston-Salem**
29:8
**Wisconsin**
132:23
**wise** 170:13
**wish** 14:23
**withdraw** 61:24
**withdrawn**
98:14 110:23
**witness** 1:8 2:15
3:3 5:25 7:9,13
7:21 8:12 13:5
15:12 18:25
19:8 22:16
23:3 24:8
30:16 31:2
32:1 35:3 38:1
38:17 39:6
41:4,6,8 45:8
47:5,9,11 48:2
48:16 55:10
56:9 57:8
58:24 59:5
60:12 62:2,25
63:11,14,23
64:19 65:12,25
66:15 69:21
70:18 74:12
75:24 76:2
81:18 83:18

84:7 85:1,14
87:3 91:13,21
93:6 95:8,22
96:4 98:1,25
101:18 103:18
103:23 104:3
106:4,19 108:2
114:13 115:22
118:2 126:22
131:25 132:14
136:1,4,15
138:18 139:13
145:2 149:5
153:16 154:20
156:14 161:22
162:18,22
163:21 165:14
168:12 169:17
169:25 170:15
174:9 178:14
181:9 182:6,15
183:3,7 184:5
**wives** 14:19
**wonderful**
107:13
**Woodmont** 6:9
**word** 40:24
111:21 135:25
**words** 56:5
97:23 153:10
**work** 21:20,25
24:1 25:19
33:2 36:10
40:13 144:20
147:19 170:22
171:8 179:8
**worked** 57:9
66:22 164:24
**working** 22:18
36:14 37:4
46:6 52:3
54:13 64:14
80:5 177:13
**works** 7:21
44:21 79:25
80:1 131:18
137:8 173:12
**world** 156:19
**worth** 123:9,12

169:14
**worthiness** 140:9
**wouldn't** 10:7 79:23 118:20 122:8,9 166:4 166:17
**wrap** 123:14
**writing** 127:17
**written** 41:1 49:10 181:22
**wrong** 14:19 46:17 61:4 138:1 166:12
**wrote** 58:21 152:10

**X**

**x** 171:6
**XYZ** 88:5

**Y**

**yeah** 20:13 30:13 31:2 36:13 46:22 79:8 81:12 88:13 91:20 112:13 123:22 124:24 126:7 170:11 177:12
**year** 17:22 18:21 19:8 20:22 39:17 48:25 64:17 66:3,23 80:6 83:9 104:16 113:17 119:12 130:1 142:13
**years** 6:11 15:16 15:17 17:19 18:14,15,17 19:22 20:11 31:12 33:13 40:9 48:4 51:22,24 52:2 82:7 107:18 110:23 119:13 129:17 140:13 140:16 167:3 175:17

**yield** 17:11 24:12 57:11 67:12 69:24 70:2,6 85:4 88:21 89:10 110:7 113:14 124:8 143:18 145:9 146:2 154:11,12,25 163:3 165:4 174:13 175:5,6 177:1
**yields** 93:18
**York** 21:12 25:17 26:14,15 26:16 27:2,11 47:25
**young** 13:12 26:4 40:7 45:22 79:25

**Z**

**Ziegler** 46:25 118:20 172:5 173:9 174:3,4

**0**

**08** 81:11 82:4

**1**

**1** 1:9 6:22 8:23 9:24 79:3 126:25
**1/12/15** 3:11,22
**1/14/15** 4:7
**1/15/15** 4:9
**1:30** 74:19
**10** 3:7 65:7 83:10,10 175:17
**10-year** 175:8 175:13
**10:18** 11:25
**100** 41:17 54:5 127:19 128:22 150:4 157:4,16 179:25
**11/18/14** 3:10
**11:30** 61:7
**11:45** 61:11

**12** 50:16,16 54:4 130:19 149:18 150:17
**12-year** 172:14 175:3,5,7
**12.5** 65:23,24
**12.6** 142:13
**12/17/14** 3:15
**12/18/14** 3:17,19
**12:05** 74:15
**120** 41:16 109:7 170:11
**120134** 142:9,11 145:6
**125** 3:10 109:7
**1286** 136:2
**12912** 132:8
**12966** 144:15
**129964** 137:1
**13** 50:16 172:16
**130** 3:11 41:16
**132** 3:13
**136** 3:15
**13675** 128:9
**13719** 129:7,13
**13720** 129:22
**138720** 126:5
**14** 3:8 42:13 158:19
**140** 3:17
**144** 3:19
**146** 3:20
**149** 3:22
**15** 50:1 63:20 128:16 129:14 172:10 175:16
**151** 4:5
**158** 4:7
**15th** 120:17 173:23
**16** 167:5 175:16
**16151** 146:21
**1662** 6:21,23 7:6 8:23
**16th** 120:17
**17** 136:3 137:12 138:7 175:16
**17-year** 104:14 113:16

**171** 4:9
**175** 1:11 2:9
**176** 4:10
**17th** 133:17 138:13,21 153:23 182:24
**18** 126:9 141:9 145:4 149:20 175:16
**180** 170:11
**180,000** 170:10
**185** 1:9
**18th** 152:10,18 153:12,23 182:24
**19** 6:14 15:18 16:16
**1930** 2:18
**1947** 6:14
**1970** 16:18
**19th** 153:23
**1st** 73:7,14 127:6

**2**

**2** 75:9 124:11 169:5 170:8 175:24
**2:50** 151:15
**20** 49:18 50:1
**200** 2:17 41:14
**2008** 82:18
**2010** 50:4
**2011** 119:16
**2012** 52:11
**2013** 50:15 52:11 172:15
**2014** 41:12,20 63:20 73:14 100:21 110:20 115:9,9,15 126:9 128:1 131:20 133:10 137:12 141:9 145:5 149:21 180:5
**2015** 1:13 5:3 12:17 73:7,14 100:16 110:20

110:20 129:18 130:1,19 149:18 150:17 158:19 172:10 184:7
**202** 1:25
**2034** 129:18
**24** 12:17 15:23 16:1
**25** 156:4

**3**

**3** 15:2 129:8 168:25
**3:02** 151:18
**3:40** 171:12
**3:41** 171:16
**3:56** 183:10,11
**30** 1:13 5:3 71:23 130:1 178:25 179:17 184:7
**30,000** 165:1,2,3 165:25
**30092** 6:10
**312-886-3803** 2:12
**32** 175:13
**33131** 2:19
**34** 128:16 129:14
**35** 180:12,12
**36** 3:7 10:24 11:3
**37** 3:8 14:5,9 75:5
**38** 3:9 125:20,25 126:4
**39** 3:11 130:10 130:13,14
**3M** 21:18 22:1

**4**

**4** 180:15,25
**4.25** 145:6 154:24 155:1,3 155:4
**4.30** 172:14 174:22,24 175:3

**4.75** 155:5
  159:21 174:23
**4.9** 169:7
**40** 3:12 132:3,7
  132:7 136:18
  162:15
**41** 3:14 136:19
  136:23,25
**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**
  6:14
**42** 3:16 140:21
  140:25,25
**43** 3:18 144:10
  144:14,14
**44** 3:20 146:16
  146:20,20
**45** 3:21 149:7,11
  149:13 178:25
**46** 4:4 151:24
  152:3
**467** 1:25
**47** 4:6 158:6,9,9
**475** 155:2
  159:25
**48** 4:8 171:21,23
  172:2
**49** 4:10 176:15
  176:19,22,24
**4th** 127:1,10

— **5** —
**5** 50:1 55:7
  176:11
**5.05** 175:6
  176:12
**5.30** 172:14
  175:2,4
**50** 154:17,24
  156:2,4
**500** 78:24
**505** 161:17
  164:14

— **6** —
**6** 3:4 32:4
  147:13 152:11
  153:8 167:9
  168:14 170:9
  170:17
**6.8** 164:23

**6.9** 170:18
**6.95** 164:23
**60604** 1:12 2:11
**63** 16:6,7
**6405** 6:9
**65** 15:18
**69** 15:19 16:16
  21:17

— **7** —
**7** 15:21 17:6
**70** 49:21 122:11
**70s** 16:16
**750** 78:24
**77** 16:24 18:5
  21:17
**78** 18:5
**786-220-3328**
  2:20

— **8** —
**8** 15:25 121:8
**80** 49:21
**80,000** 41:15
  180:5
**800** 165:24
**81** 18:20
**82** 18:19,20
  19:12,12
**83ish** 19:10
**84** 19:24
**85** 19:23,24
  179:16,17
**86** 19:23
**87** 20:14
**88** 20:12,14,15
**89** 16:18 20:12
  29:24
**8th** 115:2 120:16

— **9** —
**9** 75:9,9
**9/11** 38:24
**9:00** 1:16
**9:23** 12:18
**9:45** 5:3
**9:52** 11:21
**90** 16:13 29:25
**900** 1:11 2:10
**900,000** 121:9

**163:4,7**
**9200** 1:25
**9th** 115:3 120:16
  150:4